UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

AARON JABOT,

                            Plaintiff,

                                                            9:13-CV-01407
v.
                                                            (DNH/TWD)

CORRECTION OFFICER MINOR,

                            Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

AARON JABOT
15-A-4539
Plaintiff, *pro se*
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13201

FITZGERALD MORRIS BAKER FIRTH P.C.              JOSHUA D. LINDY, ESQ.
Attorneys for Defendant
16 Pearl Street
P.O. Box. 2017
Glens Falls, New York 12801

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

        This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable David N. Hurd, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local

Rule ("L.R.") 72.3(c).  Plaintiff Aaron Jabot, an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), alleges violations of his

civil rights while confined at Washington County Correctional Facility, located in the Town of

Fort Edward, New York. (*See generally* Dkt. No. 5.) Specifically, Plaintiff alleges that

Defendant Correction Officer Michele Minor, who served as the hearing officer at Plaintiff's

November 6, 2013, disciplinary hearing, violated his Fourteenth Amendment due process rights.

*Id*. at 2.[1]

Currently pending before the Court is Defendant's motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 52.) Plaintiff has opposed the motion.

(Dkt. No. 54.) Defendant has filed a reply. (Dkt. No. 55.) For the reasons that follow, the Court

recommends that Defendant's motion be granted. (Dkt. No. 52).

# I.    BACKGROUND[2]

On July 2, 2013, Plaintiff was arrested on a parole violation, and was committed to the

Washington County Correctional Facility. (Dkt. No. 52-11 at ¶ 7.) On or about October 20,

2013, at approximately 18:20 hours, Plaintiff asked Correction Officer Jacob Freebern ("C.O.

Freebern") if he could have some hot water. (Dkt. No. 52-8 at ¶ 4.) C.O. Freebern reminded

Plaintiff that his microwave privileges had been suspended by Sergeant Strain, and advised

Plaintiff that that if he had any questions regarding the microwave suspension, he could address

the issue with Sergeant Strain when he was in the unit.[3] *Id*. at ¶ 5. Immediately thereafter,

Plaintiff became verbally assaultive by shouting obscenities and banging on his cell door. *Id*.

---

[1]  Unless otherwise noted, page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docketing system.

[2]  In light of the procedural posture of this case, the following recitation is derived from the record now before the Court, with all inferences and ambiguities resolved in Plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[3]  Plaintiff was housed in administrative segregation in the C-Unit. (Dkt. No. 52-8 at ¶ 3.)

Later that evening, C.O. Freebern issued Plaintiff a misbehavior report charging him with the following violations: (1) verbal or written harassment; (2) profanity and unnecessary noise; (3) insolence towards facility staff; and (4) disruptive conduct. (Dkt. No. 52-8 at 10.[4]) C.O. Freeborn provided a copy of the Inmate Misbehavior Report to Plaintiff. (Dkt. No. 52-11.) On November 3, 2013, Plaintiff was provided with a "24 Hour Hearing Board Notice," indicating that the disciplinary hearing was scheduled to take place November 6, 2013. (Dkt. No. 52-9 at 41.) Plaintiff refused to acknowledge receipt of that Notice. *Id*.

On November 6, 2013, Defendant served as the Hearing Officer at Plaintiff's disciplinary hearing. (Dkt. No. 52-9 at ¶ 17.) Plaintiff did not object in writing to Defendant serving as the hearing officer, nor did Plaintiff submit in writing (or any other form), a list of questions that he wanted asked of any potential witnesses. *Id*. at ¶ 18.

At the beginning of the hearing, Defendant read the charges to Plaintiff. *Id*. Plaintiff responded that he understood the charges. *Id*. at ¶ 19. Defendant then read C.O. Freebern's statement. *Id*. In response, Plaintiff stated, "I object, you are not laying grounds for proper evidence." *Id*. at ¶ 20. Thereafter, Plaintiff requested to call C.O. Freebern as a witness. *Id*. Defendant denied that request because she had previously questioned C.O. Freebern and read his statement into evidence. *Id*. at ¶ 21. Plaintiff responded to Defendant's denial by stating, "Monroe vs. Monroe." *Id*. at ¶ 22.

---

[4] Specifically, Plaintiff shouted "suck my dick" and "freebitch" at C.O. Freebern. (Dkt. No. 52-8 at ¶ 6.) Plaintiff also yelled obscenities of a sexual nature regarding Correction Officer Kendrick. *Id*. Plaintiff threatened to call social services because C.O. Freebern was planning to harm his son. *Id*. at ¶ 8. Plaintiff also made numerous threats of lawsuits and prison time to C.O. Freebern, if he did not get what he wanted. *Id*. at ¶ 9. Plaintiff claims that the charges were all lies. (Dkt. No. 52-6 at 135.)

Defendant then asked Plaintiff if he wanted to call other any witnesses. *Id.* Plaintiff objected again. *Id.* Defendant informed Plaintiff that this was his opportunity to present his defense to the October 20, 2013, disciplinary charges. *Id.* at ¶ 23. In response, Plaintiff stated that he no longer felt safe and requested to return to his cell. *Id.* at ¶ 24. Accordingly, two correction officers escorted Plaintiff to his cell. *Id.*

On November 6, 2013, following the conclusion of the disciplinary hearing, Defendant prepared an "Inmate Disciplinary Hearing Record." *Id.* at p. 47. Based upon C.O. Freebern's statement, Defendant found Plaintiff guilty of all charges, and sentenced Plaintiff to 200 days of keep lock, 30 days loss of commissary, reduced showers and shaving for 40 days, loss of 1 visit for 30 days, and a $25.00 fine. *Id.* at p. 47.[5] Plaintiff did not appeal the disposition of the November 6, 2013, disciplinary hearing. *Id.* at ¶ 28.[6]

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on November 12, 2013, alleging that on November 6, 2013, Defendant denied him a fair disciplinary hearing. (Dkt. No. 1 at 4-5.) Specifically, Plaintiff alleged he was not permitted to call witnesses at the hearing, he was denied access to the statements made against him by corrections staff, and Defendant failed to make a proper and

---

[5] Specifically, Plaintiff was sentenced as follows: (i) 90 days keep lock with 30 days loss of commissary for verbally (or in writing) harassing anyone; (ii) 40 days keep lock with three showers/shaving per week at 08:30 on Monday, Wednesday, and Friday for failing to refrain from profanity and unnecessary noise; (iii) 60 days of keep lock with loss of 1 visit for 30 days for displaying insolence towards facility staff; and (iv) 10 days keep lock and a $25.00 fine for the disruption of facility routine. (Dkt. No. 52-9 at 47.)

[6] Although Plaintiff alleges that Washington County Correctional Facility does not have an appeal process, Plaintiff testified that he may have appealed Defendant's decision. Plaintiff has not produced a copy of an appeal. (Dkt. No. 52-6 at 160).

complete recording of the disciplinary hearing. *Id*. at 4. As a result of these purported injustices, Plaintiff alleged he was being held in the segregated housing unit ("SHU") illegally. *Id*.

Upon initial review, the Court *sua sponte* dismissed Plaintiff's complaint with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted, in part, because Plaintiff failed to include any factual allegations regarding the length of the disciplinary confinement imposed as a sanction, nor did he allege any facts regarding the conditions of that confinement. (Dkt. No. 4 at 6-8.)

Plaintiff timely filed an amended complaint on December 4, 2013. (Dkt. No. 5.) Plaintiff alleged he was denied due process at the November 6, 2013, hearing, and claimed the conditions of his disciplinary confinement were atypical and significant, in part, due to his mental illness. *Id*. at 2-13. Plaintiff also attached a copy of Defendant's written statement of the November 6, 2013, decision to the amended complaint. *Id*. at 17. Upon initial review of the amended complaint, the Court found Plaintiff's allegations were sufficient to the cure the pleading deficiencies described in the November 12, 2013, Order.[7] Plaintiff's amended complaint was accepted for filing and is the operative complaint in this action. (Dkt. No. 8.) Defendant filed her answer on June 6, 2014. (Dkt. No. 12.)

## III. APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to

---

[7] Although Plaintiff alleged he was "being placed in SHU for no reason," and thus was being subjected to "cruel and unusual punishment," the Court did not construe the amended complaint to raise a separate Eighth Amendment challenge to the conditions of confinement. (*See* Dkt. No. 8.) Instead, the Court determined Plaintiff's allegations that his SHU confinement "worsened" his "mental illness" and thus was "cruel and unusual punishment" was Plaintiff's attempt to demonstrate an "atypical and significant hardship" under *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). *Id*. at 3.

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, including pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006); *see also F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Salahuddin*, 467 F.3d at 273 (citations omitted).  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005) (emphasis in original).  To defeat summary judgment,

"nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to formal pleadings drafted by lawyers." *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haynes v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). The court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

However, this does not mean that a *pro se* litigant is excused from following the procedural formalities of summary judgment, *Govan*, 289 F. Supp. 2d at 295, and "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876, at *3,

(S.D.N.Y. Oct. 28, 1999)[8] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Moreover, the latitude accorded a *pro se* litigant "does not relieve him of the obligation to

respond to a motion for summary judgment with sufficient admissible evidence." *Hamlett v.

Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (citing *Jorgensen v. Epic/Sony Records*,

351 F.3d 46, 50 (2d Cir. 2003)).

## IV.    ANALYSIS

### A.    Deficiencies in Plaintiff's Opposition

As required under L.R. 7.1, Defendant filed a statement of material facts with citations to

the summary judgment record.  (Dkt. No. 52-11.)  Although Plaintiff has opposed Defendant's

motion, Plaintiff failed to respond to the statement of material facts filed by Defendant as

required under L.R. 7.1(a)(3).  (*See* Dkt No. 54.)  Under the rule, the opposing party's response

to the movant's statement of material facts "shall mirror the movant's Statement of Material

Facts by admitting and/or denying each of the movant's assertions in matching numbered

paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue

arises."  L.R. 7.1(a)(3).

Where, as in this case, a party has failed to respond to the movant's statement of material

facts in the manner required under L.R. 7.1(a)(3), the L.R. provides that facts in the movant's

statement will be accepted as true (1) to the extent they are supported by evidence in the record,[9]

---

[8]  The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

[9]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *But see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts

and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[10]  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Here, because Plaintiff was warned of the consequences of failing to properly respond to Defendant's L.R. 7.1 Statement, and he failed to do so, the Court recommends that the facts contained in Defendant's Statement be treated as having been admitted to the extent they are supported by accurate record citations.  *Latouche v. Tompkins*, No. 09-CV-0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011).  As to any facts not contained in Defendant's Statement of Facts, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

The Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).  The Court has opted to review the entire record in this case.

A verified complaint is to be treated as an affidavit for summary judgment purposes.  *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  Here, however, Plaintiff's amended

---

in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[10]  Defendant has complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to summary judgment motion.  (Dkt. Nos. 52, 52-11.)

complaint is not verified, nor is his opposition to Defendant's motion.  (*See* Dkt. Nos. 5, 54.)

Unsworn statements are generally inadmissible in opposition to a motion for summary judgment.

*See, e.g., Witzenburg v. Jurgens*, No. CV-05-4827 (SJF)(AKT), 2009 WL 1033395, at *11

(E.D.N.Y. Apr. 14, 2009) (unsworn declarations are inadmissible for purposes of Rule 56 and

cannot be considered by the court in deciding the motion for summary judgment).

Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been

known to consider unsworn submissions in opposition.  *See, e.g.*, *Hamm v. Hatcher*, No. 05 Civ.

503(ER), 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (to afford the *pro se* plaintiff special

solicitude, the court considered unsworn statements in his opposition papers but only to the

extent based on personal knowledge or supported by other admissible evidence in the record, on

the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be

given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v.*

*Khahaifa*, No. 09CV718 (HBS), 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012).

In deference to Plaintiff's *pro se* status, the Court has considered Plaintiff's unsworn

response (Dkt. No. 54) in opposition to Defendant's motion for summary judgment (Dkt. No.

52).  However, the Court's review has revealed that Plaintiff's submission contains very little in

the way of admissible evidence.

### B.      Due Process Rights under the Fourteenth Amendment

Plaintiff alleges that Defendant deprived him of due process at the November 6, 2013,

disciplinary hearing.  (Dkt. No. 5.)  Defendant moves for summary judgment arguing that (1)

Plaintiff was not deprived of a protected liberty interest; (2) Plaintiff was nevertheless accorded

all of the process to which he was entitled at the disciplinary hearing; and (3) in the alternative,

Defendant is entitled to qualified immunity.  (Dkt. No. 52-12 at 4-16).

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

To establish a claim under § 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

### 1.     Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *Lewis v. Murphy*, No. 9:12-CV-00268 (NAM/CFH), 2014 WL 3729362, at *7 (N.D.N.Y. July 25, 2014) (citing *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994)). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). Accordingly, a plaintiff must show that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant

hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 783-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658.

As to the first factor, "[t]he prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases). Thus, the Court must inquire whether the allegations related to the conditions of Plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*. "Plaintiff has the burden of proving that the conditions of his confinement constituted an atypical, significant hardship in relation to the ordinary incidents of prison life in order to recover damages" under § 1983. *Vasquez v. Coughlin*, 2 F. Supp. 2d 255, 260 (N.D.N.Y. 1998).

The Second Circuit has instructed that in determining whether an inmate's SHU confinement has imposed an atypical and significant hardship, a court must consider, among other things, both the duration and conditions of confinement. *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013); *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009) (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)); *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)); *see Murray v. Arquitt*, No. 9:10-CV-1440 (NAM/CFH), 2014 WL 4676569, at *14 (N.D.N.Y. Sept. 18, 2014).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). However, the Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted). Instead, the Second Circuit has

provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id*. at 64-65 (citing *Colon*, 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued as a matter of law. *Id*. at 65 (citations omitted).

Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id*. (citing *Colon*, 215 F.3d at 231-32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short-e.g. 30 days-and there was no indication [of] . . . unusual conditions." *Harvey v. Harder*, No. 09-CV-154 (TJM/ATB), 2012 WL 4093792, at *6 (N.D.N.Y. July 31, 2012) (citing *inter alia*, *Palmer*, 364 F 3d at 65-66).

Here, Plaintiff was sentenced to 200 days of segregated confinement. (Dkt. No. 52-9 at 47.) Because Plaintiff's confinement was of an "intermediate duration," the Court must make a fact-intensive inquiry that examines the actual conditions of SHU confinement compared to the ordinary prison conditions at Washington County Correctional Facility. *See Palmer*, 364 F.3d at 65; *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009).

To establish that Plaintiff's 200 day SHU confinement was not atypical and not significant, Defendant submits the affidavit of Eugene McKenna, Jail Administrator at Washington County Correctional Facility. (Dkt. No. 52-10.[11]) McKenna declares that all

---

[11] McKenna was hired as a Correction Officer for the Washington County Sheriff's Office at the Washington County Correctional Facility in October 2003, and was promoted to Sergeant in 2008. (Dkt. No. 52-10 at ¶ 2.) He became the Jail Administrator for the facility on October 23, 2009. *Id*. Prior to his employment at the Washington County Correctional Facility, McKenna was a Police Officer at the Whitehall Police Department from 1986 through 2002. *Id*. at ¶ 3. He

inmates held at the Washington County Correctional Facility are provided with a handbook to assist them during their incarceration. *Id.* at ¶ 5. The handbook is meant to provide inmates with a written explanation of facility policies, including policies concerning visitation, exercise, hygiene, discipline, and restrictive housing. *Id.* The handbook provides that inmates will be entitled to two contact visits per week, with each visit not to exceed one hour. *Id.* at ¶ 6, p. 9. With regard to hygiene, showers are available to inmates throughout the day, except for mandatory lock-in times. *Id.* at ¶ 7, p. 15. Inmates are afforded a minimum of one hour of exercise per day, which may be extended based upon inmate behavior, including the cleanliness of the housing unit. *Id.*

With regard to discipline, inmates are subject to different levels of discipline including verbal warnings, being locked in a cell, loss of privileges, or loss of good-time credits. *Id.* at ¶ 8, p. 20. If the infraction is of a more serious or repetitive nature, the inmate will be issued a misbehavior report and will appear in front of a hearing officer. *Id.* at ¶ 9, p. 20. Inmates receive a notice within twenty-four hours of a hearing board proceeding, which can be waived by the inmate. *Id.* at ¶ 10, p. 20. If the charges against the inmate are affirmed as a result of the hearing, sanctions may be imposed based upon the inmate's past history and the severity of the offense, including (1) counsel or reprimand, (2) loss of one or more specific privileges, (3) restitution; and/or (4) confinement to a cell, room, or the SHU. *Id.* at ¶ 11, p. 21.

---

also served as a Correction Officer at Riker's Island for the New York City Department of Corrections from 1983 through 1985. *Id.* McKenna's affidavit is based upon the records, regulations, directions, and policy guidelines of the Washington County Correctional Facility, as well as he own personal knowledge as the Jail Administrator. *Id.* at ¶ 2. A copy of the handbook is attached to McKenna's Affidavit. *See id.* at pp. 8-36.

At Washington County Correctional Facility, the SHU consists of ten cells in one linear row, one of which is designated for medical confinement. *Id*. at ¶ 13. Each cell is seven feet by sixteen feet in dimension. *Id*. On the outside of each cell is an attached seven feet by eight feet cage reserved for recreation purposes. *Id*. Inmates housed in the SHU can communicate with other inmates in the SHU based upon their proximity to each other. *Id*.

McKenna declares, and the handbook provides, that all SHU inmates are offered one hour of recreation and a shower between the hours of 8:30am and 2:00pm at the housing unit officer's discretion. *Id*. at ¶ 14, p. 21. In addition, all inmates assigned to the SHU, keep-lock, or other types of restrictive housing are afforded visitation privileges, have access to the same healthcare and mental-health services afforded to all other inmates, and are served the same meals in their cells as those served in the facility mess hall. *Id*. at ¶¶ 15-17.

Similarly, in *Vasquez v. Coughlin*, the defendants submitted the affidavit of Anthony J. Annucci, Deputy Commissioner and Counsel for the New York State Department of Correctional Services, which provided a thorough analysis of segregated housing in comparison with other types of confinement. 2 F. Supp. 2d 255, 259-60 (N.D.N.Y. 1998). Relying on Annucci's affidavit, Judge McAvoy held that despite being housed in the SHU for 545 days, the conditions of the inmate's confinement in the SHU did not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life. *Id*. Indeed, Judge McAvoy noted that the conditions of the inmate's confinement were, for the most part, similar to those of the general prison population with the exception that the inmate received his meals in his cell and received one less shower per week. *Id*.; *cf. Bowens v. Pollock*, No. 06-CV-0457A (SR), 2010 WL 5589350, at *15 (W.D.N.Y. Oct. 12, 2010) (district court concluded that it lacked a sufficient record upon which to assess whether plaintiff had demonstrated a liberty interest where

defendants had presented no evidence regarding typical conditions of keeplock confinement compared to the general population and the actual conditions of the plaintiff's keeplock).

Defendant has provided extensive information regarding the conditions of Plaintiff's segregated confinement at Washington County Correctional Facility compared to the general population at the facility. (Dkt. No. 52-10.) However, despite bearing the burden of proving that the conditions of his confinement constituted an atypical, significant hardship, *Vasquez*, 2 F. Supp. 2d at 260, Plaintiff has offered no challenge to the submitted facts of McKenna, nor has he disputed them with facts of his own. (Dkt. No. 54.) Instead, the entire focus of Plaintiff's opposition is on the purported due process violations at his November 6, 2013, disciplinary hearing. *Id*.

Plaintiff alleges that being housed in the SHU "illegally" for twenty-three hours a day, and being denied visitation and telephone calls with family, "worsened" his mental health issues, including having a hard time sleeping and eating. (Dkt. No. 54 at 10-11.) Plaintiff's testimony regarding his loss of privileges (such as telephone, visitation, and use of microwave) and the conditions of his confinement (including lack of sleep, trouble eating, and being handcuffed and shackled during facility transport), is insufficient to warrant constitutional protections. Indeed, "there is no liberty interest in remaining a part of the general prison population." *Lewis*, 2014 WL 3729362, at *8 (citing *Frazier*, 81 F.3d at 317).

While Plaintiff's conditions of confinement are certainly more restrictive than those in general population, they are insufficient to implicate a liberty interest, even when coupled with Plaintiff's 200 days confined to the SHU. *See, e.g.*, *Johnson v. Enu*, No. 08-CV-158 (FHS/DNH), 2011 WL 3439179, at *12 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Smart v.*

*Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) (loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest); *Spence v. Senkowski*, No. 91-CV-955 (NPM), 1998 WL 214719, at *3 (N.D.N.Y. Apr. 17, 1998) (plaintiff's confinement in the SHU for 180 days, with a corresponding loss of packages, telephone privileges, commissary privileges and his prison job was not an atypical or significant hardship to establish the existence of a liberty interest).

At his deposition, Plaintiff testified that he has borderline personality order, depression, and anxiety. (Dkt. No. 52-6 at 176.) As set forth above, McKenna's affidavit established that all Washington County Correctional Facility inmates assigned to the SHU, keep-lock, or other types of restrictive housing are afforded visitation privileges, and have access to the same healthcare and mental health services afforded to all other inmates. (Dkt. No. 52-10 at ¶ 15.) Significantly, Plaintiff never testified that he was denied healthcare or mental-health services while housed in the SHU.

Based on the undisputed evidence in the record, the Court finds that Plaintiff's 200 day confinement to the SHU with loss of certain privileges was not an atypical, significant hardship in relation to other ordinary incidents of prison life. *See Palmer*, 364 F.3d at 65 (if the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law). Thus, Plaintiff is not entitled to the protections of the Fourteenth Amendment. *See Palmer*, 364 F.3d at 64 (plaintiff has "no right to due process [at his hearing] *unless* a liberty interest was infringed as a result") (emphasis in original).

Accordingly, the Court recommends granting Defendant's motion for summary judgment (Dkt. No. 52).

## 2.     Due Process

Even assuming a liberty interest exists, the Court recommends granting Defendant's motion because Plaintiff was afforded the minimum requirements of due process at his November 6, 2013, disciplinary hearing.

The Fourteenth Amendment due process protections afforded to a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004). "An inmate is entitled to advance written notice of the charges against him; a hearing affording a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Id*. (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). In some circumstances, an inmate also has a limited right to assistance. *Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1998).

The due process clause requires that a hearing officer's determination be supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied if 'there is any evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). In the Second Circuit, the "some evidence" standard requires some "reliable evidence." *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004).

Moreover, to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g.*, *Clark v. Dannheim*, 590 F. Supp. 2d 429, 429 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*,

953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary hearing because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial.")).

a.    Notice

Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are . . . ." *Wolff*, 418 U.S. 563-64.  Here, Plaintiff was provided with a copy of the October 20, 2013, Inmate Misbehavior Report.  (Dkt. No. 52-9 at 34.)  On November 3, 2013, Plaintiff was provided with formal notice that his disciplinary hearing involving the October 20, 2013, events was scheduled to take place on November 6, 2013.  *Id*. at 41.  As such, Plaintiff was provided with adequate written notice.  *See Sira*, 380 F.3d at 69.

b.    Opportunity to be Heard and Present Witnesses

An accused prisoner has the right to a hearing where he is given a reasonable opportunity to call witnesses and present documentary evidence.  *Sira*, 380 F.3d at 69.  Here, Plaintiff was afforded the opportunity to be present at his disciplinary hearing on November 6, 2013.  *See, e.g.*, *Smith v. Fisher*, 803 F.3d 124 (2d Cir. 2015) (inmate had an "opportunity to attend" where he knowingly waived his right to attend his disciplinary hearing, where he asked to leave the room, and refused to participate).

However, Plaintiff alleges that he was denied all witnesses and deprived of an opportunity to present documentary evidence.  (Dkt. No. 5 at 2.)  Contrary to Plaintiff's position, the record supports the conclusion that Plaintiff was granted a hearing with a reasonable opportunity to call witnesses and present documentary evidence.

Prior to the hearing, Defendant questioned C.O. Freebern, and he provided a written statement. (Dkt. No. 52-9 at ¶ 20.) At the beginning of the hearing, Defendant read C.O. Freebern's statement into the record. *Id.* Defendant then provided Plaintiff with an opportunity to call witnesses. *Id.* at ¶ 21. Plaintiff requested to call C.O. Freebern as a witness. *Id.* Defendant explained to Plaintiff he would not be permitted to call C.O. Freebern as a witness, as she had already questioned C.O. Freebern and had just read his statement into the record. *Id.*

Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell*, 387 F. Supp. 2d 227, 234 (W.D.N.Y. 2005) (citing *Ponte v. Real*, 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia*, *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991) (a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence)); *see also Eleby v. Selsky*, 682 F. Supp. 2d 289, 291-92 (W.D.N.Y. 2010) (hearing officers have discretion to keep the hearing within reasonable limits, and "included within that discretion is the authority to refuse to call witnesses whose testimony the prison official reasonably regards as duplicative or non-probative"). Thus, having explained her reasoning for denying Plaintiff's request to call C.O. Freebern as a witness, Defendant was acting within her discretion as a hearing officer to control the hearing. Moreover, despite being offered numerous opportunities to do so, Plaintiff failed to request any other witness to testify at the hearing.

In addition, Plaintiff raised several objections throughout the hearing, and although he was provided with an opportunity to present evidence, Plaintiff declined to do so. (Dkt. No. 52-9 at ¶ 21.) Accordingly, the Court finds no triable issue of fact exists as to whether Plaintiff had an opportunity to appear and call witnesses.

c.     Impartial Hearing Officer and "Some Evidence"

Prisoners have a constitutional right to a fair and impartial hearing officer. *Sira*, 380 F.3d at 69. However, it is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent*, 472 U.S. at 455. "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "[O]nly 'reliable' evidence can constitute 'some evidence.'" *Id.* at 76 (quoting *Luna*, 356 F.3d at 488).

In this case, Plaintiff was charged and found guilty, of the following violations: (i) Rule 2.05 (verbally or in writing harass anyone); (ii) Rule 5.06 (inmate shall refrain from profanity and unnecessary noise); (iii) Rule 5.03 (insolence towards facility staff); and (iv) Rule 5.00 (conduct which disrupts the orderly running of the facility). (Dkt. No. 52-9 at 47.)

Defendant relied upon C.O. Freebern's statement that on October 20, 2013, Plaintiff "became verbally assaultive, shouting obscenities at me and banging on his cell door. [Plaintiff] continued to shout 'suck my dick' and 'freebitch' as well as many obscenities of a sexual nature pertaining" to Correction Officer Kendrick. (Dkt. No. 52-9 at 36.) C.O. Freebern further declared that Plaintiff "proceeded to threaten me numerous times with lawsuits and prison time if he was not granted what he wanted." *Id.* Thus, Defendant's determination of Plaintiff's guilt was supported by "some evidence" as required in *Hill*, 472 U.S. at 455, and "reliable evidence" pursuant to *Luna*, 356 F.3d at 488. *See Hinton v. Prack*, No. 9:12–CV–1844 (LEK/RFT), 2014

WL 4627120, at *15 (N.D.N.Y. Sept. 11, 2014) (citation omitted) ("some evidence" standard

satisfied where the misbehavior report was made by the officer personally involved in the

incident and was based upon his first hand observation and detailed account of the incident);

*Creech v. Schoellkoph*, 688 F. Supp. 2d 205, 214 (W.D.N.Y. 2010) (same).

Moreover, prison officials "enjoy a rebuttable presumption that they are unbiased." *See*

*Rodriguez v. Selsky*, No. 9:07–CV–0432 (LEK/DEP), 2011 WL 1086001, at *11 (N.D.N.Y. Jan.

25, 2011) (citation omitted). Indeed, "[a]n inmate's own subjective belief that the hearing officer

was biased is insufficient to create a genuine issue of material fact." *Johnson v. Fernandez*, No.

9:09 CV-626 (FJS/ATB), 2011 WL 7629513, at *11 (N.D.N.Y. Mar. 12, 2011) (citing *Francis*,

891 F.2d at 46). Thus, Plaintiff's conclusory allegation that he did not "get along" with

Defendant fails to create an issue of material fact.[12]

In light of the above, the Court finds that Defendant was impartial and that her guilty

determination was supported by "some evidence" sufficient for due process.

d.      Written Statement of Decision

An accused prisoner has the right to a written statement of decision, including a statement

of the evidence relied upon by the hearing officer. *Sira*, 380 F.3d at 69. In this case, Plaintiff

does not allege, nor does the record support, a claim that he was not provided with such a written

statement of Defendant's decision. (*See* Dkt. No. 52-9 at pp. 46-47.) In fact, Plaintiff attached a

---

[12] Plaintiff's claim that he was falsely issued the October 20, 2013, misbehavior report, and thus Defendant was biased for "covering up" the "trumped up charges" is without merit. *See, e.g.*, *Gantt v. Mielenz*, No. 9:10-CV-0083 (GTS/TWD) 2012 WL 4033723, at *4 (N.D.N.Y. Sept. 12, 2012) (Suddaby, J.) ("[J]ust as an inmate possess no due process right to be free from being issued a false misbehavior report, an inmate possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at disciplinary hearing.").

copy of the November 6, 2013, Inmate Disciplinary Hearing Record to his amended complaint. (Dkt. No. 5 at 17.)

e.    Assistance

In certain circumstances, inmates have a "limited" right to assistance. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng*, 858 F.2d at 897. An inmate may need assistance, for example, if they are "illiterate, confined to [the] SHU, or unable to grasp the complexity of the issues." *Silva*, 992 F.2d at (citing *Wolff*, 418 U.S. at 570, *Eng*, 858 F.2d at 897). However an inmate's right to assistance is limited, and an inmate has no right to full counsel. *Silva*, 992 F.2d at 22. Indeed, the assistant need only perform what the plaintiff would have done but need not go beyond. *Lewis v. Johnson*, No. 9:08-CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5, 2010). Significantly, any claim of depravation of assistance is reviewed for harmless error. *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009).

Plaintiff argues that he was entitled to assistance, and Defendant fails to address this argument in her motion papers. However, even assuming Plaintiff was entitled to assistance which he did not receive, no reasonable factfinder could conclude that the deprivation resulted in any prejudice to Plaintiff. *See, e.g.*, *Pilgrim*, 571 F.3d at 206 (any error on the assistant assigned to assist the plaintiff, including failing to comply with the plaintiff's instructions on interviewing witnesses and gathering documents, were harmless in light of the plaintiff's failure to identify any relevant testimony that was excluded as a result, his decision not to call witnesses when given the opportunity, and his decision to walk out of the hearing in protest of a particular defendant serving as the hearing officer).

At the outset of the hearing, Defendant read the charges to Plaintiff. (Dkt. No. 52-9 at 45.) Plaintiff stated that he understood the charges. *Id*. Defendant provided Plaintiff with an opportunity to present witnesses and rebuttal evidence. *Id*. Plaintiff made several objections throughout the hearing. *Id.* Yet Plaintiff failed to name any witnesses, other than C.O. Freebern, that he wished to call. *Id*.

Plaintiff has argued that the October 20, 2013, charges "were all lies." (Dkt. No. 52-6 at 135.) However, Plaintiff has failed to demonstrate that the outcome of his disciplinary hearing would have been any different had he been provided with an assistant. *Lewis*, 2014 WL 3729362, at *13 (the plaintiff alleged that his counselor failed to interview witnesses but did not show how this shortcoming prejudiced the results); *Liao*, 2016 WL 1128245 at *7 (finding any error on assistant was harmless in light of hearing officer's rejection of plaintiff's request to recall the potential witnesses plaintiff alleges that his assistant should have contacted prior to the hearing).

Plaintiff testified that had he been provided with an assistant, the assistant would have interviewed witnesses to the alleged events of October 20, 2013, including "a couple of inmates," and that their testimony would have proven Plaintiff's innocence. (Dkt. No. 52-6 at 135.) Plaintiff's argument that these witnesses' testimonies would have affected the outcome of his hearing is entirely speculative and conclusory. *See Hinton*, 2014 WL 4627120, at *2 (citation omitted). Further, Plaintiff admitted that had his witnesses testified, Defendant would have been presented with two versions of the October 20, 2013, events, C.O. Freebern's and Plaintiff's witnesses. *Id*. However, as set forth above, Defendant based her decision on C.O. Freebern's statement, which was supported by "some evidence."

Finally, Plaintiff testified that he expressed all of his concerns and purported violations of due process, including the denial of assistance and witnesses, to Defendant during the disciplinary hearing. (Dkt. No. 52-6 at 125-128.) However, Plaintiff did not appeal Defendant's decision. (Dkt. No. 52-9 at ¶ 28.)

Accordingly, the Court finds that Plaintiff was not prejudiced, in the sense that the errors affected the outcome of the hearing, based upon his purported lack of assistance.

f.     Additional Due Process Violations

Plaintiff also alleges that his due process rights were violated because Defendant failed to tape record the hearing, there is "no verbatim" record of his objections, and therefore, he was unable to appeal Defendant's decision. (Dkt. No. 5 at 2-3[13].)

As an initial matter, due process does not require that disciplinary proceedings be recorded.[14] *See Livingston v. Griffin*, 9:04-CV-00607-JKS, 2007 WL 1500382, at *5 (N.D.N.Y. May 21, 2007) (while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process); *see also Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) (New York State's regulation requiring that a disciplinary hearing be recorded does not impute a federal constitutional protection).

Although Plaintiff contends that "[t]here is no appeals process [at Washington County Correctional Facility] . . . [t]here is no verbatim records . . . [t]here's nothing" (Dkt. No. 52-6 at

---

[13]  At his deposition, Plaintiff testified "how can you appeal a record if a record don't exist? How can you appeal your objections if your objections don't exist on paper because there is not a verbatim record?" (Dkt. No. 52-6 at 161.)

[14]  In fact, Plaintiff should be aware that that there is no constitutional right to have disciplinary hearings recorded by stenograph or other means. (*See* November 11, 2012, Decision and Order, Dkt. No. 33 at 6 in *Jabot v. Warren County Sheriff's Office*, No. 9:11-cv-01217 (GLS/DEP)).

126), his argument is undermined by his testimony that he has in fact utilized the appeals process at Washington County Correctional Facility. *Id.* at 154. What's more, Plaintiff testified that he received an appeal form from Defendant on November 8, 2013, and that he "may" have appealed Defendant's November 6, 2013, determination. *Id.* at 160, 162. Thus, Plaintiff's argument is without merit, and his dissatisfaction with the appeals process, in part because disciplinary hearings are not tape recorded at Washington County Correctional Facility, is misplaced.

Based upon the aforementioned, the Court finds that Plaintiff received the minimum due process to which he was entitled during his November 6, 2013, disciplinary hearing. Therefore, the Court also recommends that Defendant's motion for summary judgment (Dkt. No. 52) be granted on the grounds that she did not violate Plaintiff's due process rights during his November 6, 2013, disciplinary hearing.

### C.      Qualified Immunity

In the alternative, Defendant seeks dismissal of Plaintiff's Fourteenth Amendment due process claim on qualified immunity grounds. (Dkt. No. 52-12 at 15-16.) Inasmuch as the Court is recommending that Defendant's motion for summary judgment be granted on other grounds, it finds it unnecessary to reach the qualified immunity argument.

**ACCORDINGLY** it is hereby

**RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 52) be **GRANTED**; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: July 14, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt. W.M.
Watford, Capt. T. Healey, and John Doe # 1–5, all
as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated August
20, 1999, recommending that the motion be granted, and
upon review of that report and recommendation together
with plaintiff's letter to this Court, dated August 28, 1999,
stating that plaintiff does "not contest the dismissal of this
action", it is

ORDERED that the attached report and recommendation
of United States Magistrate Judge James C. Francis IV,
dated August 20, 1999, is adopted in its entirety; and it is
further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure. For the reasons set forth below,
I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of an
altercation with prison guards. (Am.Compl.¶¶ 17–25). An
inmate in keeplock is confined to his cell for twenty-three
hours a day with one hour for recreation. (Affidavit of
Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to
DOCS policy, inmates in keeplock must apply for written
permission to attend regularly scheduled religious
services. (Reply Affidavit of George Schneider in Further
Support of Defendants' Motion for Summary Judgment
dated September 9, 1996 ("Schneider Aff.") ¶ 3).
Permission is granted unless prison officials determine
that the inmate's presence at the service would create a
threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests by
inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the gate
officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to

attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*
Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v.*

*Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." ' *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d

104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular flaws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

### B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any

inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated.[1]

---

[1]   In light of this finding, there is no need to consider the defendant's qualified immunity argument.

---

### *Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

   Respectfully submitted,

### All Citations

Not Reported in F.Supp.2d, 1999 WL 983876

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1103045
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton
Correctional Facility; Jeffrey R. Ludwig, C.O .,
Clinton Correctional Facility; Michael B. King,
Sgt., Clinton Correctional Facility; D. Mason, C.O.,
Clinton Correctional Facility; B. Malark, C.O.,
Clinton Correctional Facility; John Reyell, C.O.,
Clinton Correctional Facility; Bob Fitzgerald, R.N.,
Clinton Correctional Facility; John Doe, C.O. (C.O.
Gallery Officer Company Upper F–6); John Doe,
C.O. (Mess Hall Supervising C.O.), Defendants.

No. 9:09–CV–308 (NAM/RFT).
|
March 23, 2011.

**Attorneys and Law Firms**

Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983, plaintiff,
an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as a
result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.

Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following:
(1) plaintiff's claims for monetary relief against all
defendants in their official capacity; (2) plaintiff's claims
of medical indifference against defendant Fitzgerald; and
(3) plaintiff's allegations of verbal harassment by
defendant Mason. Magistrate Judge Treece also
recommended denying defendants' motion for summary
judgment on plaintiff's excessive force claims against
defendants Tompkins, LaClair, Mason, Malark and Reyell
and plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28 U.S.C. §
636(b) (1)(c), this Court conducts a *de novo* review of
these issues. The Court reviews the remaining portions of
the Report–Recommendation for clear error or manifest
injustice. *See Brown v. Peters,* 1997 WL 599355, \*2–3
(N.D.N.Y.), *af'd without op.,* 175 F.3d 1007 (2d
Cir.1999); *see also Batista v. Walker,* 1995 WL 453299,
at \*1 (S.D.N.Y.1995) (when a party makes no objection
to a portion of the report-recommendation, the Court
reviews that portion for clear error or manifest injustice).
Failure to object to any portion of a report and
recommendation waives further judicial review of the
matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89
(2d Cir.1993).

**DISCUSSION**

**I. Local Rule 7.1(a)(3)**
The submissions of *pro se* litigants are to be liberally

construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)).[1]

[1]    Local Rule 7.1(a)(3) provides:

    Summary Judgment Motions

    Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

    The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

    The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

    Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the

circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions

in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.*, 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker*, 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[2]

[2]     While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

## II. *Jeffreys* Exception

Defendants argue that the Court should apply *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

*Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own

testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained those discrepancies and testified:

> Q. —did Nurse Fitzgerald ask you any questions while he was examining you?
>
> A. I think he asked me how am I feeling, how did this happen?
>
> Q. And what did you say?
>
> A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.
>
> Q. What did you say?
>
> A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—
>
> Q. Which was—
>
> A. —and that I started this.
>
> Q. And is that the truth?
>
> A. No.
>
> Q. Why did you tell the nurse that?
>
> A. Because I was being forced to.
>
> Q. Forced to how?
>
> A. By the officers that [sic] was there.
>
> Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?
>
> A. Yes, ma'am.
>
> Q. Why did you do that?
>
> A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

**\*4** In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at \*5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presents exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely implausible to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at \*7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not to be resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

### III. Reyell's Personal Involvement
Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack.

Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt" .[3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

[3]     Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries pointed to LaTouche [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of clothing.

In his deposition, plaintiff testified:

> Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

[T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for

example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

## CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2011 WL 1103045

2009 WL 1033395
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James Martin WITZENBURG, Plaintiff,

v.

Charles Herman JURGENS, individually and as
Executor of the Estate of Louise Jurgens,
Defendant.

No. CV–05–4827 (SJF)(AKT).
|
April 14, 2009.

West KeySummary

1    **Executors and Administrators**
     🔑Time for making distribution

In a dispute between relatives, the executor of
the decedent's estate did not breach his fiduciary
duties by failing to distribute estate assets on the
ground that he was not required to distribute the
assets under New York law until there was a
final accounting. The executor made certain
distributions to beneficiaries of the decedent's
will. The executor had not made any
distributions to himself or taken any fees. It was
the conduct of the cousin bringing the suit,
including his failure to pay the outstanding
judgment that he owed to the estate totally over
$750,000, that prevented the executor from
conducting a final accounting and in turn
making the final distributions under the will.
McKinney's EPTL 11–1.5(c).

Cases that cite this headnote

**Attorneys and Law Firms**

James Martin Witzenburg, Kemah, TX, League City, TX,
pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1** Before the Court are objections by plaintiff to a Report
and Recommendation of United States Magistrate Judge
A. Kathleen Tomlinson dated March 16, 2009 ("the
Report") that recommends: (1) granting defendant's
motion for summary judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure and dismissing
plaintiff's amended complaint in its entirety; (2) denying
plaintiff's motion to amend the amended complaint to add
Patrick McCarthy, Esq. as a defendant; and (3) denying
plaintiff's motion to compel discovery responses and to
impose sanctions upon defendant. For the reasons stated
herein, the Report of Magistrate Judge Tomlinson is
accepted in its entirety.

I

Rule 72 of the Federal Rules of Civil Procedure permits
magistrate judges to conduct proceedings on dispositive
pretrial matters without the consent of the parties.
Fed.R.Civ.P. 72(b). Any portion of a report and
recommendation on dispositive matters, to which a timely
objection has been made, is reviewed *de novo.* 28 U.S.C.
§ 636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is
not required to review the factual findings or legal
conclusions of the magistrate judge as to which no proper
objections are interposed. *See, Thomas v. Arn,* 474 U.S.
140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). To
accept the report and recommendation of a magistrate
judge to which no timely objection has been made, the
district judge need only be satisfied that there is no clear
error on the face of the record. *See,* Fed.R.Civ.P. 72(b);
*Baptichon v. Nevada State Bank,* 304 F.Supp.2d 451, 453
(E.D.N.Y.2004), *aff'd,* 125 Fed.Appx. 374 (2d Cir.2005);
*Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985).
Whether or not proper objections have been filed, the
district judge may, after review, accept, reject, or modify
any of the magistrate judge's findings or
recommendations. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P.
72(b).

II

Plaintiff contends that Magistrate Judge Tomlinson erred, *inter alia,* in: (1) not understanding that he is a "double first cousin once removed," to the decedent Louise Jurgens ("decedent"), (Plaintiff's Opposition to Report and Recommendation [Plf. Obj.], ¶ 1); (2) finding that the purported false will was filed in New York Surrogate's Court, as opposed to New York Supreme Court, (Plf Obj., ¶ 2); (3) finding that plaintiff moved to Texas on or about April 17, 2002, when he actually moved on August 22, 2003, (*id.*); (4) failing to recognize that he was willing to be deposed in Texas, or by remote means, but not in New York because he has a "genuine fear for his safety [which] precluded [his] attendance in New York," (Plf.Obj., ¶ 3); (5) assuming that he had access to the records of the Suffolk County Supreme Court and received a copy of the final accounting, (Plf.Obj., ¶¶ 4, 11); (6) failing to recognize that he "moved in Federal court [for relief from the final accounting] as soon as [he] could," (Plf. Obj ., ¶ 5); (7) finding that defendant did not breach his fiduciary obligation to decedent's estate notwithstanding (a) that defendant did not require McCarthy, the guardian of decedent's property, to reconcile his final account with the inventory of assets prepared by defendant, which showed a monetary difference in excess of eight hundred thousand dollars ($800,000.00), and (b) that defendant did not account for and identify "the properties returned to the Estate from Federated Securities," (Plf.Obj., ¶¶ 6–8, 11); (8) finding that defendant "pays for the various law suits and the proceedings in which the estate is involved," (Plf.Obj., ¶ 7); (9) discounting the "Jurgens Conspiracy" theory he asserts in his amended complaint, (Plf.Obj., ¶ 9); (10) finding that because defendant had no authority to oversee or supervise McCarthy, as decedent's property guardian, he had a right to abandon his fiduciary duty to account for and locate assets of the estate, (Plf.Obj., ¶ 10); and (11) "rendering [her] decision on facts which are not proven, not evidence in this case and beyond the power of [the] court to consider under the doctrine of judicial notice but on figments of the Courts [sic] imagination," (Plf.Obj., ¶ 13).

**\*2** Upon *de novo* review of the Report and consideration of plaintiff s objections and defendant's response thereto, plaintiff's objections are overruled and the Report is accepted in its entirety as an order of the Court.[1]

[1] Plaintiff has not objected to the branches of Magistrate Judge Tomlinson's Report as recommended denying his motions to amend the amended complaint and to compel discovery responses or impose sanctions. Upon review of those branches of the Report, the Court is satisfied that the Report is not facially erroneous. Accordingly, the Court accepts and adopts those branches of the Report.

## II. Conclusion

Upon *de novo* review of the Report, plaintiff's objections are overruled, the Report is accepted in its entirety, defendant's motion for summary judgment is granted and the amended complaint is dismissed in its entirety with prejudice. Plaintiff's motions to amend the amended complaint and to compel discovery responses or to impose sanctions are denied. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and to close this case.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

This action arises out of the role of Defendant Charles Herman Jurgens ("Defendant" or "Jurgens") as Executor of the Estate of Louise Jurgens ("Louise" or "Decedent"). Several motions are presently before the Court. Plaintiff James Martin Witzenburg ("Plaintiff" or "Witzenburg"), a beneficiary of Louise's estate, brought this action against Defendant for, *inter alia,* (1) breach of fiduciary duty, seeking to recover damages in the amount of his inheritance under Louise's Will, (2) alleged mismanagement and/or conversion of funds of Louise's estate, and (3) interest and costs. Defendant moves here for summary judgment seeking dismissal of the remaining claims. By separate motion, Plaintiff moves to add a party defendant, namely, Patrick McCarthy, Esq., who served as a court-appointed property guardian of Louise's property for thirteen months before her death. Finally, Plaintiff moves to compel Defendant to respond to outstanding document requests and interrogatories and for the imposition of sanctions. District Judge Feuerstein has referred these three matters to me for a Report and Recommendations.

## I. *BACKGROUND*

### A. *Factual Background*
The facts of this case are set forth in substantial detail in

Judge Feuerstein's March 1, 2007 Order granting in part and denying in part Defendant's motion to dismiss [DE 73]. Only the facts necessary for the analysis contained in this Report will be recited here.

Plaintiff and Defendant are apparently both cousins, in varying degrees, of the Decedent Louise Jurgens ("Louise" or the "Decedent").[1] In and around July 1999, Jurgens obtained a "full" power of attorney from Louise. On September 9, 1999, Defendant Jurgens commenced a guardianship proceeding on behalf of Louise in the Supreme Court, Suffolk County, pursuant to Article 81 of the New York Mental Hygiene Law (*Jurgens v. Jurgens,* Index No. 20414–99) (the "Suffolk Supreme Court Action"). (Schmidt Decl.[2] ¶ 4.) On December 28, 1999, the Suffolk Supreme Court appointed non-party attorney Patrick McCarthy ("McCarthy") as guardian of Louise's property and named Jurgens as Louise's personal needs guardian (*id.;* Jurgens Aff.[3] ¶ 3; Def.'s 56.1 Stat.[4] ¶ 2). As Louise's personal guardian, Jurgens attended to her medical and personal needs. (Jurgens Aff. ¶ 3; Def.'s 56.1 Stat. ¶ 5.) However, during the period from December 1999 until Louise's death in January 2001 (the "guardianship period"), Jurgens did not have any control over Louise's finances or property, as those were under the control of Attorney McCarthy as the property guardian. (Jurgens Aff. ¶ 11; Schmidt Decl. ¶ 28; Def.'s 56.1 Stat. ¶ 5.) Moreover, Jurgens had no authority to oversee or supervise McCarthy's conduct as property guardian. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 25; Def.'s 56.1 Stat. ¶ 25.)

---

[1] The record is unclear as to Plaintiff's exact relationship with Louise, as it is variously stated that he is her first cousin once removed (Compl. at 2; Jurgens Aff., Ex. A), her second cousin (Jurgens Aff. ¶ 1), or her nephew (Schmidt Decl. ¶ 4).

[2] Citations to "Schmidt Decl." are to the June 17, 2008 Declaration of Michael C. Schmidt, Esq., in Support of Defendant Jurgens' Motion for Summary Judgment [DE 123].

[3] Citations to "Jurgens Aff." are to the June 10, 2008 Affidavit of Charles Herman Jurgens in support of Motion for Summary Judgment [DE 124].

[4] Citations to "Def.'s 56.1 Stat." are to the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 [DE 125].

**\*3** Pursuant to the April 14, 2000 order of the Supreme Court, Suffolk County, McCarthy retained two Smith Barney stockbrokers as independent financial consultants to advise McCarthy with respect to managing Louise's portfolio, among other things [DE 73 at 3]. In general, McCarthy's conduct as property guardian was supervised and reviewed by the Suffolk County Supreme Court. McCarthy accounted for his actions as property guardian in a formal accounting filed with that Court (the "McCarthy Accounting"), in which he was represented by counsel. That Accounting was reviewed by McCarthy's representatives, the attorney for the Estate, the Supreme Court's accounting department, the Supreme Court Examiner, and a bonding company. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 26; Def.'s 56.1 Stat. ¶ 26.) Although Jurgens received a copy of McCarthy's Accounting, he had no role in its preparation. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 27; Def.'s 56.1 Stat. ¶ 27.)

On January 6, 2001, Louise died and both guardianships ceased. (Jurgens Aff. ¶ 4; Schmidt Decl. ¶ 6; Def.'s 56.1 Stat. ¶ 6.) Jurgens was appointed Preliminary Executor of Louise's estate (the "Estate") on January 30, 2001, and was appointed Permanent Executor on December 30, 2001. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 9.) Thereafter, Jurgens filed Louise's Last Will and Testament dated October 16, 1995 and Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) Upon reviewing the Will, Witzenburg executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

In his capacity as Executor of Louise's Estate, Jurgens took steps to liquidate her assets and sell her house, all of which was accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In the course of performing his duties as Executor, which included locating and accounting for various assets of the Estate, Jurgens discovered that Witzenburg had withheld certain of Louise's money and personal property valued at $789,039.04, which Witzenburg had obtained through specific withdrawals, transfers and check negotiations between March 1997 and June 2000. (Jurgens Aff. ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 11.)

Following this discovery, on December 5, 2001, Jurgens, in his capacity as Executor, commenced a special

proceeding in Suffolk County Surrogate's Court, pursuant to Section 2103 of New York Surrogate's Court Procedure Act, alleging that money and personal property belonging to Louise, valued at $789,039.04, had been withheld by Plaintiff (the "Surrogate's Court Action") (Jurgens Aff ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 12.) On January 14, 2002, Jurgens filed an affirmation with the Surrogate's Court identifying the specific withdrawals, transfers and check negotiations in which Plaintiff had engaged between Marcy 1997 and June 2000. (Schmidt Decl. ¶ 7.)

**\*4** On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr., granted Jurgens' motion (made on behalf of Louise's Estate) for summary judgment on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> Sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogate's Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

(Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Witzenburg. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens alleges, upon information and belief, that Witzenburg left New York shortly after entry of the Judgment on August 22, 2003. (Schmidt Decl. ¶ 12.) To date, Witzenburg has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Witzenburg has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which

it cannot do until after resolution of the instant action), it will ultimately be able to offset the amount of the Judgment against Witzenburg's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Since his preliminary appointment in January 2001 and continuing through the present date, Jurgens, in his capacity as Executor, avers that he has consistently acted in the interests of the Estate. (Jurgens Aff. ¶¶ 7, 15; Schmidt Decl. ¶¶ 22, 31; Def.'s 56.1 Stat. ¶ 22.) For example, Jurgens maintains the Estate accounts, files and pays fiduciary taxes, and assists and pays for the various lawsuits and proceedings in which the Estate is involved. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23.) In addition, Jurgens oversaw certain distributions of Louise's Will to beneficiaries during the period December 2001 through January 2004, pending a final accounting in Surrogate's Court. Jurgens has not made any distribution to himself personally and has not taken any Executor fees. (Jurgens Aff. ¶ 7; Schmidt Decl. ¶¶ 23, 24.)

To date, the Estate remains open, pending the outcome of the instant action. Once this case is resolved, Jurgens intends to render a final accounting of the Estate's property (the proceeds of which are currently held in the Estate accounts at Citibank or Smith Barney) in Surrogate's Court. (Jurgens Aff. ¶ 16; Schmidt Decl. ¶ 16.) As part of the final accounting, Witzenburg's share of the Estate will be determined, against which the Suffolk County Judgment can be applied. Then, according to Jurgens, the Estate can render final distributions of the Estate property and he can close the Estate in Surrogate's Court and complete his duties as Executor. (Jurgens Aff. ¶¶ 8, 12, 16.)

### B. *Procedural Background*
**\*5** The procedural background of this action is also set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order [DE 73] granting in part and denying in part Defendant's motion to dismiss. Only the procedural background germane to this Report will be repeated here.

On December 21, 2004, Plaintiff filed the instant action against Defendant Jurgens, individually and as Executor of the Estate, as well as against Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch) and Solomon Smith Barney Citigroup ("Smith Barney") in the United States District Court for the Southern District of Texas. On April 27, 2005, Plaintiff filed a First Amended Verified Complaint (the "Amended Complaint"). With respect to Jurgens, Plaintiff alleges that Jurgens and his attorneys were a "corrupt enterprise" and that they depleted Louise's assets, converted assets, committed "frauds" and

breached a "fiduciary duty." (Amended Complaint, dated April 27, 2005 ("Am.Compl."), at 4.) On September 15, 2005, Jurgens' motion to transfer venue was granted and the action was transferred to this Court [DE 45].


### 1. *Defendant's Prior Motion To Dismiss*

By motion dated February 3, 2006 [DE 62–65], Defendant Jurgens moved to dismiss the Complaint as against him on the grounds that the Court: (1) lacked subject matter jurisdiction under the *Rooker–Feldman* doctrine and the probate exception to diversity jurisdiction; or in the alternative, (2) should abstain from hearing this dispute because it concerns the administration of an estate; or in the alternative, (3) should dismiss the amended complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.

By Order dated March 1, 2007 [DE 73], Judge Feuerstein held that, "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the alleged conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed" [DE 73 at 8]. Moreover, Judge Feuerstein explained that, to the extent Plaintiff seeks damages resulting from a diminished inheritance, he lacks standing because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover estate property." (*Id.* at 21 (citing cases).)

On the other hand, Judge Feuerstein did not dismiss Plaintiff's claims for breach of fiduciary duty and mismanagement of assets, holding that those claims were not directly addressed in the Surrogate's Court proceeding and are not "inextricably intertwined" with the prior state court determination and. thus, are not barred by the *Rooker–Feldman* doctrine. (*Id.* at 8–9.) In addition, Judge Feuerstein held that the probate exception to diversity jurisdiction does not apply to Plaintiff's breach of fiduciary duty claims. (*Id.* at 12.) In sum, the Court found that to the extent Plaintiff requests damages "to the heirs of the estate of Louise" and for "the depletion of the estate of Louise" based upon causes of action for breach of fiduciary duty, mismanagement of assets and fraud, the probate exception does not deprive this Court of subject matter jurisdiction over those claims. (*Id.* at 12 (citing cases)).

**\*6** Likewise, the Court denied the portion of Jurgens' motion requesting that the federal court abstain from exercising jurisdiction on the grounds that, even if the Court were to assume the existence of parallel proceedings in this Court and Surrogate's Court, the balance of factors nonetheless weighs against abstention. (*Id.* at 14–17.)

The Court also denied the portion of Jurgens' motion seeking dismissal of the Amended Complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure on the grounds that Plaintiff's *pro se* complaint, although "not a model of clarity or brevity," satisfied the requirements of Rule 8(a) by providing fair notice of what plaintiff's claims are and the grounds upon which they rest. (*Id.* at 17–19.)

With regard to Plaintiff's claims against Smith Barney and Citibank, the Court granted Smith Barney's motion and dismissed the Amended Complaint as against it in its entirety, and *sua sponte* dismissed the entirety of the Amended Complaint against Merrill Lynch for lack of subject matter jurisdiction. (*Id.* at 19–22, n .6.)

In sum, the only claim against Jurgens which is before this Court on summary judgment is whether Jurgens, in his capacities as power of attorney and executor, breached his fiduciary duties to Louise's Estate, including whether he mismanaged Louise's or the Estate's funds, thereby causing "the depletion of the estate of Louise" and causing harm "to the heirs of the estate of Louise" [DE 73 at 12].


### 2. *The Preclusion Order Against Plaintiff*

On multiple occasions during the course of the present action, specifically between October 2007 and February 2008, Plaintiff failed to appear for his properly-noticed deposition, despite the Court's denial of his two motions for protective orders [DE 90, 100] and several opportunities to appear. (Schmidt Decl. ¶ 19.) During this time, the Court explicitly warned Plaintiff as to the consequences of his failure to appear for deposition. By Order dated February 4, 2008 [DE 100], Judge Boyle cautioned Plaintiff that

> [s]hould he fail to be deposed in this action on or before February 27, 200 [8] he faces a preclusion order barring him from filing any affidavit in favor or in opposition to any motion for summary judgment, and further barring him from testifying at trial."

[DE 100.] Between February 4 and February 25, 2008, Defendant made several attempts to schedule Plaintiff's

deposition, but Plaintiff nonetheless refused to appear. (DE 106, 107; Schmidt Decl. ¶ 21.) As a result, by Order dated March 4, 2008 (the "Preclusion Order") [DE 109], Judge Boyle held that

> [c]onsistent with the cautionary advice set forth in the order dated February 4, 2008, the *pro se* plaintiff, James Witzenburg, is hereby precluded from offering any affidavit in support of or in opposition to any motion for summary judgment and is also precluded from testifying at trial in this action unless, within ten (10) business days, he submits to a deposition at a mutually agreed date and time at the placed noticed by counsel for the defendants.

**\*7** [DE 109.]

On March 4, Defendant's counsel sent a letter to Plaintiff by fax, e-mail, and regular mail, enclosing a copy of the Court's March 4, 2008 Order, and offering to depose Plaintiff on March 7, 12, 14, 17, or 18, 2008. (Schmidt Decl. ¶ 22.) Plaintiff did not respond to the letter of Defendant's counsel in any traditional or electronic medium. Moreover, Plaintiff did not appear for his deposition by March 18 as directed by Judge Boyle's March 4 Order. (DE 106, 107; Schmidt Decl. ¶ 22; Def.'s 56.1 Stat. ¶ 33.) Accordingly, by operation of the March 4, 2008 Order, Plaintiff is precluded from offering any affidavit in opposition to the current summary judgment motion and from offering any testimony at trial. Judge Boyle's decision on this issue is now the law of the case.

### C. *Summary Of Plaintiff's Allegations*

In the Amended Complaint, Plaintiff seeks monetary damages as follows: (1) $106,714.43 for funds converted by Jurgens, acting alone or in concert with others, and the Merrill Lynch and Smith Barney brokers, from a brokerage account allegedly owned by Plaintiff; (2) $2,293,225 for which Jurgens is liable "to the heirs of the estate of Louise Jurgens, including Plaintiff," for breach of fiduciary duties to the Estate and/or conversion of Louise's assets; (3) $1,299,175 for which Jurgens is liable because "[b]y placing an unwarranted guardianship on Louise ... Jurgens initiated the frenzy of activity that resulted in ... depletion of the estate of Louise ..." in that amount; (4) $350,000 in inheritance to which Plaintiff is allegedly entitled pursuant to Louise's "true will,"

including a $300,000 specific bequest and $50,000 which he claims is his share of the residual value of the Estate (his inheritance per stirpes via his mother's inheritance of 40% of the residual value of the Estate); and (5) interests and costs. (Am. Compl. at 33–34).[5]

[5]    The Amended Complaint does not contain separately numbered paragraphs and does not identify specific "causes of action." Accordingly, citations are to page numbers within the Amended Complaint. Moreover, the Court affords the Amended Complaint, filed by *pro se* Plaintiff "as liberal a reading as circumstances permit." *Hardie v. Grenier,* No. 84 Civ. 4710, 1987 U.S. Dist. LEXIS 12664, at \*6 (S.D.N.Y. Jan. 15, 1988); *see also Lerman v. Board of Elections in the City of N.Y.,* 232 F.3d 135, 140 (2d Cir.2000).

As discussed above, in the Order granting in part Defendant's motion to dismiss, Judge Feuerstein found that "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed." [DE 73 at 8.] Moreover, Judge Feuerstein explained that to the extent Plaintiff is seeking damages resulting from a diminished inheritance, he has no standing to do so because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover restate property," [DE 73 at 21 (citing cases).] Accordingly, Plaintiff's claims for $106,714.43 for funds allegedly converted by Jurgens and the Merrill Lynch and Smith Barney brokers (No. (1) listed above) and $1,299,175 for depletion of Louise's assets during the guardianship period (No. (3) listed above) were dismissed pursuant to Judge Feuerstein's Order and need not be considered here. Likewise, Plaintiff's claim for $2,293,225 (No. (2) listed above) was dismissed to the extent it was based on alleged conversion of Louise's assets. The issues remaining before this Court are whether Jurgens breached his fiduciary duties to the Estate and is thus liable to Louise's heirs for $2,293,225 (No. (2) above), and whether Plaintiff is entitled to $350,000, or any portion thereof, in inheritance, pursuant to Louise's "true will" (No. (4) listed above).

**\*8** Insofar as the allegations in the Amended Complaint relate to Defendant Jurgens and are currently before this Court, Plaintiff alleges that Jurgens, in his capacity as executor of Louise's Estate, "committed five separate acts of fraud and many breaches of fiduciary duty." (Am. Compl. at 20). These acts of fraud and breaches of fiduciary duty, as distilled by the Court from the Amended Complaint, are as follows:

• Jurgens knowingly filed a false Last Will and Testament of Louise, which was prepared by Jurgens' counsel in the Surrogate's Court Action, thereby causing the Suffolk Supreme Court Action and/or the Surrogate's Court Action to be "premised upon the filing of a false document which was a fraud on the court," as well as on Louise, her estate, and her beneficiaries, including Plaintiff. (*Id.* at 20–21, Exs. 7, 8.)

• McCarthy was not an independent property guardian and he, together with the Smith Barney experts, "mismanaged" Louise's assets, and filed a false final accounting in the Suffolk Supreme Court Action. (*Id.* at 21–22, Ex. 1.)

• Jurgens' counsel in the Surrogate's Court Action hired a forensic accounting firm to prepare "a report" for which the Estate paid a fee of $53,428.94. However, no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions. Thus, the $53,428.94 "expense" "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (*Id.* at 24.)

• Jurgens' counsel in the Surrogate's Court Action caused the final accounting prepared by McCarthy, which was sent by the Court to the forensic accounting firm, to be sent to a non-existent person at the firm so that the firm would not be in the position of having to approve McCarthy's fraudulent final accounting. (*Id.* at 24–25.)

• In arranging the Estate's sale of Louise's residence, Jurgens did not conduct the sale as an "arm's length" transaction; the only appraisal submitted was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager." (*Id.* at 25.) Moreover, Jurgens submitted an affidavit to the Surrogate's Court affirming that the sale was an "arm's length" transaction. (*Id.*) Jurgens' conduct constituted a breach of his fiduciary duty to Louise's Estate. (*Id.*)

• Jurgens filed a fraudulent bond with the Surrogate's Court and such bond does not actually exist, thereby conferring a fraud on the court and Louise's beneficiaries. (*Id.* at 25–26, Ex. 9.)

In addition, Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting

(filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (*Id.* at 9.) Finally, Plaintiff claims that Jurgens brought the Suffolk Supreme Court Action against him "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (*Id.*)

## II. *THE SUMMARY JUDGMENT MOTION*

### A. *Standard of Review*

**\*9** In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Federal Rule of Civil Procedure 56(c), which provides, in part:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ....

Fed.R.Civ.P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co. .,* 434 F.3d 165, 170 (2d Cir.2006); *Gray v. Lutheran Social Servs. of Metro. New York., Inc.,* No. 04–2843, 2006 WL 1982859, at \*3 (E.D.N.Y. Jul.13, 2006). The moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that inference in the light most favorable to the non-moving party. *Id .* at 157; *Fischl v. Armitage,* 128 F.3d, 50, 55 (2d Cir.1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006). "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id. See also* *McPherson v. N.Y. City Dep't Of Educ.,* 457 F.3d 211, 215 n. 4 (2d Cir.2006)

("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl,* 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." *Fed.R.Civ.P. 56(e)(2).* In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Dobbs v. Dobbs,* No. 06 CV 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims ...").

**\*10** However, because Plaintiff is proceeding *pro se,* the Court is compelled to "read [*pro se* plaintiff's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, "the nonmoving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (quotation omitted).

**B.** *Procedural Issues*
On June 17, 2008, Defendant Jurgens served his motion for summary judgment on Plaintiff Witzenburg by e-mail and regular mail [DE 122]. With his summary judgment motion, Defendant also served Plaintiff with a cover letter providing the requisite Notice to *Pro Se litigant* which, in accordance with Local Rule of the Eastern District of New York 56.2, stated:

> [y]ou are required to serve any opposition papers on my office **within 10 days of my service of this motion,** without filing any of your opposition papers with the

Court .... Accordingly, to the extent you intend to oppose this motion, please send me within the requisite 10 days a service copy of your papers as well as an additional copy of your papers for me to send to the Court.

[DE 126] Plaintiff did not file any opposition papers or attempt any communication with Defendant or the Court by the June 27, 2008 due date. By letters dated July 1 and July 14, 2008, Defendant asked the Court to grant the summary judgment motion without opposition [DE 128, 133].

By Order To Show Cause dated July 15, 2008, the Court gave Plaintiff one final opportunity to demonstrate why Defendant's motion for summary judgment should not be treated as unopposed. The Court directed Defendant (i) to submit a written explanation to the Court no later than August 6, 2008 setting forth good cause why Plaintiff had failed to oppose Defendant's summary judgment motion; and (ii) to file any opposition papers to Defendant's summary judgment motion no later than August 6, 2008 [DE 134].

Plaintiff served his opposition to Defendant's motion for summary judgment on August 5, 2008 [DE 136], but did not submit a written explanation why he had failed to file his opposition by the original due date. (Schmidt Reply Dec.[6] ¶ 2.) Plaintiff's opposition, styled "Plaintiff's Response in Opposition to Defendant Charles Jurgens' Motion for Summary Judgment" (the "Response"), is, in effect, an unsworn affidavit. Unsworn affidavits are not competent summary judgment evidence unless they meet the requirements of 28 U.S.C. § 1746 or, at minimum, "substantially compl[y] with the[ ] statutory requirements [of 28 U.S.C. § 1746] ...." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham,* 185 F.3d 61, 65 (2d Cir.1999); *see also Nissho–Iwai Amer. Corp. v. Kline,* 845 F.3d 1300, 1306 (5th Cir.1988). Although Plaintiff signed the Response, it is not a sworn affidavit. Likewise, there is no statement that the contents are "true and correct" or made "under penalty of perjury" as required under 28 U.S.C. § 1746 and Second Circuit case law.

[6]   Citations to "Schmidt Reply Decl." are to the August 7, 2008 Reply Declaration of Michael C. Schmidt, Esq., in Further Support of Defendant Jurgens' Motion for Summary Judgment [DE 137].

**\*11** Moreover, Plaintiff is precluded from submitting any affidavits in support of his opposition to Defendant's

motion for summary judgment based upon Judge Boyle's March 4, 2008 Order, which the Court finds is law of the case on this issue. Under the "law-of-the-case doctrine, a court has discretion to re-examine an issue in certain circumstances." *Public Employees Retirement Association of New Mexico v. PriceWaterhouseCoopers LLP,* No. 07–3756–cv, 2009 WL 27704, at * 3 (2d Cir. Jan.6, 2009). However, "[c]ourts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge." *Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cior.2008) A court's decision whether to apply law-of-the-case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 607 (2d Cir.1999) (internal quotation marks omitted).

With regard to law-of-the-case doctrine, the Second Circuit has noted that

> [t]he law of the case doctrine ... while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*ATSI Communications, Inc. v. the Shaar Fund, Ltd.,* 547 F.3d 109, 112 n. 3 (2d Cir.2008) (citing *Ali v. Mukasey,* 529 F.3d at 490). I find that the law-of-the-case doctrine applies in the current circumstances. Plaintiff has provided no argument or rationale here that there has been some "intervening development of law or fact that renders reliance on [Judge Boyle's] earlier ruling inadvisable." *Calabrese v. CSC Holdings, Inc.,* No. 02–CV–5171, 2009 WL 425879, at * 6 (E.D.N.Y. Feb. 19, 2009). Plaintiff has never presented any good faith reason for his failure to show up at his duly noticed deposition, in the face of specific Orders from the court to do so. The law of the case will be disregarded "only when the court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1991) (quoting *Zdanok v. Glidden,* 327 F.2d 944, 953 (2d Cir.1964)). Here, Plaintiff presents no new evidence or facts to serve as any reasonable justification for his prior conduct or any basis whatsoever to disturb Judge Boyle's prior rulings.

In addition to the applicability of the law-of-the-case

doctrine here, the Court also observes that because Plaintiff's Response constitutes an unsworn declaration, it is inadmissible for purposes of Rule 56 and cannot be considered by the Court in rendering a decision on the present motion. *Nissho–Iwai Amer. Corp.,* 845 F.3d at 1306; *Hale Propeller LLC v. Ryan Marine Prods. Pty., Ltd.,* 151 F.Supp.2d 183, 200–01 (D.Conn.2001) (disregarding affidavit where it failed to conform to the standard for unsworn declarations set forth by 28 U.S.C. § 1746); *compare LeBoeuf, Lamb, Greene & MacRae, LLP,* 185 F.3d at 65–66 (defendant's unsworn affidavit could be considered on summary judgment where it stated that "under penalty of perjury I make the statements contained herein" and was signed and dated). Accordingly, Plaintiff's Response cannot be considered on this motion.[7]

---

[7]  Even if Plaintiff's Response were considered, the substance of the Response falls far short of the threshold necessary to support a showing of genuine issue of material fact with regard to the remaining claims. Rather, the Response contains conclusory and unsubstantiated statements, most of which purport to address "the numerous factual inaccuracies and misleading statements" in the Schmidt Declaration [DE 136 at 3], and none of which provide any evidentiary support for Plaintiff's claims.

**\*12** In addition, Plaintiff did not include in the Response a contravention of Defendant's Statement of Undisputed Material Facts [DE 125] or a separate statement of additional material facts for which there exists a genuine dispute, as required under Local Civil Rule 56.1(b).[8] Pursuant to Local Rule 56.1(c), each numbered paragraph in the moving party's statement of material facts "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Accordingly, for purposes of this motion, the statements contained in Defendant's Statement of Undisputed Material Facts [DE 125] are hereby deemed admitted as unopposed.

---

[8]  Local Rule 56.1(b) provides: "The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

Nevertheless, where, as here, the motion for summary judgment is unopposed, "the district court is not relieved

of its duty to decide whether the movant is entitled to judgment as a matter of law ." *Vermont Teddy Bear Co. v. Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *Layachi v. Minolta Bus. Sys., Inc.,* 00 Civ. 731, 2001 WL 1098008, at *3 (S.D.N.Y. Sept.18, 2001) (where "non-moving *pro se* party has failed to submit papers in opposition, summary judgment should not be granted automatically") (internal citations omitted). The Second Circuit has stated:

> the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.

*Vermont Teddy Bear Co.,* 373 F.3d at 244. Plaintiff's failure to oppose summary judgment in any legally meaningful way allows the Court to accept Defendant's factual assertions as true; however, the court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

## C. *Breach of Fiduciary Duty Claims*

As discussed above, Plaintiff seeks monetary damages against Jurgens in the amount of $2,293,225 on the grounds that, in his role as executor of Louise's Estate, Jurgens breached his fiduciary duties through various acts, including mismanaging the Estate's assets. New York law vests executors of estates with broad powers to dispose of and manage the decedent's interests in real property. Specifically, under the Fiduciaries' Powers Act, "every fiduciary is authorized" *inter alia:*

• with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein;

• to employ any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York as custodian of any stock or other securities held as a fiduciary, and the cost thereof;

**\*13** • to cause any stock or other securities (together, "securities") held by any bank or trust company to be registered and held in the name of a nominee of such bank or trust company without disclosure of the fiduciary relationship; and to direct any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York to register and hold any securities deposited with such bank, trust company or private banker in the name of a nominee of such bank; and

• to contest, compromise or otherwise settle any claim in favor of the estate, or in favor of third person and against the estate.

*See* N.Y. EPTL § 11–1.1(5)(B), (9), (10), (13).

Notwithstanding this broad authority, the Fiduciaries' Powers Act also requires executors to strictly adhere to their fiduciary duties. The following is a brief review of executors' fiduciary duties as relevant to the present case.

Pursuant to the duties of loyalty, care and safekeeping, an executor must collect and preserve the assets of the estate. *In re Estate of Donner,* 82 N.Y.2d 574, 584, 606 N.Y.S.2d 137, 141, 626 N.E.2d 922 (N.Y.1993) (noting that the executors "were fiduciaries who owed a duty of undivided loyalty to the decedent and had a duty to preserve the assets that she entrusted to them") (citing *Meinhard v. Salmon,* 240, N.Y. 458, 464 (N.Y.1928)); *Bender v. City of Rochester,* 765 F.2d 7, 12 (2d Cir.1985) (administrator of an estate has "the legal duty to collect and preserve [decedent's] assets, [and] to pay [decedent's] debts"); *In re Estate of Skelly,* 284 A.D.2d 336, 725 N.Y.S.2d 666, 667 (2d Dep't 2001) (executor "has a duty to preserve the assets of the estate ....") (internal citation omitted). Likewise, an executor is prohibited from commingling estate assets with any other assets. *See* N.Y. EPTL § 11–1.6 ("[e]very fiduciary shall keep property received as fiduciary separate from his individual property"). The Fiduciary Powers Act authorizes an executor to protect the estate's assets by employing "any broker-dealer which is registered with the [SEC] and the department of law in the state of New York ... as a custodian for a fiduciary of any stock or other securities ... [and] to register such securities in the name of such broker." N.Y. EPTL § 11–1.10.

An executor's duty of diligence and prudence requires him to administer and manage the estate assiduously in the interest of the beneficiaries. This includes "employing such diligence and prudence in the care and management of the estate assets and affairs as would a prudent person of average discretion and intelligence." *In re Robinson,* 282 A.D.2d 607, 724 N.Y.S.2d 424, 426 (2d Dep't 2001) (finding no basis to deny executors' commissions where

executors adequately explained reasons for waiting to sell decedent's property and objectant did not present any evidence to refute the explanations) (internal citations omitted); *In re Bello*, 227 A.D.2d 553, 554, 642 N.Y.S.2d 953, 954 (2d Dep't 1996) (concluding that executor met the standard of care under difficult circumstances); *In re Scott*, 234 A.D.2d 551, 651 N.Y.S.2d 592, 593 (2d Dep't 1996) (finding executors' delay in paying tax deficiencies, where resulting accrued interest exceeded amount earned by the estate, constituted breach of duty of diligence and care).

**\*14** The duties of diligence and prudence also relate to the executor's authority to invest the assets of an estate. Under the Prudent Investment Act,[9] the executor must make investment decisions pursuant to the prudent investor standard, which requires the executor to "exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(2). The Prudent Investment Act sets out specific requirements for an executor's investment strategy. N.Y. EPTL § 11–2.3(b)(3). For example, executors are required to "pursue an *overall* investment strategy to enable the trustee to make appropriate present and future distributions to or for the benefit of the beneficiaries under the governing instrument, in accordance with risk and return objectives reasonably suited to the *entire* portfolio." *In re Heller*, 6 N.Y.3d 649, 653, 2006 Slip Op 3469, at \*3 (N.Y.2006) (emphasis in original) (quoting N.Y. EPTL § 11–2.3(b)(3)(A)). The statute also provides, in relevant part, as follows:

[9]     The Prudent Investor Act applies to investments "made or held" by a trustee on or after January 1, 1995, and thus applies to the present matter. *See In re Estate of Janes*, 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997) (citing N.Y. EPTL § 11–2.3(b)(3)(C).)

[t]he prudent investor rule requires a standard of conduct, not outcome or performance. Compliance with the prudent investor rule is determined in light of facts and circumstances prevailing at the time of the decision or action of a trustee. A trustee is not liable to a beneficiary to the extent that the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument. N.Y. EPTL § 11–2.3(b)(1). Moreover, an executor is obligated to "diversify assets unless the trustee

reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(3)(C) (quoted in *In re Janes*, 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997).

Also, under New York law, an executor has discretion whether to pay any testamentary disposition or distributive share before the completion of the publication of notice to creditors or, if no such notice is published, before the expiration of seven months from the time letters testamentary or of administration are granted. Thereafter, the executor is required to pay any testamentary disposition or distributive share no more than seven months following the date the letters testamentary are granted. N.Y. EPTL § 11–1.5(a). If the executor fails to make such disposition, an heir may bring a proceeding against the executor. However, for the purpose of computing the time for the heir to commence the proceeding against the executor, the cause of action does not accrue until the executor's account "is judicially settled." N.Y. EPTL § 11–1.5(c).

Typically, the determination of whether the executor's conduct "measures up to the appropriate standards of prudence, vigilance, and care" is an issue of fact to be decided by the court. *Donner*, 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922; *Janes*, 90 N.Y.2d at 50, 659 N.Y.S.2d at 169, 681 N.E.2d 332 (internal citations omitted).

### III. *DISCUSSION*

**\*15** The issue to be decided by this Court is whether there exists any genuine issue of material fact which would preclude summary judgment in favor of Defendant on Plaintiff's claims that (1) Defendant, in his role as executor of Louise's estate, breached his fiduciary duties through various acts, including mismanaging the Estate's assets, thereby depleting the Estate's assets and harming Louise's heirs; and (2) Plaintiff is entitled to an inheritance in the amount of $350,000 pursuant to Louise's "true will."

In determining whether there are any genuine issues of material fact, the Court remains mindful of Judge Boyle's Preclusion Order which prohibited Plaintiff from submitting "any affidavit in support of or in opposition to any motion for summary judgment" [DE 109]. The Court is also cognizant that, based upon Plaintiff's failure to oppose Defendant's motion for summary judgment in a substantively meaningful way, including his failure to submit a Local Rule 56.1(b) statement contravening Defendant's statement of undisputed facts, Defendant's

factual assertions must be accepted as true. *See* Local Rule 56.1(c).

**A. *Jurgens' Conduct As Executor***
Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens fulfilled his fiduciary duties as executor of Louise's estate. Pursuant to the duties of loyalty, care and safekeeping, Jurgens was required to collect and preserve the assets of the estate. *See, e.g. Donner,* 82 N.Y.2d at 584, 606 N.Y.S.2d at 141, 626 N.E.2d 922. Thus, following his appointment as Executor of Louise's Estate, Jurgens took steps to liquidate Louise's assets and sell her house, all of which were accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In addition, since his appointment, Jurgens has continued to maintain the Estate accounts, has filed and paid fiduciary taxes, and has assisted and paid for the various lawsuits and proceedings involving the Estate. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23 .)

Although Plaintiff alleges that Jurgens has breached his fiduciary duties by failing to distribute the assets of the Estate, Jurgens is not actually required to do so until there is a final accounting. Jurgens made certain distributions to beneficiaries of Louise's Will between December 2001 and January 2004. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 24.) Moreover, Jurgens has not made any distributions to himself or taken any Executor fees to date. (*Id.*)

Jurgens will only be required to distribute the Estate's assets when the Estate "is judicially settled." *See* N.Y. EPTL § 11–1 .5(c). In fact, it is Plaintiff's conduct, including the failure to pay the outstanding Surrogate's Court Judgment against him in the amount of $789,039.04, that has prevented Jurgens from conducting a final accounting and in turn making the final distributions under the Will. (Jurgens Aff. ¶ 8; Def.'s 56.1 Stat. ¶ 24.)

**B. *Breach Of Fiduciary Duty Claims***

***1. The Purported False Will***
**\*16** Plaintiff alleges that Jurgens knowingly filed a false Last Will and Testament of Louise, thus committing fraud on the court, Louise, her estate, and her beneficiaries, including Plaintiff. (Am. Compl. at 20–21, Exs. 7, 8.) Furthermore, Plaintiff claims that pursuant to Louise's "true will," he is entitled to an inheritance in the amount

of $350,000.

Contrary to Plaintiff's assertions, Defendant Jurgens states that in his role as executor of the Estate, following Louise's death, he duly filed Louise's Last Will and Testament dated October 16, 1995 as well as the Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

Moreover, prior to the admission of the Will to probate, Plaintiff reviewed the Will and executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Waiver and Consent provides that Plaintiff "consents that the court admit to probate the decedent's Last Will and Testament dated October 16, 1995 (and codicils, if any, dated July 28, 1998), a copy of each which testamentary instrument has been received by me and that Letters Testamentary issue to Charles Jurgens." (Jurgens Aff., Ex. A.) Notably, at no time during the Surrogate's Court proceedings did Plaintiff raise any objection to the Will, despite having had ample opportunity to do so. Plaintiff raised this issue for the first time only upon bringing this action, long after the admission of the Will to probate.

If Plaintiff were seeking to withdraw his Waiver and vacate the decree admitting Louise's Will to probate in order to contest the Will (for which he has not so moved), such motion would have to be made before the Surrogate's Court, where the Waiver was entered. It is well-established that the jurisdiction to administer the probate of wills, including entry of waivers, falls within the ambit of the Surrogate's Court. *See Groman v. Cola,* 07 CV 2635, 2007 WL 3340922, at *4 (S.D.N.Y. Nov.7, 2007) (noting that federal jurisdiction is barred under the probate exception if the action requires "the probate or annulment of a will [or] the administration of a decedent's estate" (citing *Marshall v. Marshall,* 547 U.S. 293, 311–12, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)); *Lefkowitz v. Bank of N.Y .,* 528 F.3d 102,106 (2d Cir.2007) (affirming dismissal of certain tort claims against executor because "[w]ith these claims, Plaintiff seeks to mask in claims for federal relief her complaints about the maladministration of her parent's estates, which have been proceeding in probate courts) (citation omitted); *see also* DE 73 at 10. Here, any request by Plaintiff to set aside his Waiver must properly be made before the Surrogate's Court and such request would be subject to the applicable statute of limitations in that court.

However, even if Plaintiff were to make such a motion, it

is unlikely he would succeed based on the record currently before this Court. Under New York law, "[a] party seeking to set aside a probate decree entered upon his consent must show that such consent was obtained by fraud or overreaching, [or] was the product of misrepresentation or misconduct, or that newly-discovered evidence, clerical error or other sufficient cause justifies the reopening of the decree." *Moser v. Pollin,* 294 F.3d 335, 342 (2d Cir.2000) (overruled on other grounds by *Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)) (quoting *In re Hall,* 185 A.D.2d 322, 322, 586 N.Y.S.2d 285, 286 (2d Dep't 1992)); *In re Coccia,* 2008–0802, 2009 N.Y. Slip Op 1477, 2009 App. Div. LEXIS 1463, at *1 (citations omitted). In other words, the party challenging the probate decree must establish "sufficient cause ... to justify reopening the decree." *Coccia,* 2009 App. Div. LEXIS 1463, at *2 ("appellant's unsubstantiated and conclusory allegations that he did not appreciate or understand the significance of the waiver and consent were insufficient to satisfy this standard").

**\*17** Here, not only has Plaintiff not moved to set aside the Waiver, but he has not even addressed the fact that he submitted the Waiver to the Surrogate's Court. Moreover, based on the record now before this Court, no evidence has been introduced which would allow a court to determine that Jurgens had a fraudulent will admitted to probate. Nowhere does Plaintiff submit any evidence showing that he signed the Waiver as a result of fraud, overreaching, misrepresentation or misconduct on the part of any party involved in the Surrogate's Court proceeding. Neither has Plaintiff submitted newly-discovered evidence, or evidence of a clerical error or other sufficient cause which would justify the reopening of the decree. In fact, the extent of Plaintiff's assertions on this point, other than in the Amended Complaint, is found in his Summary Judgment Response, where he takes issue with Paragraph 6 of the Schmidt Declaration for, among other things, not addressing "the presence of 2 wills" which were annexed to the Amended Complaint. (Pl. Opp'n Summ. J. at 4.)

In sum, there no evidence that Plaintiff's Waiver was fraudulently obtained and should be withdrawn or that Jurgens had a false will admitted to probate. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duty as Executor in regard to the admission of the Will to probate. Likewise, Plaintiff's claim that he is entitled to an inheritance in the amount of $350,000 under a will other than the Will that was admitted to probate in the Surrogate's Court Action is without merit.

### *2. McCarthy's Final Accounting*

Plaintiff alleges that Jurgens breached his fiduciary duty because the court-appointed property guardian for Louise, Patrick McCarthy, was not functioning independently and McCarthy, together with the Smith Barney experts, "mismanaged" Louise's assets, ultimately filing a false Final Accounting in the Suffolk Supreme Court Action. (Am. Compl. at 21–22.)

However, Jurgens has stated that he had "absolutely no authority to oversee, let alone supervise, [McCarthy's] actions while he served as Louise's property guardian." (Jurgens Aff. ¶ 10; Def.'s 56.1 Stat. ¶ 25.) Specifically, during the guardianship period, Jurgens did not have any control over Louise's finances or property. (Jurgens Aff. at ¶ 11; Def.'s 56.1 Stat. ¶ 28.) Moreover, at the conclusion of the guardianship period, McCarthy accounted for his actions as Louise's Property Guardian in a formal accounting which was approved by the Suffolk County Supreme Court. (Jurgens Aff. ¶ 10.) Despite having had ample opportunity to do so, Plaintiff at no time objected to McCarthy's Final Accounting and only raises this issue for the first time in the current action, several years after the entry of McCarthy's Final Accounting.

If Plaintiff had been seeking to challenge McCarthy's Final Accounting (for which he has not so moved), he would necessarily have had to bring that information to the attention of the Suffolk County Supreme Court, which previously approved the Final Accounting. *See, e.g., In re Hunter,* 4 N.Y.3d 260, 270, 794 N.Y.S.2d 286, 292, 827 N.E.2d 269 (N.Y.2005) (Explaining that res judicata principles "apply with equal force to judicially settled accounting decrees. As a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction.") (citations omitted).

**\*18** Notwithstanding these purported facts, however, this allegation does not pertain to Jurgens, as he played no role in McCarthy's conduct as guardian. (Jurgens Aff. ¶ 11.) In fact, the conduct at issue here occurred before Louise's death, and thus prior to Jurgens' appointment as executor of Louise's estate and prior to his undertaking the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*) Moreover, McCarthy is not a party to this action.

Because this allegation relates solely to events that occurred prior to Jurgens' appointment as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact as to whether Defendant breached

his fiduciary duties in regard to McCarthy's conduct as Property Guardian and/or McCarthy's Final Accounting.

### 3. The Purported Fraudulent Forensic Accounting Report

Plaintiff contends that, in either the Suffolk Supreme Court Action or the Surrogate's Court Action, Jurgen's attorney hired a forensic accounting firm to prepare "a report" for which Louise's Estate was billed $53,428.94. Plaintiff contends that no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions and thus, Plaintiff argues, the $53,428.94 "expense" ... "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (Am. Compl. at 24.)

At first glance, it is unclear whether Plaintiff is alleging that the fraudulent forensic accounting report was prepared during the guardianship period in the course of the Suffolk Supreme Court Action, or following Louise's death in the course of the Surrogate's Court Action. However, based on Plaintiff's assertion that the accountant who was hired to prepare this report informed Plaintiff's attorney (presumably in one of these earlier actions) that he did not know McCarthy, the Court concludes that the conduct alleged here occurred during the guardianship period, because that is the only time McCarthy was involved with Louise. Specifically, Plaintiff contends that the accountant stated that "he did not know the property manager Patrick McCarthy had never spoken with Patrick McCarthy, and was hired by James Klein." (Am. Compl. at 24.) Plaintiff also adds that the accountant made this statement "after he was paid" for the report. (Id.)

Insofar as this allegation pertains to the guardianship period, there is no claim against Jurgens and thus nothing for the Court to consider because this conduct occurred prior to Jurgens' appointment as executor of Louise's estate—and prior to his assuming the corresponding fiduciary duties which Plaintiff claims were breached. (Id.)

Even if the Court were to presume that this claim alleges conduct which occurred following Louise's death—and thus while Jurgens was the executor—there is no support, beyond Plaintiff's conclusory and unsubstantiated statements, to show that Jurgens fraudulently billed the Estate for an accounting report that was not received. Thus, the Court finds that there is no genuine issue of material fact whether Defendant caused his counsel to hire a forensic accounting firm to prepare a fraudulent report or to pay an impermissible fee to such firm.

### 4. The Alleged Non–Existent Forensic Accountant

**\*19** Plaintiff alleges that in the Surrogate's Court Action, Jurgens, through his counsel, caused the Final Accounting prepared by McCarthy to be sent to the Court to a non-existent person at a forensic accounting firm so that the accounting firm would not be in the position of having to approve McCarthy's fraudulent Final Accounting. (Am. Compl. at 24–25.) However, as noted above, Jurgens did not play any role in McCarthy's conduct as the property guardian. Moreover, beyond these conclusory and unsubstantiated allegations, the only evidence offered by Plaintiff is a copy of an envelope addressed to "Ernest Patrick Smith, CPA" at a street address in Melville. Contrary to Plaintiff's proffer, the envelope does not indicate that it is directed to the accounting firm of Callahan Nawrocki. (Id. at 25, 794 N.Y.S.2d 286, 827 N.E.2d 269.) Further, the envelope was returned by the post office bearing the stamped notation "Attempted Unknown" (not "addressee unknown" as stated by Plaintiff). (Id .; Am. Compl. Ex. 11.)

Because there is no evidence of Jurgens having played any role in this alleged conduct, the Court finds that Plaintiff has failed to raise a genuine issue of material fact to support his contention that Jurgens caused McCarthy's Final Accounting to be sent to a non-existent forensic accountant.

### 5. Sale Of Decedent's Residence As An Arm's Length Transaction

With regard to the sale of Louise's residence, Plaintiff alleges that Jurgens breached his fiduciary duties as executor because the only appraisal obtained for Louise's house was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager[,]" and thus the sale was not an "arm's length" transaction. (Am. Compl. at 25.) As noted above, the New York Fiduciary Powers Act provides the executor with broad authority with regard to the sale of decedent's property. The applicable statutory provision authorizes an executor "with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein." N.Y. EPTL § 11–1.1(5).

Plaintiff's only support for his claim that Jurgens breached his fiduciary duty in the sale of the residence is

his assertion that the appraisal was submitted by a company with whom McCarthy had ties, thereby resulting in a transaction which was not at arm's length. However, Plaintiff does not specify McCarthy's connection to that company or offer any proof to show that any unlawful conduct occurred as a result of this purported connection. Nor does Plaintiff offer any proof to show that Jurgens knew or believed this sale was not "most advantageous" to Louise's beneficiaries, as required under New York law.

Significantly, by Order dated February 21, 2001, the Surrogate's Court granted Jurgens' application for permission to sell Louise's home in accordance with the terms of the contract which Jurgens had provided to the Court (Am.Compl., Ex. 9). In the Order, the Surrogate noted that Jurgens had "proffered a copy of a contract of sale for $270,000.00 and state[d] that the sale of the premises minimizes the estate's obligation to pay taxes and carrying charges on the property during the pendency of the probate proceeding." (*Id.*) The Surrogate found that Jurgens had satisfied his fiduciary duties with regard to the sale of Louise's home, and Plaintiff has not presented any evidence here to convince this Court otherwise. Accordingly, the Court finds there is no genuine issue of material fact regarding Defendant's conduct in the sale of Louise's home.

### 6. The "Fraudulent Bond" Allegation

**\*20** Plaintiff maintains that Jurgens filed a fraudulent bond with the Surrogate's Court and that no true bond actually exists, thereby resulting in a fraud on the court and Louise's beneficiaries. (Am. Compl. at 25–26, Ex. 9.) In support of this allegation, Plaintiff claims that, pursuant to the order of the Surrogate's Court requiring Jurgens to file a bond on his performance, Jurgens filed "several unbound unexecuted pages purporting to represent an executor's performance bond underwritten by Fidelity and Deposit Company of Maryland" ("F & DC"), and that in 2003, an F & DC representative informed him that "no bond exists or ever existed on the performance of Charles H. Jurgens." (*Id.* at 25–26, 794 N.Y.S.2d 286, 827 N.E.2d 269.)

In his summary judgment motion, Jurgens explains that F & DC insured Louise's Estate for $3,353,000, based on Jurgens' preliminary estimate of the value of the Estate at the time he filed the Preliminary Executor's Bond with the Surrogate's Court. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 29.) The value of the Estate was ultimately determined to be higher than the face value of the bond. However, by the time that determination was made, the Will had already been admitted to probate and an increase in the

the bond was not necessary. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 30.)

In support of his allegation that Jurgens breached his fiduciary duties by filing a false bond, Plaintiff cites to Exhibit 9 annexed to the Amended Complaint. (Am. Compl. at 25–26.) However, Exhibit 9 is neither the purported bond nor any document even suggesting that Jurgens fraudulently obtained the bond. Rather, Exhibit 9 consists of the FD & C's power of attorney dated August 25, 2000, F & DC's statement of financial condition dated May 24, 2000, and FD & C's New York State Insurance Certificate dated April 12, 2001. These documents do not in any way support Plaintiff's contention that Jurgens committed fraud in obtaining the bond, thereby breaching his fiduciary duties.

As a result, Defendant has provided no more than conclusory allegations here regarding the supposed fraudulent nature of the bond, and those allegations are not supported by the irrelevant papers included in Exhibit 9. Accordingly, the Court finds that Plaintiff has failed to carry his burden to establish a genuine issue of material fact regarding the bond filed by Jurgens with the Surrogate's Court.

### 7. Purported Accounting Discrepancies

Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (Am. Compl. at 9.)

**\*21** The conduct alleged here refers to actions taken during the guardianship period. As explained above, during this time, Jurgens had no authority over McCarthy, who was solely in charge of managing Louise's assets. Moreover, Plaintiff had ample opportunity to challenge McCarthy's accounting, including this alleged discrepancy, during the course of the Suffolk Supreme Court Action. Because this allegation relates solely to events that occurred prior to the commencement of Jurgens' role as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact regarding any alleged breach by Jurgens of his fiduciary duties as Executor.

### 8. Jurgens' Purported Improper Motives

Finally, Plaintiff claims that Jurgens brought the Suffolk Surrogate's Court action against Plaintiff "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (Am. Compl. at 9.) Plaintiff explained that, following his appointment as preliminary executor of Louise's estate in January 2001:

> In the course of performing my duties as executor, I attempted to locate and preliminarily account for various assets of the Estate. In that capacity, I learned that Plaintiff had withheld certain of Louise's money and personal property valued at $789,039.04, obtained through specific withdrawals, transfers and check negotiations in which Plaintiff engaged during the period prior to Louise's death from March 1997 through the time that Mr. McCarthy was appointed as Louise's property guardian. As a result, I commenced a special proceeding in Suffolk County Surrogate's Court in my capacity as Executor, seeking to discover property withheld by Plaintiff.

(Jurgens Aff. ¶ 5.)

On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr. granted Jurgen's motion for summary judgment (made on behalf of Louise's Estate) on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> sufficient concerns having been raised before this Court to question

the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogates' Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

**\*22** (Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Plaintiff. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens believes that shortly after entry of the Judgment in August 2003, Plaintiff left New York. (Schmidt Decl. ¶ 12.) To date, Plaintiff has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Plaintiff has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the present action), it will ultimately be able to offset the amount of the Judgment against Plaintiff's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Notwithstanding that the history of the Surrogate's Court Action strongly suggests that Plaintiff brought the instant case in an effort to further elude the Judgment entered in Surrogate's Court, Jurgens, as Executor, was well within his authority to bring that case against Plaintiff. The New York Fiduciary Powers Act specifically provides that "every fiduciary is authorized ... [t]o contest, compromise or otherwise settle any claim in favor of the estate ...." N.Y. EPTL § 11–1.1(13). Thus, once Jurgens obtained information that Plaintiff had withheld funds which properly belonged to Louise's Estate, he acted properly in bringing the Surrogate's Court Action against Plaintiff to recover those funds.

### C. Conclusion

For the foregoing reasons, Plaintiff has not provided any evidentiary basis which would enable this Court to find that Jurgens breached his fiduciary duties in his role as executor of Louise's Estate and that Jurgens' actions caused Witzenburg or any other beneficiary to incur damages. Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens' conduct as executor "measures up to the appropriate standards of prudence, vigilance, and care" as required by New York law. See Donner, 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922.

Having reviewed all of the papers submitted in support of and in opposition to Defendant's Motion for Summary Judgment on the remaining claims in this action, and reviewing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Defendant has met his burden of showing that there is no genuine issue of material fact to be tried in this case regarding Plaintiff's claims that Defendant breached his fiduciary duties to the Estate of Louise Jurgens and that he mismanaged the Estate's assets.

Accordingly, I respectfully recommend to Judge Feuerstein that Defendant's motion for summary judgment on the remaining claims be GRANTED and that the Amended Complaint be dismissed in its entirety.

## IV. *PLAINTIFF'S MOTION TO AMEND THE COMPLAINT*

Plaintiff Witzenburg also moves to amend the Amended Complaint pursuant to Fed.R.Civ.P. 15 to add Patrick McCarthy, Esq. as a party defendant. McCarthy served as the court-appointed property guardian of Louise's property for thirteen months before her death. Defendant's motion papers [DE 117] do not include a proposed Second Amended Complaint containing the requested changes. Counsel for Patrick McCarthy filed a letter [DE 119] requesting permission to oppose the motion and to extend the time to submit his opposition. By Order dated June 20, 2008 [DE 120], Judge Boyle granted McCarthy's motion without objection from Plaintiff and extended the deadline for the opposition to July 15, 2008. Defendant Jurgens has not filed papers in opposition to Witzenburg's motion to amend.

**\*23** Plaintiff seeks to amend his pleading for a second time on the grounds that, as guardian of Louise's property, McCarthy "created a false business document identified as 'The Final Accounting,' and filed said false business document with the New York State Supreme Court." [DE 117] Because the deadline to amend the pleadings has expired,[10] the amendment is permissible only if it "relates back" to the original Complaint as defined in Rule 15(c). Under Rule 15(c)(1), an amendment "relates back" to the original pleading when, *inter alia,*

---

[10]     Pursuant to the Scheduling Order [DE 22] in this action, the deadline to amend the pleadings was May 6, 2005.

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Thus, subsection (C) governs the relation back of newly added parties, as opposed to newly added claims and claims and defenses, which is governed by subsection (B) (although under the terms of (C), Plaintiff must also satisfy (B).) *See Sidney v. Wilson,* 228 F.R.D. 517, 520 (S.D.N.Y.2005).

In order for Plaintiff to amend the Amended Complaint to add McCarthy as a party Defendant, he must show that McCarthy originally would have been named as a defendant "but for a mistake concerning the proper party's identity." Under Second Circuit law, a 'mistake' in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of 'misnomer or misidentification' " or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. *Messer v. Fahnestock & Co. Inc.,* 03–4989, 2008 WL 4934608, at \*20 (E.D.N.Y. Nov.18, 2008) (internal citation omitted) (quoting *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469–70 (2d Cir .1995)); *Colombo v. S.C. Dep't of Soc. Servs.,* 221 F.R.D. 374, 376 (E.D.N.Y.2004). "However, the relation-back doctrine does not apply where defendants were not originally named merely 'because plaintiff did not know their identities.' " *Colombo,* 221 F.R.D. at 376 (quoting *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999)). Nor does the relation-back doctrine apply where plaintiff does not allege he would have sued the proposed defendant in the original complaint but for a mistake in identity. *See Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994) (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake"); *see also* Fed.R.Civ.P. 15(c) (3)[11] Advisory Committee's note (1991 Amendment) (this

provision was revised to address "the problem of the misnamed defendant").

[11]  Although numbered differently from the current version of Rule 15(c), the wording is the same.

**\*24** In his motion papers, Plaintiff asserts that the proposed amendment "asserts a claim that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Plaintiff further contends that McCarthy will not be prejudiced because he "knew or should have known that this action would have been brought against him but for a mistake concerning the proper party's identity ...." [DE 117] Other than these conclusory statements, however, Plaintiff gives no explanation as to any mistake on his part concerning McCarthy's identity. There is no evidence that Defendant's failure to name McCarthy as a defendant in the original Complaint was a result of a "misnomer or misidentification," as required under Second Circuit law. *See, e.g., Messer,* 2008 WL 4934608, at \*20, *Colombo,* 221 F.R.D. at 376. In addition, given the history of the related Suffolk Supreme Court and Surrogates' Court Actions that occurred before Plaintiff filed the Complaint in the present case, it is implausible for Plaintiff to assert that he was uncertain of Patrick McCarthy's identity. Rather, Plaintiff chose not to name McCarthy as a defendant in the present action—a mistake which does not allow the proposed amendment to "relate back" to the Complaint. *See Cornwell,* 23 F.3d at 705 (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake").

Moreover, even if the Court were to accept Plaintiff's contention that McCarthy "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity [,]" Plaintiff must show that McCarthy received timely notice of this action so as to avoid prejudice in defense of the action on the merits. *See* Fed.R.Civ.P. 15(c)(2)(C) (ii); *Colombo,* 221 F.R.D. at 377. To this end, Plaintiff states:

> [a]s Patrick McCarthy was represented by Donald J. Farrinacci when he was the Guardian of Louise Jurgens' Property, as Donald J. Farrinacci had been employed at Cozin O'Conner and is an associate of Michael Schmidt,

attorney for Charles H. Jurgens, Patrick McCarthy knew or should have know that this action would have been brought against him, but for a mistake concerning the proper party's identity ...."

[DE 117] The Court understands Plaintiff's assertion to mean that McCarthy was on notice of the present action, and therefore will not be prejudiced by being added as a defendant, because, for at least some portion of the time he served as Louise's property guardian (December 1999–January 2001), he was represented by counsel who at one time had worked with Jurgens' current counsel.

Rule 15(c) requires a showing that the defendant who is to be added to the complaint "received such notice of the action that it will not be prejudiced in defending on the merits[.]" Rule 15(c) (2)(C)(ii). Knowledge of the pendency of the action may be imputed to a party to be added as a defendant to that action where there has been "some showing that the proposed defendant's attorney knew that the additional defendant would be added to the existing suit." *Colombo,* 221 F.R.D. at 377 (granting motion to add individual defendants under *Rule 15(c)* where county attorney's office represented the named defendants, including county police department and correctional facility, and was also counsel for the proposed defendants, including individual police and correction officers, the attorneys "should have known that, despite the deficiencies in the original complaint, these individual officers should have been named, and would be added when the mispleading became evident"); *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (holding that notice of a lawsuit cannot be imputed to a proposed defendant based on sharing of counsel with a named defendant; "there must be some showing that the attorney(s) knew that the additional defendants would be added to the existing suit") (citation omitted).

**\*25** Plaintiff's allegation that McCarthy was on notice of the present action because he was, in a prior case, represented by counsel who had at one time worked with Jurgens' current counsel, is insufficient to constitute notice under Rule 15(c)(2)(C)(ii). Plaintiff does not provide the Court with any evidence regarding the relationship between McCarthy's attorney and Jurgens' former attorney.[12] Moreover, Plaintiff has not made any showing that McCarthy or his attorney knew that McCarthy would be added to the existing suit before Plaintiff filed this motion. For the foregoing reasons, Plaintiff has not satisfied the requirements of Rule 15(c) and therefore should not be permitted to amend his pleading for a second time for this purpose. Accordingly,

I respectfully recommend to Judge Feuerstein that Plaintiff's motion to add Patrick McCarthy as a party defendant be DENIED.

<sup>12</sup> In addition, the Court notes that, based on preliminary research, Plaintiff's statement appears to be incorrect. No attorney by the name of Donald J. Farrinacci presently works at the law firm of Cozen O'Connor, where Jurgens' attorney, Michael J. Schmidt, currently works. However, Schmidt's biography on the Cozen O'Connor website states that until 2005, Schmidt worked at Fischbein Badillo Wagner Harding, a firm that represented McCarthy for at least some portion of his tenure as guardian. *See* http://www.cozen.com/attorney_detail.asp?d=1 & atid=835.

## V. *PLAINTIFF'S MOTION TO COMPEL*
Plaintiff also moves to compel Defendant to respond to outstanding discovery requests. By motion dated June 26, 2008 [DE 130], Plaintiff requests an order requiring Defendant to respond to outstanding document requests and interrogatories, which Defendant has previously refused to answer on the grounds that the application of the *Rooker–Feldman* doctrine excused them from doing so. The motion is titled "Plaintiff's Motion & Notice of Motion For Sanctions," but nowhere in the body of the motion does Plaintiff request the imposition of sanctions or provide a legal basis for doing so. Accordingly, the Court will treat this request for relief as a motion to compel and to impose sanctions upon Defendant.

By letter dated July 8, 2008 [DE 131], Defendant states that, to the extent the meaning of Plaintiff's motion can be discerned, and to the extent the motion seeks to compel Defendant's further responses to discovery requests, Defendant opposes the motion on the grounds that (1) the Court had already denied an earlier motion to compel by Plaintiff, and (2) there is no basis for an award of sanctions against Defendant.

In a previous motion filed on January 31, 2008 [DE 95–97], Plaintiff moved to compel Defendant "to file adequate responses to Plaintiff's discovery requests." Specifically, Plaintiff objected to Defendant's responses to Interrogatories 4, 6, 13, and 14, and Requests for Admissions ("RFAs") numbered 1, 8, 9, 16, and 17 as being "incomplete," and requested that the Court order Defendant to respond further to the Interrogatories and to deem as admitted the specified RFAs [DE 96]. In opposition, Defendant filed the Declaration of Michael C. Schmidt, dated February 4, 2008 [DE 99], objecting to

Plaintiff's motion to compel. By Order dated February 4, 2008 [DE 100], Judge Boyle ruled that, after reviewing the motion to compel, he found Defendant's response[s] "adequate." The Order also stated that the "plaintiff is advised that he may further pursue those request[s] which do not relate to dismissed parties and causes of action, at the deposition of defendant Jurgens."

**\*26** Thus, Judge Boyle unequivocally denied Plaintiff's motion to compel on the grounds that Plaintiff's responses were sufficient and any further information could be obtained by deposing Defendant. Plaintiff's current motion to compel is essentially a more vague repetition of his earlier motion. However, Plaintiff does not provide any basis, let alone a legally sufficient one, for reconsidering Judge Boyle's Order denying that motion, and the Court declines to do so. For all of the reasons stated previously in this Report, Judge Boyle's February 4, 2008 Order on this topic is also law-of-the-case and Plaintiff has not met any of the criteria to exempt that Order from such a finding.

To the extent Plaintiff's motion seeks the imposition of sanctions upon Plaintiff, the Court interprets the motion to be requesting sanctions for "Failure to Disclose, to Supplement an Earlier Response, or to Admit," under Rule 37(c). Here, Judge Boyle previously determined that Defendant's responses were adequate. Since that time, Plaintiff has not served any additional discovery requests and Defendant has not incurred any additional obligation to respond to the original discovery requests. Consequently, there is no basis for the Court to impose sanctions on Defendant.

For the foregoing reasons, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to compel and for sanctions be DENIED.

## V. *CONCLUSION*
For the reasons discussed above, I respectfully recommend to Judge Feuerstein that: (1) Defendant's motion for summary judgment on the remaining claims be GRANTED and that Plaintiff's Amended Verified Complaint be dismissed in its entirety; (2) Plaintiff's motion to amend the Amended Complaint to add Patrick McCarthy, Esq. as a party defendant be DENIED; and (3) Plaintiff's motion to compel discovery responses and to impose sanctions upon Defendant be DENIED.

Pursuant to 28 U.S.C. § 636(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See* also

*Fed.R.Civ.P. 6(a), (e).* Such objections shall be filed with the Clerk of the Court via ECF, *except in the case of a party proceeding pro se. Pro Se Plaintiff James Witzenberg must file his objections in writing with the Clerk of the Court within the prescribed time period noted above. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein, and to my chambers as well. Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the (10) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Beverly v. Walker, 118 F.3d 900, 901 (2d Cir.),* cert. denied, *522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); Savoie v.*

*Merchants Bank, 84 F.3d 52, 60 (2d Cir.1996)*.

**\*27** Defendants' counsel is directed to serve a copy of this Report and Recommendation forthwith upon Plaintiff *Pro Se* by overnight mail and first class mail at Plaintiff's last known address. Defendant's counsel is further directed to file proof of service of the same upon ECF.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1033395

2013 WL 71770
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jeffrey HAMM, Plaintiff,
v.
Richard HATCHER, and City of New York,
Defendants.

No. 05 Civ. 503(ER).
|
Jan. 7, 2013.

### Attorneys and Law Firms

Jeffery Hamm, East Elmhurst, NY, pro se.

Kimberly D. Conway, Esq., New York City Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

### OPINION AND ORDER

RAMOS, District Judge.

**\*1** *Pro se* Plaintiff Jeffrey Hamm ("Hamm" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Richard Hatcher ("Hatcher")[1] and the City of New York (the "City," and collectively, "Defendants"). Plaintiff alleges that while he was incarcerated in Rikers Island, Defendants violated his rights under the Fourteenth Amendment to the U.S. Constitution when they suspended his antidepressant medications. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is GRANTED.

[1]    Plaintiff has named "Richard Hatcher" as a Defendant in this action. It appears from Defendants' papers, however, that his correct name is "Richard Fletcher." Because the caption of this case names "Richard Hatcher" as a Defendant, the Court will continue to refer to him by what seems to be an incorrect name.

## I. Background

### A. Undisputed Facts

Plaintiff is a 52 year-old man with a long history of substance addiction and criminal activity.[2] (Conway Decl. Ex. F ("Hamm Dep.") 9:19–23, 31:15–21, 36:24–37:6.) After serving in the military from 1980–1982, (*id.* 10:24–11:2, 35:2–8), Plaintiff and his ex-wife divorced. (*Id.* 35:15–17.) At that time, he became addicted to crack cocaine and remained addicted through 2000, (*id.* 9:20–10:2, 10:24–11:6), when he completed a twenty-day rehabilitation program and enrolled in New York City College of Technology. (*Id.* 10:4–8.) In December of 2001, on his second day of college, Plaintiff was arrested and released. (*Id.* 11:24–12:2, 13:12–14.) He struggled with substance abuse at that time, and continued to relapse into early 2002. (*Id.* 11:7–17.)

[2]    Plaintiff, by his own estimation, has been arrested at least 100 times and has been convicted of a crime at least fifty times. (Hamm Dep. 36:24–37:3.) Most of his arrests have been for the possession or sale of marijuana. (*Id.* 37:4–6.)

Plaintiff was again arrested in March 2002. (*Id.* 13:15–17.) He was immediately taken into custody at the Manhattan Detention Center. (*Id.* 13:18–25.) On March 15, 2002, while incarcerated there, Plaintiff was issued two antidepressant medication prescriptions for fourteen days each—one for forty milligrams daily of Paxil and the other for fifty milligrams daily of Trazodone. (First Unnumbered Exhibit to the Third Amended Complaint ("TAC") at first unnumbered page.) Plaintiff states that he had been taking antidepressant medications before his arrest, as well.[3] (Hamm Dep. 15:22–16:8; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at first unnumbered page.)

[3]    Plaintiff was first diagnosed with depression and anxiety by a psychiatrist in the Department of Corrections, though he does not specify when. (Hamm Dep. 16:8–9.) He believes he suffered from these psychological conditions for many years prior to his diagnosis and that they caused him to begin using narcotics in the first place. (*Id.* 16:10–14.)

In or about June 2002, Plaintiff was transferred to another detention facility,[4] but remained there for less than two months due to an incident involving an assault.[5] (*Id.* 14:11, 21–25 .) After this incident, in or about August

2002, he was transferred to segregated housing in the Central Punitive Segregation Unit of the Otis Bantum Correctional Center ("OBCC") on Rikers Island. (Conway Decl., Ex. A at 1, 2; Hamm Dep. 14:22–15:2). On August 14, 2002, a mental health clinician, Michele Garden, Ph.D. ("Garden") evaluated Plaintiff, and reported that he presented antisocial behavior, mood changes, persistent anger, and withdrawal symptoms. (Conway Decl., Ex. A at 1.) Garden diagnosed Plaintiff with early onset dysthymic disorder, dependent personality disorder, and polysubstance dependence, and directed that Plaintiff was to undergo biweekly clinician visits. (*Id.* at 1, 2.) On August 14, 2002, Plaintiff was also seen by a psychiatrist, Roberto Caga–Anan, M.D. ("Caga–Anan") at OBCC, who noted that Plaintiff stated, "I am ok," and observed that he did not present a danger to himself or to others. (Conway Decl, Ex. B at 1.) Caga–Anan prescribed Plaintiff with forty milligrams daily of Paxil and fifty milligrams daily of Atarax. (*Id.*) Both prescriptions were to last for fourteen days. (*Id.,* Ex. C.)

[4] Plaintiff refers to this detention facility as the "Beacon facility." (Hamm Dep. 14:1–4.)

[5] The details of this assault are unclear in Plaintiff's deposition testimony, but it appears to have involved corrections officers. (Hamm Dep. 14:11, 24–25.)

**\*2** On August 22, 2012, Garden and Caga–Anan again observed and evaluated Plaintiff. (Conway Decl., Ex. E.) They confirmed their prior observations, and diagnosed him with opioid dependence and adjustment disorder with depressed mood. (*Id.* at 1.) They again directed that he was to undergo biweekly clinician and psychiatrist visits. (*Id.* at 2.) On August 28, 2002, Caga–Anan renewed Plaintiff's Paxil prescription and issued him an additional prescription for fifty milligrams of Trazodone daily. (*Id.,* Ex. C.) Caga–Anan discontinued Plaintiff's Atarax prescription. (*Id.*) Again, both prescriptions were to last Plaintiff for fourteen days-until September 11, 2002.[6] (*Id.*)

[6] Plaintiff states that he was medicated for the entire duration of his detention in segregated housing at OBCC. (Hamm Dep. 15:13–17.)

## B. Facts in Dispute
In early September 2002, Plaintiff was transferred from segregated housing at OBCC to the George Motchan Detention Center ("GMDC") on Rikers Island. (Hamm Dep. at 15:18–21.) It is at this point where Plaintiff's and Defendants' versions of facts diverge.

## 1. Defendant's Version of Facts
Defendants assert that on September 12, 2002–the day after Plaintiff's prescriptions were due to expire—Vivia Francois, M.D. completed a Consultation Request form on Plaintiff's behalf and referred him to the Mental Health Department at GMDC. (Conway Decl., Ex. G.) There is no evidence in the record, however, that his prescriptions were renewed at that time. On September 13, 2002, Plaintiff was admitted to the Mental Health Department and screened by S. Hernandez ("Hernandez"), a clinical social worker. (*Id.*) Hernandez completed a mental health intake form for Plaintiff, and noted that he had a history of mental illness and that he was taking medication for depression. (*Id.,* Ex. I.) There is no evidence in the record that Plaintiff's prescriptions were renewed at that time, either.

On September 16, 2002, a clinical supervisor reported that Plaintiff's case had been assigned to Hernandez and that a psychological assessment had been scheduled to determine whether Plaintiff was "on the proper medication with the proper dosage." (*Id.,* Ex. J.) On the same day, Hatcher[7] first evaluated Plaintiff in the Mental Health Clinic at GMDC. (Conway Decl., Ex. K.) Hatcher reported that Plaintiff stated he had not received Paxil for *five* days, that he felt mildly to moderately depressed at times due to his "legal problems and not recently getting his scheduled medications," and that Plaintiff stated, "I know I need the medication because as soon as I stop it I start feeling anxious, irritable and depressed." (*Id.*) However, Hatcher also noted that Plaintiff stated "I'm doing alright," that he denied experiencing any hallucinations or side effects of his medications, that he denied any suicidal or homicidal ideations, that his mood was calm and stable, that he was eating and sleeping well, and that he did not present any paranoia. (*Id.*) Hatcher diagnosed Plaintiff with Dysthymic Disorder, and stated that he would "re-start [Plaintiff's] regimen at 'start doses.' " (*Id.*)

[7] Hatcher's position is unclear from the record. According to a Progress Note and a Medication Order Sheet he completed upon treating Plaintiff, it appears Hatcher may be a Nurse Practitioner, as indicated by his signature "Richard Fletcher NP." (Conway Decl., Exs. K, L.) However, during Hamm's deposition, Defendants' attorney repeatedly referred to Hatcher as "Dr. Fletcher." (*E.g .* Hamm Dep. 17:16.)

discusses these inconsistencies below. *See infra* n. 13.

**\*3** Hatcher prescribed Plaintiff twenty milligrams daily of Paxil for depression and fifty milligrams daily of Trazodone for sleep. (*Id* .) Hatcher issued prescriptions for one immediate dose of both of medications on September 16, 2002, (*id.,* Ex. L), and an additional prescription for both medications to being immediately thereafter and to last for fourteen days. (*Id.*) Thus, according to the prison medical records submitted by Defendants, Plaintiff was without his prescribed medications from September 11, 2002 through September 15, 2002–a total of five days.

On September 19, 2002, Hernandez evaluated Plaintiff again. (*Id.,* Ex. N.) A Clinical Assessment and Comprehensive Treatment Plan noting Plaintiff's symptoms, diagnosis, and treatment plan was completed and signed by Hernandez, Gerard Derisse, a psychiatrist, and Gilberto Matta, C.S.W., a clinical supervisor. (*Id.*) Plaintiff was thereafter periodically treated for his psychiatric conditions; the last record of his treatment submitted to the Court is dated January 1, 2003. (Third, Fourth, and Fifth Unnumbered Exhibits to TAC.)

## 2. Plaintiff's Version of Facts[8]

[8]   As set forth more fully below, the Court finds that all such disputed facts are not material, and even construing the facts in a light most favorable to Plaintiff, he cannot defeat Defendants' motion.

Plaintiff stated in his deposition testimony that when he was transferred from segregated housing at OBCC to GMDC in September 2002 and was first seen by Hatcher, Hatcher told him that GMDC maintained a policy that newly transferred inmates were required to wait ten days before receiving any medical prescriptions. (*Id.* 17:21–25, 22:2–7.) Hatcher then took Plaintiff off of Paxil and Trazodone for ten days despite Plaintiff's statements to Hatcher that he needed the medication.[9] (*Id.* 17:16–18, 22:2–13.)

[9]   Plaintiff's evidence regarding the time during which he went without his medication is inconsistent. In his memorandum of law in opposition to the instant motion, he states that he "hadn't had [his] medication in 5 days" when he was first transferred to GMDC and met with Hatcher. (Pl.'s Mem. second unnumbered page.) He further states that Hatcher "took it upon himself to lower [his] dosage" after learning of the five-day delay in receiving treatment. (*Id.*) The Court

Plaintiff further stated in his deposition testimony that once he stopped taking his medication, he began to experience the "side effects of withdrawal." (Hamm Dep. 23:2–4.) These symptoms included exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (*Id.* 23:5–16.) He avers that he made frequent attempts to alert the mental health staff to the side effects he experienced while not taking his medication[10]-including filing a grievance at GMDC, (*id.* 41:23–42:8, 42:22–43:4; TAC at 4)-but that he remained without his medication for the duration of his first ten days there. (Hamm Dep. 23:17–24:2, 24:10–11.) When the ten days expired, Plaintiff testified that Hatcher prescribed him half of his regular dosage of Paxil and his full dosage of Trazodone. (*Id.* 18:1–3, 28:1–8.) Hatcher later prescribed Risperidone to Plaintiff for impulse control. (*Id.* 29:4–8.)

[10]   Plaintiff's testimony is also inconsistent in this regard. For example, he also stated in his deposition testimony that he did *not* ask to speak to anyone on the mental health staff in his first ten days at GMDC when he was not medicated. (Hamm Dep. 25:25–26:3, 26:22–25, 27:17–19.)

Plaintiff testified in his deposition that he did not tell Hatcher the full extent of the symptoms he was experiencing as a result of going off of his medications. (*Id.* 19:10–14, 21:13–22, 24:8–19.) He believed that because he had recently come out of segregated housing as a result of his involvement in an assault, if he were to explain the nature and degree of his symptoms, he would be placed on suicide watch, be forcibly sedated, or be placed in segregated housing. (*Id.* 21:21–22:1, 24:8–19.)

## 3. The Criminal Prosecution of Plaintiff

**\*4** Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was sentenced to three to six years imprisonment. (First Unnumbered Exhibit to Second Amended Complaint ("SAC")at 12.) Plaintiff later attempted to withdraw his guilty plea, arguing that he was impaired by his state of withdrawal from medication. (SAC ¶ 6.) On February 6, 2003, Judge Ronald A. Zweibel of the Supreme Court of the State of New York, New York County denied Plaintiff's motion to withdraw his plea, and the Supreme Court, Appellate Division, First Department affirmed the

denial of Plaintiff's motion on April 5, 2005. (First Unnumbered Exhibit to SAC at 12–13). In its Decision and Order, the Appellate Division stated that the record established that Hamm's plea "was knowing, intelligent, and voluntary, and [the record failed] to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (*Id.*) The Appellate Division also noted that the Plaintiff had "freely admitted his guilt, demonstrated his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and that the trial court had "relied on its own recollection of [Hamm's] lucidity at the time of the plea" in rejecting his motion to withdraw his plea. (*Id.*) On June 18, 2005, The Court of Appeals of the State of New York denied Plaintiff's application for leave to appeal. (Second Unnumbered Exhibit to SAC at first unnumbered page.)

## II. Procedural History

Plaintiff filed suit on May 17, 2004 in the Northern District of New York, from where this action was transferred to the Southern District of New York on January 14, 2005. (Doc. 1.) Then–Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend, (*id.*), and Plaintiff filed an Amended Complaint on March 28, 2005. (Doc. 2.) The case was subsequently reassigned to the Honorable Colleen McMahon. (Doc. 3.) Plaintiff filed a Second Amended Complaint on July 31, 2006. (Doc. 9.) The case was again reassigned to the Honorable Kenneth M. Karas on August 6, 2007. (Doc. 18.) Plaintiff, who by that time had completed his prison term, moved for default judgment as to Hatcher on December 6, 2007. (Doc. 24.) On September 5, 2008, Defendants filed a motion to dismiss the Second Amended Complaint, (Doc. 22), and on September 8, 2008, Judge Karas denied Plaintiff's motion for default judgment. (Doc. 27.) On May 5, 2009, Judge Karas issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss, and granting Plaintiff leave to amend the complaint.[11] (Doc. 31.) On August 7, 2009, Plaintiff filed a Third Amended Complaint. (Doc. 33.) On January 23, 2012, this matter was reassigned to the undersigned, and on June 21, 2012, Defendants filed the instant motion. (Docs.61, 63 .)

---

[11]    In his opinion, Judge Karas dismissed Plaintiff's Fourteenth Amendment claim against Hatcher to the extent that it was based on allegations that Plaintiff received a lower dose of Paxil than he requested. (Doc. 31 at 21.) Accordingly, this Court only addresses herein the portion of Plaintiff's Fourteenth Amendment claim that has survived the motion to dismiss, i.e., that

Defendants violated his constitutional rights by depriving him of antidepressant medication for some period of time.

## III. Applicable Legal Standards

### A. Summary Judgment

**\*5** Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009) (citing *Celotex Corp.,* 477 U.S. at 322–23). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp.,* 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion

for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts. *Senno,* 812 F.Supp.2d at 467. The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "[T]he non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor ." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986)).

**B. Local Rule 56.1 and *Pro Se* Litigants**

**\*6** Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to *Fed.R.Civ.P. 56,* must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. Local Rule 56.1(b), (d); *see also Fed.R.Civ.P. 56(c)* (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of *Federal Rule of Civil Procedure 56* and Local Rule 56.1. Local R. 56.2. Once served with a statement pursuant to Local Rule 56.2, "[p]ro se litigants are then not excused from meeting the requirements of Local Rule 56. 1." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009) (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir.2004)). Each factual statement set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local R. 56.1(c); *see also T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied,* 130 S.Ct. 3277 (2010).

In the instant case, the Defendants have complied with their obligations by submitting a Local Rule 56.1 Statement and providing Plaintiff with notice, pursuant to Local Rule 56.2, of his obligations. (Docs.63, 66.) Plaintiff has failed to submit an appropriate response. Instead, he filed an unsworn, handwritten memorandum of law in opposition to the instant motion with several exhibits attached. (Doc. 60.) However, as the Second Circuit has made clear, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (quoting *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)), and "where a *pro se* plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F.Supp.2d at 178 (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)). Moreover, courts are to read a *pro se* litigant's submissions "liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

**\*7** Therefore, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in Plaintiff's opposition papers and the documents attached thereto, and to determine if there are any other material issues of fact based on the evidence in the record. *Geldzahler v. N.Y. Med. Coll .,* 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y.2010). The Court has considered the present motion in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled, *Burke v. Royal Ins. Co.,* 39 F.Supp.2d 251, 257 (E.D.N.Y.1999), as well as the unsworn statements in his opposition papers-but only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record—on the assumption that if his allegations were sufficient to raise an issue of fact, Plaintiff would be given an opportunity to submit an affidavit properly attesting to those allegations. *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 603 n. 1 (S.D.N.Y.2004). However, even in light of Plaintiff's *pro se* status, the Court cannot rely on any assertions for which he has failed to offer proper support. *Goenaga,* 51 F.3d at 18.

**IV. Discussion**

## A. Plaintiff's Claim Against Hatcher

### 1. Cruel and Unusual Punishment

The Eighth Amendment to the U.S. Constitution guarantees convicted prisoners the right to be free from cruel and unusual punishment. *U.S. Const. amend. VIII.* A prisoner's Eighth Amendment rights are violated when he is denied adequate medical care due to a prison official's deliberate indifference to a substantial risk of serious harm. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)). Because the Eighth Amendment only applies where there has been a "formal adjudication of guilt," a pretrial detainee—such as Plaintiff, whose cause of action arose before he was convicted—enjoys a right to adequate medical care pursuant to the Due Process Clause rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983). Nevertheless, the analysis is the same under the Due Process Clause and the Eighth Amendment in this Circuit, because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856; *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"). Thus, an "official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant,* 101 F.3d at 856.

The standard for a cruel and unusual punishment claim under both the Eighth Amendment and the Due Process Clause includes an objective and a subjective component. *E.g., Mitchell v. Prison Health Services, Inc.,* 07 Civ. 8267(PKC), 2008 WL 5069075, at *3 (S.D.N.Y. Nov. 20, 2008). First, the objective component requires the alleged deprivation of medical care to be sufficiently serious. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A deprivation of medical care is sufficiently serious if two prongs are satisfied: (1) the prisoner was actually deprived of adequate medical care; and (2) the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). An actual deprivation of adequate medical care occurs only if a prison official denies an inmate reasonable medical care, *Id.* (citing *Farmer,* 511 U.S. at 844–47), and it is sufficiently serious if "a condition of urgency ... that may produce death, degeneration, or extreme pain" is present. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks and citations omitted). Relevant factors to this inquiry include "the existence of an injury

that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks, brackets, and citation omitted).

**\*8** Second, the subjective component requires the defendant to "act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298). An official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This is the "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002)).

In the instant case, Plaintiff is unable to satisfy both the subjective and objective components.

### 2. Plaintiff Did Not Sustain a Sufficiently Serious Deprivation of Medical Care.

When a prisoner alleges a complete denial of adequate medical care, courts must evaluate the seriousness of the prisoner's underlying medical condition. *Bellotto v. Cnty. of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (citing *Smith,* 316 F.3d at 184–86 .) Alternatively, when—as in the instant case—a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, the seriousness inquiry is "narrower," *Salahuddin,* 467 F.3d at 280, and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's underlying medical condition. *Id.* (citing *Smith,* 316 F.3d at 185; *see also Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) (explaining that the seriousness of a delay in medical treatment may be decided "by reference to the *effect* of delay in treatment .... [considering] the seriousness of the medical need [and] deciding whether the delay worsened the medical condition") (emphasis in original)). In the latter scenario, the court must examine all relevant facts and circumstances when determining whether a delay in treatment is sufficiently serious. *DiChiara v. Wright,* 06 Civ. 6123(KAM)(LB), 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011) (quoting *Smith,* 316 F.3d at 187). Accordingly, because Plaintiff's claim against Hatcher is based on a short-term interruption in the

treatment that is otherwise unchallenged,[12] the court must focus on the risk of harm from the challenged delay in analyzing whether the alleged deprivation was sufficiently serious.

[12] To the extent that Plaintiff has argued that Hatcher prescribed him a dosage of Paxil that was too low—and thus inadequate—after the ten-day delay, such a claim has already been addressed and dismissed by Judge Karas. *See supra* n. 11.

"Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco,* 222 F.3d at 106 (internal quotation marks and citation omitted). It is also true that "[f]requently missed doses [of medication] could readily result in adverse medical events." *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009). Such a delay or interruption in treatment, however, only gives rise to a violation of a prisoner's constitutional rights if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002). Although adverse medical effects are not required to prove a constitutional violation, "the absence of ... physical injury will often be probative," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187, 188.

**\*9** Plaintiff contends that he was deprived of adequate medical care because his access to his medication was interrupted for ten days after being transferred from OBCC to GMDC. (TAC at 3; Hamm Dep. 18:20–25.) He further avers that the delay was the result of a policy at GMDC that prevented all newly transferred inmates from taking any medication for their first ten days of detention there.[13] (TAC at 3; Hamm Dep. 17:21–25, 21:13–15, 22:2–7.) Plaintiff relies exclusively on the alleged statement made by Hatcher to establish the existence of the ten-day policy. However, he cannot demonstrate that such a purported policy, as applied to him, caused a sufficiently serious deprivation of adequate medical care.

[13] As noted above, *see supra* n. 9, Plaintiff's evidence of GMDC's adherence to this policy is inconsistent. First, in his Third Amended Complaint, dated August 7, 2009, and again in his deposition testimony, dated December 30, 2009, Plaintiff stated that due to a

GMDC policy, he was unable to receive his medications for the first ten days after being transferred there. In his opposition papers, dated October 17, 2011, however, Plaintiff states that after not receiving his medication for *five* days upon his transfer to GMDC-with no mention of a prison policy-Hatcher lowered his Paxil dosage. While the Court is well aware that on summary judgment, it may not resolve issues of credibility, it is also well settled that "a party cannot attempt to defeat a summary judgment motion by contradicting factual allegations in his complaint" or in prior sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester,* 783 F.Supp.2d 381, 407 (W.D.N.Y.2010) *aff'd,* 660 F.3d 98 (2d Cir.2011) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528–529 (2d Cir.1985).

The Court is not required to accept Plaintiff's assertion that he was deprived of the medication for ten days, as opposed to five, given that his statements are both equivocal, *see id.,* and unsupported by admissible evidence, *see Wali,* 678 F.Supp.2d at 178 (citing *Holtz,* 258 F.3d at 73.), and in light of the uncontroverted documentary evidence submitted by Defendants. *See Celotex Corp.,* 477 U.S. at 322. However, because the allegations fail even if the Court accepts Plaintiff's assertion that the delay lasted ten days, the Court will analyze the claim based on that version of the facts.

As a result of the delay in access to his medication, Plaintiff avers that he began to experience the "side effects of withdrawal," including exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (Hamm Dep. 23:1–4, 6–16.) Even assuming that Plaintiff's averments were substantiated by admissible evidence, the psychological consequences he alleges to have suffered are insufficient to show that he was subjected to a significant risk of serious harm.[14] Courts have repeatedly refused to find constitutional violations where the harm alleged as a result of a delay in medical care is similar to that alleged here. *Bellotto,* 248 F. App'x at 237 (plaintiff who alleged missed medication dosages and inadequate monitoring of medications did not sustain a constitutional violation "because the risk of harm [he] faced as a result of the alleged treatment was not substantial," and because the only medical consequence he alleged was an "anxiety attack," which resulted in no physical injuries or acute distress); *Barnard v. Beckstrom,* No. 07–CV–19, 2008 WL 4280007, at *16 (E.D .Ky. Sept. 17, 2008) (doctor's affidavit found no merit in plaintiff's claim that a ten-day delay in making alterations to psychiatric medication rose to the level of a serious medical need as he did not "suffer from any physical injury as the result of any alleged or actual delay in treatment"); *Caldwell v. McEwing,* No. 00–CV–1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept. 28, 2006) (granting summary judgment to defendants

where plaintiff saw a doctor for psychiatric assessments, refused to take psychiatric medication, and no physical harm resulted); *cf. Bilal v. White,* 10–4594–PR, 2012 WL 3734376, at *2 (2d Cir. Aug. 30, 2012) (plaintiff who suffered from epilepsy and arthritis—"arguably ... serious underlying conditions"-but failed to demonstrate that his condition worsened due to the delay, was unable to establish a sufficiently serious medical need); *Smith,* 316 F.3d at 181–82 (two separate delays of several days each in provision of medication to inmate with HIV-positive status—an indisputably serious medical condition—did not cause sufficiently serious injury where plaintiff suffered temporary itching, severe headaches, as well as stress due to the missed medication, but his HIV infection and overall health did not worsen).

[14]    Although the Court would have greatly benefitted from an affidavit from Hatcher or other medical professionals employed by the City's Department of Corrections—and is perplexed why Defendants failed to submit one—"summary judgment may not properly be based on an absence of a statement from an expert that the care given was [or was not] grossly negligent when inferences drawn from the record could support such a finding." *Pellum v. Burtt,* 9:05–3339–JFA–GCK, 2008 WL 759084, at *33 (D.S.C. Mar. 20, 2008) (citing *Miltier v. Beorn,* 896 F.2d 848, 852 (4th Cir.1990)).

*10 The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment. *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (dentist's one-year delay in treating a cavity—a condition tending to cause acute pain if left untreated—precluded summary judgment in defendant's favor because of the severity of the risk of harm involved); *Demata v. N .Y. State Corr. Dept. of Health Servs.,* No. 99–0066, 198 F.3d 233 (Table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (a delay in providing necessary medical care may rise to the level of a constitutional violation, but the Second Circuit has reserved such a classification for cases involving deliberate delay of treatment as a form of punishment, disregard for a life-threatening and fast-degenerating condition, and extended delay of a major surgery) (collecting cases); *Hathaway,* 37 F.3d at 67 (plaintiff found to have serious medical need where he suffered from a degenerative hip condition that caused him to have difficulty walking and significant pain over an extended period of time, and corrective surgery was delayed over two years); *Silvera v. Conn. Dept. of Corr.,* 726 F.Supp.2d 183, 191–92 (D.Conn.2010) (plaintiff who suffered from severe mental health issues and an

acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need). The absence of any physical injury to Plaintiff as a result of the ten-day delay underscores the Court's finding. *Smith,* 316 F.3d at 187.

There is no indication in the record that Hatcher's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v. Genovese,* 694 F.Supp.2d 137, 159 (N.D.N.Y.2010) *aff'd,* 415 F. App'x 313 (2d Cir.2011). Accordingly, Defendants' motion for summary judgment may be granted on this basis alone.

### 3. Hatcher Did Not Act With Deliberate Indifference.

However, even assuming *arguendo* that Plaintiff had been subjected to a "sufficiently serious" deprivation of medical care, his claim for cruel and usual punishment against Hatcher would still fail because he cannot prove that Hatcher acted with deliberate indifference. As discussed above, *see supra* Part IV.A.1, a prison official cannot be found to have acted with deliberate indifference unless a plaintiff can demonstrate that the official "knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result," but he must be subjectively aware that his conduct creates a substantial risk of harm. *Salahuddin,* 467 F.3d at 280. Mere negligence, however, even if it gives rise to a medical malpractice claim, is insufficient to sustain a constitutional claim. *Salahuddin,* 467 F.3d at 280; *Hathaway,* 37 F.3d at 68. Thus, in order to establish liability, Plaintiff must demonstrate the Hatcher knew of and disregarded an excessive risk to his safety in delaying Plaintiff's access to his medication for ten days.

*11 While Plaintiff alleges that he was "severely depressed" when Hatcher first evaluated him, (First Unnumbered Exhibit to TAC, second unnumbered page), by his own testimony he never communicated that to Hatcher. (Hamm Dep. 19:10–15.) Indeed, Plaintiff admits that he *purposely* withheld the full extent of his symptoms from Hatcher in order to avoid being placed in segregated housing, on suicide watch, or being sedated. (Hamm Dep. 21:18–22:1, 24:8–21.) Rather, Plaintiff told Hatcher that he was "doing alright," that he was eating and sleeping well, and that he felt only "mild[ly] to moderately depressed due to his legal problems and not recently getting his scheduled medications." (Conway Decl., Ex K.) Hatcher noted that Plaintiff's mood was "calm and stable" at that time. (*Id.*) Therefore, Plaintiff has set forth

no facts tending to prove that Hatcher knew of any risk to Plaintiff's health resulting from the short-term delay in his treatment, much less that he disregarded any such risk. Accordingly, any potential risk to Plaintiff's health as a result of the delay in receiving antidepressant medication would not be actionable, because Plaintiff did not properly advise Hatcher of his actual psychological condition.

As there is no evidence in the record before the Court that Hatcher acted with deliberate indifference by failing to prescribe Plaintiff his medications for the first ten days of his detention at GMDC, Plaintiff's claim against Hatcher would fail the subjective test, as well.

**B. Plaintiff's Claim Against the City ("*Monell* Claim")**
The Court need not reach the merits of Plaintiff's *Monell* claim. As the Second Circuit has stated, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) (emphasis in original). When a district court concludes that there is "no underlying constitutional violation," it

need not address "the municipal defendants' liability under *Monell*." *Id.* Therefore, the Court GRANTS Defendants summary judgment on Plaintiff's *Monell* claim against the City.

**V. Conclusion**
For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge V. United States,* 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to teminate this motion (Doc. 63), enter judgment in favor of Defendants, and close this case.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 71770

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2401574
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nicholas ROBLES, Plaintiff,
v.
Warden S. KHAHAIFA, et al., Defendants.

No. 09CV718.
|
June 25, 2012.

**Attorneys and Law Firms**

Nicholas Robles, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**Order**

HUGH B. SCOTT, United States Magistrate Judge.

**\*1** Before the Court is defendants' motion for summary judgment dismissing this action (Docket No. 37[1]). Responses to this motion were due by April 3, 2012, and any reply was due by April 16, 2012 (Docket No. 47). After denying (Docket No. 53) plaintiff's motions (Docket No. 47) for appointment of counsel and to stay the defense summary judgment motion (Docket No. 50), responses were due by May 14, 2012, and replies by May 25, 2012 (id.). The parties consented to proceed before the undersigned as Magistrate Judge on August 15, 2011 (Docket No. 30).

---

[1]    In support of this motion, defendants submitted their Memorandum of Law, Docket No. 38; their Statement of Facts, Docket No. 39; the declarations of defendants sergeant Darin Austin, Docket No. 40; inmate grievance resolution program supervisor Brian Fitts, Docket No. 41; retired Superintendent Sibatu Khuhaifa, Docket No. 42; Dr. Dwight Lewis, Docket No. 43; corrections officer Todd Wilson, Docket No. 44; and a declaration of their counsel, with exhibit (videotape of May 7, 2009), Docket No. 45; the declaration of Dr. Winston Douglas with exhibits, plaintiff's medical record, filed under seal, Docket No. 48; their attorney's reply Declaration, Docket No. 58.

In opposition, plaintiff submits his motion to stay summary judgment and for appointment of counsel and its supporting papers, Docket Nos. 50, 51, 52; his letter to Chambers, dated Apr. 11, 2012, Docket No. 54; and his "Affidavit of Truth Amendment in Opposition to Respondents Summary Judgment," with enclosed Affidavit of Junior Lorenzo Cepeda and exhibit of a grievance, Docket No. 55; his amendment renewed motion for stay of defense motion, Docket No. 57.

Plaintiff filed a renewed motion to stay the defense motion (Docket No. 57); that motion is **denied.**

**BACKGROUND**

Plaintiff, proceeding *pro se,* commenced this action alleging that defendants were deliberately indifferent to his medical condition while he was incarcerated at the Orleans Correctional Facility ("Orleans") in 2009 (Docket No. 14, Am. Compl.; Docket No. 39, Defs. Statement ¶¶ 1, 3). The Amended Complaint alleges claims against Superintendent S. Khuhaifa, Dr. Winston Douglas and Dr. Dwight Lewis, inmate grievance supervisor Fitts, Sergeant Austin, and corrections officer Wilson (Docket No. 14, Am. Compl.). He claims that Drs. Douglas and Lewis exhibited deliberate indifference to plaintiff's right shoulder from February 2009 to June 2010 by failing to treat his shoulder and depriving plaintiff of pain medication. He alleges that the original injury arose from a prison assault while he was at Fishkill Correctional Facility, but he alleges here only claims arising in this District surrounding the treatment he received (or did not receive) while at Orleans (id. ¶¶ 16–17). Since plaintiff did not receive what he believed to be adequate pain medication, he substituted illegal marijuana to self-medicate his pain and was disciplined for marijuana possession (id. ¶ 20). Plaintiff moved for leave to proceed *in forma pauperis* (Docket Nos. 2, 5) and leave was granted (Docket No. 7).

*Defense Motion for Summary Judgment*
According to defendants' Statement of Undisputed Facts (Docket No. 39), plaintiff alleges that defendants were deliberately indifferent to the condition of his right shoulder, alleging that Superintendent Khahaifa instituted a policy which forbade prescribing narcotics to inmates (Docket No. 39, Defs. Statement ¶ 3; *see also* Docket No.

14, Am. Compl. ¶ 21). Superintendent Khahaifa states that, because medical decisions are delegated to medical personnel, he disclaims any influence over that decision making and denies that a no antinarcotic policy exists at Orleans (Docket No. 39, Defs. Statement ¶ 4; Docket No. 42, Khahaifa Decl. ¶ 6). Narcotic pain medication is prescribed on a case-by-case basis as needed by an inmate patient (Docket No. 39, Defs. Statement ¶ 5). Khahaifa received five letters and numerous grievances from plaintiff regarding his medical treatment which he forwarded to appropriate office or, with the grievances, he considered the appeal and affirmed denial of relief, with these appealed grievances then appealed to Department of Corrections and Community Supervision ("DOCCS") Albany central office (id. ¶ 9; Docket No. 42, Khahaifa Decl. 12).

**\*2** Defendant Fitts was employed as an inmate grievance resolution program supervisor at Orleans (Docket No. 39, Defs. Statement ¶ 11; Docket No. 41, Fitts Decl. ¶ 1). Plaintiff claims that Fitts circumvented the grievance process (Docket No. 39, Defs. Statement ¶ 12), but Fitts claims that all grievances were filed and processed pursuant to DOCCS directives (id. ¶ 13).

Defendant Austin was a sergeant at Orleans during this time and plaintiff alleges that he mislead and misinformed unnamed DOCCS officials in Albany by incorrectly telling them that he saw plaintiff lift weights (id. ¶¶ 17–18). Austin denies contacting Albany about plaintiff and he disclaims ever seeing plaintiff exercise (id. ¶¶ 22, 23).

Defendant Wilson is a corrections officer at Orleans (id. ¶ 25) and plaintiff claims that Wilson interfered with plaintiff's medical care by collaborating with nursing staff and Sergeant Austin in misinforming Albany officials about plaintiff's ability to lift weights (id. ¶ 26). When Wilson was questioned by medical staff about plaintiff, Wilson told them that he saw plaintiff lift weights daily (id. ¶¶ 27–28). A member of medical staff then went to the gym but missed plaintiff because he finished there (id. ¶ 29). Wilson never contacted Albany about plaintiff; had such contact been made, it would have been memorialized in a memorandum (id. ¶ 31).

Plaintiff alleges that Dr. Douglas, Facility Health Services Director at Orleans, refused to prescribe narcotics to plaintiff and instead chose to treat plaintiff's shoulder differently (id. ¶ 35). Dr. Douglas was plaintiff's primary physician at Orleans (see Docket No. 43, Dr. Lewis Decl. ¶ 4). Dr. Douglas explains that plaintiff made repeated demands for Percocet and other narcotics that were not medically necessary and plaintiff was not compliant with

medical instructions (Docket No. 39, Defs Statement ¶ 39; see id. ¶¶ 36–38, 40–41; Docket No. 48, Dr. Douglas Decl. ¶¶ 17, 18, 15, 20). Knowing plaintiff's history of drug abuse and his medical condition, Dr. Douglas changed plaintiff's medication (Docket No. 39, Defs. Statement ¶ 40; Docket No. 48, Dr. Douglas Decl. ¶ 20). Plaintiff was prescribed a sling and physical therapy as treatment for his shoulder (Docket No. 39, Defs. Statement ¶ 43), but plaintiff did not regularly wear the sling or attend physical therapy sessions, seeking instead imaging of the shoulder (id. ¶¶ 44, 42). Plaintiff also lifted weights (id. ¶ 45; Docket No. 48, Dr. Douglas Decl. ¶¶ 12–13), despite being told by medical staff to refrain from lifting weights (Docket No. 48, Dr. Douglas Decl. ¶ 12). On plaintiff's almost daily sick calls, medical staff noted plaintiff's "bulky well defined deltoids and bicep muscles, which are signs indicative of continued exercise" (id.). Defendants point to plaintiff's failed November 2008 surgery by outside surgeon Dr. Stegamann at Erie County Medical Center as the cause for plaintiff's rotator cuff damage (Docket No. 39, Defs. Statement ¶ 46; Docket No. 48, Dr. Douglas Decl. ¶ 24, Ex. A, at Bates No. 311).

**\*3** Plaintiff charges that Dr. Lewis, a facility physician at Orleans, was deliberately indifferent (Docket No. 39, Defs. Statement ¶¶ 49–50). Dr. Lewis asserts that plaintiff was given proper medical care for his shoulder while at Orleans, he was prescribed pain and antiinflammatory medicines, physical therapy, and a sling (id. ¶ 51; Docket No. 43, Dr. Lewis Decl. ¶ 3), as well as monitoring images of his shoulder and examinations by outside consulting physicians (Docket No. 39, Defs. Statement ¶ 52; Docket No. 43, Dr. Lewis Decl. ¶ 3).

Defendants argue that both the subjective and objective elements of a deliberate indifference claim are not met here. Subjectively, they argue that plaintiff has not proven a culpable state of mind for any of the defendants (Docket No. 38, Defs. Memo. at 8–13). Objectively, defendants contend that plaintiff was scheduled for shoulder surgery in 2007 but was released and that surgery was never performed. Plaintiff was again incarcerated in 2008 and had two surgeries on his shoulder (Docket No. 48, Dr. Douglas Decl. ¶ 6). In 2009, plaintiff was deemed not to be a candidate for surgery, and was prescribed anti-inflammatory medication instead. Plaintiff, however, was not compliant with medical advice. Plaintiff worked out extensively, with one routine on May 7, 2009, videotaped showing plaintiff lifting weights, punching a heavy bag, and playing basketball, despite medical instruction to avoid such strenuous activity (Docket No. 45, Defs. Atty. Decl. ¶¶ 5–10, Ex. A (videotape)[5]). Defendants conclude that plaintiff's complaints did not rise to the level of serious medical need to meet the

objective prong of the deliberate indifference claim (Docket No. 38, Defs. Memo. at 5–7).

2    Plaintiff reviewed the videotape, Docket No. 45, Defs. Atty. Decl., Ex. A, cover letter Feb. 13, 2012 (with written notation "tape reviewed: 2–16–12" and signed by plaintiff).

Defendants each deny conspiring against plaintiff (Docket No. 39, Defs. Statement ¶¶ 10, 16, 24, 33, 48, 54; Docket No. 38, Defs. Memo. at 19–21) and deny any deliberate indifference on their part to plaintiff's condition (see Docket No. 39, Defs. Statement ¶ 54). They also argue that plaintiff fails to establish the personal involvement of Superintendent Khahaifa, Austin, Fitts, or Wilson in plaintiff's medical care (Docket No. 38, Defs. Memo. at 13–19). Defendants alternately argue that they are entitled to qualified immunity if a constitutional violation is found here (id. at 21–23).

Plaintiff responds that he complains that he continues to suffer pain in that shoulder due to not being prescribed pain medication (Docket No. 54, Pl. letter response dated Apr. 11, 2012, at 1–2), although he has not amended his Complaint to allege continuous liability. He was prescribed Ibuprofen 800 mg., but plaintiff states that he could not tolerate this medicine in his stomach (id . at 1). Plaintiff previously argued that there is conflicting testimony (Docket No. 51, Pl. Memo. in support of motion for appointment of counsel and stay of defense motion ¶¶ 2, 5) but does not identify these conflicts. Plaintiff denies that he alleges any conspiracy among the defendants (Docket No. 52, Pl. Aff. in support of appointment motion ¶ 3).

*4 Plaintiff also complains about an assault that allegedly occurred on April 4, 2012, seeking to have this Court and prison grievance official review videotape of the incident (Docket No. 54, Pl. letter, at 1–2). That incident and others he raises in his papers (some discussed below), however, are beyond the scope of this pending action[3].

3    Plaintiff also sought production of his medical records from January 2012 to present, Docket No. 54, Pl. Letter at 3. Docket No. 48 is plaintiff's medical record during the relevant period for this action, from February 13, 2009, to June 1, 2010, see Docket No. 48, Dr. Douglas Decl. ¶ 4, Ex. A, at first page, cover letter of April 12, 2011; see generally id., Ex. A.

In his "Affidavit of Truth" (Docket No. 55), plaintiff describes the injury to his shoulder that lead to the surgeries and pain he suffers (Docket No. 55, Pl. Aff., FACTS ONE, TWO, FOUR, Ex. B; Docket No. 57, Pl. Amend. ¶¶ 7–8) and complains that physical therapy ended with his transfer to Fishkill Correctional Facility prior to his imprisonment at Orleans (Docket No. 55, Pl. Aff., FACT SIX). He faults Dr. Douglas for relying upon other medical personnel in plaintiff's medical record rather than his own assessment (id. FACT TEN), in fact plaintiff claims that Dr. Douglas used a purported assessment of plaintiff from Erie County Medical Center in January or February 2011 which claimed that plaintiff was in the Attica Correctional Facility but plaintiff was not confined at that time (id. FACT NINE). Plaintiff states that due to "the medical malpractice of Winston Douglas," plaintiff had undergone severe and excruciating pain (id. FACT ELEVEN). He claims that he was denied proper medical assistance at Orleans (id. FACT SEVEN) and that a Jane Doe, a nurse administrator at Orleans but not named as a defendant here, violated HIPAA[4] by having security personnel investigate plaintiff's medical claims (id. FACT EIGHT). Plaintiff then alleges that, on April 11, 2012, he was assaulted by prison guards during a cell search (id. FACT 14).

4    Health Insurance Portability and Accountability Act, Pub.L. No. 104–191, 110 Stat.1936 (1996). As recently held by this Court, any violation of medical privacy under HIPAA is limited to enforcement by the Secretary of Health and Human Services, Wright v. Szczur, No. 11 CV 140, 2012 U.S. Dist. LEXIS 10872, at *15,2012 WL 268283 (W.D .N.Y. Jan. 30, 2012) (Skretny, Ch. J.). Thus, even if plaintiff were deemed to allege such a claim, it would have to be denied.

He submits Junior Cepeda's "Affidavit of Truth" about medical staff disregarding plaintiff's complaints on March 28, 2012 (Docket No. 55, Cepeda Aff. of Truth). Cepeda states that he saw unnamed medical personnel "refuse to listen" to plaintiff on March 28 to his complaints, stating that plaintiff would always "complain about the same right shoulder all the time and everyday" (id. FACT 3). Cepeda states that he overhead medical staff talking about plaintiff's medical condition with security personnel at Orleans (id. FACT 4). Cepeda also witnessed plaintiff being assaulted by security personnel on April 11, 2012 (id. FACT 6).

Because plaintiff was refused pain medication, he claims that he took marijuana and then plead guilty in a disciplinary proceeding to marijuana use when caught (Docket No. 57, Pl. Amend. ¶ 9). He states that he declined what he termed an experimental surgical procedure by Dr. Stegamann in January of 2011 (id. [first] ¶ 10). Plaintiff alleges that since his reassignment to

Orleans, defendants has been denied appropriate pain medication (*id.* [second] ¶ 10; *see id.* ¶ 11). Plaintiff's condition worsened when he injured his right knee and was then denied pain medication (*id.* ¶ 12).

**\*5** In their reply, defendants note that plaintiff made "numerous irrelevant references (Docket No. 58, Defs. Atty. Reply Decl. ¶¶ 4, 6) and submitted an unsworn witness statement (*cf.* Docket No. 55, Cepeda Aff. of Truth) that he saw medical personnel walk from plaintiff on March 28, 2012 (Docket No. 58, Defs. Atty. Reply Decl. ¶ 5). Defendants argue that this statement is too vague and conclusory to create a material issue of fact, it does not identify any defendant as the medical personnel involved, and is outside the time period (2009–10) for this action (*id.*). They conclude that plaintiff has failed to raise a material issue of fact to preclude summary judgment (*id.* ¶ 7).

### DISCUSSION

#### I. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); Fed.R.Civ.P. 56(a), (c)(1) (effective Dec. 2010). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986) (emphasis in original removed); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002). The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed.R.Civ.P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a) (1), (2) (effective Jan. 1, 2011). The movant is to submit facts in which there is no genuine issue, *id.* R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, *id.* R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, *id.* Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, *id.* R. 56(a)(3).

**\*6** The pleading of a *pro se* plaintiff, however, is to be liberally construed, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam).

> "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* [550 U.S. 544, 555], 127 S.Ct. 1955, 1964, (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra,* at [555], 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, (citing

*A., 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))."

*Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam). In *Erickson,* the Court held that the Tenth Circuit departed from the liberal pleading standards of Rule 8(a)(2) by dismissing a *pro se* inmate's claims.

> "The Court of Appeals' departure from the liberal pleading standards set forth by Rule 8(a)(2) is even more pronounced in this particular case because petitioner has been proceeding, from the litigation's outset, without counsel. A document filed *pro se* is 'to be liberally construed,' [*Estelle v. Gamble,* 429 U.S., 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ], and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,' *ibid.* (internal quotation marks omitted). *Cf.* Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

551 U.S. at 94; *see Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Thus, the *pro se* plaintiff's complaint has to be construed "more liberally" than one filed by counsel, *Boykin, supra,* 521 F.3d at 214.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made with personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed.R.Civ.P. 56(c)(4) (2010) (formerly Rule 56(e)).

## II. Deliberate Indifference Standard

Under the Eighth Amendment, in order to state a claim for inadequate medical treatment, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious medical need," *LaGrange v. Ryan,* 142 F.Supp.2d 287, 293 (N.D.N.Y.2001); *see Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct.

1108, 130 L.Ed.2d 1074 (1995). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway, supra,* 37 F.3d at 66 (quoting *Estelle, supra,* 429 U.S. at 104). Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, *see Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind. *Hathaway, supra,* 37 F.3d at 66. "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (quoted in *Hathaway, supra,* 37 F.3d at 66). Plaintiff needs to prove that defendants wantonly intended to cause him to suffer. *Wilson v. Seiter, supra,* 501 U.S. at 302.

## III. Application

### A. Procedural Grounds

*7 Here, plaintiff did not submit his counterstatement of facts providing a point-by-point refutation or adoption of the defense statement of facts. Instead, plaintiff provides in moving papers an attempt to stay the hearing of this motion and in other documents alleging generally that there were contested issues of fact (Docket Nos. 51, 52) or stating specific facts (contested or not) that he is now asserting in response to the motion (Docket Nos. 55, 57). He lists various facts in the latter instances without clearly indicating which fact is material to this motion. Despite his *pro se* status, the fact plaintiff did not state what facts were contested (even if not in a formal counterstatement) and compels this Court to look exclusively at defendants' statement as the conceded facts in this case. Plaintiff does point to some minor discrepancies in facts (for example, Dr. Douglas relying upon medical findings in 2011 while plaintiff was in another facility, Docket No. 55, Pl. Aff. FACT NINE; *but cf.* Docket No. 48, Dr. Douglas Decl. ¶ 11, Ex. A Bates No. 277 (consultation with Dr. Stegamann occurred in *2010* )) but these are not material to oppose the defense motion.

First, plaintiff submits his own and a witness's "Affidavit of Truth" (Docket No. 55), but both are unsworn and not witnessed statements, *cf.* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or opposing a summary judgment motion need not be notarized, they may be made under penalty of perjury, but unsworn statements

will be rejected). Plaintiff certified and swore "to my unlimited commercial liability that the testimony I give before this court is, to the best of knowledge and understanding, true, correct, and complete, not misleading, the truth, the whole truth, and nothing but the truth, so help me God," and concluded that he declared "under the Laws of the Constitution of the United States of America that the above stated facts are true, correct, and complete to the best of my knowledge and belief. So help me God" (Docket No. 55, Pl. Aff. of Truth at pages 1 of 3 and 3 of 3). Witness Cepeda, a "sovereign American," submits a similar "Affidavit of Truth," declaring that "the facts stated/listed below are true, correct, and complete to the best of my understanding and belief so help me God," concluding that he "declares under the laws of the constitution of the United States of America (1787) as amended (1791) by the Bill of Rights that the above is true, correct, and complete, to the best of my belief and knowledge. And does declare that notary assistance was not possible upon time and date of submitting this Affidavit of Truth. So help me God" (*id.,* Cepeda Aff. of Truth). The handwriting for both Affidavits is similar as is the verbiage. Neither document is a declaration stating expressly that they were made under penalty of perjury, *cf.* 28 U.S.C. § 1746.

**\*8** Nevertheless, given that plaintiff is an inmate proceeding *pro se* and, as indicated by Cepeda, may have lacked notary assistance with these documents, this Court will consider them as part of the opposition to summary judgment. But even considering these papers, Cepeda's Affidavit of Truth is not admissible for the information it contains since it discusses events in 2012 that are beyond the scope of this action as currently plead, *see* 10B Wright, Miller & Kane, *supra,* § 2738, at 330, 341 (court excludes summary judgment affidavit if its irrelevance is clear). As currently plead, this case involves defendants' deficient treatment of plaintiff in 2009–10; plaintiff has not sought to amend this Complaint again to allege continuing harm. Further, Cepeda's statement accuses an unnamed medical staffer for ignoring plaintiff's pleas for treatment on his shoulder without any connection of that unnamed employee to the named defendants in this case.

Next, this Court addresses the substance of defense arguments.

B. Deliberate Indifference

As for the objective element of a deliberate indifference Eighth Amendment claim, at worst plaintiff alleges medical malpractice (if that) in not prescribing the medication he desired. He sought narcotic medication while the facility medical staff prescribed Ibuprofen. That allegation is not sufficient to state a constitutional deprivation. Mere negligent treatment or malpractice upon a prisoner does not create an Eighth Amendment violation. *Estelle, supra,* 429 U.S. at 106; *Corby, supra,* 457 F.2d at 254. Plaintiff also exercised his shoulder, engaging in weight lifting and hitting a heavy bag, stressful and strenuous activities on an injured rotator cuff. Defendants' motion for summary judgment on this ground is **granted.**

As for subjective element, plaintiff has not suggested that defendants wantonly wished to cause him to suffer or lay out that defendants had the sufficiently culpable state of mind to establish this element. On this ground, defendants' motion is also **granted.**

C. Personal Involvement

As alternative ground, defendants motion is **granted** as to certain supervisory defendants because plaintiff fails to establish the personal involvement of supervisory officials retired Superintendent Khahaifa, Austin, Fitts, or Wilson in the denial of the sought medical care. The medical decisions were made by medical staff, in particular defendant Doctors Douglas and Lewis. The administrators named here merely considered grievances raised by plaintiff regarding this care.

To state a § 1983 claim, plaintiff must allege the manner in which defendant was personally involved in depriving plaintiff of his rights, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). There are several ways to allege personal involvement: plaintiff could claim that defendant had direct participation in the event; plaintiff could claim that defendant failed to remedy the violation after it was noticed; defendant created the policy which lead to the violation or allowed the policy to continue; defendant was grossly negligent in managing subordinates which caused the violation to occur; or defendant exhibited gross negligence or deliberate indifference to plaintiff's rights by failing to act on information indicating that unconstitutional acts were taking place, *Wright, supra,* 21 F.3d at 501. An allegation of personal involvement is a prerequisite for damages under a § 1983 claim in this Circuit, *e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001).

**\*9** Plaintiff here has not alleged any of these bases for personal involvement of the supervisory defendants. Plaintiff merely claims that they failed to intervene or grant his grievance regarding the quality of medical care he received or that the superintendent had a no narcotics policy for the inmates. He does not refute defendants'

contention that the supervisory defendants had no role in the medical decision making for plaintiff's treatment or Khahaifa's denial of having a policy regarding prescribing narcotics to inmates. Defendants' motion for summary judgment on this ground is **granted.**


**D. Qualified Immunity**

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under *Saucier,* this Court first considers the constitutional question, then considers the qualified immunity question, *id.* But the Supreme Court, in *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), overruled *Saucier* in mandating the order in which trial courts are to consider qualified immunity claims. In *Pearson,* the Court recognized that district and circuit courts had the discretion to determine the order of the *Saucier* steps they would consider first (either the substance of the constitutional claim or the immunity claim), 555 U.S. at 232.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin,* 1 F.3d 1317, 1327 (2d Cir.1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996).

Given that no constitutional violation was found, this Court **need not address** defendants' alternative contention that they deserve qualified immunity for their actions.


**IV. Post Script—2012 Allegations**

During the pendency of this action, plaintiff has been transferred, first from Orleans to Attica Correctional Facility then to Groveland Correctional Facility and later back to Orleans. Plaintiff has written two letters to this Court and to the grievance officials complaining about conditions following his last transfer to Orleans (letter of plaintiff to Chambers, Apr. 30, 2012; letter of plaintiff to Chambers, Apr. 30, 2012). In these letters (and in other papers he submitted in response to defendants' motion, Docket No. 54; *see also* Docket No. 57), plaintiff claims that he was harassed and beaten by prison guards when he refused to lift his arms for a frisk due to his shoulder injuries. He also alleges that medical staff at Orleans refused to treat him in 2012. In his responding papers, he also discusses an April 2012 incident that he seeks the Court to investigate (Docket No. 54; *see also* Docket No. 57).

**\*10** Since these letters and papers allege incidents that occurred in February 23, 2012, and April of that year, well after the incidents alleged in this pending action and unrelated to those in this action, this Court **declines** plaintiff's implied request to amend the Complaint to add these new allegations. Since plaintiff also sent these letters to the grievance authorities, any potential claims may not have been administratively exhausted.


CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket No. 37) is **granted.** Plaintiff's renewed motion to stay consideration of defendants' motion (Docket No. 57) is **denied** and plaintiff's attempted motion for leave to amend the Complaint to assert claims arising from the April 2012 incident is also **denied.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

The Clerk of Court is instructed to close this case.

So Ordered.


**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2401574

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3729362
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marc LEWIS, Plaintiff,

v.

MURPHY, Captain, Coxsackie Correctional
Facility; J. Lewis, Corrections Counselor,
Coxsackie Correctional Facility; Matthews, Deputy
Superintendent for Administration, Coxsackie
Correctional Facility; Christopher Miller, Deputy
Superintendent for Security, Coxsackie
Correctional Facility; Eric G. Gutwein,
Commissioner Hearing Officer, N.Y.S., D.O.C.C.S.,
Defendants.

No. 9:12–CV–00268 (NAM/CFH).
|
Signed July 24, 2014.
|
Filed July 25, 2014.

Attorneys and Law Firms

Marc Lewis, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Joshua E. McMahon, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

*ORDER*

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a
Report–Recommendation by Magistrate Judge Christian
F. Hummel, duly filed on the 27th day of June 2014.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all
objections filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt.
No. 46) is granted and the Clerk shall enter judgment
accordingly.

3. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION AND ORDER**[1]

[1]  This matter was referred to the undersigned for report
and recommendation pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

Plaintiff *pro se* Marc Lewis ("Lewis"), an inmate
currently in the custody of the New York State
Department of Correctional and Community Supervision
("DOCCS"), brings this action pursuant to 42 U.S.C. §
1983 alleging that defendants, five DOCCS employees,
violated his rights under the Fourteenth Amendment.
Compl. (Dkt. No. 1). Presently pending is defendants'
motion for summary judgment pursuant to Fed.R.Civ.P.
56. Dkt. No. 46. Lewis opposes and defendants replied.
Dkt. Nos. 57, 61. For the following reasons, it is
recommended that defendants' motion be granted.

**I. Background**

The specific facts of the case are set forth in the
Report–Recommendation and Order filed February 28,
2012, familiarity with which is assumed. *See* Dkt. No. 39
(Report–Recommendation); Dkt. No. 43
(Memorandum–Decision and Order). The facts are related
herein in the light most favorable to Lewis as the
non-moving party. At all relevant times, Lewis was an
inmate at Coxsackie Correctional Facility ("Coxsackie").

### A. November 5, 2011 Letter

On November 5, 2011, Lewis was watching television when non-party Correctional Officer Whit ("Whit") changed the channel on the television that Lewis was watching. Dkt. No. 46–9 at 2. Lewis wrote a letter to non-party Superintendent Martuscello ("Martuscello") complaining about the incident and stated that Whit harassed and intimidated him. Compl. ¶ 1. Lewis indicated that he would "blow the whistle on a lot of other wrong doings in this facility if need be." Dkt. No. 46–9 at 4. Lewis further indicated that he feared correctional officers would retaliate against him because he filed this complaint. *Id.* at 3. Lewis sent a copy of this letter to non-party Commissioner Fisher. Lewis Dep. # 1 (Dkt. No. 46–6) at 43:8–14. On November 7, 2011, Lewis was taken from his cell and told by non-party Sergeant Martin that he was being placed under keeplock[2] status for threats Lewis made against someone in the administration building. *Id.* at 27:14–22. At that time, Lewis had yet to receive a copy of the misbehavior report. *Id.* at 28:11–15. Based on the content of the November 5, 2011 letter, Lewis was charged with making threats and attempting to bribe and extort personnel. Dkt. No. 46–9 at 1.

[2]    "Keeplock" is a form of disciplinary confinement where an inmate is confined in his cell for the duration of the disciplinary sanction. *Gittens v. Lefevre,* 891 F.2d 38, 39 (2d Cir.1989) (citing N.Y. COMP.CODES R. & REGS. tit. 7, § 251–1.6 (2012)).

### B. Tier III Disciplinary Hearing

**\*2** On November 10, 2011, Lewis was escorted by non-party Correctional Officer Stevenson ("Stevenson") to attend his disciplinary hearing before defendant Captain Murphy ("Murphy"). Lewis Dep. # 1 at 34:8–12, 35:12–13. Murphy started the recording, explained the hearing process, and took Lewis's plea. *Id.* at 35:17–22. Lewis advised Murphy that he had not been served with a copy of the misbehavior report and had not yet been provided inmate assistance. Compl. ¶ 4; Murphy Decl. (Dkt. No. 46–22) ¶ 8. Murphy attested that he immediately stopped the hearing and directed Stevenson to provide Lewis with a copy of the misbehavior report and to arrange for the plaintiff to receive inmate assistance. Murphy Decl. ¶¶ 8, 11. Lewis also objected to Murphy being the officer who reviewed the misbehavior report and authorized Lewis to be placed in keeplock pending a disciplinary hearing, and the hearing officer. *Id.* ¶ 9. According to DOCCS Directive 4932, 251–2.2(f)

Murphy could not serve as both the reviewing and hearing officer on the same misbehavior report. Dkt. No. 46–12 at 4. Lewis was then brought back to his cell to review the misbehavior report and receive inmate assistance. Compl. ¶ 5.

### 1. Inmate Assistance

Defendant Corrections Counselor Jackie Lewis ("Counselor Lewis") was assigned as Lewis's employee assistant. Lewis Decl. (Dkt. No. 46–14) ¶ 4. On November 10, 2011, Counselor Lewis arrived at Lewis's cell to help prepare a defense for his hearing. *Id.* ¶ 7. During the meeting, Lewis requested that Martuscello and Fischer be called as witnesses and asked for the name of the review officer who authorized his keeplock confinement. *Id.* ¶ 8; Lewis Dep. # 1 at 40:8–16. Counselor Lewis indicated that Murphy was the reviewing officer and took note of the witnesses whom Lewis wanted to question. Lewis Dep. # 1 at 40:15–17; Dkt. No. 46–15. Lewis also stated that he requested an explanation of the charges but Counselor Lewis said she was not going to do that because she was trying to go home. Compl. ¶¶ 7–8. Since Counselor Lewis did not meet Lewis's standards for assistance, Lewis did not sign the inmate assistance form and Counselor Lewis left the cell at that time. *Id.* ¶ 8. Counselor Lewis maintains that Lewis never asked her for definitions or an explanation of the charges. Lewis Decl. ¶ 9.

### 2. Hearing Extension

On November 10, 2011, a request for an extension of the Tier III disciplinary hearing was filed because Lewis was going to be in court from November 14, 2011 to November 18, 2011 and no staff was available to conduct the hearing before that time. Dkt. No. 46–17; Compl. ¶ 10. The request indicated that defendant Commissioner's Hearing Officer Gutwein ("Gutwein") was the hearing officer and that the hearing had not commenced. Dkt. No. 46–17. Lewis contends that defendant Deputy Superintendent for Administration Matthews ("Matthews") had filed the request. Compl. ¶ 10. Lewis believes that the request contained false information because Murphy began the hearing on November 10, 2011 and Lewis was only in court from November 14, 2011 to November 16, 2011. *Id.* Matthews attested that Lewis is mistaken about who wrote the report. Matthews Decl. (Dkt. No. 46–16) ¶¶ 8–10. Matthews explained that

although the request indicates "Matthew" as the contact person, extension requests are filed by clerical staff in Coxsackie's Discipline Office; thus the reference to "Matthew" refers to someone in that office, and not Matthews. *Id.*

**\*3** Later on November 10, 2011, Lewis wrote a letter to Martuscello explaining his November 5, 2011 letter and objecting to Murphy being the hearing officer. Dkt. No. 46–19. Martuscello directed defendant Deputy Superintendent Miller ("Miller") to respond to the letter. Miller Decl. (Dkt. No. 46–18) ¶ 7. By letter dated November 15, 2011, Miller informed Lewis that Gutwein was assigned as the hearing officer. *Id.;* Dkt. No. 46–20.

### 3. Hearing on November 21, 2011

On November 17, 2011, a second request to extend the date of the disciplinary hearing to November 21, 2011 was filed because no hearing officer was available to conduct the hearing before that time. Dkt. No. 46–13. On November 21, 2011, Gutwein conducted the disciplinary hearing for Lewis. Hr'g Tr. (Dkt. No. 46–10) at 2.[3] Lewis pleaded not guilty to the charges against him. *Id.* at 3. Lewis objected to: (1) Murphy commencing a disciplinary hearing concerning the same misbehavior report on November 10, 2011; (2) Murphy being both the reviewing and hearing officer; (3) Gutwein commencing the hearing more than seven days after placement in keeplock; and (4) Counselor Lewis providing inadequate assistance because she did not fulfill his requests. *Id.* at 4.

[3]    The page numbers following "Hr'g Tr." refer to the pagination of the header numbers generated by CM/ECF, not the individual transcripts.

Lewis requested that Counselor Lewis, Murphy, Stevenson, Fischer, Martin, and Martuscello be called as witnesses. Hr'g Tr. at 8. Lewis also requested that the November 5, 2011 letter be produced as evidence. *Id.* Gutwein noted for the record that the November 5, 2011, letter was placed in the hearing packet and denied Lewis's request to have the log books produced as evidence. *Id.* at 8, 19. Gutwein denied Lewis's request to call Murphy, Stevenson, and Counselor Lewis as witnesses on relevance grounds as Lewis wanted them to testify to the defects of the disciplinary hearing. Gutwein Decl. (Dkt. No. 46–8) ¶ 28; Hr'g Tr. at 19, 20. Since Gutwein called Martin to testify to the misbehavior report, Gutwein declined to call Martuscello and Fischer as witnesses for

their testimonies would have been duplicative. Hr'g Tr. at 8, 19, 20.

Gutwein produced Martin and asked him questions concerning the grounds for authoring the misbehavior report. Hr'g Tr. at 9. Martin explained that Lewis's November 5, 2011 letter contained statements threatening actions if certain demands were not met and Lewis would "blow the whistle if need be." *Id.* Lewis was afforded an opportunity to direct questions at Martin through Gutwein. *Id.* Gutwein denied Lewis's request to have the definitions of bribery, extortion, and threats because the definitions would be irrelevant to the incident in the report. *Id* . at 19.

Gutwein then made a written disposition and found Lewis guilty of the charges based on: (1) the misbehavior report, which stated that Lewis would retaliate if his demands were not met; (2) review of the November 5, 2011 letter stating that Lewis will retaliate by "blowing the whistle on the wrong doings by staff"; (3) Martin's testimony stating that the letters contained an ultimatum; (4) Lewis's Testimony stating that the hearing was commenced previously in an improper and untimely manner; and (5) Lewis's disciplinary history. Hr'g Tr. at 20. Gutwein sentenced Lewis to seven months in the Special Housing Unit ("SHU"),[4] along with seven months without packages, commissary privileges, phone privileges, and loss of good time credits. *Id.* Gutwein's determination and sentence was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that Lewis should modify his behavior in the future. Gutwein Decl. ¶ 12.

[4]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. COMP.CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

### C. SHU conditions

**\*4** On November 30, 2011, Lewis received a letter indicating that he had been unsatisfactorily discharged from the Aggression Replacement Training ("ART") Program because he was going to be in SHU for seven

months. Compl. ¶ 39. Nevertheless, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 (Dkt. No. 46–6) at 69:7–14.

Since Lewis had his telephone privileges taken away, he was unable to call his sister who was in need of a kidney transplant. Lewis Dep. # 2 (Dkt. No. 46–7) at 12:6–11. Lewis also stated he was in the process of filing paperwork to donate a kidney to his sister but being in SHU prevented him from finishing it. *Id.* at 12:3–5, 13:2–3. By the time Lewis was released from SHU, his sister had received a transplant. *Id.* at 13:4–7.

Lewis was also unable to interact with other inmates by attending group activities such as congregational prayer or group chow during his time in SHU. Compl. ¶ 46. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his [religious] prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers whenever they wanted, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis claims he was prevented from practicing Islam because Muslims must be "in a state of purification in order to pray" and Islamic law states that men must not expose their body from the navel to the knee. Therefore he was restrained from doing "wudu," a ritual where one must wash their whole body in preparation for prayer. *Id.* at 16.

### D. Appeal of the Hearing Disposition

Lewis filed an appeal of the hearing disposition. Compl. ¶ 34. Miller reviewed the appeal and found "the hearing to be without procedural error and the resulting sanctions appropriate." Dkt. No. 46–21. Lewis appealed to non-party Albert Prack, the director of the Special Housing/Inmate disciplinary program, who reversed the guilty determination on the ground that "the evidence used fails to provide enough information to support the charges." Dkt. No. 57 at 49. Therefore, after sixty-nine days, Lewis was released from the SHU. Compl. ¶ 45.

### II. Discussion

Lewis contends that (1) all defendants deprived him of his Fourteenth Amendment rights by denying him procedural due process in connection with the disciplinary hearings at issue and (2) defendants Miller, Matthews, Murphy,

and Gutwein conspired against him to cover up Murphy's improper commencement of the hearing.

Defendants seek summary judgment dismissing the complaint in its entirety. Defs.' Mem. of Law (Dkt. No. 46–2) at 3. Defendants specifically move for summary judgment on the grounds that: (1) Lewis failed to establish a due process claim; (2) Lewis failed to establish an actionable conspiracy claim; and (3) defendants are entitled to qualified immunity. *Id.* Additionally, Matthews moves for summary judgment for lack of personal involvement. *Id.*

### A. Legal Standard

**\*5** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed

"liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

## B. Personal Involvement

**\*6** "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[5]

Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. *See e.g., Brown v. Artus,* 647 F.Supp.2d 190, 200 (N.D.N.Y.2009).

[5]    Various courts in the Second Circuit have postulated how, if at all, the *Iqbal* decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated *Iqbal* 's impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon* 's personal involvement standard).

Lewis has failed to establish the personal involvement of defendant Matthews in allegedly depriving him of his Fourteenth Amendment due process rights by filing a Tier III hearing extension request. Lewis contends that Matthews filed a Tier III hearing extension form that falsely listed Gutwein as the hearing officer, the hearing had not yet commenced, and the dates for which Lewis would be out of the facility for an unrelated trial. Compl. ¶ 10. Matthews attested that the notation "Contact: Matthew" on the extension request did not refer to him. Rather, the extension requests are submitted by members of Coxsackie's Discipline Office; hence, it can be inferred that the notation refers to a clerical staff member in the Discipline Office. Therefore, Matthews did not participate directly in the alleged constitutional violation. Matthews Decl. (Dkt. No. 46–16) ¶ 10; Dkt. No. 46–17. Furthermore, Matthews attested that he was not even aware of Lewis's disciplinary hearing or the extension request until after the lawsuit was filed. Matthews Decl. (Dkt. No. 46–16) ¶ 11. Accordingly, Matthews could not have failed to remedy any wrong after he was informed of the violation through a report or appeal, since he was never informed of any violation.

In addition, Matthews did not exhibit deliberate indifference to Lewis's rights by failing to act on information indicating that unconstitutional acts were occurring because Matthews had no information indicating that any wrong was occurring. Matthews also attested that he had no supervisory role over Coxsackie's inmate disciplinary program; consequently, Matthews could not have created or allowed the continuation of a policy or custom under which unconstitutional practices

occurred. Matthews Decl. ¶ 2. Lastly, since Matthews held no supervisory authority over the inmate disciplinary program, he could not have been grossly negligent in supervising subordinates who committed the allegedly wrongful acts. *Id.* Lewis points to no evidence in the record to substantiate his assertions that Matthews created the extension request. Moreover, Lewis testified in his deposition and indicated in his response papers that he voluntarily withdraws his claims against Matthews. Lewis Dep. # 2 (Dkt. No. 46–7) at 28; Resp. (Dkt. No. 57) at 9. It is fair to conclude that a rational finder of fact would determine that these assertions are merely speculative and therefore, Lewis cannot establish the personal involvement of Matthews in the alleged unconstitutional actions.

**\*7** Accordingly, defendants' motion on this ground should be granted.

### C. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest in remaining free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Liberty Interest

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[Procedural] due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of*

*Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short—e.g. 30 days—and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66).[6]

[6]     All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

**\*8** Defendants contend that Lewis has failed to demonstrate that he suffered from atypical and significant confinement and therefore cannot establish a protected liberty interest. The Court considers factors such as the length of time the prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general

prison population" to determine whether the prisoner can establish a liberty interest in remaining free from segregated confinement. *Palmer*, 364 F.3d at 64–65. The length of time in which Lewis spent in confinement was sixty-nine days, which is less than an intermediate amount of time. As such, the length of time itself cannot determine that the confinement was atypical and significant. Therefore, the Court determines if the confinement is atypical and significant by looking at the conditions of the segregated confinement compared to ordinary prison conditions.

Lewis contends that his confinement was atypical and significant because he was deprived of: (1) communications with the outside world; (2) an opportunity to possibly donate a kidney to his sister; (3) religious practices due to the unsanitary conditions of his confinement; (4) participation in the ART program; and (5) interaction with other inmates during activities like group chow and congressional prayer.[7] Dkt. No. 57 at 12–14. In New York, under "normal SHU conditions" an inmate is:

[7]     Lewis may be attempting to raise First Amendment claims based on the denial of attendance to congregated services and sanitary conditions of his SHU cell. However, these claims were not specifically pled in the original complaint. Moreover, Lewis made no attempt to amend his complaint to include these claims. Therefore, the Court addresses these issues as arguments for establishing a liberty interest for purposes of a Fourteenth Amendment claim.

placed in a solitary confinement cell, kept in his cell for twenty-three hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited.

*Colon*, 215 F.3d at 230; *see also* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 304.1–.14, 305.1–.6 (setting forth minimum conditions of SHU confinement). Lewis's confinement was of a similar kind, with twenty-three hours a day of isolation, an hour of recreation, and denial of telephone and commissary privileges. Such a claim falls short of establishing a liberty interest as Lewis fails to allege any particular condition or further deprivation outside of those generally applicable to the incidents of prison life in SHU confinement. *Vasquez*, 2 F.Supp.2d at 259; *Frazier*, 81 F.3d at 317 (explaining

that while prisoners in SHU may be deprived of "certain privileges that prisoners in the general population enjoy," there exists no liberty interest in remaining a part of the general prison population); *see also Alvarado v. Halle Hous. Assoc.*, 152 F.Supp.2d 355, 355 (S.D.N.Y.2001) (finding restrictions such as loss of phone privileges, one hour of exercise a day, and three showers per week, fail to meet *Sandin* requirements).

*9 Lewis's inability to communicate with the outside world through phone or post for the purpose of transplanting his kidney to his sister or otherwise is not considered atypical because loss of telephone privileges is an aspect of SHU confinement in New York and courts have held that this would not violate an inmate's constitutional rights. *See Long v. Crowley*, No. 09–CV–456(F), 2012 WL 1202181, at *11 (W.D.N.Y. March 22, 2012) (sixty days in keeplock with loss of telephone and commissary privileges is not a protected liberty interest); *Borsack v. Early*, No. 03–CV–395 (GLS/RFT), 2007 WL 2454196, at *9 (N.D.N.Y. Aug. 22, 2007) (GLS/RFT) (finding that a ninety-day confinement in SHU with a ninety-day loss of packages, commissary and telephone privileges is insufficient to raise a liberty interest).

Lewis has failed to show that his unsatisfactory discharge from his ART programming due to his placement in SHU posed an atypical and significant hardship. Compl. ¶ 46; *Thompson v. LaClair*, No. 08–CV–37 (FJS/DEP), 2009 WL 2762164, at *8 (N.D.N.Y. Jan. 30, 2009) (plaintiff's inability to participate in ASAT, ART, and MAWP programs not atypical and significant hardship); *Deutsch v. U.S.*, 943 F.Supp. 276, 280 (W.D.N.Y.1996) (holding that prisoners do not have a protected liberty interest in rehabilitative programs). Moreover, Lewis was able to complete this program after his release from SHU. Lewis Dep. # 1 at 69:7–14.

Lewis's claim that his exclusion from group activities posed an atypical and significant hardship is also unfounded because SHU confinement usually segregates the inmate from the rest of the prison and therefore, the inmate would be unable to participate in group activities. *Sealey v. Coughlin*, 997 F.Supp. 316, 321 (N.D.N.Y.1998) ("plaintiff's administrative segregation in SHU was not an atypical and significant hardship"); *Edmonson v. Coughlin*, 21 F.Supp.2d 242, 249, 250 (W.D.N.Y.1998) (plaintiff's inability to participate in congregate activities such as group counseling, and religious services during his eight months of administrative segregation is not a protected liberty interest).

Lastly, in his opposition papers to the instant motion, Lewis claims that the unsanitary conditions of his cell posed an atypical and significant hardship. Lewis contends that he was "restrained from practicing the prerequisite [rituals] associated with performing his prayers" while in SHU because the cells were unsanitary, he had to share a cell, the correctional officers gave him showers at their choosing, and he was not given a shower three times a week. Dkt. No. 57 at 15–16. Lewis contends that his cell always accumulated dirt and dust, was cleaned once a week with a dirty sponge without any germicidal cleaning agents, and the water used was "black from prior use of 20 or more cells." *Id.*

Courts have found that the denial of a clean cell and personal hygiene items, as well as double-celling in SHU, do not constitute an atypical and significant hardship. *See Davidson v. Murray, 371 F.Supp.2d 361, 364, 369 (W.D.N.Y.2005)* (concluding that the denial of hygiene items and cleaning materials is not an atypical and significant hardship); *McNatt v. Unit Manager Parker, No. 99–CV–1397 (AHN), 2000 WL 307000, at *4, *8 (D.Conn. Jan. 18, 2000)* (finding stained, smelly mattresses, unclean cell, no cleaning supplies for toiletries for six days, no shower shoes, and dirty showers during SHU confinement do not constitute a constitutional violation of due process); *Bolton v. Goord,* 922 F.Supp. 604, 630 (S.D.N.Y.1998) (finding double-celling of inmates is not considered an atypical and substantial hardship). Nevertheless, a finder of fact may conclude that Lewis's cell conditions in conjunction with the denial of three showers a week to constitute an atypical and significant hardship that amount to a protected liberty interest. *See, e.g., Welch v. Bartlett, 196 F.3d 389, 393 (2d Cir.1999)* (stating that allegations of "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes" may be a constitutional violation). Drawing every inference in Lewis's favor, these conditions were present during the entirety of Lewis's SHU confinement. Moreover, defendants do not specifically address these allegations with argument or evidence. Therefore the Court will proceed as though Lewis has established a protected liberty interest.

### 2. Procedural Due Process

**\*10** Defendants argue that Lewis was afforded ample due process. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v.. McDonnell, 418 U.S. 539, 556 (1974).* A prisoner is "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v.. Morton, 380 F.3d 57, 69 (2d Cir.2004)* (citations omitted).

#### a. Written Notice

In this case, Lewis received proper written notice. An inmate must be provided advance written notice of the charges against him at least twenty-four hours before the disciplinary hearing commences. *Wolff, 418 U.S. at 563–64.* Notice must be written "in order to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Id. at 564.* When Lewis was brought to the hearing before Murphy on November 10, 2011, Lewis had not yet received written notice of the charges. Murphy attested that once Lewis stated he did not receive a copy of the misbehavior report or inmate assistance, Murphy stopped the hearing immediately. Murphy attested that no testimony was taken, he did not review any documentary evidence other than the misbehavior report, and did not discuss the statements in the misbehavior report with Lewis. Murphy Decl. ¶ 16. Lewis was then provided a copy of the misbehavior report and inmate assistance on the same day. On November 21, 2011, Gutwein took over Lewis's Tier III disciplinary hearing. Even assuming Murphy had commenced the hearing, the ultimate penalty imposed on Lewis was by Gutwein based on the evidence presented on November 21, 2011. Lewis received a copy of the misbehavior report on November 10, 2011, well in advance of the November 21, 2011 hearing date. As such, Lewis received advanced written notice of the charges against him.

Accordingly, defendants' motion on this ground should be granted.

#### b. Opportunity to Call Witnesses and Present Documentary Evidence

Lewis contends that he was deprived of an opportunity to call all his requested witnesses and present some documentary evidence. However, "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly, 962 F.2d*

145, 146–47 (2d Cir.1992). With respect to documentary evidence, Lewis requested the admission of the logbooks as evidence to show that he had already been taken for a disciplinary hearing regarding the same misbehavior report. Hr'g Tr. at 19. Gutwein correctly denied this request because they were irrelevant to the charges in the misbehavior report and would not have aided in Lewis's defense to such charges. Gutwein Decl. ¶¶ 33–34. As for the November 5, 2011 letter, Gutwein allowed for a copy of it to be placed in the hearing packet as evidence. Hr'g Tr. at 8.

**\*11** As for witnesses, Gutwein permitted Martin to testify at Lewis's disciplinary hearing but denied the request for Murphy, Stevenson, and J. Lewis on relevance grounds because their testimonies would have concerned the alleged defects in the disciplinary hearing rather than the charges giving rise to the hearing. Gutwein Decl. ¶ 28. Furthermore, since Martin was to testify to the content of the November 5, 2011 letter, Gutwein denied testimonies from Martuscello and Fischer on the grounds that they would be unnecessary and duplicative. *Id.* ¶ 32.

Lewis was provided with an opportunity to question Martin through Gutwein. "While inmates do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v.. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N.Y.2002). Thus, Gutwein retained the authority to administer the questioning in a manner he saw fit. Gutwein did not permit Lewis to ask every question, but Gutwein offered reasoning for the denial of certain questions that Lewis wanted to ask. Hr'g Tr. at 9–18. A review of the hearing transcript shows that Lewis was permitted to question Martin rather extensively until Lewis was finished. *Id.* As such, Lewis was provided an opportunity to call witnesses and present documentary evidence. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### c. Fair and Impartial Hearing Officer

Lewis contends that Gutwein was not an impartial hearing officer because Gutwein had not allowed Lewis to call his requested witnesses and denied him the standard and legal definitions of bribery, extortion, and threats. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that

required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer] .." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

As discussed *supra,* "[i]t is well settled that an official may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992). Therefore, Gutwein was within his discretion to deny the calling of certain witnesses and the admission of certain evidence.

**\*12** Even though Lewis's guilty determination was reversed, it is not clear evidence that Gutwein was not a fair and impartial hearing officer. The determination was reversed on the grounds that there was insufficient evidence to support the charges, not on any procedural defects. Dkt. No. 57 at 49. The record shows no indication that Gutwein was biased and failed to serve a fair and impartial hearing officer. It is unclear to the Court how the denial of the requested definitions served as evidence of bias on Gutwein's part. Rather, it is clear from the hearing transcript that Gutwein allowed Lewis to state all of his objections for the record and question Martin as much as he needed to. *See generally* Hr'g Tr.

Gutwein had reliable evidence of Lewis's guilt, which is presented in his statement of the evidence relied upon. Gutwein relied on the statements in the November 5, 2011 letter that stated Lewis would 'blow the whistle' on wrongdoings in the facility and Martin's testimony regarding the ultimatums made by Lewis. Hr'g Tr. at 20–21. Lewis had admitted to writing the November 5, 2011 letter. *Id.* at 6. Gutwein's determination was made to impress upon Lewis that it is a serious violation to threaten employees, which would not be tolerated at the correctional facility and that he should modify his behavior in the future. Lewis points to no evidence in the record to show that Gutwein came to his determination improperly. As such, despite Lewis's contentions of bias, the record is clear that there is no question of material fact regarding the process that Lewis was provided.

Accordingly, defendants' motion on this ground should be granted.

#### d. Written Statement of Disposition

It is undisputed that Lewis received a written statement of the hearing disposition. On November 21, 2011, Lewis was present when Gutwein rendered his decision on the misbehavior report. Hr'g Tr. at 20–21. The record indicates that Lewis received a written statement of the evidence relied upon and the reasons for the disciplinary action. *Id.;* Dkt. No. 46–11 at 9. Thus, Lewis was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

#### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802 (MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (*Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)). Lewis was confined in SHU from November 7, 2011, onward and thus was entitled to an inmate assistant. Dkt. No. 46–12 at 5; N.Y. COMP.CODES R. & REGS. tit. 7 § 251–4.1(a)(4).

**\*13** Lewis alleges that he was deprived of adequate inmate assistance. Lewis first met with his inmate assistant, Counselor Lewis, on November 10, 2011. According to Lewis, Counselor Lewis refused to give him definitions of the charges against him and interview potential witnesses. Counselor Lewis denies that she was asked to give explanations of the charges and notes that the alleged request is not indicated on the assistant form. Lewis Decl. ¶ 9; Dkt. No. 46–17. Gutwein had also denied Lewis's request for the definitions of threats,

bribery, and extortion during the hearing on relevance grounds.

Taking Lewis's version of events as true, even if Counselor Lewis failed to provide such definitions of the charges, Lewis does not demonstrate that he was somehow prejudiced as a result of this error, and does not show that he was unable to present a defense or that the outcome of the hearing would have been different had Counselor Lewis provided such definitions. *Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) ("To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." (citation omitted)).

Furthermore, Lewis was able to present a defense and pose questions to Martin that evinced an understanding of the charges. *See generally* Hr'g Tr. at 5–18. For example, Lewis asked Martin whether the November 5, 2011 letter contained any threats of harm, which suggests that Lewis had some understanding of what constitutes "threat." *Id.* at 9. Lewis then asked "did I—anything of value to us from—Martuscello, yourself or anyone," which shows that Lewis understood the nature of the extortion charge. *Id.* at 10. Lastly, Lewis was able "did I give or attempt to give—money, gifts,—or anything worth—value ... to ... Superintendent Martuscello and—or—administrator ...." This demonstrates that Lewis had an understanding of what bribery meant. *Id.* at 11.

Lewis also alleged that Counselor Lewis failed to interview Martuscello or Fischer but does not show how this would have changed the outcome of the hearing or how this failure prejudiced him as a result. Therefore, any shortcomings in the assistance rendered by Counselor Lewis was harmless error and does not rise to the level of a due process violation. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 455 (S.D.N.Y.2008) (plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses, and thus any alleged inadequate assistance was harmless error not warranting denial of summary judgment). Additionally, even though Gutwein failed to provide an explanation of the charges, Lewis was not prejudiced as a result because Gutwein described in his hearing disposition the evidence he relied upon to determine that Lewis was guilty. An explanation of these charges to Lewis would not have changed the evidence which Gutwein had relied upon. As such, Lewis's due process claim based on inadequate inmate assistance must fail.

**\*14** Accordingly, defendants' motion for on this ground

should be granted.

### f. Timeliness

Lewis contends that the Tier III disciplinary hearing concerning the November 7, 2011 misbehavior report was not commenced in a timely manner because his hearing did not begin until November 21, 2011. Where an inmate is confined pending a disciplinary hearing, the hearing must commence within seven days of his initial confinement and conclude within fourteen days of the writing of the misbehavior report. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b);[8] Dkt. No. 46–12 at 5–6. The Commissioner of Correctional Services or his designee must authorize any delay beyond those time limits. N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1(a)(b); Dkt. No. 46–12 at 5–6.

[8]     Section 251–5.1, states that
        (a) Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.
        (b) The disciplinary hearing or superintendent's hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.
        (c) Violation hearings must be completed within seven days of the writing of the misbehavior report.
        N.Y. COMP.CODES R. & REGS. tit. 7 § 251–5.1.

Lewis's Tier III hearing was timely commenced. Although Lewis's hearing was initially required to commence by November 14, 2011, an extension was granted until November 18, 2011 because Lewis was scheduled to be out of the facility from November 14, 2011 through November 18, 2011, and no staff was available to conduct the hearing before that time period. Gutwein Decl. ¶ 21; Dkt. No. 46–13. A second request was made on November 17, 2011 because no hearing officer was available to conduct plaintiff's hearing until

November 21, 2011. Gutwein Decl. ¶ 22; Dkt. No. 46–13. DOCCS Central Office Special Housing Unit granted the facility permission to commence Lewis's hearing by November 21, 2011 and the hearing commenced on that date. Dkt. No. 46–13. Therefore, the hearing was commenced in a timely manner in accordance with the pertinent New York regulations.

Accordingly, defendants' motion on this ground should be granted.

### D. Conspiracy

Lewis claims that defendants Murphy, Miller, and Gutwein conspired to deny him procedural due process. To establish a claim under Section 1985(3), a plaintiff must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325. Therefore, the plaintiff must provide some details of the time, place, and the alleged affects of the conspiracy, which would include facts to demonstrate that there was an agreement between the defendants to achieve some unlawful goal. *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted).

In this case, defendants all deny conspiring to cover up the hearing that was allegedly commenced by Murphy. Lewis Dep. # 2 at 1–8; Gutwein Decl. ¶ 39; Miller Decl. ¶ 17; Matthews Decl. ¶ 12; Murphy Decl. ¶ 11. Lewis points to no evidence in the record to show that there was an agreement between the defendants to deprive him of his constitutional rights. Lewis alleges that the defendants conspired to cover up Murphy's attempt to start the Tier III disciplinary hearing because Murphy could not have served as the hearing officer. Murphy stated that he stopped the hearing once he realized that Lewis had not received a copy of the misbehavior report. Lewis was provided a copy and the hearing commenced on November 21, 2011 with Gutwein as the hearing officer. Therefore, there was no wrongdoing on Murphy's part for the defendants to cover up.

**\*15** Lewis alleges that there must have been an agreement to conspire against him because of the alleged discrepancies and false statements in the extension requests, Miller's letter ruling on the appeal, and other prison forms. These allegations are conclusory and do not

provide any evidence that the defendants made an actual agreement to deprive Lewis of his constitutional rights. Furthermore, as discussed *supra,* there was no deprivation of Lewis's constitutional rights and therefore there can be no valid conspiracy claim.

Moreover, Lewis's conspiracy claim fails on the grounds that it is barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Nassau Cnty. Employee "L" v. Cnty. of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (internal citations and quotation marks omitted). The doctrine applies when officers and officials are working in the scope of their official duties. *Id.* Although the doctrine began in cases involving corporations, the doctrine has been extended where there are allegations of conspiracy between a public entity and its employees. *Id.; see also Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (collecting cases). This doctrine would therefore exclude conspiracy claims against employees of DOCCS working within the scope of their employment. *Hartline v. Gallo,* 546 F.3d 95, 99, n. 3 (2d Cir.2008) (citations omitted); *Little v. City of New York,* 487 F.Supp. 426, 441–42 (S.D.N.Y.2007) (citations omitted). There is an exception to the doctrine when the individuals of the conspiracy are "pursuing personal interests that are separate and apart from the entity." *Nassau Cnty. Employee "L",* 345 F.Supp.2d at 304. Furthermore, personal bias is not considered a personal interest and is not within the exception to the intra-corporate conspiracy doctrine. *Everson,* 216 F.Supp.2d at 76 (citations omitted).

In this case, Lewis's allegations of conspiracy are against defendants who were all employees of DOCCS, which is one public entity, who were acting within the scope of their employment when they filed extension requests and other prison forms. Therefore, they are legally incapable of conspiring against each other. Lewis makes no allegation that the defendants were pursuing personal interest apart from their official duties. As such, Lewis's conspiracy claim fails as a matter of law.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants contend that even if Lewis's § 1983 Fourteenth Amendment and conspiracy claims are substantiated, they are nevertheless entitled to qualified

immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230.

**\*16** Here, the second prong of the inquiry need not be addressed with respect to Lewis's Fourteenth Amendment and conspiracy claims against the defendants because, as discussed *supra,* it has not been shown that defendants violated Lewis's Fourteenth Amendment rights or conspired against Lewis to violate his Fourteenth Amendment rights.

Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 46) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: June 27, 2014.                                    Not Reported in F.Supp.3d, 2014 WL 3729362

**All Citations**

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1128245
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Shihsiang Liao, a/k/a Shih-Siang Shawn Liao,
Plaintiff,
v.
Faisal Malik,[1] Defendant.

Civil Action No. 9:13-CV-1497 (GTS/DEP)
|
Signed 02/26/2016

[1]     The remaining defendant in this action is identified in
        plaintiff's complaint as S. Malik. *Dkt. No. 1 at 3.* It is
        clear from his motion papers, however, that defendant's
        first name is 'Faisal.' See, e.g., *Dkt. No. 41-2 at 1.* The
        clerk of the court is respectfully directed to adjust the
        court's records accordingly.

**Attorneys and Law Firms**

FOR PLAINTIFF: SHIHSIANG LIAO, Pro se, P.O. Box
472, Wassaic, NY 12592.

FOR DEFENDANT: HON. ERIC T. SCHNEIDERMAN,
New York State Attorney General, The Capitol, KEITH J.
STARLIN, ESQ., Assistant Attorney General, Albany,
NY 12224.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff
Shihsiang Liao, a former New York State prison inmate
who has also identified himself as Shih–Siang Shawn
Liao, against four employees of the New York State
Department of Corrections and Community Supervision
("DOCCS"), including its former commissioner and
current acting commissioner, pursuant to 42 U.S.C. §
1983. While his complaint contains additional claims, the
sole remaining cause of action in this case is asserted
against defendant Faisal Malik based on allegations that
he denied plaintiff due process while assisting him in
preparing for a disciplinary hearing by failing to interview
and obtain witnesses identified by plaintiff.

Currently pending before the court is a motion brought by
the defendant Malik requesting the entry of summary
judgment dismissing plaintiff's remaining claim. For the
reasons set forth below, I recommend that defendant's
motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND*[2]

[2]     In light of the procedural posture of this case, the
        following recitation is derived from the record now
        before the court, with all inferences and ambiguities
        resolved in plaintiff's favor. *Terry v. Ashcroft,* 336 F.3d
        128, 137 (2d Cir. 2003).

Prior to his release from prison in or about September
2014, *Dkt. No. 25,* plaintiff was an inmate held in the
custody of the DOCCS.[3] *See generally Dkt. No. 1.* At the
times relevant to his remaining claim, plaintiff was
confined initially in the Ogdensburg Correctional Facility
("Ogdensburg"), located in Ogdensburg, New York, and
later the Gouverneur Correctional Facility
("Gouverneur"), located in Gouverneur, New York. *Id.*;
*Dkt. No. 41–6 at 19.*

[3]     It appears that following his release from prison in New
        York, plaintiff served time in two correctional facilities
        in Ohio. Dkt. Nos. 25, 30; *see also Dkt. No. 41–6 at
        129.*

On November 19, 2010, plaintiff was issued a series of
misbehavior reports accusing him of violating prison rules
arising from conduct occurring while housed in
Ogdensburg. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7.* The
charges set forth in those misbehavior reports accused the
plaintiff of (1) soliciting goods or services without
consent from the superintendent or his designee; (2) the
unauthorized exchange of personal items without
authorization; (3) possession of contraband; (4) taking
state property; (5) providing incomplete, misleading,
and/or false statements or information; (6) impersonation;
and (7) providing legal assistance to another inmate
without prior approval from the superintendent or his
designee. *Dkt. No. 1 at 21–24; Dkt. No. 41–7.* Those
charges were based upon a search of plaintiff's cell,
conducted on November 19, 2010, and the resulting
confiscation of several prohibited items. *Dkt. No. 1 at 4,*
21–24; *Dkt. No. 41–7; see also Dkt. No. 41–6 at 17–19.*

Following the issuance of the misbehavior reports,
plaintiff was transferred to a special housing unit ("SHU")

in Gouverneur to await a Tier III disciplinary hearing concerning the pending charges.[4] *Dkt. No. 41–6 at 16,* 19. In preparation for the Tier III hearing, defendant Faisal Malik, who at the time was a vocational instructor at the facility, was assigned to assist plaintiff. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 1,* 6–7. After receiving the assignment, defendant Malik met with plaintiff on November 22, 2010. *Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 28.* While the parties generally disagree as to what occurred after their meeting on November 22, 2010, both plaintiff and defendant appear to agree that plaintiff provided defendant with several names of individuals who he wished to have testify on his behalf at the upcoming disciplinary hearing. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 21.* One of the individuals was identified by plaintiff as Ronlad Gantt, an inmate in Ogdensburg. *Dkt. No. 41–2 at 7.* Another potential witness was Tom Lawrence, the facility law librarian at Ogdensburg. *Id.; see also Dkt. No. 41–6 at 32.* The other witnesses plaintiff identified to defendant Malik during their meeting were (1) May Liao, plaintiff's sister, who lived in Seattle, Washington; (2) Scot Liao, plaintiff's father, who lived in Taiwan; (3) Ronald Abraham, an administrative law judge who lived in Brooklyn, New York; (4) Imam Settles, the Imam assigned to Ogdensburg; and (5) an individual plaintiff indicated worked as a volunteer for an organization called Chan Meditation. *Dkt. No. 1 at 26; Dkt. No. 41–2 at 7; Dkt. No. 41–3.* Plaintiff expected that defendant Malik would contact each of the individuals and ensure that they would be available to testify at the hearing by way of personal appearance, telephone, or written affidavit. *Dkt. No. 41–6 at 40–41.*

---

[4]  The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also* *Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

**\*2** A Tier III hearing was conducted by Hearing Officer Randy Abar, beginning on November 30, 2010, to address the charges lodged in the misbehavior reports dated November 19, 2010. *Dkt. No. 41–8.* On December 2, 2010, at the close of the hearing, plaintiff was found guilty on all counts, with the exception of the charge of unlawful soliciting. *Dkt. No. 41–8 at 28.* Based upon that finding, Hearing Officer Abar imposed a penalty that

included six months of disciplinary SHU confinement, with a corresponding six-month loss of recreation, packages, commissary, and telephone privileges, and additionally recommended that plaintiff forfeit three months of good time credits. *Id.* The hearing officer's determination was administratively reversed on May 9, 2012, based upon a review by Corey Bedard, the DOCCS's Acting Director of Special Housing/Inmate Disciplinary Program. *Dkt. No. 1 at 38.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about December 5, 2013. *Dkt. No. 1.* As defendants, plaintiff's complaint names K. Trimm, a corrections sergeant; Faisal Malik, a civilian employee; Ann Charlebois, the former DOCCS Acting Superintendent; Brian Fischer, the former DOCCS Commissioner; and Anthony J. Annucci, the Acting DOCCS Commissioner, and sets forth several causes of action against those individuals. *See generally id.* Upon initial review of plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"), pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Chief District Judge Glenn T. Suddaby issued a decision and order on June 4, 2014, granting plaintiff's IFP application and dismissing all claims with the exception of plaintiff's procedural due process cause of action against defendant Malik. *Dkt. No. 11.*

On July 9, 2015, following the close of discovery, defendant Malik moved for summary judgment, requesting dismissal of plaintiff's remaining claim against him on a variety of grounds. *Dkt. No. 41.* That motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendant's Motion*
Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express,* 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendant's motion. The motion was properly filed by defendant Malik, and defendant, through his motion, has met his burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendant has met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)).[5]

[5]  Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*3** Because defendant has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendant's motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010)* (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's Local Rule 7.1 Statement, *Dkt. No. 41 at 3,* and he has failed to do so, I recommend that the court deem the facts contained in defendant's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

### B. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see*

also *Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Analysis of Plaintiff's Procedural Due Process Claim*
In his remaining claim, plaintiff contends that defendant Malik deprived him of procedural due process as guaranteed under the Fourteenth Amendment while assisting him in preparing for his Tier III disciplinary hearing. *Dkt. No. 1 at 7–8.* To prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir. 1996).

As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[6] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

---

[6]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

**\*5** As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation

under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon, 215 F.3d at 231* ("Confinement in normal SHU for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, although Hearing Officer Abar sentenced plaintiff to six months of disciplinary SHU confinement, plaintiff testified at his deposition that he served approximately five months, or 150 days, in the SHU, having been released early for good behavior. *Dkt. No. 41–6 at 118*. Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky, 292 F. App'x 120, 123 (2d Cir. 2008)*. While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were not extraordinary in any way,[7] defendant has not provided the court any evidence with respect to the conditions of ordinary prison life in support of his motion. Because the court is without this evidence, it cannot undertake the type of specific fact-finding required to determine, on summary judgment, whether plaintiff suffered an atypical and significant hardship during his confinement. *See Reynoso, 292 F. App'x at 123* (reversing the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest by way of his five-month SHU confinement and have proceeded to analyze whether defendant Malik provided plaintiff with constitutionally adequate assistance prior to his disciplinary hearing.

[7]   Plaintiff testified that, while confined in the SHU, he (1) requested legal materials from the law library daily and that they were delivered to him approximately four days later; (2) was permitted to choose non-legal books to read once per week when a corrections officer would do rounds with a cart of books; (3) was permitted to shower three times per week; (4) was provided access to the outdoors for a period of recreation time one hour per day; (5) ate three meals per day; and (6) was allowed to write, send, and receive mail and otherwise correspond with corrections staff by way of "interview slips." *Dkt. No. 41–6 at 119–26*.

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell, 418 U.S. 539 (1974)*. In its decision in *Wolff,* the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff, 418 U.S. at 564–69; see also Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004)*. To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill, 472 U.S. 445, 455 (1985); Luna, 356 F.3d at 487–88*.

**\*6** Plaintiff's only contention against defendant Malik is centered upon the duty under *Wolff* to provide assistance in preparing a defense. As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin, 858 F.2d 889, 897 (2d Cir. 1988)*. That requirement is particularly acute when an inmate faces obstacles in defending himself, including "being confined full-time to SHU[.]" *Eng, 858 F.2d at 897*. Although the Second Circuit in *Eng* specifically declined to define the extent of an assistant's obligations in helping an inmate to prepare for a disciplinary hearing, it offered the following observation:

> Although this is not the occasion to define the assigned assistant's precise role and the contours of the assistant's obligations, such help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Id*. at 898; accord, *Samuels v. Selsky, 166 F. App'x 552, 556 (2d Cir. 2006)*.[8]

[8]   The constitutional requirement to provide an assistant

to an inmate to aid in preparing for a disciplinary hearing is echoed in New York by regulation. 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2; *see also Brooks v. Prack,* 77 F.Supp.3d 301, 315 (W.D.N.Y.2014); *Fernandez v. Callens,* No. 06–CV–0506, 2010 WL 4320362, at *9 (W.D.N.Y. Oct. 29, 2010).

The scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng,* is not unlimited, and clearly does not require the assignment of counsel or of the functional equivalent of a private investigator. *See Samuels,* 166 F. App'x at 556 ("The required assistance does not equate to legal counsel."); *Fernandez,* 2010 WL 4320362, at *9 ("The Supreme Court has held that a prisoner's right to assistance as a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney."); *Gates v. Selsky,* No. 02–CV–0496, 2005 WL 2136914, at *6 (W.D.N.Y. Sept. 2, 2005) (citing cases). The assigned assistant is required only to perform those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n assistant must be assigned to the inmate to act as his *surrogate* – to do what the inmate would have done were he able." (emphasis in original)); *accord, Samuels,* 166 F. App'x at 556; *see also Lewis v. Murphy,* No. 12–CV–0268, 2014 WL 3729362, at *12 (N.D.N.Y. July 24, 2014) (Mordue, J., *adopting report and recommendation by* Hummel, M.J.). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009).

In support of his motion, defendant Malik, a vocational instructor who is periodically assigned to assist inmates in connection with disciplinary hearings and has received DOCCS training for serving in that role, has submitted a declaration detailing his efforts to assist plaintiff in mounting a defense to the charges against him. *See generally Dkt. No. 41–2.* According to that declaration, after being assigned to the matter, defendant Milak met with plaintiff on November 22, 2010, to discuss the charges against him. *Dkt. No. 41–2 at 6–7.* After reviewing the charges and insuring that plaintiff understood them, defendant Malik inquired as to what assistance plaintiff desired. *Id.* at 7. Liao identified several witnesses who he contemplated calling as witnesses at the hearing, including inmate Gantt; Ogdensburg Law Librarian Tom Lawrence; May Liao, plaintiff's sister; Scot Liao, plaintiff's father; Ronald Abraham, an administrative law judge; Imam Settles assigned to Ogdensburg; and an unidentified individual who plaintiff referred to as a volunteer at Chan Meditation. *Id.*; *see also Dkt. No. 41–3.* Plaintiff told defendant Malik that he would like all of those individuals to testify at the upcoming hearing, either in person or by phone, notwithstanding that plaintiff's sister lived in the State of Washington, plaintiff's father was located in Taiwan, and Ronald Abraham resided in Brooklyn. *Dkt. No. 41–2 at 7.* Uncertain of the extent of his obligation with regard to plaintiff's requested witnesses, defendant Malik contacted the prison disciplinary office and learned that inmate Gantt had been released on November 17, 2010. *Id.* at 8; *see also Dkt. No. 41–4.* Defendant was informed by the disciplinary officer on duty that employee assistants are not required to track down non-inmate potential witnesses outside of the facility or to arrange for or schedule the testimony of non-inmates who are "outside the correctional facility." *Dkt. No. 41–2 at 8.*

**\*7** Immediately following his discussion with the disciplinary office, defendant Malik reports that he returned to plaintiff's cell and informed him of Gantt's release from Ogdensburg, and advised plaintiff that he would have to provide contact information for the other desired witnesses who were not inmates and/or working in a DOCCS facility. *Dkt. No. 41–2 at 9.* Defendant Malik informed plaintiff "that he would then have to tell the hearing officer that he wanted them to testify, that the hearing officer would then decide if they could testify, and that if he/she decided to allow them to testify, their testimony would then be scheduled and arranged." *Id.* According to defendant, plaintiff responded by providing defendant Malik the phone number for his sister, and defendant wrote that number down on the assistant form. *Id.*; *Dkt. No. 41–3.* Plaintiff also told defendant that he would obtain the contact information for the other witnesses, aside from Tom Lawrence, from his sister. *Dkt. No. 41–2 at 9–10.* Plaintiff "did not tell [defendant Malik] that he needed assistance with anything else," and defendant then asked plaintiff to sign and date the assistant form, and plaintiff complied. *Id.* at 10. Defendant Malik did not hear anything further from plaintiff in connection with his assignment as plaintiff's assistant. *Id.* at 10.

Although plaintiff's version of the interaction with defendant Malik on November 22, 2010, differs to some degree, the factual disputes are not material. Plaintiff contends that defendant Malik forced plaintiff to sign the assistant form at the end of their meeting, which plaintiff alleges lasted only fifteen minutes, by threatening plaintiff with an additional misbehavior report for failing to

comply with a direct order. *Dkt. No. 1 at 7–8; Dkt. No. 41–6 at 23*. Additionally, plaintiff alleges that he did not see or speak with defendant Malik again after their first meeting. *Dkt. No. 41–6 at 29*. Defendant Malik disputes these allegations by plaintiff. *Dkt. No. 41–2 at 9–11*.

Even assuming plaintiff's allegations are true – that he was forced to sign the assistant form and did not see or hear from defendant Malik again after their first meeting – there is no record evidence that supports plaintiff's claims that defendant Malik did nothing to assist him. In fact, on the first day of the disciplinary hearing, plaintiff was under the impression that defendant Malik was contacting witnesses for him. *Dkt. No. 41–6 at 58*. While defendant Malik has offered a detailed account of his efforts to provide plaintiff assistance, Dkt. No. 41–2, plaintiff has failed to adduce any evidence, nor is there any in the record, that suggests defendant Malik provided plaintiff with constitutionally inadequate assistance. It is clear from plaintiff's deposition testimony that he expected defendant Malik to undertake the role of plaintiff's advocate by contacting his requested witnesses, explaining plaintiff's circumstances, and arranging for them to testify in person, by phone, or by way of a prepared affidavit. Dkt. No. 41–6 at34–36, 38–41. Additionally, plaintiff expected defendant Malik to arrange a settlement of the misbehavior report between him and facility security to avoid the need for a disciplinary hearing. *Id.* at 84.

Plainly, plaintiff's expectations for his assigned assistant were unreasonable and exceeded the constitutional requirements under *Wolff* and *Eng*. Both the Supreme Court and courts in this circuit have unequivocally held that the constitution does not require inmate assistants to serve as legal counsel or investigator for prisoners. *Wolff, 418 U.S. at 570; Samuels, 166 F. App'x at 556; Gates, 2005 WL 2136914, at *6*. Setting aside plaintiff's unsupported allegations that defendant Malik did not assist him in any way, the uncontroverted record evidence in this case reflects that defendant met with plaintiff ahead of the hearing, explained to him the charges, asked for a list of potential witnesses, clarified his role as plaintiff's assistant with the disciplinary office, and informed plaintiff that he would be responsible for gathering the contact information for the witnesses that were not employed at Ogdensburg and then requesting them as witnesses during the hearing. *SeeDkt. No. 41–2*. This conduct satisfies the due process to which plaintiff was entitled. In any event, even assuming defendant Malik's assistance fell short, any error was harmless in light of Hearing Officer Abar's rejection of plaintiff's requests to call the potential witnesses plaintiff alleges defendant Malik should have contacted prior to the

hearing.[9] *Dkt. No. 41–6 at 99; Dkt. No. 41–8 at 2*, 3, 4, 16, 26. Based upon the foregoing, I recommend defendant Malik's motion be granted.[10]

[9]  At the hearing, plaintiff did not request to call Imam Settles or the individual referred to by plaintiff as a volunteer at for Chan Meditation as witnesses. *See generallyDkt. No. 41–8*.

[10]  In light of my recommendation that defendant's motion be granted on the merits, I have not addressed the additional arguments set forth in his motion. With respect to whether plaintiff exhausted the available administrative remedies prior to filing this action, however, it is worth noting that there is no dispute that plaintiff failed to file a grievance through the DOCCS's inmate grievance program regarding the alleged inadequate assistance he received from defendant Malik. *Dkt. No. 41–6 at 104*. Plaintiff's vague and unsupported allegations that he did not file a grievance because he "was afraid of retaliation" is not sufficient to excuse that failure. *See, e.g., Baines v. McGinnis, 766 F.Supp.2d 502, 504 (W.D.N.Y.2011)* (citing *McCloud v. Tureglio, No. 07–CV–0650, 2008 WL 1772305, at *11 (N.D.N.Y. Apr. 15, 2008)* (Mordue, J., *adopting report and recommendation by* Lowe, M.J.)). While it is true that an appeal from a disciplinary hearing that raises the precise procedural infirmities asserted in a section 1983 action may be sufficient to exhaust administrative remedies, *LaBounty v. Johnson, 253 F.Supp.2d 496, 502 n. 5 (W.D.N.Y.2013)*, there is no record evidence reflecting whether plaintiff raised his claim regarding defendant Malik in his appeal of Hearing Officer Abar's determination that was ultimately reversed. It seems unlikely that plaintiff would have included this ground as a basis for his appeal in light of his insistence that he did not file a grievance through the facility because of a fear of retaliation and that, by naming a particular person in a grievance or complaint, he would be targeted by corrections officers. See *Dkt. No. 41–6 at 138–40*, 156–57, 162. Accordingly, while I do not recommend dismissal of defendant's complaint on this basis, and do not intend to render any findings on this issue, it does appear likely that plaintiff's complaint is procedurally barred based on his failure to exhaust the available administrative remedies prior to filing suit.

## IV. *SUMMARY AND RECOMMENDATION*

**\*8** Defendant has moved for summary judgment dismissing the sole remaining claim in this action, relating to plaintiff's allegation that he was denied procedural due process as a result of defendant's failure to render proper

assistance to him in preparing for a disciplinary hearing. Because plaintiff has failed to oppose defendant's motion, and I find that it is facially meritorious, I recommend that it be granted on this basis. Moreover, the record before the court, including a declaration from defendant Malik detailing his efforts on plaintiff's behalf, demonstrates both that there are no genuine disputes of material fact for trial and that no reasonable factfinder could conclude that defendant deprived plaintiff of procedural due process. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment *(Dkt. No. 41)* be GRANTED and that plaintiff's remaining claim in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993).*

**All Citations**

Slip Copy, 2016 WL 1128245

2014 WL 4676569
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

James O. MURRAY, III, Plaintiff,

v.

T. ARQUITT, Correction Officer, Upstate
Correctional Facility; Norman Bezio, Director
Special Housing, Inmate Disciplinary Programs,
New York State Department of Correctional
Services; B. Bogett, Correction Officer, Upstate
Correctional Facility; B. Clark, Correction Officer,
Upstate Correctional Facility; B. Fischer,
Commissioner, New York State Department of
Correctional Services; B. Grant, Correction
Officer, Upstate Correctional Facility; J. Herbert,
Sergeant, Upstate Correctional Facility; J.
Laramay, Lieutenant, Upstate Correctional
Facility; F. Manley; J. McGaw, Correction Officer,
Upstate Correctional Facility; Albert Prack, Acting
Director Special Housing, Inmate Disciplinary
Program, New York State Department of
Correctional Services; T. Ramsdell, Correction
Officer, Upstate Correctional Facility; D. Rock,
Superintendent, Upstate Correctional Facility; C.
Rowe, Correction Officer, Upstate Correctional
Facility; Stanley Tulip, Correction Officer, Upstate
Correctional Facility; Uhler, Deputy Supt. of Sec.
Serv., all in their Individual and Official
Capacities, Defendants.

No. 9:10–CV–1440 (NAM/CFH).
|
Signed Sept. 17, 2014.
|
Filed Sept. 18, 2014.

Attorneys and Law Firms

James O. Murray, III, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Colleen D. Galligan, Esq., Assistant
Attorney General, Albany, NY, for Defendants.

MEMORANDUM–DECISION AND ORDER

Hon. NORMAN A. MORDUE, Senior District Judge.

INTRODUCTION

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Corrections and Community
Supervision ("DOCCS"), brought this *pro se* action under
42 U.S.C. § 1983. Defendants' motion for partial
summary judgment (Dkt. No. 103) was referred to United
States Magistrate Judge Christian F. Hummell for a report
and recommendation pursuant to 28 U.S.C. §
636(b)(1)(B) and Local Rule 72.3(c). In his
Report–Recommendation and Order (Dkt. No. 117)
Magistrate Judge Hummel recommends that the motion
be granted.

Plaintiff has filed objections to the
Report–Recommendation and Order (Dkt. No. 124).
Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews
*de novo* those parts of a report and recommendation to
which a party specifically objects. Where a party
interposes only general objections to a report and
recommendation, the Court reviews for clear error or
manifest injustice. *See Davis v. Chapple,* 2010 WL
145298, *2 (N.D.N.Y. Jan. 8, 2010), Brown v. Peters,*
1997 WL 599355,*2–* 3 (N.D.N.Y.), *aff'd without op.,*
175 F.3d 1007 (2d Cir.1999). As set forth below, the
Court accepts the Report–Recommendation and Order
and grants the motion.

STANDARD ON SUMMARY JUDGMENT MOTION

Summary judgment is appropriate when there is no
genuine issue with regard to any material fact, and the
moving party is entitled to judgment as a matter of law.
*See Celotex Corp. v.Catrett,* 477 U.S. 317, 322 (1986).
Stated otherwise, summary judgment is appropriate
"[w]here the record taken as a whole could not lead to a
rational trier of fact to find for the non-moving party [.]"
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475
U.S. 574, 587 (1986). When deciding a summary
judgment motion, the Court must "resolve all ambiguities
and draw all factual inferences in favor of the party
opposing the motion." *McPherson v. Coombe,* 174 F.3d
276, 280 (2d Cir.1999). Where, as here, the nonmovant is
proceeding pro se, the Court must read that party's papers
liberally and interpret them "to raise the strongest
arguments that they suggest." *Id.* (citation omitted).

## DISCUSSION

Plaintiff raises two objections to the Report–Recommendation and Order. First, he objects to dismissal of the Eighth Amendment claims against Corrections Officer T. Ramsdell on the ground of lack of personal involvement. Officer Ramsdell testified at the Tier III hearing that when he arrived at the scene of the altercation in the infirmary, the use of force was over and all he did was "relieve the officers that were holding [plaintiff]." Officer Ramsdell further stated that plaintiff was then placed in a cell with no additional use of force. Officer Ramsdell's testimony is consistent with that of other corrections officers and the various reports of the incident. The Court agrees with Magistrate Judge Hummel that plaintiff's single conclusory statement at the Tier III hearing that at some point during the incident he saw Officer Ramsdell is insufficient under all the circumstances to raise a question of fact on excessive force or failure to intervene, particularly in light of plaintiff's deposition testimony that he named Officer Ramsdell as a defendant solely because his name appeared on the use of force report. Plaintiff's objection cites to no other evidence supporting his claim against Officer Ramsdell. On *de novo* review, reading plaintiff's papers liberally, interpreting them to raise the strongest arguments that they suggest, and resolving all ambiguities and drawing all factual inferences in plaintiff's favor, the Court grants summary judgment dismissing the Eighth Amendment claims against Officer Ramsdell for lack of personal involvement.

**\*2** Plaintiff's second specific objection to the Report–Recommendation and Order concerns the recommendation that summary judgment be granted dismissing the due process claims against the following defendants: Deputy Superintendent Uhler, who conducted the Tier III hearing; Director of Special Housing/Inmate Discipline Bezio; Acting Director of Special Housing/Inmate Discipline Albert Prack; Superintendent Rock; and Commissioner Brian Fischer. In his objection, plaintiff argues that his due process rights were violated at the Tier III hearing because Deputy Superintendent Uhler should have considered a videotape of plaintiff's medical examination on the day following the alleged incident, and because the following people should have been called as witnesses: Lt. Laramy; Corrections Officers Ramsdell, Manley, and Bogett; Dr. Weisman; Inmates Robertson and Gillard. On *de novo* review, after reading the transcript of the Tier III hearing and reviewing the record, and giving plaintiff all the deference to which he is entitled as a *pro se* litigant, the Court finds as a matter of law that plaintiff was afforded due process at the Tier III hearing. Further, there is no basis to find personal involvement in any infringement of plaintiff's rights on

the part of Director Prack, Superintendent Rock, or Commissioner Fischer.

In addition to the two above-discussed objections, plaintiff merely states that he "objects to the Report–Recommendation and Order in its entirety." In response to this general objection, the Court reviews the remaining issues for clear error or manifest injustice. There is no error or manifest injustice, and the Report–Recommendation and Order is accepted in its entirety.

It is therefore

ORDERED that the Report–Recommendation and Order (Dkt. No. 117) is accepted; and it is further

ORDERED that defendants' motion for partial summary judgment (Dkt. No. 103) is granted; and it is further

ORDERED that summary judgment is granted dismissing all claims against the following defendants: Corrections Officer T. Ramsdell; Director Norman Bezio; Commissioner Fischer; Director Albert Prack; Superintendent Rock; and Deputy Superintendent Uhler; and it is further

ORDERED that summary judgment is granted dismissing the claims against Officer Tulip and Sergeant Herbert for allegedly filing false misbehavior reports against plaintiff; and it is further

ORDERED that all claims against all defendants in their official capacities are dismissed; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

JAMES O. MURRAY, III,

Plaintiff,

v.

T. ARQUITT, Correction Officer, Upstate Correctional Facility; NORMAN BEZIO, Director Special Housing, Inmate Disciplinary Programs, New York State Department of Correctional Services; B. BOGETT, Correction Officer, Upstate Correctional Facility; B. CLARK, Correction Officer, Upstate Correctional

Facility; B. FISCHER, Commissioner, New York State Department of Correctional Services; B. GRANT, Correction Officer, Upstate Correctional Facility; J. HERBERT, Sergeant, Upstate Correctional Facility; J. LARAMAY, Lieutenant, Upstate Correctional Facility; F. MANLEY; J. McGAW, Correction Officer, Upstate Correctional Facility; ALBERT PRACK, Acting Director Special Housing, Inmate Disciplinary Program, New York State Department of Correctional Services; T. RAMSDELL, Correction Officer, Upstate Correctional Facility; D. ROCK, Superintendent, Upstate Correctional Facility; C. ROWE, Correction Officer, Upstate Correctional Facility; STANLEY TULIP, Correction Officer, Upstate Correctional Facility; UHLER, Deputy Supt. of Sec. Serv., all in their Individual and Official Capacities,

**\*3** Defendants.[1]

[1]    In his acknowledgment of receipt of summons and complaint, defendant"Herbert" spelled his name as "Hebert." Dkt. No. 22. The Court notes the discrepancy as mere error on Murray's part and proceeds with the latter spelling in this Report–Recommendation.

### REPORT–RECOMMENDATION AND ORDER[2]

[2]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff *pro se* James O. Murray, III ("Murray"), an inmate currently in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, sixteen DOCCS employees, violated his rights under the Eighth and Fourteenth Amendments. Compl. (Dkt. No. 1). Presently pending is defendants' motion for partial summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 103. Murray opposes. Dkt. No. 116. For the following reasons, it is recommended that defendants' motion be granted.

### I. Background

The facts are related herein in the light most favorable to Murray as the non-moving party. *See* subsection II(A)

*infra.* At all relevant times, Murray was an inmate at the Upstate Correctional Facility ("Upstate").

### A. Assault—Plaintiff's Account

On December 3, 2009, Murray was experiencing chest pains and requested emergency call out. Murray Dep. (Dkt. No. 103–15) at 12–13. Non-party Nurse Travers brought Murray to the infirmary for an EKG. Murray Dep. at 14–18; Dkt. No. 103–11 at 15–16. At the infirmary, medical personnel gave Murray an EKG and concluded that Murray's symptoms resulted from indigestion. Murray Dep. at 24–25; Dkt. No. 103–11 at 20. Non-party Dr. Weissman examined Murray and concluded that there was nothing wrong with Murray. Murray Dep. at 32.

Defendants and Corrections Officers Arquitt and Tulip escorted Murray back to the cellblock. Murray Dep. at 32–33. Murray was handcuffed in the front and had on a waist chain. *Id.* at 23; Dkt. No. 103–11 at 28; *see* Compl. §§ 1–2. Tulip walked behind Murray and Arquitt walked in front of Murray. Dkt. No. 103–11 at 63, 72; *see* Dkt. No. 103–11 at 21. Murray contends that while Arquitt was opening a door, Tulip hit him on the back the head. Murray Dep. at 34–35; *see* Compl. §§ 1–2. Murray believes Tulip then tackled him. Murray Dep. at 53. Murray thought to go through the door because that area was visible to a video camera. *Id.* at 35, 55; Dkt. No. 103–11 at 21. Several corrections officers arrived and proceeded to assault Murray. Murray Dep. at 36. Specifically, Arquitt twisted Murray's ankle. Dkt. No. 103–11 at 21.

Murray was then escorted to the infirmary holding pen. Murray Dep. at 53–54. Murray alleged that, while still in a waist chain and handcuffed, defendants assaulted him in the holding pen. *Id.* at 51–52, 55; Dkt. No. 103–11 at 22. Specifically, Grant pressed down on Murray to the point that Murray could not breathe. Murray Dep. at 52–53. Murray reacted by trying to bite Grant's hand. *Id.* at 66. The officers stood Murray up against a wall. Dkt. No. 103–11 at 23. An unidentified officer ran a finger down Murray's back, hit Murray in the kidney area, spun Murray around, and attempted to hit Murray with his knee. Murray Dep. at 57, 59–60. Murray brought his own knee upward to block his groin area. *Id.* at 60. The officer attempted to hit Murray a few times before Murray fell to the ground. *Id.* at 60–61. The officers proceeded to kick and hit Murray on the floor while calling Murray racial slurs. *Id.* at 63. Defendant Laramay told the officers to knock out Murray's teeth because of Murray's grievance

activities. *Id.* at 67. The officers then sat Murray on a bench. *Id.* at 64. Defendant and Sergeant Hebert arrived, called Murray racial and religious slurs, stated "we'll kill you," and complained about the lawsuits and grievances that Murray had filed. *Id.* Hebert did not use force against Murray. *Id.* at 65.

**\*4** On December 4, 2009, Murray requested sick call. Murray Dep. at 72–73. On December 8, 2009, Murray was taken to the Alice Hyde Medical Center ("Alice Hyde") for medical treatment. *Id.* at 73. Murray alleged that at Alice Hyde, he received surgery, had a tube inserted into him to "suck[ ] the blood out," was prescribed pain medication, and was admitted for three to four days. *Id.* at 73–74. As a result of the assaults, Murray alleges that he sustained broken ribs, a collapsed lung, cuts, bruises, swelling, extreme pain in the back, neck, hip, shoulder, head, mental distress, fear of death, nightmares, flashbacks, sleeping problems, and depression.[3] Compl. ¶¶ 5–6.

[3]    In his deposition, Murray generally contends that defendants used excessive force against him as part of a conspiracy to retaliate against him for his filing of grievances and lawsuits against them. *See, e.g.,* Murray Dep. at 38–39, 44–46, 50–52. Retaliation and conspiracy claims were neither alleged in Murray's complaint nor response to defendants' motion for summary judgment. In any event, Murray's attempt to allege either claim has failed.

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Here, Murray proffers only conclusory testimony that defendants had violated his constitutional rights in retaliation for the filing of grievances and lawsuits. Murray proffers nothing more going to when and against whom he filed such grievances and lawsuits, the results of the grievances and lawsuits, or his prior disciplinary history. *Barclay v. New York,* 477 F.Supp.2d 546, 588 (N.D.N.Y.2007) (citations omitted) ("Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."). As such Murray has failed to assert a potential First Amendment retaliation claim against the defendants.

In order to support a claim for conspiracy under §§

1983 or 1985, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v.. Cnty. of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143,177 (2d Cir.2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Here, Murray fails to provide evidence sufficient to support a viable conspiracy claim among the defendants. There is nothing in the record to establish that defendants had any type of agreement between them. There were no allegations outlining with specificity when, why, or how an alleged conspiracy occurred. *Warren,* 33 F.Supp.2d at 177. Murray fails to provide any plausible information which would lend credence to a claim of an explicit or implicit agreement between any or all of the defendants. *Anilao v. Spota,* 774 F.Supp.2d 457, 512–13 (E.D.N.Y.2011) (citations omitted). As such, Murray has failed to allege any potential conspiracy claims in this action.

Accordingly, Murray's potential conspiracy and retaliation claims must fail.

## B. Assault—Defendants' Account

Defendants proffer a different account of the use of force incidents. Arquitt and Tulip were escorting Murray from the infirmary and as they approached the fire door, Murray turned around and kicked Tulip in the groin area. Dkt. Nos. 103–7 at 7 (misbehavior report), 8 (unusual incident report), 11 (use of force report), 20, 103–11 at 55, 75. Arquitt had turned his head slightly and saw Murray kicking Tulip. Dkt. No. 103–11 at 75. Murray continued kicking and the three men fell through the door and onto the ground. Dkt. No. 103–7 at 20. Tulip fell onto Murray in an attempt to control Murray's feet but became "incapacitated" and rolled on the ground. Dkt. No. 103–7 at 17; *see* Dkt. No. 103–11 at 55, 65–66. Murray attempted to bite Arquitt, who was at that point positioned around Murray's head and shoulder area. Dkt. No. 103–11 at 76.

Arquitt, along with defendants and Corrections Officers Bogett, Clark, and Grant, forced Murray to the floor using body holds. Dkt. No. 103–7 at 8, 11. Arquitt held down Murray's head with his left hand and applied pressure to Murray's left shoulder with his right hand. *Id.* at 8, 11, 20. Bogett controlled Murray's waist chain with his left hand and placed his left knee on Murray's back. *Id.* at 8, 11, 15. Clark bent Murray's left leg across the back side of the right leg then bent the right leg up into a figure four leg hold. *Id.* at 8, 11, 17.

Hebert arrived and ordered the officers to carry Murray into the infirmary holding pen because Murray was non-complaint. Dkt. No. 103–7 at 8, 11. Bogett grabbed Murray's shirt with his left hand and controlled Murray's right arm with his right hand. *Id.* at 8, 11, 15. Grant took control of Murray's left arm with both hands to carry him while Arquitt took Murray's legs in his left arms. *Id.* at 8, 11, 20–21. Clark attended to Tulip. *Id.* at 17.

Hebert was in the infirmary holding pen with Murray. Dkt. No. 103–7 at 6 (misbehavior report). Murray refused to comply with staff and attempted to bite and kick Grant. Dkt. Nos. 103–7 at 6, 8, 11, 21, 103–11 at 114. Hebert gave several direct orders to Murray but Murray refused to comply. Dkt. No. 103–7 at 6. Hebert ordered Bogett and Grant to take Murray to the ground and Grant pushed on Murray's upper body while Bogett held onto Murray's legs. Dkt. Nos. 103–7 at 11, 21, 103–11 at 97. Once Murray became complaint, Hebert ordered non-party Corrections Officer McGaw to videotape Murray in the holding pen. Dkt. Nos. 103–7 at 11, 103–11 at 106–07.

**\*5** Defendants and Corrections Officers Manley and Ramsdell responded to the incident, relieved Bogett and Grant, and escorted Murray to see medical personnel. Dkt. No. 103–7 at 18–19. Murray refused to remove his clothing. *Id.* at 8. Medical personnel examined Murray fully-clothed, and noted discoloration at the base of Murray's neck and minor lacerations over the right clavicular area, on and above the bridge of the nose and left eye, to the mid-lower lip, above and below the left eye, and on the anterior of the left ear. *Id.* at 8, 12–13. Defendant and Sergeant Rowe supervised Manley and Ramsdell escorting Murray to his cell block. *Id.* at 14, 18–19. Photographs were taken of Murray's injuries on December 3 and 4, 2009. Dkt. Nos. 103–7 at 8, 14, 27–29, 103–10.[4]

---

[4]    Photos taken by non-party Corrections Officer Gettman on December 4, 2009 of Murray indicate that Murray had red marks on his shoulder blades and neck and cuts between his eyebrows and on his nose. Dkt. No.

103–10 at 2–13.

Grant and Tulip were transported to Alice Hyde. Dkt. No. 103–7 at 8, 103–9 at 19. Tulip had an injury to the groin and Grant had swelling in the left hand. Dkt. No. 103–7 at 8. Grant and Tulip were out of work for four days. Dkt. Nos. 103–7 at 14, 103–11 at 56. Tulip considered his injury as moderate to severe. Dkt. No. 103–11 at 56. Arquitt had pain in the middle finger and remained on duty. Dkt. Nos. 103–7 at 14, 103–9 at 18.

### C. Tier III Disciplinary Hearing and Appeals

On December 4, 2009, Murray received misbehavior reports from Hebert and Tulip. Compl. ¶ 8. Hebert charged Murray with violent conduct, interference with employee, and refusing direct orders. Dkt. No. 103–7 at 3. Tulip charged Murray with violent conduct, assault on staff, and interference with employee.[5] *Id.*

---

[5]    The DOCCS "IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response; and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted). On December 6, 2009, Murray filed a grievance claiming the defendant corrections officers used excessive force against him while also failing to intervene on his behalf. Dkt. No. 103–13 at 6. On January 25, 2010, non-party Deputy Superintendent Otis denied Murray's grievance. *Id.* at 2. On March 10, 2010, CORC affirmed the superintendent's decision. *Id.* at 1.

Murray was provided with non-party Corrections Officer Fish as an inmate assistant. Dkt. No. 103–7 at 5, 66. Fish met Murray on December 7, 2009. Dkt. No. 103–11 at 4. Fish denied Murray the videotape of the holding pen area for December 4, 2009. Dkt. No. 103–7 at 5. Murray's witness request list included: non-party Inmate Bonaparte; non-party Inmate Robertson; Arquitt; Clark; Grant; Hebert; Tulip; non-party Nurse Administrator Smith; and Travers. *Id.*

On December 17, 2009, defendant Captain Uhler commenced a Tier III disciplinary hearing that concluded

on December 30, 2009. Dkt. Nos. 103–11 at 2, 103–12 at 88. Uhler stated that all documents generated from the use of force incidents were provided to Murray. Dkt. No. 103–11 at 9. Such documents included: unusual incident reports; use of force reports; to-and-from memoranda; log book entries; watch commander's log; and misbehavior reports. *Id.*

On December 21, 2009, Murray submitted a written complaint to Uhler. Dkt. No. 103–7 at 33–51. Murray asserts that he received inadequate inmate assistance, was denied the opportunity to present documentary evidence, and Uhler should not have conducted the hearing because Uhler had issued a restraint order against Murray and conducted the investigation. *Id.* at 33; Murray Dep. at 77. Uhler stated that he was not involved in the investigation of the charges. Dkt. No. 103–12 at 87.

#### i. Documentary Evidence

**\*6** At the disciplinary hearing's inception, Murray asked for a copy of Directive # 4940, which provides that when an anticipated use of force incident occurs, a video camera would be dispatched to record the incident. Dkt. No. 103–11 at 6. Uhler explained that despite language in the Directive, the area sergeant was first obligated to secure and move Murray to an area that did not jeopardize the safety and security of the facility. *Id.* at 7.

Uhler explained that he would use his discretion in producing any grievances, complaints, and lawsuit correspondences that Murray had filed with respect to the assault incidents as well as medical reports of corrections personnel. Dkt. No. 103–11 at 4–6. Uhler stated there was a video recording of the area outside the infirmary but no recording of the area inside the door. *Id.* at 6. There was handheld camera footage of the escort to the holding pen then back to the prison block, which could be introduced. *Id.*

Uhler stated that the non-audio video recording of the infirmary shows a door abruptly opening with Tulip at one side of the door, bent over on his hands and knees. Dkt. No. 103–11 at 23–24. An officer assisted Tulip. *Id.* at 24. Four staff members tried to force Murray to the ground. *Id.* at 25. Uhler watched the video several times with Murray. *Id.;* Dkt. No. 103–12 at 73–74. Murray contends that Tulip was not in pain before coming out of that door. Dkt. No. 103–11 at 24. It is undisputed that the officers used force against Murray in the hallway but Uhler did not see anyone kicking or punching Murray. *Id.* at 25, 27. This incident lasted approximately one minute.

*Id.* at 27–28.

Uhler denied Murray's videotape request of a medical exam that took place on December 4, 2009 because the videotape contained no evidence of the December 3, 2009 incidents. Dkt. No. 103–7 at 59.

#### ii. Witnesses

Uhler proceeded to allow ten witnesses to testify. Arquitt, Grant, Hebert, and Smith testified. Dkt. Nos. 103–11 at 71, 96, 103–12 at 5–6, 65.

Bogett testified that he was walking to the infirmary area when he witnessed Murray kicking Tulip. Dkt. No. 103–12 at 43. Murray was on the ground when Bogett responded and Bogett assisted in controlling Murray by holding the waist chain. *Id.* Murray was removed from the area because it was not secure. *Id.* at 44. Bogett assisted in moving Murray to the holding pen and stood him up against a wall. *Id.* at 44–45. Murray attempted to bite Grant and struggled. *Id.* at 45. Hebert ordered Bogett to take down Murray and shortly thereafter Bogett was relieved. *Id.* at 45.

Bonaparte testified that before the December 3, 2009 incidents, he heard Gettman and other nurses talk to Murray, insinuating that Murray would be assaulted. Dkt. No. 103–12 at 48–50.

Clark testified that when he responded to the scene, Murray and other officers were on the ground, Murray was kicking his feet, and an officer was lying across Murray's legs. Dkt. No. 103–12 at 28. Clark did not carry Murray to the holding pen. *Id.* at 29. Clark testified that Murray was removed from that area, which was considered unsecured. *Id.* at 31, 35.

**\*7** Ramsdell testified that he did not use force on Murray. Dkt. No. 103–12 at 81. When Ramsdell arrived at the scene, the use of force incident was completed and he relieved the officers who held Murray. *Id.* at 82. Ramsdell did not witness the incident itself. *Id.*

Nurse Travers testified that based on Murray's complaints and symptoms on December 3, 2009, she ordered an EKG for Murray. Dkt. No. 103–11 at 39. Travers advised Murray that the nurse at the infirmary would give him an EKG and take a full set of his vital signs. *Id.* at 42. Travers did not speak with Tulip in the infirmary. *Id.* Tulip testified that he did not have a conversation with Travers in the infirmary where Travers stated, "I'd like to

get a car started for this [Murray]." *Id.* at 53.

Uhler denied Murray's witness request for: (1) Laramay because he only responded to the first incident and assisted Tulip, was not present during the use of force incident, and did not give any orders to staff; (2) Manley because he was not present at either incident and was only directed to escort Murray following the incidents; (3) Dr. Weissman because she had retired, attempts to contact her were futile, and she was not present during the incidents; (4) Robertson because he was on parole and stated that he did not want to testify; (5) non-party Inmate Gillard because he was contacted and declined to testify.[6] Dkt. Nos. 103–7 at 12, 14, 56–58, 103–12 at 58, 62–64. Uhler indicated he would allow Murray's request to question Rowe; however, Rowe was not produced. Dkt. No. 103–12 at 61–62.

[6]    Uhler stated that he would conduct a secondary inquiry into the reason behind Gillard's refusal. Dkt. No. 103–11 at 14.

### iii. Warnings

At the disciplinary hearing's inception, Murray asked to call his lawyer as a witness and Uhler denied that request, warning that "[o]utbursts and continued outbursts by yourself are going to result in me giving you a final warning and the next step will be I will remove you from this hearing." Dkt. No. 103–11 at 7–8. However, Uhler stated that his intent was not to remove Murray from the hearing. *Id.* at 8.

At one point, because Murray was having difficulty asking cogent questions, Uhler offered Murray additional time to formulate questions. Dkt. No. 103–11 at 68. Uhler explained that Murray "needed to prepare a defense" as Murray was "badgering" witnesses. *Id.* However, Murray declined the offer. *Id.* at 69–70. At another point, Uhler stated,

> I warned you on all three days that, do not state policy that's not true. And you expect me to ask the witness about a policy that doesn't exist. I'm not going to discredit staff, and belittle staff based on some makeup believe policy that you believe exists when I ruled on it already telling you it doesn't

exist.

Dkt. No. 103–12 at 39.

During the inception of Bogett's testimony, Uhler ejected Murray, stating, "I am not going to continue you to stare down and try to intimate the witnesses of this hearing. I've explained this to you in detail, in detail, alright? So I'll have you removed from this hearing at this time." Dkt. No. 103–12 at 40. After Bogett's testimony, Uhler spoke with Murray and returned Murray to the hearing. *Id.* at 46.

### iv. Disposition and Appeals

**\*8** On December 30, 2009, Uhler issued a hearing disposition. Dkt. No. 103–7 at 4. Uhler relied on: reports written by Hebert and Tulip; review of two unusual incident reports; testimony from eight staff members and one inmate; and a video tape of the infirmary door area showing staff tackling Murray to the floor. *Id.* Uhler concluded that all staff testimony was consistent with each other and the video evidence. *Id.* Uhler considered Tulip's testimony that he had moderate to serious injuries from Murray's kicking and was out of work for four days per a doctor's order. *Id.* at 4, 14. Grant was out of work for four days as well. *Id.* at 14. Travers and Smith testified that care given was appropriate. *Id.* at 4. Further, Uhler considered testimonies that Murray had attacked staff. *Id.* Uhler wrote, "[t]his type of behavior will not be allowed. Inmate caused serious harm to staff and placed many others in grave danger." *Id.* A copy of the disposition was given to Murray. *Id.* Uhler ordered that Murray be placed in the Special Housing Unit ("SHU")[7] for sixty months. Compl. ¶ 9; Dkt. Nos. 103–7 at 3, 103–12 at 90–91. Uhler also gave Murray sixty months loss of privileges for packages, commissary, phone, and good time credits. Dkt. Nos. 103–7 at 3, 103–12 at 90–91.

[7]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On March 8, 2010, defendant Director of SHU/Inmate Discipline Bezio modified Murray's sentence to twenty-four months in SHU, to begin on June 28, 2014.

Dkt. No. 103–6 at 2–3; Murray Dep. at 12.[8] By letter dated June 3, 2010, Murray's attorney at Prisoners' Legal Services sought reconsideration of the disciplinary hearing disposition. Dkt. No. 103–14 at 9–12. By letter dated August 18, 2010, defendant Acting Director of SHU/Inmate Disciplinary Programs Prack denied reconsideration. *Id.* at 13.

[8]    Defendant Bezio also reduced the punishment to twenty-four months of other privileges and good time credits to begin on April 22, 2011. Dkt. No. 103–6 at 2–3.

As of February 17, 2012, Murray has approximately seventeen years of prison time left to serve in SHU from other misbehavior reports. Murray Dep. at 11. Murray alleges that SHU confinement causes him mental distress. Compl. ¶ 15; Murray Dep. at 76. Murray does not seek reinstatement of good time credits. Compl. ¶ 16.

## II. Discussion

Murray alleges that his Eighth Amendment rights were violated when: (1) defendants Arquitt, Bogett, Clark, Grant, Hebert, Laramay, Manley, McGaw, Ramsdell, Rowe, and Tulip either used excessive force against him and failed to intervene on his behalf; (2) defendants Bezio and Prack exhibited deliberate indifference to his safety in denying his appeals; and (3) defendants Fischer and Rock exhibited deliberate indifference in failing to train subordinates. Compl. ¶¶ 2–7, at 27. Murray further alleges that his Fourteenth Amendment rights were violated when: (1) defendants Hebert and Tulip issued false misbehavior reports against him; (2) defendants Bezio, Prack, and Rock denied his appeals and failed to remedy the alleged constitutional violations; and (3) defendant Uhler failed to provide him with due process. *Id.* ¶¶ 8–13, 17, at 27. Murray seeks monetary damages and injunctive and declaratory relief. *Id.* at 28.

**\*9** Defendants seek summary judgment of certain claims, contending that Murray's: (1) claims against them in their official capacities for monetary damages are barred by the Eleventh Amendment; (2) Eighth Amendment claims against Ramsdell and Fourteenth Amendment claims against defendants Fischer, Prack, and Rock must fail because they were not personally involved in the alleged constitutional violations; (3) Fourteenth Amendment procedural due process claim against defendants Bezio, Fischer, Prack, Rock, and Uhler must fail because Murray received all process that was due; (4) Fourteenth

Amendment claims against defendants Hebert and Tulip based on the filing of false misbehavior reports must fail; and (5) defendants Bezio, Fischer, Prack, Rock, and Uhler are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 103–16) at 4–5.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or

vexatious filings by *pro se* litigants," ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

**\*10** *Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

## B. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (*citing Edelman v. Jordan,* 415 U.S. 651, 663 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985). Here, because Murray seeks monetary damages against defendants for acts occurring within the scope of their duties, the Eleventh Amendment bar applies and serves to prohibit claims for monetary damages against them in their official capacity.

Accordingly, defendants' motion on this ground should be granted.

## C. Personal Involvement

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." ' *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

**\*11** (1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[9]

---

[9]    Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five *Colon* factors which were traditionally used to determine personal involvement. *Pearce v. Estate of Longo,* 766 F.Supp.2d 367, 376 (N.D.N.Y.2011), *rev'd in part on other grounds sub nom., Pearce v. Labella,* 473 F. App'x 16 (2d Cir.2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five *Colon* factors); *Kleehammer v. Monroe Cnty.,* 743 F.Supp.2d 175 (W.D.N.Y.2010) (holding that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster...."); *D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (disagreeing that *Iqbal* eliminated *Colon's* personal involvement standard).

### 1. Ramsdell

Murray has failed to establish the personal involvement of Ramsdell for the claims of excessive force and failure to protect. Murray believes that Ramsdell was present and assaulted him during the second incident on December 3, 2009 but does not know if Ramsdell had struck him. Contrary to Murray's assertion, Ramsdell testified that his involvement did not commence until he arrived at the scene after Bogett and Grant used force on Murray. Further, Ramsdell only escorted Murray to seek medical attention. Ramsdell's version of the events is consistent with use of force reports, unusual incident reports, and internal memoranda. *See* Dkt. Nos. 103–7 at 14, 18–19, 103–8, 103–9 at 1–5.

While "an [inmate']s 'inability to positively identify those who allegedly violated his rights is not *per se* fatal to his claims" Murray does not point to any record evidence establishing that Ramsdell was at scene of Murray's assault either before or during the time of the alleged use of excessive force. *De Michele v. City of New York,* No. 09–CV–9334 (PGG), 2012 WL 4354763, at *16 (S.D.N.Y. Sept. 24, 2012) (citations omitted).[10] Despite Murray's conclusory and speculative assertions, it is fair to conclude that a rational factfinder could not find in favor of Murray as the record is devoid of any evidence indicating that Ramsdell was present at either assault. *See, e.g., Coleman v. Hauck,* No. 09–CV–1391 (GTS)(GHL), 2012 WL 4480684, at *9 (N.D.N.Y. Sept. 26, 2012) (granting summary judgment for certain defendants on personal involvement grounds where plaintiff argued that "[a]ll named Defendants responded to the scene where Plaintiff was repeatedly mixed and kicked in the face" but failed to point to record evidence establishing that those defendants arrived at the scene before the use of force was applied).

[10]     All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

Furthermore, Murray failed to proffer any evidence showing that Ramsdell had "a realistic opportunity to intervene to prevent the harm from occurring." *De Michele,* 2012 WL 4354763, at *17 (citing *inter alia Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994)) (internal quotation marks omitted). As Murray does not provide even a scintilla of evidence that Ramsdell was present at the time of the alleged assaults, Murray cannot

show that Ramsdell had directly participated in the assaults or failed to intervene in the misconduct. Moreover, Murray does not allege, and the record does not reflect the contrary, that Ramsdell had created a policy or custom under which unconstitutional practices occurred or was grossly negligent in his supervision. *Colon,* 58 F.3d at 873. Therefore, Murray cannot establish the personal involvement of Ramsdell in the alleged unconstitutional actions.

**\*12** Accordingly, defendants' motion on this ground should be granted.

### 2. Fischer

Murray claims that Commissioner Fischer was negligent in managing his subordinates. The gravamen of Murray's complaints against Fischer is that he was in a position of power, thus always involved with anything occurring in conjunction with Murray's incarceration. However, attempts to establish personal involvement based upon the supervisory role this defendant occupied is inappropriate. *Wright,* 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Drawing every favorable inference in Murray's favor, Murray contends that he notified Fischer of the alleged constitutional violations through letters and grievances. However, merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 (S.D.N.Y.2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").

The only correspondence which referenced any involvement by Fischer was a letter addressed to Fischer from Murray for an extension to appeal the Tier III hearing disposition. Dkt. No. 103–14 at 4–5. A letter from

Bezio explained to Murray that the letter was received and Murray's letter request satisfied the thirty-day time period for submitting an appeal. *Id.* at 3. Here, it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)). Moreover, conclusory allegations about negligent supervision and a failure to train are insufficient to establish personal involvement.

Accordingly, defendants' motion on this ground should be granted.

### 3. Prack

Murray claims that Prack violated his Fourteenth Amendment rights by denying his appeals and failing to remedy the alleged constitutional violations. The only correspondence referencing Prack's involvement is a letter denying reconsideration of Bezio's reduced penalty for the disciplinary hearing. The affirmation of an allegedly unconstitutional disciplinary hearing appears to establish personal involvement. *See Thomas v. Calero,* 824 F.Supp.2d 488, 505–11 (S.D.N.Y.2011) (discussing cases and concluding that affirming or modifying, as opposed to vacating and remedying, an allegedly constitutionally infirm disciplinary proceeding can satisfy various prongs of *Colon* and, regardless of *Iqbal's* impact on the *Colon* factors, results in a constitutional violation of which the defendant had knowledge, failed to remedy, and allowed to continue). However, as discussed *infra,* Murray's disciplinary hearing passes constitutional muster. As such, Murray cannot establish Fourteenth Amendment due process claims against Prack based on the affirmance of a constitutional disciplinary hearing.

**\*13** Accordingly, defendants' motion on this ground should be granted.

### 4. Rock

Lastly, Murray contends that Superintendent Rock violated his Fourteenth Amendment by denying his appeals, failing to remedy the alleged constitutional violations, and failing to train subordinates. The record is devoid of any reference to Rock's personal involvement. Before the Court is a superintendent decision dated January 25, 2010 that denied Murray's grievance. Nevertheless, that decision was signed by Deputy Superintendent Otis, not Superintendent Rock. As previously discussed, it is within the purview of a superior officer to delegate responsibility to others. *See Vega,* 610 F.Supp.2d at 198 (citation omitted). As such, Murray has failed to establish Rock's personal involvement in the alleged due process violations. *Colon,* 58 F.3d at 873.

Accordingly, defendants' motion on this ground should be granted.

### D. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty. It protects only against deprivations of liberty accomplished without due process of the law." *Baker v. McCollan,* 443 U.S. 137, 145 (1979) (internal quotation and citations omitted). "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (citations omitted). An inmate retains a protected liberty interest to remain free from segregated confinement if the prisoner can satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

### 1. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection. *See generally Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general

prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998). This standard requires a prisoner to establish that the confinement or condition was atypical and significant in relation to ordinary prison life. *See Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

**\*14** While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality. *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (citations omitted). The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citations omitted). Instead, the Second Circuit has established guidelines that "[w]here the plaintiff was confined for an intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required." *Id.* at 64–65 (citing *Colon,* 215 F.3d at 232). In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law." *Id.* at 65 (citations omitted). Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality. *Id.* (citing *Colon,* 215 F.3d at 231–32). Also, "[i]n the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short-e.g. 30 days-and there was no indication [of] ... unusual conditions." *Harvey v. Harder,* No. 09–CV–154 (TJM/ATB), 2012 WL 4093792, at \*6 (N.D.N.Y. July 31, 2012) (citing *inter alia Palmer,* 364 F.3d at 65–66).

Defendants contend that Murray has failed to show the deprivation of a liberty interest because he has yet to serve the assigned SHU time. Courts in this District have held that where the plaintiff had not yet served the sentence imposed at the time he filed his complaint, the Court is unable to determine whether the confinement conditions of SHU were atypical or significant. *See, e.g., Chavis v. Kienert,* No. 03–CV–0039 (FJS/RFT), 2005 WL 2452150, at \*12 (N.D .N.Y. Sept. 30, 2005). However, Murray was sentenced to twenty-four months of SHU confinement, which amounts to 730 days. This length of confinement is sufficient to establish atypicality. *Palmer,* 364 F.3d at 64. Even though Murray has yet to serve the penalty, he is scheduled to serve it on June 28, 2014, and there is no evidence before the Court indicating otherwise. Given the length of the sentence and the imminent date for commencement of that sentence, the

Court is not persuaded that Murray has failed to establish a liberty interest for purposes of his procedural due process claims. *Cf. Benitez v. Mailloux,* No. 05–CV–1160, 2009 WL 1953847, at \*10–11 (N.D.N.Y. Mar. 25, 2005), *report and recommendation adopted in part, rejected in part on other grounds,* No. 05–CV–1160 (NAM/RFT), 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (concluding no liberty interest in 2009 when sentence was to be served in 2012). As such, the Court proceeds with the understanding that Murray has in fact established a liberty interest.

**\*15** Defendants alternatively argue that Murray's procedural due process claims against defendants Bezio, Fischer, Prack, Rock, and Uhler should be dismissed because Murray was given all process that was due. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v.. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

### a. Written Notice

In this case, the issue of a written notice is undisputed. An inmate must be provided advance written notice at least twenty-four hours before the hearing commences. *Wolff,* 418 U.S. at 563–64. Murray was provided with a written notice of the Tier III disciplinary hearing. On December 4, 2009, Murray received the misbehavior reports authored by Hebert and Tulip. Those reports charged Murray with violent conduct, interference with employee, and refusing direct order, and assault on staff for the December 3, 2009 incidents. The disciplinary hearing commenced on December 17, 2009. As such, Murray was provided with written advance notice. *Sira,* 380 F.3d at 69.

### b. Opportunity to Call Witnesses and Present Documentary Evidence

Murray contends that he was deprived of an opportunity to call all witnesses and present certain documentary evidence. However, "[i]t is well settled that an official

may refuse to call witnesses as long as the refusal is justifiable [such as] ... on the basis of irrelevance or lack of necessity." *Scott v. Kelly,* 962 F.2d 145, 146–47 (2d Cir.1992) (internal quotations and citations omitted). Uhler permitted ten individuals to testify at Murray's disciplinary hearing. Gillard and Robertson did not testify because they declined to do so and Murray has not alleged, and the record does not reflect the contrary, that intimidation by prison officials resulted in the witnesses' refusals. *Webb v. Selsky,* No. 01–CV–149S, 2008 WL 796179, at *6 (W.D.N.Y. Mar. 24, 2008) ("A failure to summon the testimony of a witness who has refused to testify, in the absence of evidence that the refusal was linked to intimidation on the part of prison officials, does not violate due process because calling a witness who refuses to speak upon questioning would be futile.") (citing *Johnson v. Doling,* No. 05–CV–376 (TJM/RFT), 2007 WL 3046701, at *7 (N.D.N.Y.Oct.17, 2007)). There is nothing in the record indicating that either Gillard or Robertson would have provided evidence favorable to Murray beyond what was given by Bonaparte. *Livingston v. Kelly,* 423 F. App'x 37, 40 (2d Cir.2011) (citation omitted). Furthermore, while Laramay, Manley, Weissman, and Rowe did not testify, they did not observe what transpired during the use of force incidents on December 3, 2009. Thus, their testimonies would not assist Uhler in arriving at a decision regarding the appropriateness of the misbehavior reports.

**\*16** The same is true for the evidence which was denied. Uhler denied Murray's request to watch footage of Murray on December 4, 2009 because it was irrelevant to the events on December 3, 2009. Further, Murray was provided all documents generated from the use of force incidents as well as review of a video recording showing what occurred after Arquitt, Murray, and Tulip fell through the door. Moreover, Uhler ultimately granted Murray the opportunity to watch handheld footage of his escort from the examination room to his cell. "Courts have long recognized ... that the right to know evidence supporting prison disciplinary rulings is not absolute." *Sira,* 380 F.3d at 74 (citations omitted). Accordingly, in light of all documentary evidence that was provided to Murray, discovery of irrelevant documents regarding medical records and video surveillance would be of no value in determining the validity of the disciplinary tickets.

Murray was provided with an opportunity to extensively question his witnesses through Uhler. "While inmate do have the right to question witnesses at their disciplinary hearings, that right is not unlimited and its contours are under the discretion of prison officials." *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 125 (S.D.N .Y.2002). Thus,

Uhler retained the authority and discretion to administer the questioning in a manner he saw fit. While Uhler did not permit Murray to ask every question, a review of the hearing transcript shows that he did permit Murray to question the witnesses rather extensively. Moreover, when Uhler denied Murray's questions he provided reasoning regarding the denial, such as the lack of relevance to the ultimate issue of the validity of the misbehavior report.

Accordingly, Murray was provided with an opportunity to call witnesses and present documentary evidence. *Sira,* 380 F.3d at 69.

### c. Fair and Impartial Hearing Officer

Murray contends that Uhler was not an impartial hearing officer because Uhler had personally investigated the matter, already decided on the credibility of witnesses, and ejected Murray from the hearing during Bogett's testimony. Prisoners have a constitutional right to a fair and impartial hearing officer. *See, e.g., Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.1994). However, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges ... [as i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996) (citations omitted). The Supreme Court held "that the requirements of due process are satisfied if some evidence supports the decision by the [hearing officer]." and the Second Circuit has held that the test is whether there was " 'reliable evidence' of the inmate's guilt." *Luna v. Pico,* 356 F.3d 481, 487–88 (2d Cir.2004); *see also Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985).

**\*17** It was clear that Uhler was objective and carefully listened to the testimony and arguments presented by Murray as Uhler reversed his prior decision about allowing Bonaparte to testify as well as offering Murray an opportunity to adjourn the hearing so that Murray may formulate more cogent questions to support and present his defense. Throughout the hearing, Uhler reiterated that he had yet to determine whether Murray was guilty of the prison violations charged. *See, e.g.,* Dkt. No. 103–12 at 83. Moreover, Uhler offered to make personal inquiries as to certain witnesses to confirm their intention to decline appearing at the disciplinary hearing.

Murray specifically claims that Uhler had stated Traver's credibility was not at issue. However, this assertion is

misplaced. In context, Uhler stated, "[h]er credibility is not on[,] here's the problem[,] it is my job to determine the credibility of any witness whether it is employee or inmate is good or bad at this hearing." Dkt. No. 103–11 at 45. Uhler continued, explaining that in order to show a witness was providing false allegations, Murray should submit evidence to substantiate his position. *Id.* at 49.

Murray asserts that Uhler should not have conducted the hearing because Uhler had investigated the charges against him and issued a restraint order for Murray after the alleged assault on staff. These conclusory assertions remain unsubstantiated. Uhler stated that he did not investigate the incidents. In fact, Uhler further explained,

> you've stated that you were assaulted[.] I can tell you as the Dep. of Security at this facility[,] I am aware of those complaints prior to coming down here today to do this hearing. I am aware that you have made allegations of abuse. I have not been part of the investigation that is being done by someone else at this point ... and that's outside of this hearing room.

Dkt. No. 103–11 at 35. Moreover, Uhler explained that he had only signed a recommendation from a sergeant, which was recommended by the watch commander for full restraints based on allegations against Murray. Dkt. No. 1–3–12 at 87. There is no record evidence showing the contrary; thus, Murray's contention on this point is unsubstantiated and without merit.

Murray also asserts that Uhler violated his due process rights when Uhler removed him from the hearing during Bogett's testimony. However, "inmates do not possess a constitutional right to be present during the testimony of witnesses during a disciplinary proceeding." *Harmon v. Escrow,* No. 08–CV–6381 (CJS), 2012 WL 3560812, at *4 (W.D.N.Y. Aug. 16, 2012) (citing *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989), *Hidalgo v. Hopin,* No. 01–CV–0057(Sr), 2009 WL 4803689 (W.D.N.Y. Dec. 9, 2009) (stating inmates do not have "a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings)). As such, Murray's due process rights were not violated when Uhler took Bogett's testimony in Murray's absence.

**\*18** Lastly, it is clear that Murray's disciplinary disposition was based on reliable evidence of his guilt. Arquitt and Tulip testified that they were escorting Murray from the infirmary when Murray turned around

and kicked Tulip in the groin area. In response, Arquitt and Tulip tackled Murray to the ground and in doing so, fell through a door. Tulip denied having hit Murray in the head prior to being kicked. Hebert testified that after Murray was placed in the holding pen, Murray continued to struggle with Bogett and attempted to bite Grant. Clark was working in the infirmary and responded a loud noise in the entrance where he found Murray on the ground with officers attempting to restrain him. Clark assisted Tulip, who appeared injured. These officers' testimonies are consistent with each others' account of the events, a video tape of the infirmary's entrance way, and are supported by internal memoranda and the use of force and usual incident reports. As for Bonaparte's testimony regarding Travers and other prison staff, these individuals are not parties to this action. Uhler carefully considered the competing evidence, namely the testimonies, reports, video recording, and injuries suffered by Tulip and Grant, with Murray's contention that he did not provoke the use of force incidents. Ultimately, Uhler reasoned that Murray's behavior caused harm to staff, and given the environment of prisons, such behavior should and would not be tolerated.

Accordingly, despite Murray's conclusory and unsupported contentions of bias, the record is clear that there is no question of material fact surrounding the process Murray was provided. As such, defendants' motion should be granted on this ground.

### d. Written Statement of Disposition

It is undisputed that Murray received a written statement of the hearing disposition. On December 30, 2009, Murray voluntarily left his disciplinary hearing before Uhler rendered his decision on the two misbehavior reports. Dkt. No. 103–12 at 88–89. The record indicates that Murray received a written statement of the evidence relied upon and reasons for the disciplinary action. Thus, Murray was provided with a written statement of the Tier III disciplinary hearing disposition. *Sira,* 380 F.3d at 69.

Accordingly, defendants' motion on this ground should be granted.

### e. Inmate Assistance

"An inmate's right to assistance with his disciplinary hearing is limited." *Neree v. O'Hara,* No. 09–CV–802

(MAD/ATB), 2011 WL 3841551, at *13 (N.D.N.Y. July 20, 2011) (*Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). This Circuit has held that an assistant is constitutionally necessary when the plaintiff is confined in SHU and unable to marshal evidence and present a defense. *Id.* (citation omitted). In such a case, the assistant need only perform what the plaintiff would have done but need not go beyond the inmate's instructions. *Lewis v. Johnson,* No. 08–CV–482 (TJM/ATB), 2010 WL 3785771, at *10 (N.D.N.Y. Aug. 5.2010) (citing *Silva,* 992 F.2d at 22). Furthermore, "any violations of this qualified right are reviewed for 'harmless error.' " *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437 (W.D.N.Y.2010) (citing *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir.2009)).

**\*19** Here, Murray was confined in SHU from December 3, 2009 onward and thus is entitled to an inmate assistant. Dkt. No. 103–5 at 3; *see also Murray v. Goord,* 668 F.Supp.2d 344, 350 (N.D.N.Y.2009) ("Upstate ... [is] a maximum security prison comprised of special housing unit ("SHU") cells in which inmates are confined ....") (citation omitted). Murray alleges that he was generally deprived of adequate inmate assistance. Murray first met with his Inmate Assistant Fish on December 7, 2009. Fish assisted Murray with completing the assistant form to identify witnesses and documentary evidence. Fish also assisted Murray with contacting potential witnesses to testify at the disciplinary hearing. Dkt. No. 103–11 at 5, 14. Fish denied Murray any complaints or legal correspondence with respect to Murray being assaulted in the infirmary area. Dkt. No. 103–11 at 5. However, Uhler stated at the disciplinary hearing that he may produce such records if during the hearing, he determines that those records are relevant. *Id.* As for video footage of what occurred on December 3, 2009 inside the door, Uhler explained that such footage did not exist. *Id.* Further, Uhler denied Murray video footage of him on December 4, 2009 because it was irrelevant to the December 3, 2009 incidents.

Even assuming Fish had provided inadequate assistance, such a deprivation was rendered harmless and a factfinder could not conclude that Murray was prejudiced as a result. *Gallo,* 22 F.3d at 1223–24. The record shows that Uhler took steps to provide Murray with the requested evidence. Uhler also offered Murray more time to prepare for the hearing, which Murray declined. There is no indication that the result of Murray's hearing would be different had Fish provided Murray with all requested evidence. *See Chavis v. vonHagn,* No. 02–CV–0119 (Sr), 2009 WL 236060, at *53 (W.D.N.Y. Jan. 30, 2009) (finding due process claim based on denied employee assistant to prepare for disciplinary hearings was without merit because the record showed that "plaintiff was indeed able

to present evidence (and often did), both oral and documentary, in his own defense) (citation omitted). As such, Murray's due process claim based on inmate assistance must fail.

Accordingly, defendants' motion on this ground should be granted.

## 2. False Misbehavior Report

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988)). Even so, a due process claim predicated upon a false misbehavior report issued in retaliation against an inmate still fails to state a claim if the inmate received all the procedural process protections that was due to him. *Livingston,* 423 F. App'x at 40 (citing *inter* alia *Freeman,* 808 F.2d at 952). Here, Murray alleges that defendants Hebert and Tulip filed false misbehavior reports against him in retaliation for Murray lodging grievances and complaints. *Boddie,* 105 F.3d at 862; *see* Murray Dep. 38–39. However, as discussed above, Murray received all the procedural process protections that he was due.

**\*20** Moreover, to allege a claim based on the issuance of false misbehavior reports as retaliatory conduct, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks and citation omitted); *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010). Murray does not allege any facts going to establishing a causal connection. Murray does not proffer any information with regard to grievances or complaints he filed against either Hebert or Tulip. Murray further testified that he believes Tulip retaliated against him because he insulted Tulip. Murray Dep. at 41. However, such insults do not constitute protected speech. *Doe v. Selsky,* No. 08–CV–6199L, 2013 WL 5311221, at *3 (W.D.N.Y. Sept. 20, 2013) (citing *Lockett v. Suardini,* 526 F.3d 866, 874 (6th Cir.2008) (finding inmate's

insulting comments to a disciplinary hearing officer was not protected speech), *Chevalier v. Schmidt,* No. 11–CV–788(JTC), 2012 WL 6690313, at *3 (W.D.N.Y. Dec. 21, 2012)* ("Vulgar, insulting, and threatening statements have been found not to be protected speech for purposes of the First Amendment")). As such, Murray has failed to allege a due process claim based on the issuance of false misbehavior reports as retaliatory conduct.

Accordingly, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants Bezio, Fischer, Prack, Rock, and Uhler contend that even if Murray's Fourteenth Amendment claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 F. App'x 146 (2d Cir.2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine

whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be addressed with respect to Murray's Fourteenth Amendment claims against these defendants because, as discussed *supra,* it has not been shown that defendants violated Murray's Fourteenth Amendment rights.

**\*21** Accordingly, defendants' motion on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for partial summary judgment (Dkt. No. 103) is **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Filed April 22, 2014.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4676569

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4093792
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gregory HARVEY, Plaintiff,
v.
David HARDER, et al., Defendants.

No. 9:09–CV–154 (TJM/ATB).
|
July 31, 2012.

**Attorneys and Law Firms**

Gregory Harvey, pro se.

Aaron Marcus, Asst. Broome County Atty., for
Defendants.

## ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrtate Judge.

**\*1** This matter has been referred to me for Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights
amended complaint, plaintiff alleges that defendants
violated his rights to due process and equal protection[1]
when they kept him in "segregated housing" for
approximately one month, without any disciplinary
incident or hearing. (Am, Compl .; Dkt. No. 33). Plaintiff
also alleges that defendant Shear improperly ordered
plaintiff to be put in restraints whenever he left his cell.
(*Id.*) Plaintiff seeks substantial monetary relief.

[1]   The amended complaint refers only to "due process,"
      however, the plaintiff's response to defendants'
      summary judgment motion mentions "equal
      protection." The court will consider both claims in this
      recommendation.

Presently before the court is defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt.
No. 47). Plaintiff has responded in opposition to the
motion. (Dkt. No. 50). For the following reasons, this
court agrees with defendants and will recommend
dismissal of the amended complaint.

## DISCUSSION

### I. *Facts and Procedural History*[2]

[2]   The court must note that plaintiff has filed eight cases
      in the Northern District of New York, only three of
      which are currently pending. *Harvey v. Farber, et al.,*
      9:09–CV–152 (MAD/TWD); *Harvey v. Corrections
      Officers 1 through 6, et al.,* 9:09–CV–154
      (LEK/TWD); and this case, *Harvey v. Harder,*
      9:09–CV–154 (TJM/ATB). The cases that are closed
      are the following: *Harvey v. Grow, et al.,* 9:09–CV–518
      (GTS/RFT); *Harvey v. Sawyer, et al.,* 9:09–CV–598
      (FJS/DRH); *Harvey v. Luther, et al.,* 9:09–CV–599
      (DNH/GJD); *Harvey v. City of Utica Police Officers, et
      al.,* 9:09–CV–644 (TJM/GHL); and *Harvey v. Law,*
      9:10–CV–1468 (LEK/DEP). The court understands that
      at the time plaintiff filed his original complaint in this
      action, many of the above cases had not yet been filed;
      however, by the time plaintiff filed his amended
      complaint in March of 2011, *all* of the other cases had
      been filed, but plaintiff continued to list only one case
      on the amended complaint form. (Am.Compl.¶ 5).

Plaintiff alleges that he was improperly placed in
"segregated housing" at Broome County Correctional
Facility ("BCCF") from January 12, 2007 until he was
transferred out of the facility on February 13, 2007.
Plaintiff claims that defendants violated his rights to due
process and equal protection because they did not afford
him a hearing prior to his confinement in the Special
Housing Unit ("SHU"). Plaintiff's original complaint
named only the Broome County Sheriff, David Harder.
(Dkt. No. 1). In his amended complaint, plaintiff added
the names of five more defendants, who plaintiff believes
are responsible for his improper confinement: (1)
Sergeant Robert E. Buholski; (2) Sergeant Jon C. Gillette;
(3) Lieutenant Wesley C. Shear; (4) Corrections Officer
("CO") David B. Thompson; and (5) Lieutenant William
Lillie.[3]

[3]   Defendant Lillie has not been served in this case. After
      the first attempt at service was unsuccessful for various
      defendants, the court reissued summonses on March 31,
      2011. (Dkt. No. 34). Service on four of the five new
      defendants was successful, and they all join in the
      motion for summary judgment. Another summons for
      defendant Lillie was reissued on October 14, 2011, but
      the summons was returned "unexecuted" on October
      26, 2011. (Dkt.Nos.40, 42). The "Process Receipt"

states that defendant Lillie is no longer employed at BCCF. Defendant Lillie has not been served in this action, and defense counsel requests dismissal of the case against defendant Lillie for lack of service under Fed.R.Civ.P. 4(m). (Dkt. No. 47–28; Def. s' Br. at 11) (page assigned by defense counsel to his brief, not the CM/ECF page). Because this court is recommending dismissal with prejudice, both procedurally and on the merits of this action, the court need not address lack of service, which would normally result in a dismissal without prejudice.

Plaintiff claims that on January 12, 2007, when plaintiff was transferred from Herkimer County Correctional Facility ("HCCF"), defendant Harder "ordered his staff to wrongfully imprison and put restraints upon plaintiff by housing him illegally in segragated [sic] housing without any record of a disciplinary incident report or any record of a disciplinary hearing." (Am. Compl. ¶ 6; Facts). Plaintiff also alleges that, beginning on January 17, 2007, "restraints were put on him," and that defendant Harder and his staff violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment with their "deliberate indifference." (Am. Compl. ¶ 6; CM/ECF pp. 6–7). Plaintiff states that he became paranoid "from the loss of liberty enjoyed by other prisoners." (*Id.* at p. 7) Plaintiff alleges that each of the five new defendants "signed an order" wrongfully housing plaintiff in SHU; defendant Thompson signed two orders; and defendant Shear also signed an order "to place Plaintiff in restraints whenever he left his cell." (Am. Compl. ¶ 7; Causes of Action; CM/ECF pp. 6–7).

There is no dispute in this case that plaintiff was housed in "segregated housing" for the entire time that he was incarcerated in BCCF. Defendants state that plaintiff was in Administrative Segregation ("Ad Seg"), rather than *disciplinary* segregation. In support of the motion for summary judgment, each defendant has submitted an affidavit, explaining the circumstances under which plaintiff was confined to Ad Seg for the period between January 12th and February 13th of 2007. (Dkt.Nos.47–19–47–26). An affidavit was submitted by Sergeant Edward J. Cermak, who is not a defendant, but states that it was he, (not defendant Gillette),[4] who reviewed the Order placing plaintiff in Ad Seg in the facility's SHU (D–Pod). (Dkt. No. 47–20; Cermak Aff. ¶ 12; Gillette Aff. ¶ 11). Affidavits were also submitted by CO Franklin Sherman, the Classification Officer at BCCF; and Mark Smolinsky, the Jail Administrator at BCCF. (Dkt.Nos.47–24, 47–25).

[4]  Based on this admission by Sergeant Cermak, plaintiff

has requested in his response to the motion for summary judgment, that the court allow plaintiff to amend his amended complaint to remove defendant Gillette as a defendant and replace him with Sergeant Cermak. Generally, the court would allow such an amendment. However, because the court is recommending dismissal on the merits of this case, it would be futile to add Sergeant Cermak at this time. The court would still recommend dismissal notwithstanding the addition of Sergeant Cermak. The court will consider his affidavit.

**\*2** Defendants' affidavits all state that plaintiff was transferred from HCCF to BCCF on January 12, 2007. Prior to the transfer, defendants state that, on January 11, 2007, a " 'Custodial Transfer Information' sheet" was created at HCCF, evidencing plaintiff's transfer. (Buholski Aff. ¶ 2; Cermak Aff. ¶ 2; Gillette Aff. ¶ 2; Shear Aff. ¶ 2; Sherman Aff. ¶ 3; Smolinsky Aff. ¶ 5; Thompson Aff. ¶ 3).[5] This information, prepared by Lieutenant John Coddington at HCCF, indicated that plaintiff had known mental health problems, was on medication, had been assaultive toward staff and inmates at HCCF, and had poor adjustment to confinement. (*Id.* & Ex. F)

[5]  Many of the affidavits contain similar paragraphs regarding the background of this case. The court will cite to the affidavit of Mark Smolinsky, Jail Administrator, for ease of citation, even though the same information is contained in other affidavits. Mr. Smolinsky is *not* a defendant in this case, and his affidavit contains additional information that is relevant to the motion. I will cite to other affidavits as noted for additional information that is not contained in Administrator Smolinsky's statement.

Accompanying the custodial transfer information, was a letter from HCCF Lieutenant Coddington, further explaining that plaintiff had an "extensive psychiatric history"; had been assaultive toward staff at HCCF; had very long fingernails, which he refused to cut and had threatened to use as weapons against the staff; had a long history of threat-related activity, including threats to the President of the United States;[6] had been housed in HCCF Ad Seg due to continued outbursts and threats toward staff; had not been housed in general population due to unstable behavior and continued to be housed "alone"; was very paranoid, and was subject to "drastic mood swings." (Smolinsky Aff. ¶ 6 & Ex. G). The court notes that while incarcerated in HCCF, on October 8, 2006, plaintiff was notified that his "classification level" was "Maximum."[7] (Def.s' Ex. D).

6    Defendants have also filed the June 6, 2006 letter of Timothy M. Kirk, Resident Agent in Charge of the Syracuse office of the United States Secret Service. (Def.s' Ex. B). The letter requests that the Secret Service be notified in the event the plaintiff was released from custody for any reason, due to plaintiff's long history of threat-related activity. (*Id.*) The reason for this request was so that, if plaintiff were released, the Secret Service could assess whether he posed a danger to "any of our protectees." (*Id.*)

7    Plaintiff was incarcerated in HCCF, pending his prosecution for First Degree Rape; Third Degree Assault; Second Degree Unlawful Imprisonment; and Criminal Mischief. (*See* Def.' s' Ex. E; Herkimer County Court commitment, dated October 30, 2006—indicating no bail pending trial). Plaintiff was clearly incarcerated in HFFC prior to October 30th because his classification notice is dated October 8, 2006. (Def.' s' Ex. D).

Plaintiff arrived at BCCF on Friday, January 12, 2007 at approximately 12:49 p.m. (*Id.* ¶ 7). He was screened by CO Joe Spaziano, who noted that the plaintiff had a "chronic psychiatric history with mental health treatment" and referred him to the forensic unit for evaluation. (*Id.*) Plaintiff was taken to the Ad Seg area of the forensic/medical unit at 5:29 p.m. on January 12. Until that time, plaintiff had been housed in cell number 5 of the "admissions unit," where all inmates are housed as part of the facility's admission procedures.[8] (*Id.* & Def.s' Ex.H; Housing History Sheet). The forensic referral sheet is Defendants' Exhibit I. On January 14, 2007, plaintiff was cleared by forensics, medical, and corrections to leave the medical unit, and he was then taken to A–Pod, another housing unit used for classification purposes. (*Id.* ¶ 15 & Def.s' Ex. H). CO Sherman is the facility's Classification Officer, and was charged with completing plaintiff's classification. (Sherman Aff. ¶ 2).

8    An Ad Seg Order was drafted on January 12, 2007 by defendant Thompson. (Def.' s' Ex. J). There were three reasons marked with an "X" for why plaintiff was being placed in Ad Seg. The first reason was due to "facility admission procedures." The second and third reasons were that the staff perceived a serious threat to the inmate's safety (although no request for protection had been made) and the inmate was exhibiting unusual behavior and could threaten to, or cause injury to himself or others. (*Id.* & Buholski Aff. ¶ 8). Defendant Buholski reviewed the order and placed plaintiff in Ad Seg within the medical unit. (Buholski Aff. ¶ 10). The order was approved by defendant Lillie. (*Id.* & Def.s'

Ex. J).

Prior to the completion of plaintiff's classification, on January 17, 2007, there was an incident in A–Pod, in which plaintiff allegedly directed threats toward the President of the United States as well as other individuals. (Smolinsky Aff. ¶ 16; Sherman Aff. ¶ 8). Because of this incident, plaintiff was returned to the medical unit at 2:00 p.m. on January 17th. (*Id.* & Def.s' Ex. H). Another Ad Seg order was drafted by CO Thompson, who noted that plaintiff was again admitted to Ad Seg as part of the facility admission procedure, but also noted that the staff perceived a serious threat to the inmate's safety, although he had not requested protection. (Shear Aff. ¶ 10 & Def.s' Ex. M). Sergeant Cermak reviewed the Order and directed plaintiff's placement in Ad Seg in SHU. (Shear Aff. ¶ 12). At the same time, defendant Shear states that he signed a "Restraint Order" which meant that plaintiff would have a "two officer escort" anytime that he was out of his cell. (Shear Aff. ¶ 13). Defendant Shear states that "[n]o physical restraints, e.g. handcuffs, shackles, etc., were made part of this Order, or placed on the plaintiff." (*Id.*). When plaintiff was released from the medical unit on January 18, 2007 he, was placed in Ad Seg in D–Pod, the SHU of BCCF to finish out his classification period.[9] (*Id.*) Defendant Shear states that he had no control over plaintiff's ultimate classification. (Shear Aff. ¶ 16).

9    Defendant Shear states that inmates may be placed in D–Pod without a hearing for reasons other than disciplinary. (Shear Aff. ¶ 15).

**\*3** Plaintiff's classification was completed on Friday, January 19, 2007. He was determined to be a "maximum" security inmate, and his assignment to D–Pod was continued. (*Id.* ¶ 18). CO Sherman states that he conducted the classification pursuant to the facility's "Classification of Inmates" and the "Special Security Classification" policy. (Sherman Aff. ¶ 9). The "Special Security Classification" policy allows the facility to assign inmates to SHU if they have exhibited violent behavior during periods of incarceration. (Sherman Aff. ¶ 10). CO Sherman states that in making his classification determination, he considered the transfer papers sent by HCCF. In addition, he noted that plaintiff's current charges included Rape in the first and second degree, both violent felonies; he had exhibited assaultive behavior at HCCF; had an extensive psychiatric history; had a history of substance abuse; and had threatened the President of the United States. (Sherman Aff. ¶ 10). CO Sherman used a "Classification Point Scale" and determined that plaintiff was a "maximum" security inmate, not eligible

for general population. (*Id.* ¶ 11). CO Sherman states that this classification was not made for punitive reasons, but for the safety and the security of the facility, its staff, and other inmates. (*Id.*) Plaintiff was notified of his classification on Monday, January 22, 2007. (Smolinsky Aff. ¶ 19).

Plaintiff was transferred out of BCCF on February 13, 2007. (Def .s' Ex. H). Defendants do not dispute that plaintiff was confined in "segregated housing" for his entire stay at BCCF.

## II. *Summary Judgment*

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. *Fed.R.Civ.P. 56; Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment." *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Fed.R.Civ.P. 56(c)(1)(A).* If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48.

## III. *Exhaustion of Administrative Remedies*

### A. Legal Standards

**\*4** The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia,* to excessive force claims). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted).

In order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock,* 549 U.S. at 218–19 (citing *Woodford v. Ngo,* 548 U.S. 81 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

Generally, exhaustion of administrative remedies involves utilizing the facility's grievance process, however, when an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing or confinement, he exhausts his administrative remedies by presenting his objections in the administrative appeals process. *Sweet v. Wende Correctional Facility,* 514 F.Supp.2d 411, 413 (W.D.N.Y.2007) (citing *Rosales v. Bennett,* 297 F.Supp.2d 637, 639 (W.D.N.Y.2004) (discussing the difference between the grievance process and the administrative appeals process for disciplinary or administrative segregation appeals).

The Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004)). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own

actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

## B. Application

Plaintiff in this case did not challenge his classification or the administrative segregation decision. In his response to the summary judgment motion, plaintiff argues that he asked a corrections officer about challenging the decision. (Pl.'s Br. at 14). The corrections officer told plaintiff that BCCF did not have a grievance committee, "you write a sergeant if that doesn't work you write a lieutenant." (*Id.*) Plaintiff claims that he wrote to both a sergeant and a lieutenant, who told plaintiff that he "is on administrative segregation and there is nothing anyone can do about it." (*Id.*) In support of his argument, plaintiff cites Jail Administrator Smolinsky's affidavit, which confirms that an administrative segregation decision is not "grievable." (*Id.* & Smolinsky Aff. ¶ 21).

**\*5** Plaintiff may be attempting to claim that the officers prevented him from challenging the decision by "misleading" him about the proper procedural vehicle for the challenge. The corrections officer who told plaintiff that the decision was not grievable was not misleading. While defendants agree that an administrative segregation decision is not subject to the "grievance" process, the defendants assert that the Ad Seg decision is subject to challenge by appealing to the Facility Administrator. (Def.s' Ex. P). Defendants' Exhibit P is a page from the Inmate Handbook, specifically referencing "Administrative Segregation/Protective Custody." The handbook states that "[y]ou have the option to appeal administrative segregation decisions to the Facility Administrator." (*Id.*)

Plaintiff in this case concedes that he did not appeal to the Facility Administrator when he states that he wrote to a sergeant and a lieutenant. There is no indication, and he does not allege, that he was not given an inmate handbook. The "corrections officer" was correct in telling plaintiff that an administrative segregation determination was not grievable because the proper method of appeal is through the Jail Administrator.

The court understands that plaintiff's incarceration at BCCF was quite short, and one of the exceptions noted above involves whether the administrative remedies were actually "available" to the plaintiff. The administrative segregation decision was ultimately made on January 19, 2007, and plaintiff was transferred to another facility on February 13, 2007. It is unclear how long it would have

taken to challenge the classification. There may have been very little time to appeal the decision. It has been held that transfer to other custody does not eliminate the plaintiff's duty to exhaust his administrative remedies, "at least where an inmate has sufficient time to pursue administrative remedies in the facility where the incident complained of took place." *Flowers v. City of New York,* 668 F.Supp.2d 574, 578 (S.D.N.Y.2009). If there were insufficient time to appeal, an exception to the exhaustion requirement might be available to plaintiff. While, the court could recommend dismissal for failure to exhaust, because the case may also be dismissed on the merits, and there could be an argument that plaintiff did not have sufficient time to appeal the decision, I will not recommend dismissing the action based solely upon plaintiff's failure to exhaust administrative remedies.

## IV. *Due Process*

## A. Legal Standards

In order to begin a due process analysis, the court determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995).

**\*6** The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin.*" *Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter

confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

"SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer v. Richards,* 364 F.3d at 65 (citations omitted). In the absence of a detailed factual record, cases in this Circuit typically affirm dismissal of due process claims where the period of time spent in SHU was short–*e.g.,* 30 days-and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases). *See also Arce v. Walker,* 139 F.3d 329, 334–35 (2d Cir.1998) (the *Sandin* analysis is properly applied to determine whether non-punitive, administrative segregation implicates a state-created liberty interest).

**B. Application**

Plaintiff was in Ad Seg at BCCF from January 12, 2007 until February 13, 2007, a total of 32 days. The first eleven days,[10] however, were spent in Ad Seg due to the admissions/classification procedure at the facility. New York regulations governing county jails provide that the chief administrative officer of each facility shall "establish, implement and maintain a formal and objective system for the consistent classification of all inmates." N.Y. COMP. CODES R. & REGS. tit. 9, § 7013.1 (N.Y.CRR)). The regulations are quite detailed and provide specific requirements for such policies and procedures. *Id.* 9 NYCRR § § 7013.1–7013.9.

[10]    January 12, 2007 until January 22, 2007 (counting the first day that he was brought to BCCF as "one" and the day the he was notified of his classification).

In accordance with these regulations, BCCF policy provides that, upon transfer into the facility, all inmates must go through initial screening and classification procedures. (Def.s' Ex. N; Broome County Sheriff's Correction Division Policy Statement). The policy statement provides that "[u]pon completion of the initial screening and risk assessment the inmate will be placed in Ad Seg for classification." (*Id.* ¶ 3). Classification may last up to five business days.[11] (*Id.*) If records are not available, the Jail Administrator may extend the classification time to ten business days.

[11]    Although it appears that the defendants complied with state regulations, providing for particular time limits, the violation of a state law or regulation alone would not necessarily rise to the level of a constitutional violation. *Dixon v. Goord,* 224 F.Supp.2d 739, 744–45 (S.D.N.Y.2002). *See Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990)).

**\*7** The policy statement also provides detailed factors that the classification officer must consider when determining how to classify an inmate for housing purposes. (*Id.* ¶ 6(a)–6(j)). Those factors include criminal history; propensity for victimization or violence; history of medical or mental illness; history of hostile relationships with other inmates; and any other information that "may affect the safety and welfare of the inmate or facility staff." (*Id.*) After the primary classification interview is completed, the interviewing officer recommends appropriate housing for the inmate. (*Id.* ¶ 10). This paragraph also provides a procedure for challenges to primary housing assignments, and any changes in primary housing relating to custody level will be discussed with the inmate by the classification officer and tour supervisor. (*Id.* ¶ 10(b), 10(c)). The classification officer competes a "Classification Sheet," containing a numerical value assigned to the various factors considered. (Def.s' Ex. O).

"The [Supreme] Court has counseled judicial restraint in the federal courts' review of prison policy and administration, noting that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995) (quoting *Turner v. Safely,* 482 U.S. 78, 84 (1987)). The overarching consideration is that a prison regulation infringing on an inmate's constitutional rights is valid so long as the regulation is "reasonably related to the legitimate penological interests." *Turner v. Safely,* 482 U.S. at 89. In *Turner,* the Supreme Court held that the court should determine whether the government objective is legitimate and neutral, and then whether there is a valid, rational connection between the prison regulation or the official action and the legitimate governmental interest that justifies that action. *Id.* Finally, the court determines whether there are alternative means for the inmate to exercise that constitutional right. *Id.* at 90.

In this case, the regulations cited above, together with the policy of allowing temporary segregation of inmates upon transfer into a facility are unquestionably related to the safety and security of the facility. Until an inmate is screened for prior violence; propensity for victimization;

possible enemies; behavior; and adjustment, the facility administrators have no way of knowing where the best place to house the inmate will be. Thus, a short classification period in administrative segregation in order to complete this objective is a completely reasonable restriction on an inmate's liberty. The regulations provide for notice to the inmate and for a challenge to the classification. Thus, the regulations are valid under *Turner,* and no due process right is violated.[12]

[12]      The court would also point out that the regulations do not violate equal protection because all inmates are subject to the same regulations governing classification. Plaintiff does not mention equal protection in his amended complaint, however, in his response the motion for summary judgment, he mentions equal protection for the first time. Even assuming that plaintiff could raise a new claim in his response, this claim has no merit. In order to state a claim for an equal protection violation, plaintiff would have to allege that other similarly situated inmates were treated differently that he was. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985) (the Equal Protection Clause provides that the government shall treat all similarly-situated people alike). Plaintiff in this case has not alleged that any other inmates, similarly situated to plaintiff, were treated differently regarding classification.

As shown by the plaintiff's housing history report, he spent part of his classification time in the mental health area of the medical unit. (Def.'s Ex. H). Although he complains that the administrative segregation damaged his mental health and that defendants were deliberately indifferent to his mental condition, it appears that the defendants were very concerned about his mental condition, and according to his housing record, placed him in the medical unit three times prior to his final classification.[13] Defendants could not ignore the transfer papers indicating that plaintiff was a safety risk.[14] They could not ignore plaintiff's unusual behavior and statements to the screening officer, and the progress notes written during his stay in the medical unit show that the concern for his mental health was justified.[15] (Def.s' Ex. L).

[13]      Plaintiff's own exhibits show that on January 19, 2007, plaintiff was brought back to the medical unit for a physical problem, unrelated to his mental status. (Pl.'s Ex. F). The exhibit also shows that the progress note for January 18, 2007 states that the inmate was "seen and cleared by forensics today. [L]eft unit for general population." *Id.* Plaintiff argues that Dr. Rahmon "increased his medication and cleared him for general

population on January 14th. (Pl.'s Br. at 7). Plaintiff cites his Exhibit B as support for this, however, Exhibit B only states that Dr. Rahmon increased plaintiff's medication. Exhibit D is the exhibit to which plaintiff may be referring, however, the note only states that plaintiff left the unit for general population on January 18th, not that plaintiff was "cleared" for general population. In any event, plaintiff was still in his classification period on January 14th and could not have gone back to general population because his classification was not completed until January 19.th

[14]      As part of plaintiff's "equal protection" claim, he argues that the defendants cannot "prove" that they ordered other inmates into Ad Seg, based upon letters from another county. The burden is on plaintiff to show that he was treated differently than other "similarly situated" inmates. He makes absolutely no claim that other inmates who had such a history of violence and threats were treated differently and makes no claim that other inmates were not placed in Ad Seg as part of the admission/classification procedures.

[15]      On January 14, 2007, the progress notes indicate that Dr. Rahmon was "in to see inmate." (Def.s' Ex. H). The note states that plaintiff's speech was "rushed," his thoughts were racing, he stated that he was a producer from Los Angeles, who spoke to a Fox news reporter about "the CIA issues," and "spoke to himself "most of the day." (*Id.*) On January 17, 2007, plaintiff was involved in an incident whereby plaintiff allegedly threatened the President of the United States, resulting in his second transfer to the mental health unit. Based upon plaintiff's history and behavior, he cannot seriously argue that defendants had no reason to be concerned about the security of the facility.

**\*8** In addition, plaintiff's relatively brief Ad Seg placement did not implicate a liberty interest under *Sandin.* Plaintiff's classification was completed on Friday January 19, 2007, and he was notified of his classification on Monday January 22, 2007, one business day after the determination was made.[16] He was entitled to a review of this classification, but did not take the opportunity to challenge it. Plaintiff spent the last 21 days of his stay at BCCF in Ad Seg. Based on *Sandin,* a period of 30 days segregation does not create a liberty interest, particularly when plaintiff has not made any assertion that the conditions of confinement (other than the separation from other inmates) was in any way atypical or significant. Even if the court were to count the entire time that plaintiff was in administrative segregation (32 days), he still would not have had a liberty interest that is protected

by due process.[17]

[16]    The New York Regulations provide for notice of the classification determination in "one business day" after the determination is made. 9 NYCRR § 7013.8(f).

[17]    *See, e.g., Brown v. Graham,* 9:07–CV–1353 (FJS/ATB), 2010 WL 6428251, at *9 (N.D.N.Y. Mar. 30, 2010) ("The federal district courts in New York, applying *Sandin,* have been consistent in holding that terms of SITU or "keeplock" of approximately 30 days or less do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.") (Report–Recommendation), adopted, 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011); *Rivera v. Goord,* 9:05–CV–1379, 2008 WL 5378372 at *2–*3 (N.D.N.Y. Dec. 22, 2008) (granting summary judgment on the issue that 40 days in room confinement did not constitute a cognizable liberty deprivation under *Sandin* ); *Smith v. Taylor,* 149 F. App'x 12, 2005 WL 2019547 at *1 (2d Cir.2005) (affirming grant of summary judgment dismissing plaintiff's claims of defects in an administrative hearing that resulted in his disciplinary confinement for 45 days in the SITU; plaintiff did not offer evidence that his confinement was more onerous that those generally present in the SITU and thus did not have a protected liberty interest in avoiding the 45–day confinement).

Finally, even if plaintiff had a liberty interest, he received all the process he was due. It is clear that his confinement was administrative, not disciplinary. Plaintiff confuses the two types of confinement. He continues to argue that he was entitled to notice of "charges." There were no "charges" of which to receive notice. Instead, he got notice of the *classification determination* and an opportunity to challenge the determination as required by the regulations involving classification and housing assignments. The fact that he did not challenge the determination does not change the result. Thus, for all of the above procedural and substantive reasons, plaintiff's due process claim may be dismissed.

## V. *Conditions of Confinement*

Plaintiff hints that certain of his conditions of confinement were unconstitutional. Plaintiff states that defendants were deliberately indifferent to his mental health by keeping him in "isolation." Plaintiff also states that defendants issued a "restraint order," and he was placed in restraints whenever he left the cell.

## A. Medical Care

### 1. Legal Standards

The defendants never actually mention the date of plaintiff's conviction. The reason the court mentions this is simply to clarify the standard under which conditions of confinement are analyzed. Allegations of mistreatment of pretrial detainees in state custody are brought under the Due Process Clause of the Fourteenth Amendment. *See Caiozzo v. Korman,* 581 F.3d 63, 69 (2d Cir.2009). It has been held that because a pretrial detainee has not been "convicted," the proper inquiry is whether the conditions of confinement amount to punishment under the Due Process Clause, not whether the "punishment" is cruel and unusual under the Eighth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979) (contrasting sentenced prisoners with pretrial detainees). Sentenced prisoners are protected by the Eighth Amendment prohibition against cruel and unusual punishment. However, the same standard applies to claims of deliberate indifference to a serious threat to the health or safety of a person in custody, regardless of whether they are brought under the Eighth Amendment, relating to convicted prisoners, or under the Fourteenth Amendment for pretrial detainees.[18] *See Caiozzo v. Korman,* 581 F.3d at 72. Thus, the date of plaintiff's conviction is not relevant to any discussion because the standard would be the same whether plaintiff were still a pretrial detainee or whether he had been convicted of the charges.

[18]    Because the due process rights of pretrial detainees are "at least as great as the Eighth Amendment protections available to a convicted prisoner," and the same standard applies, cases cited that refer to the Eighth Amendment are thus applicable to the conditions of confinement claims of a pretrial detainee. *Revere v.. Mass Gen. Hosp.,* 463 U.S. 239, 244 (1983).

*9 In order to state a claim based on constitutionally inadequate medical treatment, plaintiffs must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. at 106. There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

## 2. Application

Plaintiff in this case claims that the isolation made him depressed and harmed his mental health. However, plaintiff spent several days in the mental health unit, and was examined by Dr. Rahmon, according to the progress notes submitted by both plaintiff and defendants. (Def.s' Ex. L). Plaintiff was monitored and his medications were regulated. There is absolutely no indication that the defendants, none of whom are medical personnel, were deliberately indifferent to plaintiff's medical needs, because it is clear that, when a concern arose regarding plaintiff's mental health, he was transferred to the medical unit for observation. Plaintiff's conclusory allegation that the "isolation" made his mental status worse is baseless.

## B. Restraints

### 1. Legal Standards

In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Whitley v. Albers,* 475 U.S. 312, 319–20 (1986); *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985)). The placement of restraints such as handcuffs on an inmate does not, by itself, amount to excessive force or cruel and unusual punishment. *See Bridgeforth v. County of Rensselaer,* No. 1:08–CV–779, 2012 WL 2873361, at *6 (N.D.N.Y. July 12, 2012) (absent some allegation beyond forceful cuffing, the claim against defendant was insufficient as a matter of law).

In this case, defendant Shear states that he did sign a "Restraint Order," but the order only called for plaintiff to have a two-officer escort or "double team" anytime that he left his cell. (Shear Aff. ¶ 13). Defendant Shear further states that "[n]o physical restraints" such as handcuffs or shackles were made a part of the order, "or placed on plaintiff." (*Id.*) Plaintiff himself submits the Order in question, and it supports defendant Shear's affirmation. (Pl.'s Ex. C; Dkt. No. 50–1 at 6). The order is signed by defendant Shear. Although the typewritten portion of the order states that, due to plaintiff's involvement in the January 17t' incident, he would be placed in "full restraints" when he left the housing unit for a period of seven days, above the typewritten material, is a handwritten note by defendant Shear that reads: "Double Team only." (*Id.*) The order was reviewed and continued on two occasions: "1/26/07 ... 2/2/07." (*Id.*)

*10 Plaintiff's own exhibits support defendant Shear's statement that no physical restraints were placed on plaintiff. (Pl.'s Ex. C, G). The "restraint" only involved assigning two officers to plaintiff when he left the housing unit. This order does not come anywhere near the level of a constitutional violation, particularly given plaintiff's behavior during the time in question. Thus, to the extent that plaintiff's amended complaint can be read as alleging an Eighth Amendment or Substantive Due Process claim regarding his conditions of confinement, it may be dismissed.[19]

[19]  Defendant Harder also argues that he had no contact with plaintiff and bore no personal responsibility for his housing assignment or any other problem that plaintiff might have had at BCCF. (Harder Aff. ¶ 2). Because the court is recommending dismissal on the merits and on procedural grounds, defendant Harder's involvement is not critical to the court's recommendation. The court would just note that personal involvement is required for the assessment of damages in a section 1983 action. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). The same is true for defendant Jon Gillette who was mistakenly named by plaintiff instead of Edward J. Cermak.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 47) be **GRANTED,** and plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is further

**ORDERED,** that plaintiff's request to amend the amended complaint to remove defendant Gillette and add defendant Cermak (Dkt. No. 50) is **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 4093792

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5589350
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Donald BOWENS, Plaintiff,
v.
M.E. POLLOCK, et al., Defendants.

No. 06–CV–0457A(Sr).
|
Oct. 12, 2010.

**Attorneys and Law Firms**

Donald Bowens, Utica, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

### *REPORT, RECOMMENDATION AND ORDER*

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** This case was referred to the undersigned by the Hon. Richard J. Arcara, pursuant to Title 28, United States Code, Section 636(b) (1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. # 19.

Plaintiff, proceeding *pro se,* commenced this action pursuant to Title 42, United States Code, Sections 1981, 1983, 1985 and 1986, alleging that defendants engaged in a conspiracy and violated his constitutional rights to free speech, access to the courts, equal protection and due process and subjected him to cruel and unusual punishment in retaliation for the performance of his duties as Secretary of the Groveland Correctional Facility ("Grove land"), Inmate Liaison Committee ("ILC"), during his incarceration at that facility. Dkt. # 1.

Currently before the Court are defendants' motions for summary judgment (Dkt. 31 and 51), and plaintiff's motion for summary judgment. Dkt. # 45. For the following reasons, it is recommended that defendants' motions are granted in part and denied in part and that plaintiff's motion be denied in its entirety.

### *BACKGROUND*

Plaintiff arrived at Groveland in January 2004. Dkt. # 1, ¶ 23. Plaintiff signed a client participation contract for the Veterans Residential Therapeutic Program ("Veterans Program"), on April 8, 2004, and subsequently completed both the basic and after care portions of that program. Dkt. # 26, p. 106. The Veterans Program Conduct Guide provides, *inter alia:*

> Be reminded that *NO* pornographic materials, or gambling are allowed as a participant of this Program, or dorm resident.

Dkt. # 26, p. 104.

Following completion of the Veterans Program, plaintiff continued as a Clerk in the Veterans Program and remained in the Veterans Program Housing Unit. Dkt. # 1, ¶ 23. Plaintiff chose to volunteer as a Clerk so that he could keep his higher paying position as a Clerk in the Law Library, but understood that he would have the option of dropping his position in the Law Library should it become necessary for him to be paid as a Clerk in order to remain in the Veterans Program Housing Unit. Dkt. # 1, ¶ 24.

In February 2005, plaintiff was elected as the Veterans Program Representative to the ILC and in July 2005, he was elected Secretary of the ILC. Dkt. # 1, ¶ 25. In October 2005, the Chair of the ILC, inmate McDuffy, instructed plaintiff to speak to Sergeant Pollock, the ILC Staff Advisor, regarding the movie selection for November. Dkt. # 1, ¶ 26. When he was unable to locate Sergeant Pollock on October 13th and 14th, plaintiff typed two letters and placed them both under Sergeant Pollock's door, expecting that Sergeant Pollock would forward the second letter to Deputy Superintendent Bartlett. Dkt. # 26, p. 51. Plaintiff states that he did not send copies of these letters to anyone else. Dkt. # 26, p. 52.

The first letter requested that Sergeant Pollock "let the movie selection that was voted on by the inmate population and submitted for November, go unchanged." Dkt. # 1–2, p.9. The second letter was addressed to Deputy Superintendent Bartlett and advised that:

> **\*2** It has come to the attention of the I.L.C. that D.O.C.S. has approved all movies that are listed in the Swank Catalog for all Correctional Facilities

throughout the State of New York.

At this time the I.L.C. is respectfully requesting that they be provided with a Swank Movie Catalog. A Swank Catalog will increase the Population's viewing selection and assure that the selection[s] are in compliance with D.O.C.S., and Media review. Also, the I.L.C. is respectfully requesting that they be provided with a catalog of the movies that are available from the Dansville Block Buster Video Store.

Thank you for your time in this matter, and may we please hear from you soon.

Dkt. # 1–2, p. 10.

Sergeant Pollock explained that,

[o]n 10/18/05, I found two letters, on I.L.C. letterhead, that had been shoved underneath my office door in the Peterson Building. I reviewed the letters; one was a letter to me requesting that I rescind my decision to change the November movies that had been voted on by population. The second was a letter to DSP Bartlett requesting movie catalogs from two vendors. Both letters were photocopies and there was no cover letter. Inmate Bowens signed both. Bowens is the Secretary for the Inmate Liaison Committee.

I had Inmate Liaison Committee Chairman M. McDuffie[1] ... report to my office so I could ask what the memos were about. Inmate McDuffie had knowledge of the situation, but denied giving Inmate Bowens permission to send any letters. McDuffie stated that he delegated Bowens to talk to me, but not put anything in writing. There is a standing order from me that no letter from the I.L.C. can be sent out unless signed by the Chair or Vice–Chair. Further, I must review the letter and sign off first before it goes beyond the I.L.C. It appeared that the letters from Bowens were in violation of these orders. McDuffie asked if I could call Bowens to my office for further information.

[1]     The record in unclear whether the correct spelling of Inmate Liaison Committee Chairman's last name is McDuffie or McDuffy. Accordingly, it appears in this Report, Recommendation and Order as it appears in the documents in the record, either McDuffie or McDuffy.

When Inmate Bowens reported to my office, I asked him to sit down. Inmate McDuffie was still present. I asked what the memos were all about. I explained that I did not change the November listings, nor do I ever see

the list. D. Petric, Senior Librarian, supervises the Movie program with permission from D.S.P. Bartlett. I also asked when was there ever a vote taken by population over the monthly movies. I asked how many inmates voted, where did they vote, etc? I do admit being assertive, but not hostile or irate. Inmate Bowens admitted that there had not been a vote. Just some inmates came up to him in the yard and suggested some films.

In regard to the memo to DSP Bartlett, Inmate Bowens then stated he had not yet sent it to her. I asked whether he had spoken to Mr. Petric about the movie catalogs and he admitted he had not. He could offer no explanation for not going through the chain of command. He stated he would give all copies of both memos to ILC Chair McDuffie. Both inmates were then sent on their way. *3 Dkt. # 26, p. 124. Sergeant Pollock further explained that he

did take [the] memo issued by Bowens very seriously because it was a breach of protocol and additionally placed my creditability [sic] with the Inmate population at risk. As the Inmate Liaison Committee Staff Advisor, my creditability [sic] is what allows me to do my job effectively.

Dkt. # 26, p. 137.

On October 19, 2005, Sergeant Pollock explained that he was reviewing my notes and found that Inmate Bowens was residing in G–2 Dorm. The entire G–Block is reserved for inmates programmed into the V.R.T.P. program or the G–Block porters. Inmate Bowens was a full time paid Eve/Late Eve Law Library Clerk. Records reflected that he was a volunteer clerk for the V.R.T.P. program. I spoke with Correction Counselor Strollo and confirmed that Inmate Bowens was not active in the Treatment Program. After Mr. Strollo and I spoke about the incident, he stated that there was no need for Inmate Bowens to reside in the block. I notified Captains' Office of my findings and they ordered him to be moved to another dorm to allow another inmate to

begin the Treatment program. As a sergeant, I do not have the authority to make such a move on my own.

Dkt. # 26, p. 135. Captain Wilcox authorized plaintiff's move after Sergeant Pollock brought to his attention the fact that plaintiff was a volunteer clerk, explaining to plaintiff during the course of his Tier III hearing that it was his policy for inmates to be housed where they are programmed, and noting that,

> [a]ccording to Mr. Strollo you were not on the payroll but you were a volunteer. Now if you're a volunteer and [you are taking] bed space from an inmate that is supposed to be programmed there, I will move you ...

Dkt. # 26, pp. 12 and 14.

In response to plaintiff's grievance concerning his removal from the Veterans Program Housing Unit, Inmate Grievance Program Supervisor O'Brien responded that Captain Wilcox advised that,

> the Veteran's dorm is for those actively participating in the Veteran's Program. Facility records confirm that the grievant completed his active participation in the program on 10/2/05. It is not the policy of this facility to house inmates based upon their choice of volunteer service. The grievant was properly moved at the discretion of security for facility needs. The space in the Veteran's dorm is correctly given to those actively in the program, for which a waiting list exists.

Dkt. # 26, pp. 156–158. Plaintiff complains that he was removed from a therapeutic housing environment of 34 inmates "to one of the most incident prone dorms in the facility" housing 60 inmates and that he was "moved from a single man cube to the top bunk in a double bunk area." Dkt. # 1, ¶ 53.

At approximately noon on October 19, 2005, Sergeant Pollock authored a misbehavior report charging plaintiff with a violation of Rule 113.15 (Contraband—Inmates shall not purchase, sell, loan, give, or exchange personally

owned articles without authorization); Rule 113.22 (Contraband—Inmates shall not use or possess authorized articles in unauthorized areas); Rule 113.23 (Contraband—Inmates shall not be in possession of any article that is not authorized by the Superintendent or designee); Rule 116.10 (Inmates shall not lose, destroy, steal, misuse, damage or waste any type of State property); and Rule 180.17 (Unauthorized Legal Assistance). Dkt. # 26, p. 5. Sergeant Pollock described the incident as follows:

**\*4** On 10/19/05, C.O. R. Dickerson ordered D. Bowens ... to pack up his personal property to move to K–1. The inmate took the draft bags. A short time later the officer went to check on Bowens and could not locate him. The office [r] went to the basement V.R.T.P. Clerk's Office where Bowens was a volunteer clerk. Officer Dickerson found and checked a bag and found Bowen's personal legal work and some state office supplies. He then secured the office. A short time later, he found Inmate Bowens packing in his cube. The inmate finished and before leaving asked for access to the basement Clerk's office to get his personal draft bag. At that point the inmate was directed to complete his move. Officer Dickerson had the bag transport[ed] to the watch commander's office so I could investigate further. I found inmate Bowen's personal legal work, other inmate's legal work, law books (Jailhouse Lawyers Manual with the name "Jose" on the cover, Statsky Legal Thesaurus/Dictionary with "Groveland Correctional/Main Library" crossed out with the initials "D.B." in it, NYS Homeless Veteran's Service Guide marked "Guidance Unit Main"; State owned office supplies [ ] tape, paper clips, folder labels, wire bound spiral memo book, 3 pornographic magazines, lined [paper], photocopies of pornographic photos from the magazine, assorted blank paper, 12" ruler marked "Book Room—Clerk."

The VRTP Clerk's Office is a program area for the Guidance Unit. No personal property, especially legal work or pornographic materials are allowed. Further the inmate was not authorized to remove state-owned office supplies from any area and place them in his personal property except for a Mead Composition Book (09910) for use as the ILC Secretary. Inmate Bowens is a Eve/Lt Eve Law Library Clerk.

Dkt. # 26, pp. 5–6. C.O. Dickerson endorsed the misbehavior report. Dkt. # 26, p. 5. As part of his duties as Review Officer, defendant Irving Schoenacker received the misbehavior report. Dkt. # 53, ¶ 8. Initially, defendant Schoenacker determined that the misbehavior report was complete and stated a valid charge. *Id.* "Then, given the serious nature of plaintiff's alleged infractions, I

determined that plaintiff should be entitled [sic] a Superintendent's hearing and coded the misbehavior report as a Tier III." *Id.* Plaintiff was not confined following issuance of the misbehavior report. Dkt. # 26, p. 10.

Sergeant Pollock informed Lt. Keller that:

[o]n October 21, 2005, I again interviewed Inmate Bowens in my office. This was a follow-up to a ticket I wrote on Inmate Bowens concerning contraband he had in the V.R.T.P. Clerk's office that was discovered by R. Dickerson, C.O., the day of his move out of G–2. I explained the seriousness of the misbehavior report and that it would be a Tier III ticket and the possible dispositions. I then asked Inmate Bowens about other inmate law library clerks violating the condition of their assignments as law library clerks. Inmate Bowens denied any knowledge of any unauthorized activities in the Law Library. Serving Officer J. Martin contacted me during the interview and asked for me to send Inmate Bowens to C–School after I was done with him, so he could serve him his ticket.

**\*5** Concerning the inmate's accusation on any note I allegedly authored to the Law Library officers stating that he could not work his assigned job, I do not recall writing any such note. I asked the officer covering the Activities Building today to look for such a note, all that could be found on this date is Bowens name scratched off the roster. I have not spoken to any of the assigned Law Library officers at all about Inmate Bowens....

Dkt. # 26, p. 136. As part of the investigation into plaintiff's complaints, however, C.O. Bauman wrote:

My only involvement in this matter is that I did work the law library on 10–21–05 and upon reporting to the law library at 3:00 p.m., I did find a note on my desk saying to not let inmate Bowens work in the law library until further notice per Sgt. Pollock. Inmate Bowens showed up for work and I told him to leave & not show up again until further notice.

Dkt. # 1–2, p. 12. C.O. Austin explained that,

[o]n Oct. 24 ... 2005 I reported to my bid [sic] in the law lib. I opened the log book and there was a note inside that stated inmate Bowens ...

was not allowed in the law library until after his hearing per Sgt. Pollock. I explained this to Bowens and told him he would be handled as if he were [keeplock] that if he needed any legal assistance he could drop me a tab stating what he needed for his hearing. He did not send me any tabs saying he needed help.

Dkt. # 1–2, p. 13.

Plaintiff appeared before the Program Committee on October 24, 2005. Dkt. # 1, ¶ 37. Sergeant Pollock explained that this was a scheduled appearance and that,

[p]rior to his coming into the room, I did inform Mr. Lindsay, the Program Committee Chair[,] about Bowen's situation. As Chair, Mr. Lindsay decided that Inmate Bowens should be removed from the Law Library Clerk position pending his hearing. This is a normal procedure, when a misbehavior ticket is written in an inmate's program area.

Dkt. # 26, p. 136. By Memorandum dated November 14, 2005, in response to plaintiff's complaints, S.C.C. Lindsay advised Inmate Grievance Supervisor O'Brien that plaintiff was,

scheduled for Program Committee on a routine basis due to his completion of Transitional Services Phase III.

Prior to his entry into the room, the Program Sergeant informed me that inmate Bowens ... had a misbehavior report pending. When inmate Bowens came into the room, I informed him that I wanted to review the misbehavior report. When we checked the misbehavior report we found that the Tier III misbehavior report contained three charges which involved his Program in the Law Library, where he was assigned as an administrative clerk. As program Chairperson I decided to remove him from the assignment until the misbehavior report had been resolved. If he is found not guilty of those charges, he will be restored to the law library, including back pay. If he is found guilty of those charges he will be rescheduled for Program Committee when the disciplinary sanctions are completed and re-Programmed to another assignment.

**\*6** Dkt. # 26, p. 146. Deputy Superintendent for Security Gerard Krempasky affirms that it was "standard procedure" to remove an inmate from his programming pending resolution of a disciplinary hearing where the misbehavior report involved allegations pertaining to that programming. Dkt. # 38, ¶ 7.

The Tier III hearing commenced on November 1, 2005 before Captain Wilcox. Dkt. # 26, p. 10. In response to plaintiff's concern that he needed an employee assistant, Captain Wilcox advised plaintiff that he could request documents during the course of the hearing and made arrangements for plaintiff to access the Law Library. Dkt. # 26, p. 16. Inmate assistance is not required when an inmate is not confined. Dkt. # 42, ¶ 6.

Plaintiff explained to Captain Wilcox that he was in possession of the *Jailhouse Lawyers Manual* because another inmate, Jose Marrero, put them on the [Veterans Program's] office desk Wednesday morning so that he could donate them to the Law Library. Dkt. # 26, p. 25. Inmate Marrero testified that he brought the manual and its supplement to the office for plaintiff to drop off at the Law Library because he is getting ready to be released and rarely leaves his dorm so as to avoid any trouble before his release. Dkt. # 26, pp. 41–42. It was confirmed that inmate Marrero properly received the books through legal mail. Dkt. # 26, p. 58. Captain Wilcox informed plaintiff that inmate Marrero could not leave books with an inmate to donate, but was required to follow a process through the Dep. of Programs. Dkt. # 26, p. 25. Plaintiff responded that he had tried to find the appropriate procedure for an inmate wishing to donate books to the Law Library, but found none, and noted that he had only received the book the morning he was directed to move. Dkt. # 26, p. 26.

Plaintiff informed Captain Wilcox that he had checked the legal thesaurus out of the Law Library and Captain Wilcox confirmed that was so. Dkt. # 26, pp. 30 and 73. Plaintiff also stated that the ruler was inside a folder and that he would have removed it if he had been able to go though his bag inside the office because he understood that it would be considered contraband inside the K dorm. Dkt. # 26, p. 44. He explained that the file folders and file folder labels were in his draft bag because he used them in both the veterans office and in the Law Library to assist veterans who were not residents of the Veterans Program Housing Unit. Dkt. # 26, p. 30.

C.O. Dickerson testified that he went down to the basement in the office and observed a bag half full of property which contained contraband. Dkt. # 26, p. 44. C.O. Dickerson locked the door and confirmed the bag

was plaintiff's when he asked C.O. Dickerson to unlock the door so he could get his bag. Dkt. # 26, p. 45. Sergeant Pollock testified that he considered the Playboy magazines contraband because pornography is forbidden in the veteran's residential treatment program dorm, as well as in any program areas, including the veteran's inmate clerk's office. Dkt. # 26, p. 56. Sergeant Pollock testified that plaintiff was a Volunteer Clerk in the Veterans Program and resided in the Veterans Program Housing Unit, which would subject him to the conditions of that housing unit. Dkt. # 26, p. 56. Sergeant Pollock confirmed that he believed the assorted legal papers of plaintiff and other inmates to be contraband because they were discovered in an area where they did not belong. Dkt. # 26, p. 57. Sergeant Pollock explained that although the wire bound memo pads were once issued to the ILC, "a revised memo came out making them contraband." Dkt. # 26, pp. 57–58.

**\*7** Sergeant Pollock spoke with the Veterans Program director, Mr. Strollo, and determined that plaintiff could be moved as he had completed the program and was a volunteer clerk. Dkt. # 26, p. 60. Corrections Counselor Strollo perceived that Sergeant Pollock "was upset about what Mr. Bowens had done," but was handling the situation himself. Dkt. # 26, p. 89. Corrections Counselor Strollo testified that plaintiff was part of the Veterans Program and had been hired as a clerk in the Veterans Program. Dkt. # 26, p. 87. Corrections Counselor Strollo testified that inmates residing in the Veterans Program Housing Unit, regardless of whether they were a program participant or not, were not allowed to possess magazines such as Playboy. Dkt. # 26, p. 87. Corrections Counselor Strollo also testified that plaintiff was not allowed to take personal property, including legal work, into the clerk's office. Dkt. # 26, pp. 87–88.

Plaintiff conceded possession of the Playboy magazines, but testified that they were in his locker until he was directed to pack his belongings, at which time he attempted to put all his books, magazines, and papers into one bag. Dkt. # 26, p. 94. Similarly, plaintiff explained that his legal materials had been in his locker and was taken to the veterans office when he was directed to pack his bags so that all his books and papers would be in the same draft bag. Dkt. # 26, pp. 32–33. Plaintiff explained that the legal materials containing other inmates' names were draft pleadings available as reference materials in the Law Library and drafts of work he did for inmates as part of his duties as a clerk in the Law Library. Dkt. # 26, pp. 34–35. He conceded that he "must have grabbed too many files when he" retrieved his own possessions from the Law Library, adding that he would have returned them to their proper spot had he had a chance to go through his

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.          98

draft bag as he had planned. Dkt. # 26, p. 35. Plaintiff testified that he kept his veterans related material and books for a business course he was taking in the veterans office. Dkt. # 26, p. 33. He testified that the business class was sponsored by the Veterans Program and explained that he would work on the course work in the veterans office whenever he had free time, adding that he was never told he couldn't work on the business course in the Veterans Program office and assumed that he could "because it was all veteran's related stuff that I was doing." Dkt. # 26, p. 29. Plaintiff reiterated that the program director gave him the memo pads. Dkt. # 26, pp. 28–29.

Sergeant Pollock testified that he spoke with the Chair of the ILC, inmate McDuffy, about the letter and was informed that plaintiff had been instructed to speak to Sergeant Pollock, but had not been given authority to write a letter. Dkt. # 26, p. 64. Inmate McDuffy confirmed that he had told plaintiff to get in touch with Sergeant Pollock about the movies but never told him to write to Deputy Superintendent Bartlett. Dkt. # 26, p. 79. Sergeant Pollock assumed that the letter addressed to Deputy Superintendent Bartlett had been sent. Dkt. # 26, pp. 68 and 81. Sergeant Pollock testified that as the ILC staff advisor, he maintained an open door policy with the Chair or the Vice Chair of the ILC. Dkt. # 26, p. 65. Sergeant Pollock challenged the content of the letter and testified that plaintiff admitted that there was no vote by the population. Dkt. # 26, p. 65. Sergeant Pollock testified that he was very disappointed by the way this issue was handled by plaintiff and that he reprimanded plaintiff because,

> *8 this letter brings up a question of my credibility to population and that I can't work efficiently and effectively as an ILC staff advisor if my credibility is at stake. Also that I had nothing to do with the movie selection.

Dkt. # 26, p. 66.

Sergeant Pollock testified that plaintiff was removed from his program at the library because he had completed the program and was scheduled for a program change. Dkt. # 26, p. 70. Sergeant Pollock sat on plaintiff's program committee. Dkt. # 26, p. 69. Sergeant Pollock also testified that he conferred with Mr. Lindsay and

> advised him that this inmate had a pending tier three that may [have] something to do with this program

area and Mr. Lindsay determined that pursuant to facility procedure that he be removed pending the outcome of the hearing.

Dkt. # 26, p. 70. Sergeant Pollock explained that if plaintiff was found not guilty, he would be programmed back with back pay. Dkt. # 26, p. 71. Sergeant Pollock denied leaving any instructions denying plaintiff access to the Law Library. Dkt. # 26, p. 71.

Captain Wilcox found plaintiff guilty of unauthorized exchange based upon plaintiff's acceptance of the Jailhouse Lawyers Manual from inmate Jose Marrero; possession of Playboy magazines in an unauthorized area; and misuse of state property based upon his use of office supplies designated for the Veterans Program in his capacity as clerk in the Law Library, but found plaintiff not guilty of possessing contraband and providing unauthorized legal assistance. Dkt. # 1–2, p. 39. In support of the disposition, Captain Wilcox relied upon

> the written report by Sgt. Pollock ... and his verbal testimony at this hearing that on the date of 10/19/05 while packing for a housing unit move, you were found to be in possession of items allowed in general population but not allowed in the housing unit you were in, possessed books belonging to another inmate and were using office supplies issued from one area of the facility in other areas. Your allegation that Sgt. Pollock issued the report as a form of retaliation was not substantiated.

Dkt. # 1–2, p. 40. Captain Wilcox imposed two months keeplock, with loss of commissary and phone privileges and confiscation of plaintiff's law books, thesaurus, homeless veterans dictionary, tape dispenser, paper clips, ruler and wire bound steno pads. Dkt. # 1–2, p. 39. Plaintiff was immediately transferred to Livingston Correctional Facility. Dkt. # 1–2, p. 44.

### *DISCUSSION AND ANALYSIS*

**Summary Judgment**
Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations omitted).

**\*9** A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

### Title 42, United States Code, Section 1981

Title 42, United States Code, Section 1981 provides that:

> All persons within the jurisdiction

of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

To establish a claim under Title 42, United States Code, Section 1981, a plaintiff must demonstrate that (1) the plaintiff is a member of a racial minority, (2) the defendants intended to discriminate on the basis of race, and (3) the discrimination concerns one of the statute's enumerated activities. *Brown v. City of Oneonta, New York,* 221 F.3d 329, 339 (2d Cir.2000), *cert. denied,* 534 U.S. 816, 122 S.Ct. 44, 151 L.Ed.2d 16 (2001). "Essential to an action under Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated." *Albert v. Carovano,* 851 F.2d 561, 571–72 (2d Cir.1988) (internal citations omitted). Although direct evidence of discrimination is not necessary, a plaintiff must do more than cite to his mistreatment and ask the court to conclude that it must have been related to his race. *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 104 (2d Cir.2001).

"To support a claim of selective enforcement, [plaintiff] must allege purposeful and systematic discrimination by specifying instances in which they were singled ... out for unlawful oppression in contrast to others **similarly situated.**" *Brown,* 221 F.3d at 573 (internal quotation omitted). While the circumstances need not be identical, there should be a reasonably close resemblance of facts and circumstances where the plaintiff seeks to draw inferences of discrimination by showing that he was similarly situated in all material respects to the individuals to whom he compares himself. *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir.2001).

**\*10** To establish retaliation, a plaintiff must show that he was (1) engaged in an activity protected under anti-discrimination statutes, (2) the defendant was aware of plaintiff's participation in the protected activity, (3) the defendant took adverse action against plaintiff based upon that activity, and (4) a causal connection existed between plaintiff's protected activity and the adverse action taken by defendant. *Id.* at 105.

As there is no evidence before the Court to suggest that

plaintiff was disciplined or moved from his housing unit or removed from his prison work and volunteer assignment because of his race or because of his complaints of racial discrimination, or that similarly situated inmates of other races were treated preferentially to plaintiff, it is recommended that plaintiff's claims pursuant to 42 U.S.C. § 1981 be dismissed.

## Title 42, United States Code, Section 1983

Title 42, United States Code, Section 1983 provides "a method for vindicating federal rights elsewhere conferred, including under the Constitution.' " *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010), *cert. denied,* —— U.S. – – – – , 131 S.Ct. 158, 178 L.Ed.2d 243, 2010 WL 2300385 (2010) (internal quotation omitted).

## Retaliation

Plaintiff alleges that his constitutional rights were violated in retaliation for his performance of his duties as Secretary of the ILC. Dkt. # 1, ¶ 21. Specifically, plaintiff complains that he was removed from his housing unit, issued a Tier III misbehavior report for infractions undeserving of such disciplinary procedures, removed from his job in the Law Library, denied access to the Law Library, subjected to loss of his personal legal work, and denied timely resolution of his grievances, all in retaliation for writing two letters regarding the inmate movie selection. Dkt. # 1.

> A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the

misbehavior report.

*Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002) (internal quotations and citations omitted). "Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Moreover, the Court of Appeals has recognized that prisoners' claims of retaliation should be examined "with skepticism and particular care" given the "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

## Housing Unit Transfer

**\*11** To sustain a First Amendment retaliation claim, a prisoner must demonstrate that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the prisoner; and (3) there was a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004).

Prisoners possess a substantive right to free and uninhibited access to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers. *Davis v. Goord,* 320 F.3d 352–53 (2d Cir.2003); *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). Thus, plaintiff possessed a constitutional right to raise his concerns about the inmate movie selection and inmate access to movie selections to prison authorities.

Adverse action is defined objectively as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights. *Id.* Within a day of the discovery of the letters raising concerns about the inmate movie selection, Sergeant Pollock requested that plaintiff be removed from his housing unit. Dkt. # 26, p. 137. As a result, plaintiff alleges that he was removed from a therapeutic housing environment of 34 inmates "to one of the most incident prone dorms in the facility" housing 60 inmates and that he was "moved from a single man cube to the top bunk in a double bunk area." Dkt. # 1, ¶ 53. This is sufficient to satisfy the adverse action requirement.

The causal connection may be established by the contemporaneous timing of Sergeant Pollock's discovery of the letters and his request to Captain Wilcox that plaintiff be transferred. *See Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (Causal connection may be established by demonstrating that the protected activity

was close in time to the adverse action). In addition, Sergeant Pollock admitted that he took the memos "very seriously because it was a breach of protocol and additionally placed my creditability [sic] with the Inmate population at risk." Dkt. # 26, p. 137. Moreover, the Veterans Program Director, Corrections Counselor Strollo, testified at plaintiff's disciplinary hearing that Sergeant Pollock showed him the letters and "was upset about what [plaintiff] had done." Dkt. # 26, pp. 68 and 88–89.

Whether plaintiff would have been transferred out of the housing unit absent Sergeant Pollock's distress over the letters authored by plaintiff is a question of fact which must be resolved by a jury, particularly in light of plaintiff's allegation that he understood that he would be afforded the option of dropping his higher paying position as a Paralegal in the Law Library should it become necessary for him to be paid as a Clerk in order to remain in the Veterans Program Housing Unit. Dkt. # 1, ¶ 24. Thus, it is recommended that Sergeant Pollock's motion for summary judgment be denied with respect to plaintiff's claim of retaliatory transfer from the Veterans Program Housing Unit.

**Misbehavior Report**

**\*12** Although "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," the issuance of a false misbehavior report in retaliation for exercising a constitutional right is actionable under Title 42, United States Code, Section 1983. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *see Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.").

For the same reasons set forth above with respect to the housing transfer, plaintiff has demonstrated that the letters raising concerns regarding inmate movie selection were protected activity. In addition to subjecting plaintiff to the prospect of discipline, the issuance of the misbehavior report by Sergeant Pollock caused plaintiff to be removed from his work assignment at the Law Library pending resolution of the disciplinary proceeding and excluded from the Law Library generally for the period between the issuance of the misbehavior report and the start of the disciplinary hearing, thereby satisfying the adverse action requirement.

As set forth above, the issuance of the misbehavior report authored by Sergeant Pollock within one day of his

discovery of the letters raising concerns over the movie selection and Sergeant Pollock's admission that he took the memos "very seriously" and Corrections Counselor Strollo's testimony that Sergeant Pollock "was upset about what [plaintiff] had done" is evidence of causal connection. Dkt. # 26, pp. 68, 88–89 and 137. In addition, Captain Wilcox commented at the hearing that plaintiff had not had a disciplinary ticket in five years. *See Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995) (evidence of prior good behavior may be circumstantial evidence of retaliation). Finally, although plaintiff conceded possession of a book owned by another inmate and pornography in a housing unit where pornography was prohibited, as well as using state property issued for use in the Veterans Program in the Law Library instead, he was cleared of more serious charges of providing unauthorized legal assistance and possession of unauthorized articles. *See Gayle,* 313 F.3d at 683 ("vindication of the inmate after a hearing may constitute circumstantial evidence of a defendant's retaliatory motive.").

Although plaintiff conceded possession of a book owned by another inmate and pornography in a housing unit where pornography was prohibited, as well as using state property issued for use in the Veterans Program in the Law Library instead, the Court finds a question of fact as to whether plaintiff would have been subjected to a misbehavior report for these infractions absent Sergeant Pollock's unhappiness over plaintiff's perceived breach of protocol in writing letters of concern regarding the inmate movie selection. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be denied.

**Determination of Appropriate Disciplinary Tier**

**\*13** Lieutenant Schoenacker's determination that the charges set forth in the misbehavior report were sufficiently serious as to warrant a Superintendent's hearing is not actionable. Even accepting for purposes of this motion that Sergeant Pollock authored the misbehavior report in retaliation for plaintiff's letters, there is no evidence that Lieutenant Schoenacker was aware of that fact or had any communication with Sergeant Pollock which would support the inference of conspiracy. Accordingly, it is recommend that this aspect of defendants' motion for summary judgment be granted.

**Removal from Law Library Job**

New York law does not give a prisoner any statutory, regulatory or precedential right to a prison job. *Gill v.*

*Mooney,* 824 F.2d 192, 194 (2d Cir.1987). However, a claim for relief may be stated pursuant to Title 42, United States Code, Section 1983 "if otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights" such as the right to petition government for the redress of grievances. *Id.* Thus, plaintiff could not be removed from his work assignment in retaliation for his exercise of his right to question the selection of inmate movies.

The record reveals that the decision to remove plaintiff from his position within the Law Library was made by Senior Corrections Counselor Lindsay after Sergeant Pollock informed him of the pending misbehavior report. Dkt. # 26, pp. 137 and 146. Moreover, the record is uncontroverted that it was standard procedure to remove an inmate from his program pending resolution of disciplinary proceedings relating to an inmate's program. Dkt. # 26, pp. 137 and 146; Dkt. # 38, ¶ 7. There is no evidence to suggest that S.C.C. Lindsay was motivated by, or was even aware of, plaintiff's complaints regarding the inmate movie selection when he determined that plaintiff should be removed from his position in the Law Library until the disciplinary proceeding was resolved and no suggestion of any agreement between Sergeant Pollock and S.C.C. Lindsay to retaliate against plaintiff for the exercise of his right to complain about the inmate movie selection. *See Dawes,* 239 F.3d at 492 (allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action); *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983) ("Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under section 1983."). Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Timely Resolution of Grievances**
Plaintiff alleges that the grievances he filed following the issuance of the misbehavior report were not resolved in a timely fashion and were not resolved in the order in which his grievances were received. Dkt. # 1, ¶ 73. As a result, plaintiff complains that he was denied evidence for use in his disciplinary hearing. Dkt. # 1, ¶ 75.

**\*14** The grievance process is not an appropriate vehicle for gathering evidence for use in a disciplinary proceeding. Moreover, as the Inmate Grievance Supervisor Bonnie O'Brien declares, there is no requirement or expectation that grievances will be handled in the order in which they are received, as some grievances require more time to investigate and resolve

than others. Dkt. # 40, ¶ 9. In any event, plaintiff's grievances were resolved within three weeks of the filing of the first grievance and were dismissed, negating any suggestion that an earlier resolution would have supported his arguments at the disciplinary hearing. There is no evidence to suggest any agreement between Sergeant Pollock and the inmate grievance committee to deny his grievances in retaliation for plaintiff's letters regarding the inmate movie selection. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Access to the Courts**
"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *accord Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). "The right of access to the courts requires that prisoners defending against criminal charges or convictions (either directly or collaterally) or challenging the conditions of their confinement ... not be impeded from presenting those defenses and claims for formal adjudication by a court." *Bourdon v. Loughren,* 386 F.3d 88, 96 (2d Cir.2004). Inmate access to the court must be "adequate, effective, and meaningful." *Bounds,* 430 U.S. at 822. To establish a violation of this right, an inmate must demonstrate "actual injury" by showing "that a non-frivolous legal claim had been frustrated or was being impeded" because of the inadequate access. *Lewis,* 518 U.S. at 353 (footnotes omitted).

Although the Court finds a question of fact as to whether Sergeant Pollock denied plaintiff access to the Law Library in retaliation for the letters concerning the inmate movie selection, this claim fails for lack of evidence of actual injury. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Due Process Claim**
To state a cognizable section 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996); *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship

on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004), *quoting Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id., quoting Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999).

**\*15** In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65. As a result, district courts are "required to examine the conditions of confinement in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009) (internal quotations omitted). The district courts are "required to examine the actual circumstances of confinement and to identify with specificity the facts upon which their conclusions are based." *Id.* at 134 (internal quotations omitted). A detailed factual record is required unless the period of time spent in SHU was exceedingly short—less than 30 days—and there is no indication that the plaintiff endured unusual SHU conditions. *Id.* at 135. "Only when the conditions are uncontested may a district court resolve the issue of atypicality of confinement as a matter of law." *Id.* at 134.

As defendants have presented no evidence regarding typical conditions of keeplock confinement as compared to the general population and the actual conditions of plaintiff's keeplock confinement, the Court lacks a sufficient factual record upon which to assess whether plaintiff has demonstrated a liberty interest with respect to his keeplock confinement of two months. Accordingly, it is recommended that defendants' motion be denied on this ground.

**Sufficiency of Process**

**Impartiality of Hearing Officer**

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff v. McDonnell,* 418 U.S. 539, 570–71, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *see Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46.

**\*16** Plaintiff complains that Captain Wilcox refused to recuse himself from conducting the hearing, denied plaintiff's request for an employee assistant, denied plaintiff's request for documents and was predisposed to a finding of guilt. Dkt. # 1. Contrary to plaintiff's allegations, the record establishes that Captain Wilcox conducted an impartial hearing. The evidence in the administrative record (hearing transcript) establishes that plaintiff's acceptance of a book from another inmate and thereafter, maintaining possession of that book after it could not be donated to the law library even though the other inmate was still at Groveland, was a clear violation of Sub Section 113.15 of the Standards of Inmate Behavior. Dkt. # 42, ¶ 14. In addition, the evidence clearly established that plaintiff was not allowed to possess the Playboy magazine in the dorm where he was housed pursuant to the Veteran's Residential Therapeutic Program Conduct Guide Sub Section Housing Unit K and therefore, was in violation of Sub Section 113.22, property in an unauthorized area. *Id.* Lastly, the evidence clearly supported the finding of plaintiff guilty of Sub Section 116.10, theft of state property. *Id.*

Plaintiff was found not guilty of the charges of contraband and unauthorized legal assistance, as Captain Wilcox found that there was not enough evidence available to show his culpability for these charges. *Id.* As

discussed below, Captain Wilcox's disposition was supported by evidence in the form of the misbehavior report, as well as the testimony of defendant Pollack, inmate McDuffy and Mr. Strollo. It is clear from the record that Captain Wilcox was impartial and unbiased in the conduct of the Tier III disciplinary hearing and clearly evaluated all of the evidence presented during the hearing, as demonstrated by the fact that he found plaintiff not guilty of several of the charges. Therefore, it is recommended that this portion of defendants' motion for summary judgment be granted.

**Sufficiency of the Evidence**

Regardless of plaintiff's explanation for why he was in possession of inmate Marrero's Jail House Lawyer's Manual, there is no dispute that inmate Marrero transferred possession of this book to plaintiff. Dkt. # 26, pp. 25–26, 41–42, 58. Thus, the evidence was sufficient to find plaintiff guilty of unauthorized exchange of personal property. Similarly, plaintiff does not dispute that he possessed pornographic magazines within the confines of the Veterans Program Housing Unit, in violation of the Veterans Program Conduct Guide. Dkt. # 1–3, p. 20. Finally, the evidence is sufficient to support a finding that plaintiff was using office supplies issued to the Veterans Program in the Law Library, as plaintiff testified at his disciplinary hearing that he used the supplies in the Veterans Office and in the Law Library to assist veterans who were not residents of the Veterans Program Housing Unit. Accordingly, it is recommended that this aspect of defendants' motion be granted.

**Employee Assistant and Request for Documents**

*17 Plaintiff also complains that Captain Wilcox denied plaintiff's request for an employee assistant and denied plaintiff's requests for two unspecified documents to be used as evidence during the disciplinary hearing. Plaintiff requested an employee assistant to aid in the retrieval of two documents to support his defense. Captain Wilcox denied plaintiff's request pursuant to DOCS Directive 4932 Sub Section 251.4, 1, because plaintiff was not confined in segregated confinement while awaiting the Tier III disciplinary hearing and could have obtained the documents himself. Dkt. # 42, ¶ 6. An inmate's right to an employee assistant while being confined has been well established. *Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988). However, the right to an employee assistant does not extend to an inmate who is able to conduct his own investigative work. *Hameed v. Mann,* 57 F.3d 217 (2d Cir.1995).

Insofar as plaintiff claims that he was denied access to certain unspecified documents, as noted above, plaintiff was in a position to conduct his own investigative work. With respect to the two documents specifically discussed during the disciplinary hearing, one was a copy of the housing unit change form plaintiff thought was used when he was moved from G–2 form to K–1 dorm. However, because Captain Wilcox oversaw all movement within the facility and further, authorized all moves, Captain Wilcox explained that he did not use any move forms and thus, the document requested by plaintiff simply did not exist. The second document requested by plaintiff was a form to the law library program recommending that plaintiff be removed from his program assignment. During the hearing, plaintiff was given ample opportunity to produce the document. Moreover, once plaintiff was advised that he needed to obtain the document on his own, he never formally requested the document from Captain Wilcox. Notwithstanding the foregoing, Captain Wilcox determined that such document would be cumulative and duplicative because other evidence was presented during the hearing concerning plaintiff's removal from the law library program. For the foregoing reasons, the alleged denial of the employee assistant and failure to provide plaintiff with the requested documents does not constitute a denial of due process in the conduct of the Tier III disciplinary hearing. For the foregoing reasons, it is recommended that this portion of defendants' motion for summary judgment be granted.

**Equal Protection**

"The equal protection clause directs state actors to treat similarly situated people alike." *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1985), *citing Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "To prove an equal protection violation, claimants must prove purposeful discrimination directed at an identifiable or suspect class." *Id.* Alternatively, plaintiff may proceed on a "class of one" theory, in which case "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005), *overruled on other grounds, Appel v. Spiridon,* 531 F.3d 138 (2d. Cir.2008). Thus, in a "class of one" case, a plaintiff must establish that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy;

and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Id.*

**\*18** Plaintiff cannot sustain a claim that Captain Wilcox denied him due process of law in finding plaintiff, but not inmate Marrero, guilty of unauthorized exchange because inmate Marrero was not subject to a misbehavior report and therefore, not before him for a disciplinary hearing. Accordingly, it is recommended that this aspect of defendants' motion for summary judgment be granted.

**Personal Involvement**

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under *section 1983. Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989).* Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873, citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

Defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay all claim that they lack the requisite personal involvement and therefore, plaintiff's claims against each of them should dismissed. In his complaint, plaintiff alleges that defendants Hunt, Kruppner, Krempasky and Bartlett each had personal knowledge that defendant Pollack issued a deprivation order and further that defendants Pollack and Lindsay conspired in retaliatory removal of plaintiff from his job in the law library, but did nothing. Dkt. # 1, ¶¶ 107–115. Plaintiff further claims that these defendants had knowledge that defendant O'Brien had obstructed and hindered plaintiff's grievances from going forward. *Id.* at ¶ 16. Moreover, plaintiff claims that defendant Hunt was responsible for appointing defendant Wilcox to serve as the hearing officer, notwithstanding the fact that he knew of defendant Wilcox's personal involvement in the removal of plaintiff from the Veterans Residential Treatment Program and the dorm. *Id.* at ¶ 114.

There is nothing in the record before this Court to support a conclusion that Superintendent Hunt, Deputy Superintendents Kruppner, Krempasky and Bartlett and Lieutenants Keller and Kelsay were more involved than simply by virtue of the fact that they held supervisory positions within the prison chain of command. The fact that Superintendent Hunt issued two memos in response to plaintiff's claims of retaliation does not alter the analysis of whether he was sufficiently personally involved thereby requiring denial of his motion for summary judgment. Similarly, defendant Krempasky's review of the investigation which concluded that no wrongdoing had occurred does not require a finding that he was sufficiently personally involved. Both Lieutenant Keller's and Lieutenant Kelsay's involvement was limited to conducting the subject investigation. Dkt.36 and 37. Finally, defendants Bartlett and Kruppner neither participated in the investigation nor knew plaintiff. Dkt.34 and 39. Accordingly, because defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay were not sufficiently personally involved in the alleged constitutional deprivations, it is recommended that plaintiff's claims against each of them fail as a matter of law.

**Conspiracy—Title 42, United States Code, Section 1983**

**\*19** "To sustain a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must demonstrate that a defendant acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds that violated the plaintiff's rights, privileges, or immunities secured by the Constitution or federal courts." *Duff v. Coughlin,* 794 F.Supp. 521, 525 (S.D.N.Y.1992) (internal quotation omitted). "To establish that a conspiracy existed plaintiff must demonstrate the defendants 'agreed' or 'reached an understanding' to violate his rights." *Id.* "Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief under *section 1983.*" *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983). As plaintiff does not allege and the record does not reflect any agreement among the defendants, summary judgment is appropriate with respect to plaintiff's vague allegations of conspiracy. For the foregoing reasons, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim be granted.

**Conspiracy—Title 42, United States Code, Section 1985(3)**

42 U.S.C. § 1985(3) provides:

If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... if one or more persons ... do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is ... deprived of having and exercising any right or privilege of a citizen of the United states, the party so injured or deprived may have an action for the recovery of damages.

"The conspiracy must be motivated by racial or related class-based discriminatory animus." *Graham v. Henderson, 89 F.3d 75, 82 (2d Cir.1996).* Other than plaintiff's speculative and conclusory allegations that defendants conspired to retaliate against the plaintiff in racially motivated ways, the complaint is devoid of any allegations of invidious discriminatory animous on the part of the defendants. Conclusory allegations are wholly insufficient to state a claim pursuant to section 1985(3). Accordingly, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1985(3) be granted.

**Conspiracy—Title 42, United States Code, Section 1986**

Title 42, United States Code, Section 1986 imposes liability on an individual who has knowledge of discrimination prohibited under Title 42, United States Code, Section 1985. *Graham, 89 F.3d at 82.* Thus, a section 1986 claim is contingent upon a valid section 1985 claim. *Id.* Because plaintiff fails to establish a cause of action pursuant to Title 42, United States Code, Section 1985, his claim pursuant to Title 42, United States Code, Section 1986 must also be dismissed. For the foregoing reasons, it is recommended that defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1986 be granted.

***CONCLUSION***

**\*20** For the foregoing reasons, this Court recommends

that:

1. Defendants' motion for summary judgment on plaintiff's claim pursuant to Title 42, United States Code, Section 1981 be granted;

2. Defendants' motion for summary judgment on plaintiff's retaliation claim (Housing Unit Transfer) be denied;

3. Defendants' motion for summary judgment on plaintiff's retaliation claim (Misbehavior Report) be denied;

4. Defendants' motion for summary judgment on plaintiff's retaliation claim (Determination of Appropriate Disciplinary Tier) be granted;

5. Defendants' motion for summary judgment on plaintiff's retaliation claim (Removal from Law Library Job) be granted;

6. Defendant's motion for summary judgment on plaintiff's retaliation claim (Timely Resolution of Grievances) be granted;

7. Defendants' motion for summary judgment on plaintiff's access to the courts claim be granted;

8. Defendants' motion for summary judgment on plaintiff's due process claim be denied;

9. Defendants' motion for summary judgment on plaintiff's sufficiency of due process (disciplinary hearing) be granted;

10. Defendants' motion for summary judgment on plaintiff's equal protection claim be granted;

11. Defendants' motion for summary judgment based on lack of personal involvement of defendants Hunt, Kruppner, Krempasky, Bartlett, Keller and Kelsay be granted;

12. Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1983 be granted;

13. Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United States Code, Section 1985(3) be granted;

14. Defendants' motion for summary judgment on plaintiff's conspiracy claim pursuant to Title 42, United

States Code, Section 1986 be granted; and

15. Plaintiff's motion for summary judgment be denied in all respects.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo,* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988). *Failure to file objections within the specified time or to*

*request an extension of such time waives the right to appeal the District Judge's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.*

**\*21 SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5589350

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3439179
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eric JOHNSON, also known as Debah J. Smith,
Plaintiff,
v.

Ayisha ENU, Physician, Hudson Correctional
Facility; Peter Bogarski; Reuteneaur, Jane Doe;
McCoy, John Doe; H.M. Miles; Joyce Duke; Wolff,
John Doe; Rother, Jane Doe; George, John Doe;
Testo, John Doe; Peter Behrle; M. Graziano;
Michael Ambrosino; Philip Heath; T. Mahar,
Senior Correction Counselor, Greene Correctional
Facility; T. Gaines; Caulfield, John Doe; John Doe
# 1; John Doe # 2; Karen Meicht, Nurse, Hudson
Correctional Facility; Winnie, Lieutenant, Hudson
Correctional Facility; and Coffey, John Doe,
Defendants.[1]

[1]    Ankesh Nigam and John Rodgers were also named
       as defendants in the amended complaint. Dkt. No.
       64. On September 18, 2010, their motion for
       summary judgment was granted. Dkt. No. 115.
       Further, John Doe George was named as a
       defendant in the original complaint (Dkt. No. 1)
       but he was not named as a defendant in the
       amended complaint (Dkt. No. 64). The amended
       complaint also fails to allege that George engaged
       in any of the alleged unconstitutional conduct.
       Accordingly, the Clerk is directed to terminate him
       as a party to this action.

No. 08–CV–158 (FJS/DRH).
|
July 13, 2011.

## Attorneys and Law Firms

Eric Johnson, c/o Debah J. Smith, Brooklyn, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Dean J. Higgins, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

## REPORT–RECOMMENDATION AND ORDER[2]

[2]    This matter was referred to the undersigned for report
       and recommendation pursuant to 28 U.S.C. § 636(b)
       and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff *pro se* Eric Johnson ("Johnson"), formerly an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. §§ 1983 and 1985 alleging that
defendants, twenty-one DOCS employees, violated his
constitutional rights. Am. Compl. (Dkt. No. 64). Presently
pending is defendants' motion for summary judgment
pursuant to Fed.R.Civ.P. 56. Dkt. No. 119. Johnson has
not opposed this motion. For the following reasons, it is
recommended that defendants' motion be granted in its
entirety.

## I. Failure to Respond

Johnson did not oppose defendants' motion. "Summary
judgment should not be entered by default against a pro se
plaintiff who has not been given any notice that failure to
respond will be deemed a default." *Champion v. Artuz,* 76
F.3d 483, 486 (2d Cir.1996). Defendants and the Court
provided such notice here. Dkt. Nos. 119–14, 120.
Despite this notice, Johnson failed to respond. "The fact
that there has been no response to a summary judgment
motion does not ... mean that the motion is to be granted
automatically ." *Champion,* 76 F.3d at 436. Even in the
absence of a response, a defendant is entitled to summary
judgment only if the material facts demonstrate his or her
entitlement to judgment as a matter of law. *Id.;*
Fed.R.Civ.P. 56(c).

Because Johnson has not responded to raise any question
of material fact, the facts-but not the legal conclusions-set
forth in defendants' Rule 7.1 Statement of Material Facts
(Dkt. No. 119–1) [hereinafter "Defs.' 7.1 Statement"] are
accepted as true. *See, e.g., Onanuga v. Pfizer, Inc.,* 369
F.Supp.2d 491, 493 n. 1 (S.D.N .Y.2005) (citing *Holtz v.
Rockefeller & Co., Inc.,* 258 F.3d 62, 72 (2d Cir.2001);
*Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D
.N.Y.1997); *see also* N.D.N.Y.L.R. 7.1(a)(3) ("*The Court
shall deem admitted any facts set forth in the Statement of
Material Facts that the opposing party does not
specifically controvert.*" ) (emphasis in original).

Finally, as to those facts not contained in defendants' 7.1
statement, the Court will assume for purposes of this
motion that plaintiff's version of those facts is true, as
plaintiff is entitled to the benefit of all inferences at this

stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998). To be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit (or verified complaint) must, among other things, be based on "personal knowledge." Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). While the amended complaint is not notarized as was the original complaint (Dkt. No. 1), the amended complaint contains a statement above Johnson's signature stating, "I declare under penalty that the foregoing is true and correct." Am. Compl. at 31; Compl. at 21. Both verifications suffice to require that these documents be considered in opposition to the pending motion as long as the other requirements of Rule 56(c)(4) are satisfied, including personal knowledge, admissibility, and competency. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

## II. Background

**\*2** In February 2005, while housed at Ulster Correctional Facility, Johnson was diagnosed with Hepatitis B. Defs.' 7.1. Statement ¶ 18. He was transferred to Hudson Correctional Facility ("Hudson") on March 15, 2006. Id. ¶ 19. Dr. Ayisha Enu, a defendant herein, reviewed Johnson's medical records upon his arrival at Hudson. Id. ¶ 22. On March 22, Hudson medical staff performed additional blood tests. Id. ¶ 24. Five days later, on March 27, Johnson informed Dr. Enu of his hepatitis diagnosis. Id. ¶ 23.

Dr. Enu received the results from Johnson's blood tests on September 1. Id. ¶ 25. The tests revealed that Johnson was HbeAg negative and anti-HBe positive, indicating that he had a variant of Hepatitis B and likely had it "for a very long time.". Id. ¶¶ 26–27. Dr. Enu then ordered liver function tests and counseled Johnson on the disease and treatment options. Id. ¶ 28. Johnson's liver function and Hepatitis B viral load tests were drawn on August 30. Id. ¶ 29. Those tests revealed elevated liver enzyme levels as compared to tests conducted earlier in the year. Id. ¶ 30. Dr. Enu and Johnson discussed the results on September 5. Id. ¶ 31. Johnson stated that he did not believe the results because his liver function tests were always normal. Id. Dr. Enu then ordered a repeat of the liver function and Hepatitis B viral load tests. Id. ¶ 32.

On September 11, 2006, the results from the Hepatitis viral load drawn on August 30, 2006, "revealed a very high [viral load] count." Defs.' 7.1 Statement ¶ 33. Four days later, on September 15, Dr. Enu made arrangements for Johnson to see Dr. Rodgers, a gastroenterology specialist at Albany Medical Center Hospital, to discuss Hepatitis treatment. Id. ¶ 34. Samples for liver function and Hepatitis B tests were drawn again on September 20, 2006. Id. ¶ 35. Those tests, once again, revealed elevated enzyme levels. Id. Dr. Enu saw Johnson again on October 26. Id. ¶ 36. Dr. Enu ordered Hepsera for Johnson, and they discussed the blood and liver function testing regiment that Johnson would undergo once he started treatment. Id.

After starting treatment on October 26, Johnson researched Hepsera and learned of the complications that could develop if he were to ever stop taking the drug. Am. Compl. at 9; *see also* Defs.' Ex. B (Dkt. No. 119–4) at 263. Johnson returned to medical staff on November 3, 2006, because he had questions about the medication. Defs.' 7.1 Statement ¶ 37. Dr. Smith, who was covering for Dr. Enu, explained to Johnson the need for follow up and compliance because Hepatitis B is a chronic disease and that his liver function tests showed abnormal enzyme levels. Id. Johnson returned to the medical department on November 16 because he was concerned about Hepsera's side effects. Am. Compl. at 9; *see also* Defs.' Ex. B at 258. Nurse Peter Bogarski, a defendant herein, allegedly ignored Johnson's questions and asked that he be removed from the examination room. Id.

**\*3** Johnson requested permission from his instructor to file a grievance after returning to his work assignment. Am. Compl. at 9. He went to the library to file a grievance directly with Grievance Officer T. Testo, a defendant herein, but Testo was not present. Id. at 9–10. Johnson took a grievance form and attempted to return to his assignment but was stopped by Correction Officer Rother, also a defendant herein. Id. at 10. Rother conducted a pat and frisk of Johnson and told him that he could not file a grievance in there and to return to his assignment. Id. Correction Sergeant John Doe Wolfe,[3] another defendant herein, escorted Johnson back to his assignment. Id. Wolfe then questioned Instructor Deer about Johnson's "movement." Id. Deer stated that he assumed that Johnson was returning to the medical unit. Id. Johnson received a misbehavior report. Id.

---

[3]     Defendant Wolfe's name is incorrectly spelled in the amended complaint. *See* Dkt. No. 64. The correct spelling is Wolfe. *See* Defs.' Answer to Am. Compl. (Dkt. No. 79) ¶ 2.

A CT scan was performed on Johnson at Albany Medical Center Hospital on November 25, 2006. Defs.' 7.1 Statement ¶ 38. On November 28, Dr. Enu learned that the scan revealed a mass on the tail of Johnson's pancreas. *Id.* ¶ 39. Johnson had an MRI on December 18. *Id.* ¶ 40. Consistent with the results of the earlier CT scan, the MRI also showed a mass on the tail of Johnson's pancreas. *Id.* ¶ 44. The differential diagnosis of the MRI "include[d] islet cell tumor, metatastic disease, or carcinoid." *Id.* ¶ 45; *see also* Defs.' Ex. B at 150.

Nurse Karen Meicht, a defendant herein, examined Johnson on December 13, 2006, after Johnson complained of stomach problems. Am. Compl. at 11; *see also* Defs.' Ex. B at 256. Johnson asked when he would see Dr. Rodgers again. Am. Compl. at 11. Meicht told Johnson that he would have to wait until the test results were ready for review. *Id.; see also* Defs.' Ex. B at 256. Johnson then received some stomach fiber and left the medical department. Am. Compl. at 11.

Dr. Enu referred Johnson to Dr. Nigam, a surgeon at Albany Medical College, for a consultation. Defs.' 7.1 Statement ¶ 46. Dr. Nigam's first examined Johnson on January 5, 2007, and Johnson agreed to remove the mass on the pancreas surgically. Nigam Aff. (Dkt. No. 94–2) ¶¶ 9–10. Four days later, Johnson claims to have written a letter to Bogarski, "requesting further clarity on the proposed surgery." Am. Compl. at 9. On January 30, 2007, the day of the scheduled surgery, Johnson expressed his reluctance to proceed with the surgery and wanted more information on other options, including waiting or a biopsy. Nigam Aff. ¶ 11. Dr. Nigam warned Johnson that there was a "small risk" that the mass could develop into cancer by waiting. *Id.* Johnson decided not to have the surgery, and on April 5, 2007, Dr. Nigam wrote an order for a biopsy of the pancreas with Dr. Sood. *Id.* ¶ 12; Defs.' 7.1 Statement ¶ 49.

Johnson met with defendants Enu, Bogarski, Meicht and Nurse Jane Doe Reuteneaur[4] on February 2, 2007, to discuss follow-up surgical treatment. Am. Compl. at 14; *see also* Defs.' Ex. B at 88. Johnson claims that Enu acted as if the surgery were an elective procedure and focused on the mass on the chest instead of the mass on the pancreas. Am. Compl. at 14. Reuteneaur allegedly told Johnson that there was nothing that medical staff could do because Johnson refused the surgery. *Id.* Following this meeting, Hudson Deputy Superintendent for Security H.M. Miles, a defendant herein, allegedly removed Johnson from the outside community work crew, "implying" that Johnson had caused a disturbance. Am. Compl. at 14.

[4]   Both the original complaint and the amended complaint name "Jane Doe Reuteneaur" as a defendant. Johnson believes that this defendant is female. *See* Am. Compl. at 5, 18. Terry Reuteneaur accepted service of the original complaint. *See* Dkt. No. 49. In support of the present motion, Terry Reuteneaur submitted an affidavit stating that he is male and that the allegations made against Jane Doe Reuteneaur do not refer to him. Reuteneaur Decl. (Dkt. No. 119–12) ¶¶ 4–5. Even if the pleadings were served on the incorrect person, no further identification or service upon Jane Doe Reuteneaur is necessary because doing so would be futile as Johnson has failed to state a claim against Jane Doe Reuteneaur. *See* discussion infra Point III(D)(4).

**\*4** On March 1, 2007, Johnson was brought to the medical building after complaining of a "spinning headache." Defs.' 7.1 Statement ¶ 61; Am. Compl. at 15. Dr. Enu recommended that Johnson be evaluated at Columbia Memorial Hospital because the Hudson emergency medical staff leaves at 10:00PM, and Johnson's "new symptom" might require emergency medical staff. Defs.' 7.1 Statement ¶¶ 62–64. Johnson refused to go to the private hospital. *Id.* ¶ 66. Johnson was then sent to Coxsackie Correctional Facility's Regional Medical Unit ("Coxsackie RMU") for observation. *Id.* ¶ 68. Before returning to Hudson on the next day, Coxsackie RMU medical staff allegedly told Johnson that there was no reason for the transfer. Am. Compl. at 16.

Upon Johnson's return to Hudson on March 2, Meicht issued Johnson a misbehavior report, accusing Johnson of lying, providing false information, and failing to report an illness. Am. Compl. at 16; *see also* Defs.' Ex. D (Dkt. No. 119–6) at 4. Correction Lieutenant Winnie, a defendant herein, found Johnson guilty. Defs.' Ex. D at 1. Johnson received thirty-days in keeplock, and he had recreation, package, commissary, and phone privileges suspended for fifteen days. *Id.*

Johnson learned on March 15, 2007, that Dr. Enu requested a change in Johnson's medical level so that he could be transferred. *Id.* at 17. Johnson claims that the real reason for the transfer was because he was "argumentative and problematic." *Id.* Johnson also wrote to Bogarski on March 15 to request a "reevaluation of the canceled pancreatic surgery." Am. Compl. at 17. Johnson did not receive a response. *Id.*

Johnson was transferred to Greene Correctional Facility ("Greene") on March 21, 2007. Defs.' 7.1 Statement ¶ 52. Upon arriving at Greene, Johnson wrote to Greene Superintendent Peter Behrle, a defendant herein, requesting information on the transfer. Am. Compl. at 18.

Greene Deputy Superintendent for Security M. Graziona, also a defendant herein, responded on April 2, 2007, and told Johnson that he was transferred for unspecified medical reasons and that he would return to Hudson once his medical needs were met. *Id.* Also on April 2, Johnson spoke with Physician John Doe Caulfield, another defendant herein, about the reason for the transfer and biopsy. *Id.* Johnson claims that Caulfield "made it appear as if [Johnson] were requesting the needle biopsy as an elective procedure," and that it took Caulfield two months to order the biopsy despite the "urgency of [the] condition." *Id.*

Graziano allegedly wrote to Johnson on June 17, 2007, to inform Johnson that his medical condition was changed, permitting him to transfer out of Greene. Am. Compl. at 19. Three days later, Johnson claims to have received a letter from Correction Counselor T. Gaines, a defendant herein, stating that Johnson's transfer was awaiting approval from the central office in Albany. *Id.*

**\*5** On June 6, 2007, while at Greene and under the care of Dr. Sood, Johnson underwent an upper endoscopy ultrasound in an attempt to biopsy the pancreatic mass. Defs.' 7.1 Statement ¶¶ 50–51. The pancreatic mass, however, could not be visualized. *Id.* ¶ 51. On September 7, 2007, under the care of Dr. Doreen Smith at Greene, Johnson had a CT scan. *Id.* ¶ 53. This scan showed a stable pancreatic tail mass that had been stable for at least ten months. *Id.* ¶ 53. Johnson also received a letter on September 7 from Behrle, stating that the transfer back to Hudson was now permissible. Am. Compl. at 19. But two weeks later, on September 21, Johnson received a letter from Gaines, stating that the central office denied the transfer as Greene was the proper facility because of Johnson's medical condition. *Id.* at 20. Greene Deputy Superintendent Michael Ambrosino, also a defendant herein, allegedly sent Johnson a letter on September 24 to inform him that his "medical level" was changed due to a hold placed on Johnson by the parole board on March 15, 2007. *Id.*

While at Greene, Johnson filed two grievances on September 22, 2007. Am. Compl. at 23. One grievance was about the failure to honor his request to speak with Caulfield. *Id.* The other was related to the circumstances of Johnson's transfer to Greene in March 2007. *Id.* Johnson was allegedly told that transfers were not grievable and that the grievance would not be filed. *Id.* Johnson alleges that it was Defendants John Doe # 1[5] and John Doe # 2 who refused to file these grievances. *Id.* On October 3, 2007, Senior Correction Counselor Tim Mahar, another defendant herein, wrote to Johnson to inform him that an "unscheduled transfer [has] been

submitted." Am. Compl. at 20. Johnson received a letter on October 16 from Greene Deputy Superintendent for Programs Philip Heath, also a defendant herein, stating that Johnson was "to remain at Greene." *Id.*

5     Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b) (service of process must be made within sixty days of the filing of the complaint). Because these defendants have not been identified by Johnson or served with process, it is recommended that the complaint be dismissed without prejudice as to John Doe # 1 and John Doe # 2. No further identification or service upon John Doe # 1 or John Doe # 2 are necessary because doing so would be futile as Johnson has failed to state a claim against these defendants. *See* discussion *infra* Point III(F).

Johnson returned to Hudson on February 2, 2008. Defs.' 7.1 Statement ¶ 56. Dr. Enu continued to work with Johnson in conjunction with Dr. Nigam and Dr. Rodgers.[6] *Id.* ¶ 52. Dr. Enu saw Johnson on March 28 and April 9, 2008, to discuss the elevated tumor markers. *Id.* ¶ 57. A CT of the liver was scheduled to be performed on May 12, 2008, because of an elevated tumor marker located next to the Hepatic Vein. *Id.* ¶ 58. Johnson, however, refused the procedure until he had an opportunity to discuss it with his family. *Id.*

6     A detailed discussion of Dr. Nigam's and Dr. Rodgers's involvement in Johnson's medical treatment can be found in the report and recommendation that recommended their dismissal. *See* Dkt. No. 114.

On April 28, 2008, Johnson was transferred to Coxsackie RMU for a medical trip. Defs.' 7.1 Statement ¶ 5; Am. Compl. at 22. Medical Transport Officer John Doe Coffey, a defendant herein, secured Johnson into a transport vehicle with handcuffs, chains, and leg irons. Defs.' 7.1 Statement ¶ 5. Johnson alleges that he was fondled in the "groin area" by Coffey during this process. Am. Compl. at 22. Johnson claims that this was the third such incident. *Id.* Johnson and Correction Sergeant Wolfe discussed this incident several days later, and Wolfe said that he would conduct an investigation. *Id.* Johnson was scheduled for a medical trip on May 12, 2008. *Id.* He requested that Coffey not be the transport officer for that trip. *Id.* On May 12, however, Coffey was the transport officer, but Wolfe supervised the process. *Id.* Johnson complained that the shackles around his ankles were too tight but Wolfe said that Johnson had enough room. *Id.*

**\*6** Dr. Enu had another appointment to discuss the liver biopsy with Johnson on July 30, 2008. *Id.* at ¶ 59. Johnson refused the procedure. *Id.* at 55. This appointment was the last time that Dr. Enu examined Johnson. *Id.* ¶ 54. Johnson was transferred to Greene on August 15, 2008. *Id.* ¶ 60.

### III. Discussion

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits that support the motion. *Id.; see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Id.* at 586. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-moving party special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude,"; that a *pro se* litigant's submissions must be construed "liberally,"; and that such submission must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read

into pro se submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest,"; that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

*Id.* (internal citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.") (citations omitted).

### B. Eleventh Amendment Immunity

**\*7** The Eleventh Amendment prohibits suits against a state in federal court unless the state consents or waives its immunity. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997). The State has not consented to suit or waived its immunity here. § 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Daisernia v. New York,* 582 F.Supp. 792, 796 (S.D.N.Y.1984). Thus, a suit that seeks monetary damages from an official in his or her official capacity is barred even though asserted against the individual. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).

Johnson has named defendants in their official capacities as DOCS employees. *See* Am. Compl. at 2–6. Although defendants have not moved to dismiss on Eleventh Amendment grounds, it is recommended that the Court *sua sponte* dismiss any claims against defendants for money damages in their official capacities. *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

### C. Personal Involvement

Personal involvement is an essential prerequisite for § 1983 liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A section 1983 defendant, however, cannot be liable "merely because he held a supervisory position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved" only if the defendant: (1) directly

participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that a violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).[7]

[7]    The Supreme Court's decision in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), casts doubt in the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

### 1. McCoy, Duke, and Testo

Besides naming McCoy, Duke, and Testo in the amended complaint, Johnson has made no allegations that those defendants engaged in the alleged unconstitutional conduct. Accordingly, those defendants should be granted summary judgment.

### 2. Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines

Behrle, Graziano, Ambrosino, Heath, Mahar, and Gaines either received letters from Johnson or responded to Johnson when he inquired as to why he was transferred to Greene from Hudson. *Id.* at 18–20. Without more, Johnson has not alleged the personal involvement of these defendants in any alleged unconstitutional conduct. Nor does Johnson allege that he notified these defendants of the alleged unconstitutional conduct. He merely inquired into reasons for the transfer. *See id.*

Further, even if Johnson alleged unconstitutional conduct in these letters, the "mere receipt of letters from an inmate by a [supervisory official] regarding [unconstitutional conduct] is insufficient to constitute personal liability." *Gonzales v. Wright,* No. 9:06–CV–1424 (JMH), 2010 U.S. Dist. LEXIS 15953, at *28, 2010 WL 681323, at *10 (N.D.N.Y. Feb. 22, 2010) (citations omitted); *see also Booker v. Doe,* No. 9:06–CV–73 (GLS), 2008 U.S. Dist. LEXIS 76413, at *22, 2008 WL 4527601, at *7

(N.D.N.Y. Sept. 30, 2008) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement.").

**\*8**  Accordingly, these defendants should be granted summary judgment.

### D. Pendent State Law Claims

To the extent that Johnson's claims may be construed as pendent state law claims alleging lack of informed consent prior to treatment, such claims must fail. Federal courts have supplemental jurisdiction over pendent state law claims pursuant to 28 U.S.C. § 1367. It is recommended, herein, however, that defendants be granted summary judgment on Johnson's federal claims against them on which rests federal jurisdiction over the pendent state law claims. Johnson asserts no other basis for the Court's jurisdiction over these claims and, therefore, the Court should decline to exercise supplemental jurisdiction over Johnson's state law claims if the recommendations are accepted. *See* 28 U.S.C. § 1367(c)(3). Such causes of action should be dismissed without prejudice.

Moreover, even if the state law claims are addressed, they still fail. In order to state an actionable claim for failure to provide informed consent:

> plaintiff must prove (1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury.

*Foote v. Rajadhyax,* 702 N.Y.S.2d 153, 153 (N.Y.2000) (citations omitted). In this case, there is nothing in the record to show that the medical treatment that any of the defendants provided were the proximate cause of

Johnson's injuries. In fact, there is nothing to show that Johnson was injured at all.

### E. Deliberate Medical Indifference

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994). The test for a § 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. Id. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir.2003) (quoting Hudson v. McMillian, 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." Brock v. Wright, 315 F.3d158, 162–63 (2d Cir.2003) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998)). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. Smith, 316 F.3d at 185.

*9 Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." Chance, 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Chance, 143 F.3d at 703. As such, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ...

are not adequate grounds for a section 1983 claim." Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996).

In this case, defendants do not appear to challenge the fact that Hepatitis B and its potential complications or the resulting malignancies in Johnson's pancreas were serious medical needs. Rather, defendants contend that they were not deliberately indifferent.

### 1. Dr. Enu

Johnson contends that Dr. Enu was not receptive enough to a biopsy when the liver tumor was first discovered in 2006, refused to follow the advice of specialists who recommend a biopsy, and failed to refer Johnson to an oncologist. Am. Compl. at 25–26.

First, mere disagreements on treatment between a prison inmate and his doctor do not rise to the level of a constitutional violation. Sonds, 151 F.Supp.2d at 312. Likewise, even if other doctors, as Johnson argues, disagreed with Dr. Enu's prescribed treatment, Dr. Enu is entitled to his own medical judgment and the mere fact that he disagreed with other medical professionals is insufficient to show deliberate indifference even if Dr. Enu's judgment was misguided or negligent. See Ortiz v. Makram, No. 96 Civ. 3285, 2000 WL 1876667, at *10 (S.D.N.Y. Dec. 21, 2000).

Also, Johnson's refusal of the prescribed treatment further negates allegations of deliberate indifference. See Gillard v. Rovelli, No. 9:09–CV–0860 (NAM/GHL), 2010 WL 4905240, at *10 (N.D.N.Y. Sept. 29, 2010) (Lowe, M.J.) (citing Rivera v. Goord, 253 F.Supp.2d 735, 756 (S.D.N.Y.2003)). On May 14, 2008, Johnson refused a CT of his liver to evaluate whether a mass had become cancerous or spread. Defs.' Ex. B at 36–38. He refused the CT scan once again on June 19, 2008. Id. at 32–34. Finally, on July 30, 2008, Johnson refused a liver biopsy. Id. at 29. While Johnson might have refused the prescribed treatment because he disagreed with them, prisoners are not afforded the medical treatment of their choice. Chance, 143 F.3d at 703.

Finally, a review of Johnson's medical records fails to reveal any indication or suggestion that Dr. Enu was deliberately indifferent to Johnson's serious medical

needs. Upon Johnson's transfer to Hudson on March 15, 2006, Dr. Enu reviewed Johnson's medical records. Defs.' Ex. B at 273. Dr. Enu conducted a physical examination of Johnson and learned of his Hepatitis B diagnosis approximately a week and a half later on March 27. *Id.* at 272. Dr. Enu ordered blood and liver function tests to evaluate Johnson's condition and repeated the tests after Johnson refused to believe the results. Defs.' Ex. B at 269–70. Dr. Enu also referred Johnson to outside specialists or other medical personnel when Hudson's facilities would be unable to provide assistance. *Id.* at 164 (consultation notes of Dr. Nigam reference referral from Dr. Enu), 176–80 (transfer to Coxsackie RMU because Johnson needed emergency care), 268 (ambulatory health record noting referral to a gastroenterology specialist). There is no indication that Dr. Enu was deliberately indifferent to Johnson's medical needs during the eighteen-month period that Johnson was under Dr. Enu's care.

**\*10** Accordingly, defendants' motion as to Dr. Enu should be granted on this ground.

### 2. Dr. Caulfield

Johnson asserts a delay in medical treatment claim against Dr. Caulfield. Am. Compl. at 18. A "delay in treatment does not violate the constitution unless it involves an act or failure to act evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Corr. Ctr,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (internal quotation marks omitted) (citing *Chance,* 143 F.3d at 703). "The Second Circuit has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Thomas,* 288 F.Supp.2d at 339 (internal quotation marks omitted) (citing *Espinal v. Coughlin,* No. 98 Civ. 2579, 2002 U.S. Dist. LEXIS 20, 2002 WL 10450, at \*3 (S.D.N.Y. Jan. 3, 2002)). Even if a prisoner is able to establish delay, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

The record is devoid of any facts demonstrating that Dr. Caulfield delayed the procedure as a form of punishment, ignored a life threatening and fast-degenerating condition, or delayed major surgery. Johnson accuses Dr. Caulfield of waiting two months before ordering a needle biopsy. Am. Compl. at 18. Johnson claims that Dr. Caulfield

acted as if the procedure were elective, and he appeared to have no knowledge of Dr. Nigam's "order for a needle biopsy." *Id.* Johnson also believed that the procedure was required immediately because of the "urgency of [his] condition." *Id.* There is no indication, however, that the needle biopsy was an urgent procedure. Dr. Nigam merely stated that delaying pancreatectomy and spleenectomy in favor of a biopsy would mean a "small risk of cancer." Defs.' Ex. A (Dkt. No. 119–3) at 38. Moreover, Johnson has failed to proffer any evidence that his condition deteriorated or became worse as a result of the delay.

Accordingly, Dr. Caulfield should be granted summary judgment on this ground.

### 3. Bogarski

Bogarski, a nurse administrator, is accused of ignoring Johnson's questions and concerns about Hepsera, and removing Johnson from the examination room for no reason on November 17, 2006. Am. Compl. at 9. An ambulatory health record signed by Bogarski and dated November 17, 2006, indicates that Johnson became "verbally upset" and "uncooperative" as an "inquisition into [Johnson's] health history [was] attempted." Defs.' Ex. B at 258. Johnson "was asked to leave the medical office," and security was notified. *Id.* 6.

Johnson also accuses Bogarski of ignoring two letters where Johnson inquired about the need for pancreatic surgery and a reevaluation for the canceled pancreatic surgery. Am. Compl. at 9, 17. On January 9, 2007, four days after Johnson's surgical consultation with Dr. Nigam, Johnson sent a letter to Bogarski, "requesting further clarity on the proposed surgery." *Id.* at 9. Then on March 17, 2007, approximately a month and a half after the surgery was canceled, Johnson wrote to Bogarski to request a reevaluation of the canceled surgery. *Id.* at 17. It does not appear that Bogarski responded to either of these letters. *See id* .

**\*11** These allegations fail to establish deliberate indifference on the part of Bogarski. There is no indication that Johnson failed to receive medical care and treatment for his conditions after Bogarski asked him to leave the medical department on November 17, 2006, or after Bogarski allegedly ignored Johnson's letters. Johnson continued to receive medical evaluations and monitoring of his liver conditions by medical staff. *See generally* Defs.' Ex. B.

Accordingly, defendants should be granted summary

judgment on this ground.


### 4. Reuteneaur

Reuteneaur, a nurse, was allegedly present at a February 2, 2007, medical appointment that Johnson had with Dr. Enu. Am. Compl. at 14; see also Defs.' Ex. B at 88 (ambulatory health record signed by Dr. Enu showing a medical consult on February 2, 2007). After Dr. Enu told Johnson that he would receive a biopsy when the need for one arose, Johnson asked what his treatment would be should his condition become serious. Am. Compl. at 14. Reuteneaur allegedly told Johnson that "there would be nothing [that medical staff] could do" because Johnson refused the surgery.

While Johnson may contend that this amounted to deliberate indifference, Johnson has proffered no facts to support this conclusory statement. Moreover, a review of the record further belies a deliberate indifference claim as Johnson continued to receive medical evaluations to monitor the progression of his disorders. *See generally* Defs.' Ex. B. Accordingly, summary judgment as to Reuteneaur should be granted.


### 5. Meicht

Nurse Meicht examined Johnson on December 13, 2006, because Johnson was experiencing stomach discomfort. Am. Compl. at 11; Defs .' Ex. B at 256. Johnson received stomach fiber before leaving. Am. Compl. at 11. Meicht also made an appointment for Johnson to see Dr. Enu. Defs.' Ex. B at 256. Without more, there is nothing to show that Meicht acted with deliberate indifference to Johnson's medical needs. Accordingly, Meicht should be granted summary judgment on this ground.


### F. Misbehavior Report and Keeplock Confinement

The amended complaint alleges that Meicht issued a false misbehavior report against Johnson on March 2, 2007. Am. Compl. at 16. Johnson possessed no constitutional right to be free "from falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," but he is still entitled "not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986).

Thus, a fair hearing would cure any due process violations resulting from false accusations. *Grillo v. Coughlin,* 31 F.3d 53, 56 (2d Cir.1994); *Livingston v. Kelly,* 561 F.Supp.2d 329, 331 (W.D.N.Y.2008) ("As the Second Circuit noted ..., an inmate's allegation that he has been found guilty of false disciplinary charges may support a constitutional claim if he also alleges that he was denied the minimal procedural due process protections ....").

**\*12** To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Also, due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F .3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with confinement in keeplock[8] or a special housing unit[9] alone is insufficient to establish an atypical and significant deprivation.

[8]    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

[9]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N .Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

Hearing Officer Winnie sentenced Johnson to thirty-days in keeplock confinement. Defs.' Ex. D at 1. Winnie also suspended Johnson's recreation, package, commissary, and phone privileges for fifteen days. *Id.* District courts have noted that "decisions in the Second Circuit are unanimous that keeplock ... of 30 days or less in New

York prisons is not 'atypical or significant hardship' under *Sandin." Auleta v. LaFrance,* 233 F.Supp.2d 396, 398 (N.D.N.Y.2010) (citing *Williams v. Keane,* No. Civ. 95–0379(AJP)(JGK), 1997 WL 527677, at *6–8 (S.D.N.Y. Aug. 25, 1997) (Peck, M.J.) (citing cases)). Moreover, "the loss of phone, telepackage, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006) (citing *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998), citing in turn *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Thus, Johnson did not have a protected liberty interest.

Even if Johnson had a protected liberty interest, he received a fair and impartial hearing. While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural due process. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Prisoners are "entitled to advance written notice ...; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted). Due process requires written notice twenty-four hours prior to the commencement of a formal disciplinary hearing in order "to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are .... " *Wolff,* 418 U.S. at 564 (citations omitted). "The effect of the notice should be to compel the charging officer to be sufficiently specific as to the misconduct ... charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges ...." *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001) (citations omitted). Such notice guarantees a meaningful hearing whereupon a prisoner can properly defend himself against the pending charges. *Id.* at 193.

*13 Here, the misbehavior report was delivered on March 2, 2007, and the hearing was held on March 8, 2006, giving Johnson six days to prepare a defense. Defs.' Ex. D at 1. Johnson also had the opportunity to present a defense, and he declined to call any witnesses. *Id.* at 2–3. Accordingly, defendants should be granted summary judgment 0n this claim.

## G. Interference with Grievance Process

Johnson accuses Rother, John Doe # 1, and John Doe # 2

of interfering with grievances that he had filed. Am. Compl. at 10, 23. The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See 370 Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F. Su pp.2d 385, 390 (W.D.N.Y.1998).

Accordingly, it is recommended that defendants be granted summary judgment on this ground.

## H. Sexual Harassment

Johnson claims that he was fondled in the "groin area" by Coffey on three separate occasions. Am. Compl. at 22. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. It is well settled that the "unnecessary and wanton infliction of pain on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Boddie,* 105 F.3d 857, 861 (2d Cir.1997) (citing *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). In order to prove a violation of the Eighth Amendment, a plaintiff must satisfy both an objective and a subjective inquiry. *See Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003). A prison official violates the standards of the Eighth Amendment when (1) the alleged punishment is "objectively, sufficiently serious" and (2) he or she acted with a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Because sexual abuse by a prison official with a culpable state of mind may constitute a violation of contemporary standards of decency and cause severe harm to the prisoner, such allegations may be cognizable under the Eighth Amendment. *Boddie,* 105 F.3d at 861 ("[S]evere or repetitive sexual abuse of an inmate ... can be 'objectively, sufficiently serious.' "); *see also Farmer,*

511 U.S. at 834–35 ("[The] rape of one prisoner ... serves no legitimate penological objective, any more than it squares with evolving standards of decency.") (internal quotation marks and citations omitted).

*14 On the other hand, sexual harassment violates the Eighth Amendment only if the harm is "objectively, sufficiently serious." *Boddie,* 105 F.3d at 861. The Second Circuit has held that a small number of isolated incidents of alleged sexual abuse, including verbal harassment, may not suffice to meet the objective prong of the test or involve a harm of a federal constitutional level. *Id.* Further, a plaintiff must demonstrate that an incident or series of incidents were sufficiently egregious to be "objectively, sufficiently serious" to the point where such actions resulted in the denial of "the minimal civilized measure of life's necessities" and posed a substantial risk of serious harm. *Id.; Trammel,* 338 F.3d at 161. The Supreme Court has also held that a plaintiff must prove that a defendant used force "maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995 (1992).

Coffey is a corrections officer, and his responsibility includes serving as a "transport officer for prisoners being taken to various places away from Hudson." Coffey Decl. (Dkt. No. 119–11) ¶¶ 1, 5. While securing a prisoner for transport, departmental policy requires securing the prisoner in a particular way, including placing a chain around the prisoner's waist. *Id.* ¶ 9. Occasionally, an "extra length chain is positioned so that it comes in contact with the prisoner's groin and waist area." *Id.* ¶ 10. Coffey states that his hands never came in contact with Johnson's groin area on the day in question. *Id.* ¶ 15. A DOCS investigation concluded that Johnson's allegations against Coffey were without merit. *See* Defs.' Ex. E (Dkt. No. 119–7) at 11–21.

Even if Coffey's hands had come into contact with Johnson's groin area while securing Johnson for transport, Johnson's allegations are insufficient to articulate a claim of constitutional dimensions. In *Boddie,* the Second Circuit dismissed as inadequate a prisoner's claim that a female corrections officer made a possible pass at him, squeezed his hand, touches his penis called him a "sexy black devil," pressed her breasts against his chest, and pushed her vagina against his penis. *Boddie,* 105 F.3d at 859–61. The Second Circuit concluded that no single incident was "severe enough to be 'objectively, sufficiently serious,' [n]or were the incidents cumulatively egregious in the harm they inflicted" to "involve harm of federal constitutional proportions as defined by the Supreme Court." *Id.* at 861; *see also Morales v. Mackalm,* 278 F.3d 126, 132 (2d. Cir.2002)

(allegations that staff member asked plaintiff to have sex with her and to masturbate in front of her and other staff members "do not even rise to the level of those made by the plaintiff in *Boddie,* [and] do not state a claim for sexual harassment in violation of the Eighth Amendment to the United States Constitution."); *Excell v. Fischer,* 08–CV–945, 2009 WL 3111711, at *6–7 (N.D.N.Y. Sep. 24, 2009) (Hurd, J., adopting Report–Recommendation on de novo review) (claim that officer grabbed and squeezed plaintiff's penis during strip search for contraband relates a "quick, isolated incident of inappropriate touching" but not an Eighth Amendment violation); *Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation that corrections officer grabbed inmate's penis during pat frisk is insufficient to state constitutional claim); *Morrison v. Cortright,* 397 F.Supp.2d 424, 425 (W.D.N.Y.2005) (allegations that a corrections officer touched plaintiff's buttocks, and that another "rubbed up against plaintiff['s] buttocks with [the officer's] private part" during a strip search describe an isolated incident unaccompanied by physical injury, and therefore are not sufficiently serious to establish a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (allegation that corrections officer squeezed inmate's genitalia during pat-frisks on several occasions does not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct).

*15 Accordingly, Coffey should be granted summary judgment as on this claim.

### I. Excessive Force

On May 12, 2008, while securing Johnson for transport, Coffey allegedly placed the leg irons "extremely tight."[10] The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. Inmates enjoy an Eighth Amendment protection against the use of excessive force and may recover damages for its violation under § 1983. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

10     Although Johnson characterized this incident as a form of harassment (Dep. Tr. at 23), it is more appropriately analyzed as an excessive force claim.

The objective element is "responsive to contemporary standards of decency" and requires a showing that "the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection." *Hudson,* 503 U.S. at 9 (internal citations omitted); *Blyden,* 186 F.3d at 262. However, "the malicious use of force to cause harm constitute[s][an] Eighth Amendment violation *per se*" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: "the extent of the injury and the mental state of the defendant[;] ... the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (internal quotation marks and citations omitted).

In this case, Johnson fails both prongs of the Eighth Amendment analysis. The alleged exertion of force resulted in no medically determinable injury to Johnson as a medical examination following the incident revealed "no bruises, no open areas, [and] no swelling" around Johnson's ankles. Defs.' Ex. B at 39–41. Moreover, an investigation concluded that Johnson was not shackled too tightly at all. Defs.' Ex. E (Dkt. No. 119–7) at 29. Johnson has proffered no evidence to raise an issue of material fact as to whether excessive force was used in this instance.

**\*16** Accordingly, defendants should be granted summary judgment on this claim.

## J. Verbal Harassment

Johnson claims that he was verbally harassed. Am. Compl. at 29. Verbal harassment alone, however, is not actionable under § 1983. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("The claim that a prison guard called [plaintiff] names ... did not allege any appreciable injury and was properly dismissed."); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem do not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983 ."). Accordingly, defendants' should be granted summary judgment as to this claim.

## K. Retaliation

Johnson alleges defendants' engaged in unconstitutional conduct in retaliation for Johnson's filing of grievances. Am. Compl. at 29–30. To state an actionable claim for retaliation, a plaintiff must first allege that his conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996); *see also Lipton v. County of Orange,* 315 F.Supp.2d 434, 447–48 (S.D.N.Y.2004) (applying First Amendment retaliation factors to a pretrial detainee complaint). "Adverse action" is action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *See Mt. Healthy Cit. Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 214–15 (N.D.N.Y.2008). Conclusory allegations alone are insufficient. *Id.* at 214 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually to be pursued with full discovery.")).

The filing of grievances is a constitutionally protected activity. *See Davis v. Goord,* 320 F.3d 346, 352–53 (2d Cir.2003). Johnson, however, has failed to allege facts

sufficient to support a retaliation claim. Johnson has only stated in conclusory terms that defendants were retaliating against him for filing grievances. Johnson offers no evidence to support his allegations, either through documentation or witness testimony. Thus, he has failed to allege specific facts from which one could conclude that defendants' actions were motivated by Johnson's constitutionally protected activities.

## L. Conspiracy

Johnson alleges that defendants conspired together to deprive him of his constitutional rights. Am. Compl. at 30. "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v.. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

> **\*17** (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Hasty,* 490 F.3d at 176 (citations omitted).

Here, Johnson does not assert any facts giving rise to a conspiracy. First, Johnson vaguely asserts conclusory statements relating to an alleged conspiracy among defendants. This is insufficient. *See generally Thomas v. Roach,* 165 F.3d 137, 147 (2d Cir.1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights."). Second, there has been proffered no evidence relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive Johnson of his civil rights. Lastly, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus.

Accordingly, defendants' motion as to this claim should be granted.

## M. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity. Defs.' Mem. of Law (Dkt. No. 119–13) at 12. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Helmer's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*18** Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted.

## IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 119) be **GRANTED** in its entirety and that judgment be entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections

shall be filed with the Clerk of the Court "within fourteen (14) days after being served with a copy of the ... recommendation." N.D.N.Y.L.R. 72 .1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).*

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3439179

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

1998 WL 214719
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kirjath SPENCE, Plaintiff,
v.
Daniel A. SENKOWSKI, Superintendent, W.J.
Wilkerson, Captain, Defendants.

No. 91–CV–955 (NPM).
|
April 17, 1998.

**Attorneys and Law Firms**

Kirjath Spence, Brooklyn, for Plaintiff, Pro Se.

Office of John F. Laidlaw, Pro Bono Standby Trial
Attorney for Plaintiff, Syracuse, John F. Laidlaw, Esq.

Honorable Dennis C. Vacco, Attorney General of the
State of New York, Attorney for Defendants, Albany,
Christopher W. Hall, Assistant Attorney General, of
Counsel.

MEMORANDUM–DECISION & ORDER

MCCURN, S. J.

I. BACKGROUND

*1 In this prisoner civil rights action, plaintiff Kirjath
Spence alleges his Fourteenth Amendment due process
rights were violated as the result of a disciplinary hearing
held at Clinton Correctional Facility ("Clinton").
Subsequent to the hearing, plaintiff was sentenced to 180
days confinement in the Special Housing Unit ("SHU"),
180 days recommended loss of good time, and 180 days
loss of privileges. Plaintiff appealed his sentence and the
hearing results were reversed, but not before plaintiff
served his 180 days in SHU.

Plaintiff subsequently filed this action pursuant to 42
U.S.C. § 1983. In August 1992, defendants moved for
summary judgment pursuant to Federal Rule of Civil
Procedure 56. The court granted defendants' motion for

summary judgment on the issue of the denial of a witness
at the hearing and on the issue of damages incurred by
reason of punishment prior to the administrative reversal.
See Spence v. Senkowski, No. 91–CV–955, 1993 WL
191163 (N.D.N.Y. June 3, 1993). The court denied the
defendants' motion for summary judgment regarding the
claim of a biased hearing officer and regarding the claim
that then superintendent of Clinton, defendant Senkowski,
was personally involved in the selection of the allegedly
biased hearing officer. See id.

In August 1995, defendants moved to dismiss the action
for failure to state a claim upon which relief can be
granted pursuant to Federal Rule of Civil Procedure
12(b)(6). In July 1997, the court denied defendants'
motion. See Spence v. Senkowski, No. 91–CV–955, 1997
WL 394667 (N.D.N.Y. July 3, 1997). In November 1997,
the court conducted a bench trial on the remaining
issues—i.e., whether plaintiff was entitled to procedural
due process under the Fourteenth Amendment, whether
the hearing officer, defendant W.J. Wilkerson
("Wilkerson"), was impartial, and whether defendant
Senkowski had any personal involvement in selecting
Wilkerson as the hearing officer.

At the conclusion of trial, defendants moved for judgment
on their behalf. The court granted the motion on behalf of
defendant Senkowski on the ground that there was no
evidence of his personal involvement. The court reserved
on the motion with respect to defendant Wilkerson.

For the reasons set forth, the court now finds in favor of
defendant Wilkerson and dismisses plaintiff's complaint.
The following constitutes the court's findings of fact and
conclusions of law pursuant to Rule 52(a) of the Federal
Rules of Civil Procedure.

II. FACTS

On May 19, 1990 a fight in the auditorium at Clinton
created a disturbance that escalated to a near-riot.
Transcript of Trial Proceedings ("Tr.") at 9. The
atmosphere in the auditorium was "very tense" and
additional fights erupted in the auditorium. Id . The prison
was "locked down" while prison authorities attempted to
maintain order. Tr. at 9–10.

Near the end of the disturbance, then-Captain Wilkerson,
the highest ranking officer at Clinton on May 19, 1990,
was notified of the incident via a distress call. Tr. at 38.
Wilkerson was advised that while the matter was quelled

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

and the disruptive inmates removed from the scene, the other inmates refused to leave the auditorium. Tr. at 38–39. Wilkerson then proceeded to the auditorium and upon arrival, advised the inmates that if they wanted to leave peacefully they could line up in the center of the auditorium and leave without repercussions. Tr. at 9, 40. Plaintiff was one of the first inmates to leave the auditorium. Tr. at 9. Within 15 minutes, after being satisfied that the disturbance in the auditorium was under control, Wilkerson left the auditorium and returned to his office. Tr. at 40–41.

**\*2** During the disturbance in the auditorium, a corrections officer—Officer Bishop—was assaulted by an inmate. Tr. at 10. On May 21, 1990, plaintiff was identified and accused by Officer Bishop as the individual who assaulted him in the auditorium on May 19, 1990 during the disturbance. Tr. at 10. The next day, plaintiff was taken to SHU and served with a misbehavior report accusing him of assaulting officer Bishop. Tr. at 11.

On May 23, 1990 a Tier III hearing was commenced by Wilkerson in connection with the misbehavior report that Officer Bishop had filed. Tr. at 11, 42. At the conclusion of the hearing, Wilkerson concluded that plaintiff was guilty as charged and provided plaintiff with the reasons for his decision. Tr. at 43–44; Defendants' Trial Exhibit "8" (Hearing Disposition Form). Plaintiff was sentenced to 180 days confinement in SHU, 180 days recommended loss of good time, and 180 days loss of privileges—which included loss of packages and loss of commissary. Tr. at 15–16. In addition, plaintiff testified that while in SHU he could not "communicate" with his father who was seriously ill, although he was subsequently escorted to his father's funeral by prison officials.[1] Tr. at 15–16.

[1] During trial, plaintiff testified that he was denied telephone privileges during his confinement to SHU. Tr. at 15. Wilkerson testified that SHU inmates can send and receive regular mail and legal correspondence. Tr. at 59.

Plaintiff administratively appealed as well as filed an Article 78 proceeding in state court and the hearing results were reversed based upon the fact that plaintiff was denied a requested witness, but not before plaintiff served his 180 days in SHU. Tr. at 16. Based upon these events, plaintiff commenced this lawsuit.

### III. DISCUSSION

In this § 1983 action, plaintiff asserts that his Fourteenth Amendment due process rights were violated by defendant Wilkerson because Wilkerson was not an impartial hearing officer. Plaintiff asserts that Wilkerson was not impartial because he witnessed and investigated the May 19, 1990 incident in the Clinton auditorium. The court, however, need not decide the issue of whether Wilkerson was impartial because it concludes that plaintiff was not entitled to the due process protection of the Fourteenth Amendment. Furthermore, even assuming plaintiff was entitled to due process protection, the court concludes that Wilkerson is immune from liability under the doctrine of qualified immunity.

The Fourteenth Amendment prohibits an individual from being deprived of constitutionally protected liberty interests without due process. *See Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Constitutionally protected liberty interests of a prison inmate are limited to freedom from restraints which impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 115 S.Ct. 2293, 2300 (1995). The Constitution "does not protect [inmates from] every change in the conditions of confinement having a substantial adverse impact on the prisoner" if those changes are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Id.* at 478, 115 S.Ct. at 2297 (internal quotations and citations omitted). Rather, the "Due Process Clause protects against restraint or conditions of confinement that 'exceed[ ] the sentence in ... an unexpected manner." ' *Arce v. Walker,—*F.3d—, 96–2012, 1998 WL 119612 (2d Cir. Mar.18, 1998). The Supreme Court has instructed that federal courts should "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Sandin,* 515 U.S. at 482, 115 S.Ct. at 2299.

**\*3** After examining the specific circumstances of plaintiff's confinement during his time in SHU, the court concludes that plaintiff did not have a constitutional liberty interest which was interfered with when he was disciplinarily confined in SHU for 180 days. Other than the length of time plaintiff was confined to SHU, plaintiff has offered little evidence to demonstrate that his punishment was of such a nature as to confer a constitutionally protected liberty interest. As the case law demonstrates, it is clear that plaintiff's confinement in SHU for 180 days was not an atypical or significant hardship, especially when compared to his sentence of six to twelve years. *See Sealy v. Coughlin,—*F. Supp.—, No. 92–CV–47, 1998 WL 113383 (N.D.N.Y. Mar.13, 1998) (152 days in SHU is not an atypical or significant hardship); *Horne v. Coughlin,* 949 F.Supp. 112, 117 (180

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

days in SHU does not implicate due process protection); *Carter v. Carriero,* 905 F.Supp. 99, 104 (W.D.N.Y.1995) (270 days in SHU not considered an atypical or significant hardship); *Husbands v. McClellan,* No. 93–CV–6025L, 1998 WL 24232, at *2 (W.D.N.Y. Jan.13, 1998) (180 days in SHU not an atypical or significant hardship); *Ruiz v. Selsky,* No. 96 Civ.2003, 1997 WL 137448, at *6 (S.D.N.Y. March 24, 1997) (192 days in SHU not a significant and atypical hardship); *Nogueras v. Coughlin,* No. 94 Civ. 4094, 1996 WL 487951, at *5 (S.D.N.Y. Aug.27, 1996) (210 days in SHU does not trigger due process concerns).

Moreover, plaintiff's testimony regarding his loss of privileges the conditions of his confinement is insufficient to elevate his claim to constitutional proportions. *See, e.g., Sealey,*—F. Supp at—, 1998 WL 113383 at *5 ("the denial of certain privileges enjoyed by inmates placed in general population fails to identify conditions outside the expected parameters of the sentence imposed by law." (citing *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)). Plaintiff testified, for instance, that he was deprived of packages, telephone privileges, commissary privileges, and his prison job. Furthermore, he stated that when he was transported anywhere in the facility, he was required to be placed in handcuffs and shackles. While these conditions of confinement are "more restrictive than those in general population," they are insufficient to implicate a liberty interest, even when coupled with the 180 days plaintiff was confined to SHU. *See Arce,* 1998 WL 119612 at * 3–4 (a prison inmate is required to show that his confinement created an atypical and significant hardship to establish the existence of a liberty interest); *Jones v. Kelly,* 937 F.Supp. 200, 203 (W.D.N.Y.1996) (court found that loss of privileges such as telephone was insufficient for finding that plaintiff's confinement was atypical).[2] Accordingly, the court concludes that plaintiff is not entitled to the protections of the Fourteenth Amendment and therefore his § 1983 action must fail.

---

[2]     During the presentation of his case, plaintiff highlighted the distinction between administrative confinement in SHU and disciplinary confinement in SHU. After reviewing this evidence, the court concludes that the administrative confinement closely resembled the disciplinary confinement in SHU at Clinton. *See* Tr. at 56 (Wilkerson testified that an inmate in SHU for administrative reasons is generally treated the same as an inmate in SHU for disciplinary reasons); *see also Jones,* 937 F.Supp. at 203 ("[d]isciplinary segregation in New York mirrors, with insignificant exceptions, the conditions of administrative segregation and protective custody." (citations omitted)). Moreover, while a "comparison between administrative and disciplinary confinement was part of the Court's analysis in

*Sandin,*" the significant analysis focused on a "careful examination of the actual conditions of the challenged punishment compared with ordinary prison conditions." *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).

**\*4** In the alternative, even if the court assumed that plaintiff's confinement to SHU represented grievous losses of liberty entitling him to due process protections—which the court declines to find—the evidence presented at trial demonstrated that defendant Wilkerson would be entitled to qualified immunity. Qualified immunity protects prison officials from personal liability under § 1983 when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). These officials' action are to be assessed in light of the legal rules that were clearly established at the time the actions are taken. *E.g., Anderson v. Creighton,* 483 U.S. 635, 638–40, 107 S.Ct. 3034, 3037–38, 97 L.Ed.2d 523 (1987). Moreover, public officials may be afforded the protection of qualified immunity "even if the contours of the plaintiff's federal rights and the public officials' permissible actions were clearly delineated at the time of the actions complained of, if it was objectively reasonable for the officials to believe that their actions did not violate those rights." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993).

Plaintiff asserts that his constitutional right to due process was violated because he did not have a hearing before an impartial hearing officer. In this regard, plaintiff contends that New York prison regulations prohibit persons who either witness the incident or investigate the incident from acting as hearing officers in a subsequent hearing concerning that incident. *See* N.Y.C.R.R. tit. 7, § 254.1. Plaintiff contends that inasmuch as Wilkerson was present at the scene he witnessed and investigated the incident and then acted as a hearing officer in violation of the section 254.1. The evidence, however, revealed that Wilkerson did not witness nor investigate the specific incident involving plaintiff (*i.e.,* the alleged assault on Officer Bishop). Wilkerson merely arrived at the auditorium as the facility's acting superintendent to ensure that order was restored and maintained in a potentially explosive situation. Tr. at 39–41.

On direct examination during trial, Wilkerson testified that he only stayed in the auditorium long enough to observe the inmates begin to be escorted out of the auditorium. Tr. at 40. Further, Wilkerson testified that he was not directly involved in the alleged incident involving plaintiff, that he did not witness Officer Bishop—or any

Spence v. Senkowski, Not Reported in F.Supp. (1998)

1998 WL 214719

other prison officer—being assaulted, that he only learned at a later time that an officer was assaulted, and that he did not review the plaintiff's misbehavior report. Tr. at 41–42; *cf. Hameed v. Mann,* 849 F.Supp. 169, 173 (N.D.N.Y.1994) (court found that hearing officer's impartiality was not compromised by pre-hearing briefing by superintendent that everyone on B–2 was involved in the incident). Wilkerson also testified that he had no predisposition as to whether plaintiff was guilty prior to the hearing. Tr. at 47. Significantly, Wilkerson testified that there was nothing about the fact that he was present at the scene of the incident which entered into his deliberations at the time of plaintiff's hearing and that he did not consider himself flawed as a hearing officer because he did not possess information prior to the hearing to form an opinion as to plaintiff's guilt or innocence. Tr. at 83, 85.

**\*5** Based upon the testimony adduced at trial, the court concludes that it was objectively reasonable for Wilkerson to believe that he was not violating plaintiff's clearly established constitutional rights to an unbiased hearing officer. *See Walker v. McClellan,* 126 F.3d 127, 128–30 (2d Cir.1997) (hearing officer entitled to qualified immunity because "the hearing officer was well-justified in the belief that his ruling was consistent with [plaintiff's] constitutional rights."); *Russell v. Selsky,* 35 F.3d 55, 61 (2d Cir.1994) (in holding hearing officer entitled to qualified immunity, court set forth that "a reasonable officer would not have recognized a denial of due process in his serving as hearing officer in a case in which he had previously served as review officer."). Accordingly, the court concludes that had plaintiff been entitled to due process protection, defendant Wilkerson would be immune from liability under the doctrine of qualified immunity.

### III. CONCLUSION

For the foregoing reasons, judgment shall be entered on behalf of defendant Wilkerson and plaintiff's complaint is hereby DISMISSED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 214719

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Samuels v. Fischer, S.D.N.Y., March 2, 2016

2014 WL 4627120
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leonard HINTON, Plaintiff,
v.
A. PRACK, et al., Defendants.

No. 9:12–CV–1844 (LEK/RFT).
|
Signed Sept. 10, 2014.
|
Filed Sept. 11, 2014.

**Attorneys and Law Firms**

Leonard Hinton, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Joshua E. Mcmahon, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

LAWRENCE KAHN, District Judge.

# I. INTRODUCTION

*1 This *pro se* action under 42 U.S.C. § 1983 comes before the Court following a Report–Recommendation filed on August 14, 2014, by United States Magistrate Judge Randolph F. Treece, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). Dkt. No. 59 ("Report–Recommendation"). Judge Treece recommends that all of Plaintiff Leonard Hinton's ("Plaintiff") claims be dismissed, except that he be awarded nominal damages for violation of his due process rights by Defendant Uhler. Report–Rec. at 31–32. Plaintiff timely filed Objections. Dkt. Nos. 62 ("Objections"); 63 ("Addendum"). For the following reasons, the Report–Recommendation is adopted in its entirety.

# II. STANDARD OF REVIEW

When a party makes a timely objection to a Report–Recommendation, it is the duty of the Court to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). Where, however, an objecting "party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted); *see also Brown v. Peters,* No. 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

# III. DISCUSSION

## A. First Disciplinary Hearing

Plaintiff argues that the evidence presented at his first disciplinary hearing was not "reliable evidence" sufficient to support the hearing officer's determination that Plaintiff was guilty of the alleged conduct. Objs. at 1. Specifically, Plaintiff argues that the evidence was insufficient because there was no independent credibility assessment of, or written statements by, the confidential informant or alleged victim to corroborate Sergeant Gower's testimony. *Id.* at 1–2.

Plaintiff already raised this argument in great detail in his Motion for summary judgment, *see* Dkt. No. 39 at 19–22, and Judge Treece explicitly addressed it in the Report–Recommendation, Report–Rec. at 12–15. Because Plaintiff's argument is "a mere reiteration of an argument made to the magistrate judge," *Dove v. Smith,* No. 13–CV–1411, 2014 WL 1340061, at *1 (N.D.N.Y. Apr. 3, 2014) (Kahn, J.) the Court reviews Plaintiff's objection only for clear error, *see Chylinski v. Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011)). The Court finds that Judge Treece committed no clear error in determining that Sergeant Gower's testimony was sufficiently corroborated by his written report and other evidence in the record. *See* Report–Rec. at 12–15; *see also Kotler v. Daby,* No. 10–CV–0136, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted "reliable evidence" under the "some evidence" standard, and that an independent assessment of the witnesses' credibility was not required).

**B. Second Disciplinary Hearing**

**\*2** Plaintiff argues that his due process rights were violated at his second disciplinary hearing because Defendant Haug, who conducted the disciplinary hearing, failed to interview or make available four of Plaintiff's requested witnesses. Objs. at 2. Specifically, Plaintiff asserts that he was prejudiced by his inability to question Captain Scarafile ("Scarafile") and Deputy Superintendent Kinderman ("Kinderman") because they "ascertained the facts of th[e] incident, and would have testified of [sic] those facts." *Id.* Moreover, corrections officer Ruggerio ("Ruggerio") and inmate Burton ("Burton") both had relevant, first-hand knowledge of the circumstances of the alleged fight. *See id.; see also* Addendum at 2.

To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). In his Objections, Plaintiff states that "[c]learly there is relevance of every witness that Plaintiff requested to testify on his behalf." Objs. at 2. However, Plaintiff fails to advance any specific arguments as to *how* these witnesses' testimonies would have affected the outcome of his disciplinary hearing.

Indeed, as Judge Treece points out, Kinderman and Scarafile were merely supervisors who were informed of the incident after it had already transpired. Report–Rec. at 19. Thus, they did not have first-hand knowledge of the events, and there is no indication that they would have testified favorably to Plaintiff. *See id.* Moreover, Ruggerio did not arrive until after the incident occurred, and his misbehavior report was virtually identical to that of Officer Betti, who testified at the hearing. *Id.* Thus, there is no indication that Ruggerio's testimony would have affected the outcome of the hearing. Finally, although Burton presumably could have offered relevant testimony, as he was the alleged victim of Plaintiff's attack, Plaintiff has not demonstrated how Burton's testimony would have affected the outcome of his hearing. To the contrary, as indicated in Sergeant Betti's Fight Investigation Report, Burton stated that Plaintiff began yelling at him for no reason and Plaintiff then hit him in the head with a frying pan. Report–Rec. at 20. Thus, Plaintiff's arguments that these witnesses' testimonies would have affected the outcome of his hearing are entirely speculative, and do not warrant finding a constitutional violation. *See* Report–Rec. at 2; *see also Grossman v. Bruce,* 447 F.3d 801, 805 (10th

Cir.2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony would have affected the outcome of his case.").

**C. Third Disciplinary Hearing**

Plaintiff next argues that he has established an actual injury in connection with his third disciplinary hearing because he was confined in the Special Housing Unit ("SHU") "as a result of the constitutional violations." Objs. at 2. Plaintiff is correct that his constitutional rights were violated by Defendants' failure to timely provide Plaintiff with a copy of the disciplinary hearing determination. *See* Report–Rec. at 25–26. However, the copy of the hearing determination was merely the means by which to inform Plaintiff of the penalty to be imposed. Thus, Defendants' failure to provide Plaintiff with a copy of the hearing decision did not affect the actual determination, because the determination had already been made. In other words, Defendants' failure to provide Plaintiff with the hearing decision did not *cause* him to be confined in SHU—the penalty had already been imposed and was entirely independent of the failure to serve Plaintiff with a written confirmation of the penalty. *See McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (noting that failure to provide a copy of a hearing determination occurs after the decision has been rendered). Therefore, Plaintiff has failed to show actual injury in relation to his third disciplinary hearing.

**D. Qualified Immunity**

**\*3** Plaintiff's final objection is that Defendants are not entitled to qualified immunity. Objs. at 3. However, Judge Treece did not find that any Defendants were entitled to qualified immunity. Therefore, Plaintiff's argument is irrelevant.

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 59) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Plaintiffs' Motion (Dkt. No. 39) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Defendant's Cross–Motion (Dkt. No. 42) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Plaintiff be awarded nominal damages in the amount of one dollar ($1.00); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

LEONARD HINTON, Plaintiff,

-v-

**A. PRACK,** *Commissioner's Designee,* **D. VENETTOZZI,** *Commissioner's Designee,* **S. BULLIS,** *Hearing Officer,* **D. HAUG,** *Hearing Officer,* **D. ROCK,** *Superintendent; Upstate Correctional Facility,* **UHLER,** *Deputy Superintendent of Security; Upstate Correctional Facility,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Leonard Hinton brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his right to due process at three separate disciplinary hearings. *See* Dkt. No. 1, Compl. Plaintiff has moved for summary judgment. Dkt. No. 39. Defendants oppose that Motion, and Cross–Move for Summary Judgment. Dkt. No. 42. Plaintiff opposes Defendants' Cross–Motion. Dkt. Nos. 44, Pl.'s Opp'n, & 45, Pl.'s Supp. Opp'n. For the reasons that follow, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED,** Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this action be **DISMISSED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*4** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to

defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir.2002) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d at 1461.

## II. DISCUSSION

### A. Due Process

**\*5** Plaintiff alleges that Defendants violated his right to due process at three separate disciplinary hearings. *See generally* Compl.

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners [,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478 (1995).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at *5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at *4–5 (W.D.N.Y. Oct. 4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F .3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F .3d at 137;

*Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*6** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476).

With these principles in tow, we discuss the process that was provided at each of the disciplinary hearings at issue *seriatim.*

### 1. Liberty Interest

Defendants concede that, in the aggregate, the amount of time Plaintiff spent in the solitary housing unit ("SHU"), as a result of the three disciplinary hearings at issue, was sufficient to implicate a protected liberty interest.[1] Dkt. No. 42–7, Defs.' Mem. of Law, at p. 11; *see also* Dkt. No. 42–4, Steven Bullis Decl., dated Dec. 26, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "1st Hr'g Tr."), dated Oct. 13–18, 2010, at p. 1; Dkt. No. 42–5, Donald Haug Decl., dated Dec. 24, 2013, at Ex. A, Disciplinary Hr'g Report, dated Sept. 7–13, 2010;[2] Dkt. No. 42–6, Donald Uhler Decl., dated Dec. 27, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "3rd Hr'g Tr."), dated February 2–3, 2011, at p. 1. Accordingly, we need only determine whether Plaintiff was deprived of any of the minimum requirements of due process during any of the disciplinary hearings at issue.[3]

[1]    We agree. In the instant case, Plaintiff has alleged that he spent a total of 910 consecutive days in SHU as a result of the three disciplinary hearings at issue. Dkt.

No. 39–2, Pl.'s Mem. of Law, dated Nov. 8, 2013, at p. 2. The Second Circuit has held that "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky,* 292 F. App'x 120, 122 (2d Cir.2008) (citing *Sims v. Artuz,* 230 F.3d 14, 23–24 (2d Cir.2000)); *see also Koehl v. Bernstein,* 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (citing *Sealey v. Gilmer,* 197 F.3d 578 (2d Cir.1999), for the proposition that "the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality.").

[2]    A transcript of the September 7–13 disciplinary hearing was not provided to the Court as part of his disciplinary record.

[3]    In addition to time in SHU, Plaintiff also lost several months of good time credits as a result of his disciplinary hearings. *See* 1st Hr'g Tr. at p. 1; Haug Decl., Ex. A, Disciplinary Hr'g Report; 3rd Hr'g Tr. at p. 1. Ordinarily, a prisoner cannot seek monetary damages for a due process violation arising out of a prison disciplinary hearing where the loss of good time credits affects the overall length of the plaintiff's sentence without first seeking a reversal or expungement of the disciplinary conviction. *See Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994)) (holding "that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages beyond that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."). However, in the instant case, Plaintiff is serving a life sentence, and accordingly, the loss of good time credits neither affects the overall length of his sentence nor prevents him from filing the instant action. *See* New York State Inmate Lookup for Inmate DIN # 96–A–0837, Leonard Hinton, http://nysdoccslookup.doccsny.gov (last checked July 31, 2014); *see also Holmes v. Grant,* 2006 WL 851753, at *18 (S.D .N.Y. Mar. 31, 2006) (surveying cases in support of the proposition that "*Heck* [v. Humphrey] does not apply [w]here, ... plaintiff is serving a life sentence, [because] the loss of good time credits ... has no effect on the length of his sentence");

LAWW § 803(1)(a) (noting that inmates serving a maximum life sentence are not eligible for reduced sentence based on good behavior).

### 2. First Disciplinary Hearing

The following facts are undisputed.

On July 25, 2010, Sgt. Gower[4] issued a misbehavior report charging Plaintiff with extortion, soliciting a sexual act, and making a third party call. Defendant Bullis found Plaintiff guilty of all three violations, and sentenced him to six months in the SHU as well as six months loss of packages, commissary, phone, and good time credits. Dkt. No. 39–3, App. to Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s App."), Sec. 1, at Ex. A, Misbehavior Rep., dated July 25, 2010 (hereinafter "1st Misbehavior Rep."); 1st Hr'g Tr. at p. 1. Plaintiff appealed the decision; but his appeal was denied by Defendant Prack, the Director of the Special Housing/ Inmate Disciplinary Program, on December 20, 2010. See Pl.'s App., Sec. I, at Exs. E, Appeal Form, dated Oct. 18, 2010; & F, Appeal Dec., dated Dec. 20, 2010. Subsequently, Plaintiff challenged the disciplinary determination, in State Court, pursuant to N.Y. C.P.L.R. § 7803 ("Article 78"). Id. at Ex. G, Pl.'s Art. 78 Pet., dated Dec. 29, 2010. The New York State Appellate Division, Fourth Department, denied Plaintiff's petition, and unanimously upheld Defendant Bullis's disciplinary determination. Id. at Ex. I, Dec., dated Nov. 9, 2012.

[4] Sgt. Gower was dismissed from this action by the Honorable Lawrence E. Kahn, Senior United States District Judge, during the Court's initial review on March 7, 2013. See Dkt. No. 4, Dec. & Order, dated Mar. 7, 2013, at p. 5. Nonetheless, Sgt. Gower was served with process and joined in Defendants' Answer. See Dkt. Nos. 7 & 23. In light of his earlier dismissal and notwithstanding the subsequent errors which occurred, the Clerk of the Court is ordered to terminate Sgt. Gower from this action.

**\*7** Plaintiff now argues that he is entitled to summary judgment as to his claims against Defendants Bullis and Prack for violations of his right to due process in conjunction with this hearing, because Defendants lacked any credible evidence to support the decision or its subsequent affirmation. See, e.g., Dkt. No. 44–1, Pl.'s Opp'n at p. 2.[5] Defendants argue that they are entitled to summary judgement as to this claim because Plaintiff was

provided all of the process that was due. Dkt. No. 42–7, Defs.' Mem. of Law, at pp. 13–16.

[5] Document Number 42–1 is listed as Plaintiff's Affidavit. However, this document contains both sworn statements and legal arguments, in non-sequentially numbered paragraphs. Accordingly, we make reference to the page numbers assigned by Plaintiff.

#### a. Notice

It is undisputed that Plaintiff was served with a copy of the misbehavior report on October 6, 2010. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition. Accordingly, Plaintiff received notice, as required, more than twenty-four hours prior to his hearing. See Sira v. Morton, 380 F.3d 57, 70 (2d Cir.2004) (citing, inter alia, Wolff v. McDonnell, 418 U.S. at 564 for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Moreover, the misbehavior report noted, inter alia: "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. Such notice was adequate to inform Plaintiff of the nature of the offenses for which he was charged. See Sira v. Morton, 380 F.3d at 70 (quoting Taylor v. Rodriguez, 238 F.3d at 193, for the proposition that "due process requires more than a conclusory charge; an inmate must receive notice of at least some specific facts underlying the accusation such that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.") (internal quotation marks omitted).[6]

[6] In his Article 78 proceeding, Plaintiff challenged the sufficiency of the notice on the grounds that it omitted the specific dates of the events in question. See generally Pl.'s App., Sec. I, Ex. H. While it does not appear that Plaintiff intended to re-raise that issue here, to the extent that he may have intended to do so, such an argument would be unavailing. Although the date of the misbehavior report was actually the date Sgt. Gower conducted his investigation rather than the date that the actual events giving rise to the report occurred, this omission was by no means fatal given the specific nature of the charges against Plaintiff. Indeed, it is clear

that Plaintiff was able to understand the nature of the charges against him and to prepare a defense. *See id.* (finding that "the report provided adequate detail to apprise [Plaintiff] of the charges and afford him the opportunity to prepare his defense") (internal quotations and citation omitted); *see also Sira v. Morton,* 380 F.3d at 71 (citing *Quinones v. Ricks,* 288 A.D.2d 568, 568–69 (N.Y.App. Div.2d Dep't 2001), for the proposition that "failure to include specific date in misbehavior report may be excused if the report otherwise provides sufficient details to permit the inmate to fashion a defense"); *Cepeda v. Urban,* 2014 WL 2587746, at *6 (W .D.N.Y. June 10, 2014) (reaching similar conclusion).

### b. Opportunity to be Heard

The record clearly establishes that Plaintiff was present at the hearing, able to question witnesses, and present rebuttal evidence. *See generally* 1st Hr'g Tr. This remains true notwithstanding the fact that four of the witnesses Plaintiff called refused to testify. *See id.* at p. 10. Crucially, "it is well settled that [a]n inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings." *Fernandez v. Callens,* 2010 WL 4320362, at *11 (W.D.N.Y. Oct. 29, 2010) (citing *Wolff v. McDonnell,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); & *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). The fact that these witnesses refused to testify on Plaintiff's behalf does not alter the fact that he was given the opportunity to call witnesses. *See Creech v. Schoellkoph,* 688 F.Supp.2d 205, 213 (W.D.N.Y.2010) (finding no due process violation where two witnesses called by inmate refused to testify); *see also Edmonson v. Coughlin,* 1996 WL 622626, at *8 (W.D.N.Y. Oct. 4, 1996) (citing *Wolff v. McDonnell,* 418 U.S. at 568–69 for the proposition that "*Wolff* specifically recognized the discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify, or witnesses who know nothing of the underlying events"); *Jamison v. Fischer,* 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013) (citing cases for the proposition that "if a requested witness refuses to testify at a disciplinary hearing, the hearing officer is not constitutionally required to compel the witness to testify."). Moreover, in such situations, all that is required of the hearing officer is that he provide the inmate with notice of the fact that witnesses are being withheld and explain the reasons why. *See* N.Y. COMP. CODES R. & REGS. tit. 7, § 254.5(a) ("If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the

reasons for the denial, including the specific threat to institutional safety or correctional goals presented."). Here, Defendant Bullis explained at the hearing that:

> **\*8** Mr. Hinton, on your assistant form you requested four potential witnesses. It is written down that they all refused to testify and in the file there are four refusal forms, one by inmate Maida ... refuses to testify he does not want to be involved. Inmate King ... states he does not want to be involved with any of this, he doesn't want to get involved with any of this don't call me again as stated on the form. The next is from inmate Woods ... stating he does not want to be involved as he stated on the form. The next is for inmate Veach ... stating he does not want to be involved he claimed he does not know anything about this incident on 7/28/2010.

1st Hr'g Tr. at p. 10.

Thus, we can find no evidence of any constitutional deficiency in Plaintiff's opportunity to appear, call witnesses, or present rebuttal evidence at the first disciplinary hearing. *See Wolff v. McDonnell,* 418 U.S. at 564–66.

### c. Written Decision

It is clear from the record that at 11:15 a.m., on October 8, 2010, Plaintiff received a written statement as to the evidence relied upon and the reasons for the disciplinary action that was taken. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition Form.

Therefore, under *Wolf v. McDonnell,* Plaintiff received all of the process due to him. 418 U.S. at 564–66.

### d. Remaining Arguments

Plaintiff also argues that there was no credible evidence to support Defendant Bullis's disciplinary determination. While an inmate is *not* entitled to a hearing officer with

the same level of impartiality required by judges; it is true that he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached." *Id.,* 472 U.S. at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d at 488).

Here, Defendant Bullis's determination was supported by ample reliable evidence, chiefly, the testimony and misbehavior report of Sgt. Gower. *See* Pl.'s App., Sec. I at Ex. C.

As noted above, the misbehavior report stated, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. At the hearing, Sgt. Gower explained, in sum and substance, that on the morning of July 25, 2010, an unidentified inmate told him that Plaintiff had attempted to solicit sex from Inmate Veach. As a result, Sgt. Gower conducted an investigation during which he interviewed Inmate Veach, who reported that "approximately 2 weeks before that he got two packs of tobacco from [Plaintiff] he was unable to pay him so [Plaintiff] had requested he perform sexual acts for approximately ten days to pay him for the tobacco." 1st Hr'g Tr. at p. 6. Veach also informed Sgt. Gower that Plaintiff had attempted to pull him into a toilet stall but stopped when Inmate Moody walked into the bathroom area. Gower verified with Inmate Moody that he saw Veach and Hinton in the bathroom at the same time; however, Moody did not see Hinton pulling Veach into the stall. Gower ordered that Veach be examined by medical, and no evidence of sexual misconduct was found. Gower also testified that Veach informed him that Plaintiff and Inmate McGee had set up a three-way call in an attempt to extort fifteen dollars from Inmate Veach's sister for the tobacco. Gower reported that he verified this with inmate McGee who admitted to helping to orchestrate the three-way call. *Id.* at pp. 6–8.

**\*9** Standing alone, the unidentified inmate's claims that Plaintiff solicited sex from Inmate Veach would be insufficient to satisfy the "some evidence" standard applicable to prison disciplinary hearings. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 611 (S.D.N .Y.2009) (citing *Sira v. Morton,* 380 F.3d at 78, for the proposition that "if any confidential informant's testimony was based solely on hearsay, a greater inquiry into the reliability of this hearsay information is required."); *Howard v. Wilkerson,* 768 F.Supp. 1002, 1007 (S.D.N.Y.1991) (citing *Vasquez v. Coughlin,* 726 F.Supp. 466, 471 (S.D.N.Y.1989), for the proposition that "[s]ince *[Superintendent v.] Hill,* [472 U.S. 445 (1985) ] it has been held that hearsay evidence does not constitute 'some evidence' "). However, here, Defendant Bullis's determination was supported by Gower's misbehavior report. More importantly, Gower testified at the hearing that prior to issuing the misbehavior report he independently corroborated the statements made to him by the unidentified inmate and the victim. Gower's investigation, report, and testimony were all valid bases from which Defendant Bullis could conclude that the information was reliable. *See Sira v. Morton,* 380 F.3d at 78 ("Where the original declarant's identity is unknown or not disclosed, the hearing officer may nevertheless consider such factors as the specificity of the information, the circumstances under which it was disclosed, and the degree to which it is corroborated by other evidence."). Since Defendant Bullis found Gower's testimony to be reliable, Bullis Decl. at ¶ 17, we need not conduct an independent assessment of Gower's credibility. *Kotler v. Daby,* 2013 WL 1294282, at * 10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted some evidence, and that an independent assessment of the charging officer's credibility is neither required nor encouraged); *Thomas v. Connolly,* 2012 WL 3776698, at *23 (S.D.N.Y. Apr. 10, 2012) (finding that disciplinary determination supported by the investigating officer's report was sufficient to satisfy the some evidence requirement). Thus, we conclude that no reasonable juror could conclude that Plaintiff's disciplinary conviction was not based on some reliable evidence.[7]

---

[7]   Indeed, the New York State Appellate Division, Fourth Department, held that the evidence adduced at Plaintiff's disciplinary hearing was sufficiently adequate to meet the "substantial evidence" standard; a burden which is much higher than the "some evidence" standard applicable to the instant action. *See* Pl.'s App., Sec. I, Exs. H, Dec. & Order, dated Oct. 26, 2011; & I, Order, dated Nov. 9, 2012; *Smith v. Fischer,* 2010 WL 145292, at *9 (N.D.N.Y. Jan. 11, 2010) (citing *Sira v. Morton,* 380 F.3d at 76 n. 9, for the proposition that the substantial evidence " "requirement is sterner than the 'some evidence' standard necessary to afford due

process" ").

Furthermore, Plaintiff's argument that Inmate Veach's statements to Sgt. Gower during his investigation are unreliable in light of the fact that Inmate Veach subsequently refused to testify at Plaintiff's hearing—reportedly, on the grounds that he knew nothing about the alleged incident—are also unavailing. *See* Pl.'s Mem. of Law at pp. 17–20; Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010; *see also Louis v. Ricks,* 2002 WL 31051633, at *13 (S.D.N.Y. Sept. 13, 2002) (surveying cases for the proposition that no due process violation occurred where the hearing assistant relied on testimony from the alleged victim which the victim later recanted).[8]

[8]    It is also worth noting that it is not entirely clear that Inmate Veach's refusal to testify was actually a recantation of his earlier statements to Sgt. Gower. Inmate Veach stated in his refusal form that he knew nothing about any incident which occurred on July 25, 2010. Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010. However, July 25, 2010 was the day that Sgt. Gower was informed about the alleged violations, not the dates that the alleged violations occurred. *See supra* Note 6. Thus, this statement is not necessarily at odds with Veach's earlier statements to Sgt. Gower.

**\*10** Accordingly, having determined that Plaintiff received all of the process that was due to him with regard to his first disciplinary hearing, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to this claim, that Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this claim be **DISMISSED.**

### e. Defendant Prack

Plaintiff alleges that Defendant Prack was liable in his supervisory capacity for Defendant Bullis's alleged due process violation because he knew of but failed to remedy the violation when he affirmed Defendant Bullis's disciplinary determination. Pl.'s Mem. of Law at p. 25. An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

      The personal involvement of a

supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

However, having failed to find any evidence of an underlying constitutional violation, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to Plaintiff's claim against Defendant Prack arising out of his affirmation of Defendant Bullis's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability." Furthermore, we also recommend that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### 3. Second Disciplinary Hearing

The following facts are undisputed.

On August 11, 2010, Plaintiff was charged with violent conduct, assault on an inmate, and fighting by Sergeant Betti, and violent conduct, creating a disturbance, and fighting by Corrections Officer Ruggerio.[9] According to Sergeant Betti's report "inmate Hinton admitted to [her] that he had a verbal argument with inmate Burton over some missing food items. He said the argument ended with him picking up a frying pan and hitting inmate Burton once over the head with it." Haug Decl., Ex. A,

Betti Misbehavior Rep., dated Aug. 11, 2010. According to Officer Ruggerio, on August 11, he heard a crashing noise in the room near the kitchen, and upon responding "observed inmate Hinton lying on his left side ... near his overturned wheelchair.... [He] also observed Inmate Burton standing over Hinton with a clinched fist. There was also a medium sized stainless steel frying pan lying near [Hinton's wheelchair]." *Id.,* Ex. A, Ruggerrio Misbehavior Rep., dated Aug. 11, 2010.

9    Neither Sergeant Betti nor Corrections Officer Ruggerio are Defendants in this action.

**\*11** Defendant Haug conducted a disciplinary hearing between September 7 and 13, 2010, and found Plaintiff guilty of all six violations. Decl., Ex. A, Hr'g Disposition, dated Sept. 13, 2010. On November 12, 2010, Defendant D. Venettozzi, the Acting Director of the Special Housing/Inmate Disciplinary Program, affirmed the disciplinary determination. *Id.* at Ex. C, Appeal Dec., dated Nov. 12, 2010. However, as a result of an Article 78 proceeding brought by Petitioner before the Fourth Department, the determination was overturned and vacated because "the hearing officer's effective denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman[10] as witnesses, without [ ] stated good faith reasons, constituted a clear constitutional violation[.]" *Id.* at Ex. C, Dec. & J., dated May 27, 2011. As a result, Plaintiff's September 13 disciplinary decision was administratively reversed on August 4, 2011. *Id.* at Ex. B, App. Dec., dated Aug. 4, 2011.

10    These individuals are not Defendants in the instant action.

In his Motion, Plaintiff claims he is entitled to summary judgment as to his due process claims against Defendant Haug because he was improperly denied the right to call witnesses on his behalf, and against Defendant Venettozzi for affirming Defendant Haug's disciplinary determination. *See* Pl.'s Opp'n at p. 5. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at his second disciplinary hearing. Defs.' Mem. of Law at pp. 17–19.

*a. Notice*

It is uncontested that Plaintiff received a copy of the misbehavior reports at issue on August 12, 2010. Haug Decl. at ¶ 9 & Ex. A, Tier III Data Sheet, dated Aug. 22, 2010. Furthermore, each report contained a detailed factual account of the basis of the charges, the names of those involved, and the date of the relevant events. *Id.* at Ex A, Misbehavior Reports, dated Aug. 11, 2010. Accordingly, Plaintiff clearly received constitutionally sufficient notice.

*b. Opportunity to be Heard*

According to the Fourth Department, the "denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman as witnesses, without a stated good faith reason[ ], constituted a clear constitutional violation." *Id.* at Ex. B, Dec. & J. at p. 5. As a result of the Fourth Department's decision, Plaintiff's disciplinary determination was subsequently administratively overturned. However, neither of these facts is dispositive for purposes of the instant action. *Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (citing cases for the proposition that collateral estoppel does not preclude defendants from re-litigating due process violations decided in an Article 78 proceeding in a subsequent 1983 case because, *inter alia,* "appellees could not have been held personally liable in such a proceeding, they did not have the same incentive to litigate that state court action as they did the federal § 1983 action[,]" and "the defenses of absolute or qualified immunity, or lack of personal involvement, were not available to appellees"); *see also LaTorres v. Selsky,* 2011 WL 7629515, *6 n. 10 (N.D.N.Y. Aug. 1, 2011) (citing *Guitierrez v. Coughlin* ).

**\*12** Moreover, Plaintiff's claim is subject to review for harmless error. *Sims v. Artuz,* 103 F. App'x 434, 436 (2d Cir.2004) (upholding magistrate's determination applying harmless error to defendant's undisputed failure to provide a reason for refusing to call witnesses during a disciplinary hearing); *Clark v. Dannheim,* 590 F.Supp.2d 426, 431 (W.D.N.Y.2008) (same); *Colantuono v. Hockeborn,* 801 F.Supp.2d 110, 115 (W.D.N.Y.2011) (citing *Clark v. Dannheim,* 590 F.Supp.2d 426, (W.D.N.Y.2008), for the proposition that "dismissing state prisoner's due process claim based on the hearing officer's denial of plaintiff's requests to review certain medical records, and to call DOCS sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced as a result"); *cf. Powell v. Coughlin,* 953 F.2d 744, 751 (2nd Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding

because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

Here, notwithstanding the fact that a denial of the right to call witnesses without an explanation is a violation of New York's prison disciplinary regulations, N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a), Defendant Haug's decision to deny, without reason, Plaintiff's request to call as witnesses Deputy Superintendent Geoghegan, Captain Scarafile, and Officer Rugerio did not rise to the level of a due process violation because Plaintiff failed to allege, in any fashion, how he was prejudiced. Indeed, it is undisputed that Deputy Superintendent Geoghegan and Captain Scarafile had no personal knowledge of the event; their only involvement was that they were informed about the alleged fight after the fact. Haug Aff. at ¶ 18 & Ex. A, Unusual Incident Report, dated Aug. 19, 2010, at p. 2. Similarly, Officer Ruggerio's misbehavior report confirms that he arrived on scene after the event, and the details of his report are nearly identical to those provided by Officer Betti, who testified at the hearing. *Id.* at ¶¶ 10 & 16–17, & Ex. A, Misbehavior Reports. Accordingly, their testimony was at best cumulative, and quite possibly irrelevant. *See Hamilton v. Fischer,* 2013 WL 3784153, at *10 (W.D.N.Y. July 18, 2013) (dismissing due process claims based on a hearing officer's failure to call witness who were not present for the incident at issue because the error was harmless).

Likewise, the record in this case compels us to reach a similar conclusion with regard to the fourth witness, Inmate Burton, although by a slightly different route. With respect to his decision to deny Plaintiff's request to call Inmate Burton, Defendant Haug avers that "I have no recollection of who that inmate was or why his testimony would have had any bearing on whether or not Plaintiff Hinton hit another inmate with a frying pan. Had I believed that this inmate had information that was pertinent to Plaintiff Hinton's defense, I would have requested his testimony." *Id.* at ¶ 19. It cannot seriously be argued that Inmate Burton, the inmate Plaintiff allegedly hit over the head with the frying pan, did not have any relevant information with regard to the incident at issue.

**\*13** However, nothing in Plaintiff's papers[11] nor the many documents submitted by Defendants indicates that had Inmate Burton been called his testimony would have altered the course of the hearing. Rather, based on the record before us, we can only conclude the opposite. In the Fight Investigation Rep., dated August 11, 2010, Sergeant Betti reported that "Burton stated [that] Hinton

approached him in the day room and was yelling at him for no reason. Hinton hit him with a pan in the head." Haug Decl., Ex. A. Crucially, Burton's statement was relied upon by Defendant Haug. *Id.,* Ex. A, Hr'g Disposition Report, dated Sep. 13, 2010, at p. 2.

[11]     It is clear from Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment that Plaintiff was aware of Defendants' claim that he failed to identify how he was prejudiced by Defendant Haug's failure to call these witnesses. *See* Pl.'s Opp'n at pp. 6–7. However, rather than explain how he was prejudiced, Plaintiff argued that the Article 78 determination constituted "law of the case" and that Defendants' reliance on the harmless error standard was misplaced. *Id.*

Given the lack of any indication in the record that Inmate Burton would have testified favorably, as well as his own admissions to Sergeant Betti that he struck Inmate Burton with the pan, Plaintiff has failed to establish that he was prejudiced by Defendant Haug's refusal to call Inmate Burton as a witness. *See Clark v. Dannheim,* 590 F.Supp.2d at 430–31 (concluding, after examining the record, that failure to call a witness who had clearly relevant information was non-prejudicial because "there [wa]s no indication or reason to believe that his testimony would have been helpful to plaintiff"); *see also Sims v. Artuz,* 103 F. App'x at 436 (upholding magistrate's determination that exclusion of witnesses from disciplinary hearing was harmless error where plaintiff "ha [d] not shown that he was prejudiced in any way"); *Tafari v. Rock,* 2012 WL 1340799 (W.D.N.Y. Apr. 18, 2012) ("A prisoner cannot demonstrate prejudice and thus non-harmless error based upon pure speculation.").

*c. Written Decision*

It is undisputed that Plaintiff received a copy of the notice of decision including the evidence that was relied upon, as well as an explanation of the reasons for the punishment assigned. *Id.* at Ex. A, Hr'g Disposition Form, dated Sep. 13, 2010, at p. 2.

Accordingly, we recommend that Plaintiff's Motion be **DENIED** as to his due process claim against Defendant Haug arising out of the second disciplinary hearing, that Defendants' CrossMotion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

#### d. Defendant Venettozzi

Having established the absence of any underlying constitutional violation, Plaintiff cannot maintain a cause of action against Defendant Venettozzi based on supervisory liability for affirming Defendant Haug's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d at 808.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** with respect to his claim against Defendant Venetozzi for affirming Defendant Haug's disciplinary determination, that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to the same, and that this claim be **DISMISSED.**

#### 4. Third Disciplinary Hearing

The following facts are undisputed.

On January 19, 2011, Plaintiff was charged with two counts of possessing unauthorized medication and smuggling. 3rd Hr'g Tr. at p. 1. On February 2–3, 2011, Defendant Uhler conducted a Tier III disciplinary hearing, from which Plaintiff was excluded. *See generally id.* Plaintiff was convicted of all three offenses and sentenced to thirty-six months in SHU as well as thirty-six months loss of packages, commissary, phone, and good time credits. *Id.* at p. 1. On February 3, 2011, Plaintiff appealed Defendant Uhler's disciplinary determination. Compl. at p. 6. On March 29, 2011, Defendant Venettozzi modified Plaintiff's punishment to eighteen months SHU and corresponding loss of privileges. Uhler Decl., Ex. B, Appeal Dec., dated Mar. 29, 2011. On June 21, 2011, Defendant D. Rock, Superintendent of Upstate Correctional facility, refused Plaintiff's request for discretionary review of his disciplinary determination. *Id.* at Ex. C, Lt., dated June 21, 2011.

**\*14** On June 30, 2011, Plaintiff filed an Article 78 petition challenging the disciplinary determination. On December 2, 2012, the Honorable S. Peter Feldstein, Acting Supreme Court Justice in Franklin County, New York, determined that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." Pl.'s App. at Sec. III, Ex. A, at p. 4. However, Judge Feldstein found that Plaintiff "must prevail" as to his argument that "he did not receive a copy of the written hearing disposition sheet, including the statement of evidence relied upon by the hearing officer, and the statement of reason(s) for the disposition imposed." *Id.* at pp. 5–6. Judge Feldstein further noted

that prison officials should "process any additional administrative appeal from the results and disposition of the Tier III Superintendent's Hearing concluded February 3, 2011 that petitioner files within 30 days service" of his decision. *Id.* at p. 6.

Plaintiff contends that he is entitled to summary judgment against Defendant Uhler because he held the third disciplinary hearing in Plaintiff's absence and because he failed to provide Plaintiff with written notice of the disciplinary determination and the evidence on which it was based. Pl.'s Mem. of Law at pp. 25–27. Plaintiff further claims that Defendants Venettozzi, Prack, and Rock were personally involved in depriving him of his due process right because they affirmed Defendant Uhler's determination. Pl's Opp'n at ¶ 53. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at the subsequent disciplinary hearing. Defs.' Mem. of Law at pp. 20–24.

#### a. Notice

Plaintiff concedes that he "receive[d] advance notice of the charges, by service of the misbehavior report." Dkt. No. 39–2, Pl.'s Mem. of Law, at ¶ 34.

#### b. Opportunity to be Heard

Originally, Plaintiff contended that Defendant Uhler violated his right to due process by unlawfully excluding him from attending the third disciplinary hearing. Pl.'s Mem. of Law at pp. 25–27. However, Plaintiff has since conceded that he is barred from re-litigating this issue in the instant matter by the doctrine of collateral estoppel.[12]

---

[12]    On July 18, 2014, we stayed the parties pending Cross–Motions for Summary Judgment and ordered them to brief the Court as to whether Judge Feldstein's prior conclusion in Plaintiff's Article 78 action, that Plaintiff was properly excluded from his disciplinary hearing based on his failure to conform to facility security protocols, precluded him from arguing in the instant case that he was unlawfully excluded from attending the third disciplinary hearing. Dkt. No. 54, Order, dated July 18, 2014. In his Reply to the Defendants' Letter–Brief, Plaintiff conceded that Judge Feldstein's determination in this regard does preclude him from re-raising this issue in the instant matter. *See* Dkt. Nos. 55, Defs.' Lt.-Br., dated July 21, 2014, & 56,

Pl.'s Reply Lt.-Br., dated July 25, 2014.

A review of Judge Feldstein's decision reveals that he indeed already considered the issue of whether "the Tier III Superintendent's Hearing was unlawfully conducted in his absence" in Plaintiff's Article 78 action. Pl.'s App. at Sec. III, Ex. A, at p. 3. Judge Feldstein noted that, "an inmate has a fundamental right to be present at a Superintendent's Hearing unless he or she refused to attend, or is excluded for reasons of institutional safety or correctional goals." *Id.* (internal quotations, alterations, and citations omitted). After considering the evidence before him, including a transcript of the hearing conducted in Plaintiff's absence—containing on-the-record testimony from multiple prison officials stating, in sum and substance, that they made every effort to bring Plaintiff to his disciplinary hearing but Plaintiff refused to comply with prison handcuffing procedures—Judge Feldstein concluded that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." *Id.* at pp. 3–6.

**\*15** Crucially, and in keeping with the standard applied by Judge Feldstein, it is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections where it occurs through no fault of prison authorities. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 380 (N.D.N.Y.2010) (citing *Howard v. Wilkerson,* 768 F.Supp. 1002, 1006 (S.D.N.Y.1991)). Accordingly, Judge Feldstein's conclusion that Plaintiff's own actions justified holding the hearing in his absence is entitled to preclusive effect in the instant action.[13] *See Williams v. Pepin,* 2011 WL 7637552, \*6 (N.D.N.Y. Dec. 23, 2011) (holding that plaintiff's due process claims which were rejected in an earlier Article 78 action were precluded from being re-litigated in a subsequent § 1983 action under the doctrine of collateral estoppel).

[13]  Moreover, even if the issue were not precluded, it is unlikely that Plaintiff's claim would have succeeded because Plaintiff fails to allege any resulting prejudice from this alleged error. *See Lunney v. Brureton,* 2007 WL 1544629, at \*28 (S.D.N.Y. May 29, 2007) (citing *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) for the proposition that "[p]rison disciplinary hearings are subject to a harmless error analysis."). Indeed, Plaintiff fails to allege that had he been offered the opportunity, he would have presented evidence or called witnesses on his own behalf, let alone that such evidence would have been likely to affect the outcome of his disciplinary determination.

Accordingly, Plaintiff's due process rights were not violated when his third disciplinary hearing was held in his absence.

### c. Some Evidence

It is clear that Defendant Uhler's disciplinary determination was supported by sufficient reliable evidence. Specifically, Defendant Uhler read the following into the record:

> The first report is by Officer Gravlin.... On 1/19/11 at approximately 9:45 AM, I conducted a pat frisk of inmate Hinton ... on 11 A 1 Gallery.... Inmate Hinton had a total of 29 pills in his front right pocket. The block nurse identified the pills as neurontin, baclofen. Both are prescription medication given to the inmate on medication rounds.... The second Report [states] ... January 19th, 2011 10:20 A.M.... On the above date and time I CO Bogardus ... was helping give inmate Hinton his level one property after being transferred from eleven building to ten building. As I was going through the letters I noticed envelopes with no addresses with objects in them sealed. I opened the envelopes and found pills. After opening all the envelopes I took the pills to the block Nurse Holmes identified them and counted them which is what came up with [sic] 319 neurontin 600 milligram, 205 baclofen 10 milligram, 100 amlodipine 5.

3rd Disciplinary Hr'g Tr. at p. 4.

Given the specificity of these reports as well as the fact that they were authored by officers with first hand knowledge of the events, no rational juror could conclude that Defendant Uhler lacked sufficient reliable evidence to support his determination. *See Thomas v. Connolly,* 2012 WL 3776698, at \*23; *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214–15 (W.D.N.Y.2010) (finding

disciplinary determination relying on misbehavior report was sufficient for purposes of "some evidence" standard where "the misbehavior report was made by the officer personally involved in the ... incident, and is based on his first hand observation, and contains a detailed account of that incident, including the time, place, circumstances, and names of participants").

### d. Written Decision

It is undisputed that Plaintiff did not receive a formal written statement of the third disciplinary determination "until at least six months after the hearing was actually held." Pl.'s Opp'n at Ex. A, Hinton Aff.[14]

[14] Defendants fail to adequately contest Plaintiff's contention that he was not served a written copy of the determination; indeed, with the exception of their unsupported statement that they "[d]eny information and belief about when plaintiff received a copy of the hearing determination," they fail to address the issue whatsoever. *See* Dkt. No. 42–1, Defs.' Reply to Pl.'s 7.1 Statement, at ¶ 35; *see also Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991) (finding that mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment).

**\*16** It is clear that Plaintiff's due process rights were violated by Defendants' failure to provide him with a copy of this statement. *See Lunney v. Brureton,* 2007 WL 1544629, at \*28 (S.D.N.Y. May 29, 2007) (surveying cases for the proposition that "the right to receive a written statement of the disposition is a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell"* ) (internal quotation marks, alterations, and citations omitted). However, notwithstanding this violation, Plaintiff is not entitled to anything other than nominal damages in the instant case because he has failed to establish an actual injury. *See McCann v.. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (citing *Carey v. Piphus,* 435 U.S. 247, 266–67 (1978), for the proposition that "[i]t is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury"); *Thomas v. Annucci,* 2008 WL 3884371, at \*5 (N.D.N.Y. Aug. 19, 2008) (citing, *inter alia, McCann v. Coughlin* for the same proposition).

Here, notwithstanding the fact that Plaintiff's constitutional rights were violated, he cannot establish actual injury. To begin with, Plaintiff cannot argue that the failure to provide him with a written notice of the determination caused him to be sentenced to a term of SHU imprisonment; indeed, that determination was made before the duty to provide Plaintiff with a copy of the notice even arose. *Cf. McCann v. Coughlin,* 698 F.2d at 126 (noting that "the failure to provide McCann with a written statement of the Committee's decision and underlying reasons could not have caused his injury. If he had received such a written statement, it would have been after the Committee rendered its decision."). Thus, in order to establish that the Defendants' failure to provide him with a copy of the notice caused him actual injury, Plaintiff would have to show that because he did not have access to the information contained in the notice, he was unable to mount a meritorious appeal, and therefore, was forced to remain in SHU longer than necessary. *Cf. Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d at 126, for the proposition that "[i]n this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim, including those elements relating to damages.... It was therefore Miner's burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed.").

Yet, despite the fact that he ultimately received a copy of the notice prior to commencing the instant action, Plaintiff fails to allege that had he known the evidentiary basis for his conviction as contained in the notice earlier, he would have been able to successfully appeal the determination. Indeed, according to his Complaint, despite the fact that Judge Feldestein explicitly granted him the right to file additional appeals after he had obtained a copy of the notice, his subsequent attempts were unsuccessful. *See* Compl. at p. 6; *see also* Pl.'s App. at Sec. III, Ex. A, at pp. 5–6.[15] Thus, Plaintiff's claim fails because he cannot establish that the failure to provide him with a copy of the hearing disposition in a timely manner caused him to suffer any actual injury.[16]

[15] Plaintiff also claims that he initially appealed his disciplinary determination on February 3, 2011, the day that it was imposed. Compl. at p. 6. However, he provides conflicting and wholly inadequate explanations for the type and content of the notice he received. *See id.* at p. 8 n. 3; *see also* Pl.'s Opp'n at Ex. A, Hinton Aff. And, although it is unclear what the bases of Plaintiff's February 3 appeal were, it is axiomatic that Plaintiff would have known at that time that he was excluded from the hearing and had not received proper notice, and accordingly, the lack of notice did not prevent him from raising either of these grounds at that time. Moreover, as a result of this

appeal, Plaintiff's disciplinary determination was modified, and his sentence was reduced from thirty-six months SHU to eighteen months. Pl.'s Mem. of Law at p. 26; Uhler Decl. at Ex. B, Review of Sup't Hr'g, dated Mar. 29, 2011.

[16] To be sure, we are not positing that the relief Plaintiff received from his Article 78 action somehow extinguished any due process violation that he may have suffered between the time that violation accrued, and the time the Article 78 Petition was granted in his favor. Rather, we are merely noting the fact that Plaintiff was unable to file a successful administrative grievance appeal at the prison once he was provided with a copy of the formal notice as evidence that nothing within the notice provided Plaintiff with a meritorious ground for appeal. Therefore, the fact that he did not receive the formal notice sooner did not prejudice him. *Compare Bogle v. Murphy,* 2003 WL 22384792, at *5 (W.D.N.Y. Sept. 9, 2003) (noting that once a due process violation accrues, a subsequent Article 78 determination in the plaintiff's favor does not rectify the harm caused); *with Lunney v. Brureton,* 2007 WL 1544629, at *27–29 (dismissing due process claim based on undisputed failure to provide timely written disposition to plaintiff, in part on the basis that after receiving a transcript of the hearing, which included a statement of the evidence relied upon, Plaintiff failed to add any new substantive arguments).

**\*17** Moreover, Plaintiff is not entitled to punitive damages in the instant action. "Courts may award punitive damages in situations where a defendant's conduct is 'willful or malicious,' or where defendants have demonstrated 'reckless intent' or 'callous indifference.' " *Giano v. Kelly,* 2000 WL 876855, at *26 (W.D.N.Y. May 16, 2000) (quoting *Memphis Comty. School Dist. v. Stachura,* 447 U.S. 299, 306 (1986)). Here, nothing in the record establishes that Defendant Uhler acted maliciously or willfully with regard to his failure to provide Plaintiff with a copy of the notice. Therefore, the court recommends **DENYING** plaintiff's request for punitive damages.

Having failed to establish any actual injury, Plaintiff is only entitled to receive nominal damages in the amount of one dollar. *McCann v. Coughlin,* 698 F.2d at 126. Accordingly, we recommend that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to Plaintiff's claim that he was unlawfully excluded from the third disciplinary hearing and **DENIED** as to Plaintiff's claim that he was not provided with a copy of the hearing disposition in a timely manner. We further recommend that Plaintiff's Motion for Summary

Judgment be **GRANTED** with respect to his claim that Defendants failed to provide him with a written disposition of the third disciplinary hearing, and that, in full satisfaction of his constitutional deprivation, he be awarded the sum of one dollar in nominal damages.

### e. Defendants Venettozzi, Prack, and Rock

Plaintiff claims that "[s]ince Venettozzi, Prack[,] and Rock all had [a] hand in affirming the [third disciplinary] decision, they as well are liable." Pl.'s Mem. of Law at p. 27. Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010) (noting that courts within the Second Circuit are split with regards to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to make a single non-conclusory allegation from which a reasonable juror could conclude that Defendants Venettozzi, Prack, and Rock did anything other than rubberstamp Plaintiff's disciplinary determination.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment as to his claims against Defendants Venettozzi, Prack, and Rock, for affirming the third disciplinary disposition be **DENIED,** and that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### B. Qualified Immunity

**\*18** Defendants argue that they are entitled to qualified immunity. Defs.' Mem. of Law at pp. 23–24. However, given that we have recommended dismissing all of Plaintiff's claims except his claim against Defendant Uhler, we do not discuss whether any of the other Defendants are entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the

allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, some limited discussion is necessary with regard to Plaintiff's due process claim against Defendant Uhler for the failure to provide Plaintiff with a written copy of the disposition.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194 at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff [ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citations omitted).

**\*19** As discussed *supra,* the right to receive a written copy of the hearing disposition, including the evidence relied upon and the reasons for the sentence, has been clearly established since *Wolff v. McDonnell. Lunney v. Brureton,* 2007 WL 1544629, at \*28. Moreover, no rational juror could conclude that it was objectively reasonable for Defendant Uhler not to provide Plaintiff with a copy of his third disciplinary hearing disposition. Accordingly, Defendant Uhler is not entitled to qualified immunity with respect to this claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Plaintiff's Motion for Summary Judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part as follows:

> 1. **GRANTED** to the extent that Plaintiff is entitled to summary judgment as to the issue of whether Defendant Uhler violated his right to due process by failing to provide him with a copy of the hearing disposition from his third disciplinary hearing, **HOWEVER,** in light of Plaintiff's inability to establish actual injury, we further recommend that he be awarded nominal damages in the amount of one dollar; and

> 2. **DENIED** in all other respects; and it is further

**RECOMMENDED,** that Defendants Cross–Motion for Summary Judgment (Dkt. No. 42) be **GRANTED** in part and **DENIED** in part as follows:

> 1. **DENIED** with respect to Plaintiff's due process claim against Defendant Uhler for his failure to provide Plaintiff with a copy of his hearing disposition from the third disciplinary hearing; and

> 2. **GRANTED,** with respect to all of Plaintiff's other claims, which should be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court **TERMINATE** Sgt. Gower from this action;[17] and it is further

---

[17]     *See supra* Note 4.

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v.*

*Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 14, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4627120

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1086001
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nelson RODRIGUEZ, Plaintiff,
v.
Donald SELSKY, Defendant.

Civil Action No. 9:07–CV–0432 (LEK/DEP).
|
Jan. 25, 2011.

**Attorneys and Law Firms**

Nelson Rodriguez, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Nelson Rodriguez, a New York state prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, as amended, Rodriguez alleges that prison officials at the facility in which he was confined at the relevant times issued him two fabricated misbehavior reports ("MBRs") falsely accusing him of violating prison rules and denied him procedural due process during the course of the ensuing disciplinary hearing.[1] Plaintiff attributes those actions to retaliation for his having filed a civil action against a corrections employee who was not named as a defendant in his complaint.

[1]    As originally constituted, plaintiff's complaint recited other purportedly unlawful conduct, alleging that he was subjected to ongoing harassment, retaliation, and interference with his access to the courts. As a result of a series of court interventions the claims in this action, which was commenced elsewhere but later transferred to this district, have been significantly narrowed.

The sole remaining claim in this action is asserted against defendant Donald Selsky, the former Director of Special Housing and Inmate Disciplinary Programs for the New York State Department of Correctional Services ("DOCS"), alleging deprivation of procedural due process arising out of plaintiff's disciplinary hearing and defendant Selky's review of the resulting determination.

Currently pending before the court is defendant's motion for summary judgment dismissing plaintiff's amended complaint. In his motion, defendant argues that 1) he was not sufficiently involved in the constitutional deprivation alleged to support a finding of liability; 2) plaintiff was afforded procedural due process in connection with the disciplinary proceedings at issue, and 3) in any event he is entitled to qualified immunity from suit. For the reasons set forth below, I recommend a finding that plaintiff was not deprived of procedural due process, and that his complaint therefore be dismissed.

I. *BACKGROUND*[2]

[2]    In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a prison inmate entrusted to the custody of the DOCS; at the times relevant to his due process claim plaintiff was housed at the Shawangunk Correctional Facility ("Shawangunk"), located in Wallkill, New York. Amended Complaint (Dkt. No. 7) ¶ 3; Selsky Decl. (Dkt. No. 62–3) ¶ 15.

As a result of an incident involving another inmate occurring on December 30, 2003, plaintiff was issued two MBRs. Amended Complaint (Dkt. No. 7) ¶¶ 12–15. Selsky Decl. (Dkt. No. 62–3) ¶ 16. The first, issued on December 30, 2003 and authored by Corrections Officer Goosby, charged Rodriguez with fighting and refusal to obey a direct order. Selsky Decl. (Dkt. No. 62–3) ¶ 17 and Exh. A (Dkt. No. 62–4). The second, issued on January 2, 2004 by Corrections Lieutenant Wright, addressed the same incident and accused Rodriguez of fighting, engaging in violent conduct, and participating in a demonstration detrimental to the order of the facility. Selksy Decl. (Dkt. No. 62–3) ¶ 18 and Exh. A (Dkt. No. 62–4).

The parties differ as to when the two MBRs were served upon Rodriguez. Plaintiff and defendant appear to be in

agreement that the second MBR was served upon him on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4); Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16. While defendant asserts that both MBRs were served on January 2, 2004, *see* Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A (Dkt. No. 62–4), plaintiff denies that he received the December 30, 2003 MBR until the commencement of his disciplinary hearing.[3] Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 68) ¶ 16.

[3]    As will be seen I have assumed, as I must at this juncture, that plaintiff's version of the facts is correct. *See* pp. 21–32, *post*.

**\*2** The two MBRs were consolidated, over plaintiff's objection, and a Tier III disciplinary hearing was conducted, beginning on January 7, 2004, to address the charges set forth within them.[4,5] Amended Complaint (Dkt. No. 7) ¶ 15; Selsky Decl. (Dkt. No. 62–3) ¶ 21 and Exhs. A (Dkt. No. 62–4) and B (Dkt. Nos. 62–5 and 62–6). In advance of the hearing plaintiff was given the opportunity to express his preferences for an assistant, and based upon his selection Corrections Counselor Roddy was assigned to assist him. Selsky Decl. (Dkt.62–3) ¶ 20 and Exh. A (Dkt. No. 62–4).

[4]    The DOCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3. Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

[5]    Plaintiff's disciplinary hearing was originally scheduled to start on January 5, 2004, in order to meet the requirements of a state regulation mandating that a disciplinary hearing commence within seven days of a prisoner's confinement in a facility's SHU, 7 N.Y.C.R.R. § 251–5.1(a) (1983). Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 18–19. While plaintiff assigns significance to the failure of prison officials to meeting the seven-day requirement, the record reveals that an extension was granted because plaintiff's assistant was unable to meet with him prior to January 5, 2004. *Id.* In any event, the violation of state regulations is not cognizable under 42 U.S.C. § 1983. *Cusamano v.*

*Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). Plaintiff's claim of undue delay is instead subject to constitutional standards, which require only that the hearing be held within a "reasonable time" and not within any prescribed number of days. *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."); *Donato v. Phillips,* No. 9:04–CV–1160, 2007 WL 168238, at \*6 (N.D.N.Y. Jan. 18, 2007) (McAvoy, J.) (hearing that started nine days after plaintiff's confinement in the SHU was reasonable).

Following its commencement on January 7, 2004, the hearing officer twice adjourned the hearing, initially to January 8, 2004, and again from January 8, 2004 to January 13, 2004, to allow the plaintiff an opportunity to prepare his defense. Selsky Decl. (Dkt. No. 62–3) and Exh. B (Dkt. No. 62–5) pp. 4–20, 20–58. During the course of the hearing plaintiff was permitted to call at least eleven witnesses to testify on his behalf, and also to introduce documentary evidence in his defense Selsky Decl. (Dkt. No. 62–3) ¶ 44 and Exh. A (Dkt. No. 62–4); Exh. B (Dkt. No. 62–5) at pp. 60–86, 94–115, 136–83, 185–209, and Exh. B (Part 2) (Dkt. No. 62–6) at pp. 2–12, 30–43, 59–71, 72–78, 76–83, 105–111, 111–117, 117–21,122–26, 128–39. Two inmate witnesses listed by the plaintiff declined to testify, and executed refusal forms stating that they did not wish to be involved in the matter. Selsky Decl. (Dkt. No. 62–3) ¶ 42 and Exh. A (Dkt. No. 62–4). The hearing officer rejected plaintiff's request that he be permitted to adduce testimony from two other witnesses, his wife and his attorney, concluding that the testimony would not be relevant to the issues involved in the hearing. Selsky Decl., Exh. B (Part 2) (Dkt. No. 62–6) pp. 98–99.

At the conclusion of hearing, plaintiff was found guilty of fighting (one count), refusing to obey a direct order, engaging in violent conduct, and participating in a demonstration, but was acquitted on the second count of fighting. Selsky Decl. (Dkt. No. 62–3) ¶ 22 and Exh. A (Dkt. No. 62–4). Based upon his findings, which were both noted in writing and stated orally at the hearing, the hearing officer imposed a penalty that included twenty-four months of disciplinary SHU confinement and a corresponding loss of package, commissary and telephone privileges. Selsky Decl. (Dkt. No. 62–3) ¶ 23; *see also* Exh. A (Dkt. No. 62–4) and Exh. B (Part 2) (Dkt. No. 62–6) pp. 156–58.

On February 11, 2004, plaintiff appealed the disciplinary determination to defendant Selsky's office. *See* Amended

Complaint (Dkt. No. 7) ¶ 21; Selsky Decl. (Dkt. No. 62–3) ¶ 26 and Exh. C (Dkt. No. 62–7). Plaintiff also submitted a supplemental appeal on or about March 12, 2004. Selsky Decl. (Dkt. No. 62–3) ¶¶ 26–27, Exhs. C (Dkt. No. 62–7) and D (Dkt. No. 62–8). Defendant Selsky issued a determination on behalf of the DOCS Commissioner on April 8, 2004, modifying the results of the hearing by dismissing the charge of engaging in a demonstration and reducing the penalty imposed to twelve months of SHU confinement with a corresponding loss of privileges.[6] Selsky Decl. (Dkt. No. 62–3) ¶ 28 and Exh. E (Dkt. No. 62–9). That determination was based upon defendant Selsky's finding that the nature of the incidents giving rise to the MBRs did not warrant the full extent of the penalty imposed and that the charge of engaging in a demonstration was not substantiated. *Id.* at ¶ 28 and Exh. E (Dkt. No. 62–9). Based upon his review, however, Selsky concluded that plaintiff received all of the procedural due process mandated under the Fourteenth Amendment and that there was evidence in the record substantiating the charges for which Rodriguez was found guilty. *Id.* at ¶ 29.

[6]   Plaintiff's SHU term of disciplinary confinement and corresponding loss of privileges was further reduced to eighth months and nine days, ending on September 9, 2004, as a result of a discretionary time cut on or about July 14, 2004, occurring while plaintiff was housed at the Southport Correctional Facility. Selsky Decl. (Dkt. No. 62–3) ¶ 53.

## II. *PROCEDURAL HISTORY*

**\*3** This action was commenced on April 11, 2007 in the Southern District of New York, but was subsequently transferred to this district by order issued by Chief District Judge Kimba M. Wood on April 11, 2007.[7] Dkt. Nos. 1, 3. Plaintiff's original complaint challenged not only the MBRs issued and the disciplinary action that ensued, but also chronicled alleged continued harassment and acts of retaliation that he experienced following his transfer into the Attica Correctional Facility, naming as defendants several DOCS employees including Donald Selsky. *See* Complaint (Dkt. No. 1).

[7]   While plaintiff's complaint was not filed in the Southern District until April 11, 2007, the transfer order issued by Chief Judge Wood noted that the complaint was received in that district on February 26, 2007. *See* Dkt. No. 3, n. 1.

Upon transfer of the case to this district and the court's initial review of plaintiff's complaint and accompanying request for leave to proceed *in forma pauperis* ("IFP"), by order dated May 17, 2007, Senior District Judge Lawrence E. Kahn granted plaintiff IFP status but directed that he file an amended complaint, noting several deficiencies in the original pleading including, *inter alia,* the apparent untimeliness of certain of his claims. Dkt. No. 5. In accordance with the court's directive, plaintiff filed an amended complaint on June 26, 2007. Dkt. No. 7. Upon review of that pleading District Judge Kahn issued an order on July 19, 2007 accepting the amended complaint for filing, but dismissing plaintiff's claims against the majority of the defendants as time-barred and further directing dismissal of plaintiff's claims against a newly-added defendant, Corrections Sergeant Corcran, without prejudice to plaintiff's right to file a separate action against that defendant in the Western District of New York.[8] As a result, Donald Selsky was left as the sole remaining defendant in the action.

[8]   District Judge Kahn explained that "[s]ince the alleged wrongdoing by Defendant Corcran occurred in the Western District of New York, and Plaintiff's claims against Defendant Corcran are very recent, and thus not in jeopardy of being time-barred at this time, the Court will dismiss Defendant Corcran from the action, without prejudice to Plaintiff filing his claims against Defendant Corcran in the Western District of New York." Decision and Order (Dkt. No. 8) at p. 3.

After filing an answer generally denying plaintiff's allegations against him and asserting various affirmative defenses, *see* Dkt. No. 10, defendant Selsky moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings, urging dismissal of plaintiff's amended complaint on the ground that it failed to allege the requisite degree of his personal involvement in any wrongdoing to support a finding of liability. Dkt. No. 47. The motion resulted in my issuance of a report on February 25, 2010 recommending that the motion be denied. Dkt. No. 54. That recommendation was adopted by District Judge Lawrence E. Kahn by order issued on September 13, 2010. Dkt. No. 67.

On June 18, 2010, defendant again moved, this time for summary judgment dismissing plaintiff's complaint. Dkt. No. 62. In his motion defendant reiterates his claim of lack of personal involvement, and additionally asserts that in any event plaintiff's due process claim lacks merit since the plaintiff was afforded all of the procedural safeguards required under the Fourteenth Amendment, and further that he is entitled to qualified immunity from suit. *Id.* Plaintiff has since responded in opposition to

defendant's motion, Dkt. No. 68, and defendant has submitted a reply memorandum addressing plaintiff's arguments and further supporting his motion. Dkt. No. 74.

**\*4** Defendant's motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment

process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

#### B. *Personal Involvement*

**\*5** In his motion defendant Selsky renews an argument previously made and rejected—that his limited involvement in reviewing the disciplinary determination in question based upon plaintiff's appeal of that decision is insufficient to support a finding of liability for any procedural due process violation which may have occurred in the context of that hearing. In response, plaintiff counters that the record reveals facts from which a reasonable factfinder could conclude that the defendant personally participated in the due process violation, including by conducting an inadequate review of the disciplinary hearing record.

It seems clear, particularly in light of the Supreme Court's relatively recent decision in *Ashcroft v. Iqbal,* ––– U.S. –––– 129 S.Ct. 1937, 1948–49 (2009), that to be held accountable for a constitutional deprivation under section 1983 a defendant must have had personal involvement in the conduct giving rise to the deprivation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (*citing Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)); *Scott v. Fischer,* 616 F.3d 100, 110 (2d Cir.2010) ("In this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.") (quoting *McKinnon* ). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

As was noted in my prior report and recommendation, the question of whether defendant Selsky's review of an allegedly infirm disciplinary hearing provides grounds for

establishing his personal involvement is one that has divided the courts. Some courts have found the mere allegation that Selsky has reviewed and affirmed a hearing determination that was the product of a due process deprivation is insufficient to establish liability for the underlying violation. *See, e.g., Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* No. 05–CV–47A, 2005 WL 2000144, at *6 (W.D.N.Y. Aug. 13, 2005) ("[t]he fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part.");[9] *see also Odom v. Calero,* No. 06 Civ. 15527, 2008 WL 2735868, at *7 (S.D.N.Y. Jul. 10, 2008) (concluding that a due process violation is complete upon the hearing officer rendering a decision, even when the liberty interest deprivation persists, and therefore is not "ongoing" when an appeal is taken to Donald Selsky).

[9]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** On the other hand, other courts have found that the act of reviewing and affirming a determination on appeal can provide a sufficient basis to find the necessary personal involvement of a supervisory employee like defendant Selksy. *See, e.g., Bennett v. Fischer,* No. 9:09–CV–1236, 2010 WL 5525368 (N.D.N.Y. Aug 17, 2010) (Peebles, M.J.) (finding questions of fact regarding Commissioner Fischer's personal involvement in disciplinary precluding summary judgment), *Report and Recommendation Adopted,* 2011 WL 13826 (N.D .N.Y. Jan. 4, 2011) (Scullin, S.J.); *Baez v. Harris,* No. 9:01–CV–807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (fact that defendant Selsky responds personally to all disciplinary appeals by inmates found sufficient to withstand summary judgment motion based on lack of personal involvement); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiff[']s appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation. Assuming that this allegation is true, as this court must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ..., Cepeda has pleaded personal involvement by Commissioner Coughlin sufficiently to

withstand this motion.") (citations omitted); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint had sufficiently alleged personal involvement of Superintendent and Commissioner to withstand motion to dismiss because plaintiff alleged that both defendants had actual or constructive notice of the defect in the underlying hearing); *Ciaprazi v. Goord,* No. 9:02–CV–0915, Report–Recommendation, 2005 WL 3531464, at *16 (N.D.N.Y. Mar. 14, 2004) (Peebles, M.J.) (recommending that Selsky's motion for summary judgment for lack of personal involvement be denied because Selsky's review of plaintiff's disciplinary hearing appeal "sufficiently establishes his personal involvement in any alleged due process violations based upon his being positioned to discern and remedy the ongoing effects of any such violations."), *adopted,* 2005 WL 3531464, at *1–2 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J.).

In support of his argument regarding personal involvement defendant cites *Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y. My 24, 2010), in which another magistrate judge of this court, in a report and recommendation adopted by the assigned district judge, wrote that "[t]he affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation." *Tafari,* 714 F.Supp.2d at 383. (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002)). I respectfully disagree with my esteemed colleague and maintain that the cases holding that Selsky's affirmance, or that of someone in his corresponding position, of a constitutionally defective disciplinary determination at a time when the inmate is still serving his or her disciplinary sentence, and the violation can therefore be abated, falls within the *Colon* factors articulated in the Second Circuit for informing the supervisory liability analysis. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). In any event, this case is distinguishable from *Tafari* since here plaintiff has alleged that through his own conduct in inadequately reviewing the underlying determination defendant Selsky committed a due process violation, *see* Amended Complaint (Dkt. No. 7) ¶ 21, thereby satisfying the Supreme Court's admonition that a defendant can only be held liable for his or own conduct for purposes of a civil rights violation. *Iqbal,* 129 S.Ct. at 1948.

**\*7** As I noted in my prior report, I believe that those cases concluding that a plaintiff's allegation that defendant Selsky reviewed and upheld an allegedly constitutionally-suspect disciplinary determination is enough to show his personal involvement in the alleged violation appear to be both better reasoned and more consonant with the Second Circuit's position regarding

personal involvement. *See Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) (criticizing a district court's denial of leave to amend to add Donald Selsky as a defendant in a due process setting and appearing to assume that Selsky's role in reviewing and affirming a disciplinary determination is sufficient to establish his personal involvement). While it may be true that the due process violations cited by Rodriguez occurred and were no longer ongoing when his appeal was taken to defendant Selsky, because it appears that the sentence imposed was still being served at the time of his review, the liberty interest deprivation allegedly effectuated without due process was therefore ongoing, and defendant Selsky was in a position to remedy the violation, at least in part, at a time when his intervention would still have been meaningful.

C. *Merits of Plaintiff's Due Process Claim*

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Defendant concedes that plaintiff's eight months of SHU disciplinary confinement "at least arguably" impacted a protected liberty interest, *see* Defendant's Memorandum (Dkt. No. 62–14) at p. 3, and I agree. *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) (finding that disciplinary confinement for a period of 305 days is "a sufficient departure from the ordinary incidents of prison life to require procedurally due process protections."). Plaintiff's claim, then, boils down to whether he was provided the procedural safeguards guaranteed under the Fourteenth Amendment prior to that deprivation.[10]

[10]   It should be noted that in this case plaintiff goes beyond merely alleging defendant Selsky's failure to rectify a past due process violation. In his complaint plaintiff also alleges that defendant Selsky participated in or furthered the violation by failing to conduct an appropriate review. Amended Complaint (Dkt. No. 7) ¶ 21.

The procedural rights to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U.S. 539, 564–67, 94 S.Ct. 2963, 2978–80 (1974).[11] Under *Wolff,* the constitutionally

mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–67, 94 S.Ct. at 2978–80; *see also Eng v. Coughlin,* 858 F .2d 889, 897–98 (2d Cir.1988). In addition, to pass muster under the Fourteenth Amendment the hearing officer's disciplinary determination must garner the support of at least "some evidence". *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

[11]   Many of the points raised in support of plaintiff's due process claim surround the alleged failure of prison officials to meet the requirements prescribed by regulation for disciplinary hearings. It is well established, however, that a violation of a state regulation is not actionable under section 1983. *Cusamano,* 604 F.Supp.2d at 482.

1. *Notice of Charges*

**\*8** The record now before the court, when interpreted in a light most favorable to the plaintiff, suggests that while the second of the two MBRs addressed at plaintiff's disciplinary hearing was served on Rodriguez on January 2, 2004, the earlier report was not received by him until the date on which the hearing was to begin.[12] Under *Wolff,* an accused inmate is entitled to meaningful advance written notice of the charges against him; in this circuit, a minimum of twenty-four hours of advance notice is generally considered to be required. *Sira v. Morten,* 380 F.3d 57, 70 (2d Cir.2004). The purpose of the notice requirement is to place the inmate on notice of the charges faced in order to permit the preparation of an adequate defense. *Id.* (citing *Taylor v. Rodriguez,* 238 F.3d 188, 192–93 (2d Cir.2001); *see also Martin v. Mitchell,* No. 92–CV–716, 1995 WL 760651, at \*2 (N.D.N.Y. Nov. 24, 1995) (McAvoy, J.) (citing *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978) (holding that the purpose of the twenty-four hour notice rule is to provide inmates with sufficient time to prepare a defense, "not to hold hearing officers to a rigid and useless requirement that they only may call an inmate into a hearing room once they are positive that the inmate received a copy of the misbehavior report at least twenty-four hours earlier").

[12]   As was previously noted, defendant disputes plaintiff's claim in this regard and asserts instead that both

misbehavior reports were served on the plaintiff on January 2, 2004 by Corrections Officer Ferguson on January 2, 2004. Selsky Decl. (Dkt. No. 62–3) ¶ 19 and Exh. A.

In this instance, any failure on the part of prison officials to provide plaintiff with notice of the charges lodged against him prior to the scheduled hearing was harmless in light of the hearing officer's agreement to adjourn the hearing, initially from January 7, 2004 to January 8, 2004, and then again to January 13, 2004, in order to allow the Rodriguez to prepare his defense. The record clearly reflects that, during those intervening periods, he was afforded the opportunity to prepare a defense to both charges before any testimony was taken. *See* Plaintiff's Memorandum (Dkt. No. 68–1) at p. 5 (admitting that plaintiff was served with the first misbehavior report at the hearing prior to any testimony having been taken).

The notice requirements of *Wolff* were therefore satisfied in this case, and no reasonable factfinder could conclude otherwise.

2. *Assistance in Preparation of a Defense*
Under *Wolff* and its progeny, a prisoner is entitled to an "employee assistant" to aid in the preparation for a disciplinary hearing when the inmate is illiterate, confined to the SHU, or unable to grasp the complexity of the issues involved. *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir.1993); *see also Eng,* 858 F.2d at 897. The Supreme Court has made it clear, however, that the assistance due prisoners is limited and is not equivalent of the right of a criminally accused legal counsel. *Wolff*, 418 U.S. at 570, 94 S.Ct. at 2981. An assistant is only required to act as the inmate's *"surrogate*—to do what the inmate would have done were he able." *Silva*, 992 F.2d at 22 ("The assistant is not obliged to go beyond the specific instructions of the inmate because if he did so he would then be acting as counsel.")

**\*9** Because Rodriguez had been relegated to SHU confinement by the time of the disciplinary hearing he was entitled to and was in fact assigned an employee assistant, Ms. Roddy, to help him prepare for the hearing. Rodriguez asserts that the assistant, however, refused to provide him with requested documents and threatened to "write him up" if he requested further assistance. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 14–17. Specifically, plaintiff claims that he was refused access to documents that would have helped prove his innocence, including a list of officers involved in the incidents

involved, letters written by another inmate, video footage of a different inmate being led to the SHU, all misbehavior reports concerning other inmates' involvement in the incidents, and all pertinent "To/From" memoranda produced by staff or inmates with knowledge of the relevant events. *Id.* at p. 15.

A careful review of the assistant forms and attachments in the record shows that the assigned assistant fulfilled her duty as plaintiff's surrogate. Plaintiff provided several lists of documents requested to prepare his defense.[13] Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 46–49, 54–61. Ms. Roddy indicated on the assistant form that she pursued all of plaintiff's requests and provided him with at least twenty pages of documents. *Id.* at pp. 17–18. On the handwritten lists, Ms. Roddy noted which documents were provided to plaintiff and gave brief explanations as to why some of the requested documents could not be produced. It was noted, for example, that plaintiff was denied access to the handwritten notes of another inmate, several requested "To/From" forms simply did not exist, and that the video footage would be available for viewing at the hearing if deemed pertinent to the pending charges. *Id.* at pp. 46–49.

[13]    It is noted that plaintiff did not request that Ms. Roddy interview any inmates or other persons as potential witnesses and refused to sign the assistant form. Selsky Decl., Exh. A (Dkt. No. 62–4) p. 17.

There is no indication that any documents were withheld from plaintiff without justification or as a result of Ms. Roddy's ineffective assistance. Ms. Roddy's role as plaintiff's assistant was limited to acting as his surrogate; if he was not permitted to receive certain documents, Ms. Roddy likewise could not access them. Even assuming plaintiff's claim that Ms. Roddy was rude and hostile toward him is accurate, such conduct in and of itself does not violate his federal due process rights. *See Gates v. Selsky,* No. 02 CV 496, 2005 WL 2136914, at \* 7 (W.D.N.Y. Sept. 02, 2005) (noting that the duty owed by an employee assistant is the provision of requested services in good faith and in the best interest of the inmate and to perform as instructed by the inmate). In short, there is no evidence now before the court from which a reasonable factfinder could conclude that plaintiff was denied effective assistance in preparing his defense to the pending disciplinary charges.

3. *Opportunity to Present Evidence*
The due process clause of the Fourteenth Amendment

plainly guarantees the right of an accused inmate to present a defense to disciplinary charges. *Wolff,* 418 U.S. at 555–56, 94 S.Ct. at 2974. That right, however, is not unfettered and does not apply to the same extent as the constitutional guarantee to a criminally accused defendant of the right to present a meaningful defense. *Hernandez v. Selsky,* 572 F.Supp.2d 446, 454 (S.D.N.Y.2008) (citing *Wolff* ). Instead, in order to keep a disciplinary hearing to within reasonable limits, a hearing officer "must have the necessary discretion ... to refuse to all witnesses that may create a risk of reprisal or undermine authority" *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2980.

**\*10** An inmate's request to have specific witnesses called to testify may be refused if the hearing officer reasonably finds that such witnesses' testimony would be duplicative, non-probative, or would interfere with correctional goals. *See Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994). "[A] hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

In support of his claim that he was denied the opportunity to present a meaningful defense plaintiff first points to the hearing officer's refusal to allow him to call his mother and attorney as witnesses. According to the plaintiff, both would have substantiated his claim of retaliatory motives on the part of correctional officials. Plaintiff's Memorandum (Dkt. No. 68–1) at p. 8; *see also* Selsky Decl., Exh. B (Dkt. No. 62–6) pp. 98–99. Neither witness, however, was present in the prison during any of the events giving rise to plaintiff's claims. The only testimony those individuals could have offered would not only have been hearsay, but would have come directly from Rodriguez himself, who was present to testify. Accordingly, the hearing officer properly determined that such testimony would have been irrelevant or unnecessarily redundant.

Plaintiff also challenges the hearing officer's failure to submit written questions to two fellow inmates who refused to testify at the hearing. Despite plaintiff's claim to the contrary, a hearing officer is under no affirmative duty to compel a response from an inmate who refuses to testify at a disciplinary hearing. If a witness has indicated that he or she will not testify if called, it would be futile and unnecessary to pursue his or her testimony further. *Silva,* 992 F.2d at 22; *see also Johnson v. Doling,* No. 9:05–CV–376, 2007 WL 3046701, at \*7 (N.D.N.Y. Oct. 17, 2007) (McAvoy, J. and Treece, M.J.) (the failure to summon the testimony of a witness who refuses to testify does not violate due process); *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at \*5 (N.D.N.Y. Sept. 26, 1997) (Pooler, J. and DiBianco, M.J.) (a hearing

officer's failure to investigate why an inmate refused to testify does not constitute a due process violation).

Here, inmates Colon and Berrios flatly refused to testify at plaintiff's disciplinary hearing, signing the appropriate refusal forms on January 14, 2004. Selsky Decl., Exh. A (Dkt. No. 62–4) pp. 110–11. Colon explained his refusal by noting that he had not witnessed the incident, and Berrios likewise claimed to have no relevant information because he was sleeping in his cell at the relevant times. *Id.* Requesting further information from these inmates would have been futile and unnecessary since they claimed not to have actually witnessed the events that led to Rodriguez's charges. It was therefore not a violation of plaintiff's due process rights for the hearing officer to refuse to inquire further into their involvement.

### 4. *Impartial Hearing Officer*

**\*11** Among the due process dictates arising under the Fourteenth Amendment is the requirement that a hearing officer assigned to address a disciplinary charge against an inmate be unbiased. *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see also Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at \*8 (S.D.N .Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 n. 10 (2d Cir.1983)). While the reality is that most hearing officers serving in that capacity are prison officials, and a prison hearing officer's impartiality generally does not have to mirror that of judicial officers, nonetheless the result of a disciplinary hearing should not be "arbitrary and adversely predetermined." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009). Within that context, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990).

It should be noted that a plaintiff's disagreement with a hearing officer's rulings alone does not give rise to a finding of bias. *See Johnson,* 2007 WL 3046701, at \*10 (hostile exchanges between plaintiff and the hearing officer throughout the proceeding and adverse rulings did not constitute bias where plaintiff was otherwise provided the opportunity to testify, call witnesses, and raise objections). Similarly, the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias. *See Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009) (failing to find bias where the hearing officer conducted both the disciplinary proceeding and the investigation into the inmate's grievance against the

involved corrections officer).

Because prison officials serving as adjudicators enjoy a rebuttable presumption that they are unbiased, *Allen,* 100 F.3d at 259, plaintiff's conclusory allegations of bias in this case are insufficient to overcome this presumption. Plaintiff claims that Hearing Officer Ewanciw was biased because he sought assistance from Lt. Wright, who authored one of the two MBRs in issue. Plaintiff's Memorandum (Dkt. No. 68–1) at pp. 18–20. However, Rodriguez fails to explain how this evidences bias against him, reflects a predetermination on the hearing officer's part, or impacted the outcome of the proceeding. The record reflects that the hearing officer disclosed to the plaintiff that he had consulted with Lt. Wright, the "disciplinary lieutenant," for the purpose of ascertaining whether plaintiff was permitted to receive copies of redacted investigation documents. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 130.

During the hearing plaintiff suggested that the hearing officer and Lt. Wright are friends outside of work. Selsky Decl., Exh. B (Dkt. No. 62–5) pp. 131–32. While the allegation denied by Hearing Officer Ewanciew, even if true this fact does not show that he was predisposed to rule against plaintiff.

**\*12** In sum, plaintiff has failed to adduce evidence from which a reasonable factfinder could conclude that the hearing officer assigned to preside over plaintiff's disciplinary hearing was biased, or had prejudged plaintiff's guilt prior to considering the evidence presented at the hearing.

5. *Determination Supported by "Some Evidence"*
In addition to repeated verbal explanations of his rulings throughout the hearing and of his ultimate findings, Hearing Officer Ewanciw provided plaintiff with a written explanation of the evidence relied upon in reaching his conclusion. Selksy Decl., Exh. A (Dkt. No. 62–4) pp. 3–4. In his written explanation, Hearing Ewanciw acknowledged that he relied in part on information from confidential witnesses. Selksy Decl., Exh. A (Dkt. No. 62–4) p. 4. The question next presented is whether these findings were supported by at least some credible evidence.

The "some evidence" standard is extremely tolerant and is satisfied if "there is any evidence in the record that supports" the disciplinary ruling. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Nonetheless to pass constitute muster, the supporting evidence must be reliable. *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d

Cir.2001). The Second Circuit has made clear that "the reliability of evidence is always properly assessed by reference to the totality of the circumstances and that an informant's record for reliability cannot, by itself, establish the reliability of bald conclusions or third-party hearsay." *Sira,* 380 F.3d at 82; *see also Dawkins v. Gonyea,* 646 F.Supp.2d 594, 614 (S.D.N.Y.2009) ("*Sira* clearly established that an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information.").

The hearing transcript reflects that the hearing officer did not make an independent inquiry into the reliability of the confidential inmate witnesses himself, but instead relied on Lt. Wright's independent finding of reliability. Selsky Decl., Exh. B (Dkt. No. 62–5) p. 128. Had the disciplinary decision been based solely on such confidential information, an issue of material fact might have been presented as to whether the "some evidence" standard was met. With defendant Selsky's reversal of plaintiff's conviction on the demonstration charge contained within the January 2, 2004 MBR, the remaining charges for which he was found guilty included fighting, refusing a direct order, and violent conduct. To support his finding of guilt on those counts Hearing Officer Ewanciw relied on a correctional officer's assertion that he witnessed plaintiff raise his fists, throw punches, and fail to stop fighting when instructed to do so—an account that was corroborated by another officer's investigation—as well as the results of an investigation into the incident and evidence found in plaintiff's cell tying him to the relevant events. There was therefore sufficient reliable evidence on which to base a disciplinary decision related to the charges, independent of the confidential witness statements, and no reasonable factfinder could conclude otherwise.

IV. *SUMMARY AND RECOMMENDATION*
**\*13** Plaintiff has failed to establish the existence of a genuine issue of material fact regarding his procedural due process claim. Rodriguez received sufficient notice of the charges against him as well as adequate assistance in preparing a defense, and had ample opportunity to appear, call witnesses, and present evidence in his defense. In addition, the record fails to disclose any basis for concluding that Hearing Officer Ewanciw was biased, and the record before the court proves that he provided plaintiff with a written explanation of the reasons for his decision, which was supported by at least some reliable evidence. I therefore recommend dismissal of plaintiff's due process claim against defendant Selsky on the merits, and in light of this recommendation find it unnecessary to

address defendant's claim of qualified immunity. It is therefore respectfully

RECOMMENDED, that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and that the complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,*

984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1086001

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 7629513
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Todd JOHNSON, Plaintiff,
v.
Christopher FERNANDEZ, et al., Defendants.

No. 9:09–CV–626 (FJS/ATB).
|
March 1, 2011.

**Attorneys and Law Firms**

Todd Johnson, pro se.

Michael G McCartin, Ass't Attorney General, for
Defendants.

## REPORT RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred for Report and
Recommendation, pursuant to 28 U.S.C. § 636(b) and
Local Rules N.D.N.Y. 72.3(c), by the Honorable
Frederick J. Scullin, Jr., Senior United States District
Judge. On November 4, 2010, this case was reassigned to
me from Magistrate Judge David R. Homer. (Dkt. No.
48).

In this civil rights complaint (Dkt. No. 1), Plaintiff alleges
that Defendants violated his rights under the First, Eighth,
and Fourteenth Amendments. Plaintiff seeks $1 million in
damages, as well as injunctive relief. Presently before this
court is Defendants' motion for summary judgment
pursuant to Fed.R.Civ.P. 56(b). (Dkt. No. 39). Plaintiff
responded in opposition to the motion. (Dkt. No. 43). For
the following reasons, the court recommends granting
Defendants' motion, and dismissing the complaint in its
entirety.

## DISCUSSION

### I. *Facts*

#### A. Excessive Force Claims Against Christopher Fernandez and Jason Yung

Plaintiff alleges[1] that he was assaulted by Defendant
Christopher Fernandez, a correctional officer, on February
9, 2008, while incarcerated at Coxsackie Correctional
Facility ("Coxsackie"). (Dkt. No. 1, Compl. at 8[2]; Dkt.
No. 39–3, Pl.'s Dep. at 13). At approximately 3:00 P.M.,
Defendant Fernandez approached Plaintiff's cell and
started screaming about people who were "loud at the
gate" earlier in the week. (Compl. at 8; Pl.'s Dep. at 12).
Defendant Fernandez told another correctional officer,
known only as Officer Ryan, to open Plaintiff's cell.
(Compl. at 8; Pl.'s Dep. at 12–13). After Officer Ryan
opened the cell, Defendant Fernandez told Plaintiff to
"step out" and "place [his] hands on the wall." (Compl. at
8; Pl.'s Dep. at 13) Defendant Fernandez allegedly began
punching Plaintiff in the ribs once he exited his cell.
(Compl. at 8; Pl.'s Dep. at 16). Although Defendant
Fernandez supposedly told Plaintiff to "fight back,"
Plaintiff refused to do so. (Compl. at 8; Pl.'s Dep. at 16).
Defendant Fernandez then began "trashing" Plaintiff's
cell, as if he were searching for contraband. (Compl. at 8;
Pl.'s Dep. at 13). Finding none, Defendant Fernandez
ordered Plaintiff to get on his knees. (Compl. at 8; Pl.'s
Dep. at 13). Defendant Fernandez then kicked Plaintiff's
lower back, causing Plaintiff's neck to snap. *Id.* (Compl.
at 8; Pl.'s Dep. at 13).

[1]    Plaintiff was deposed on February 23, 2010 (Dkt. No.
       39–3), and this court has incorporated facts that were
       brought out in plaintiff's deposition.

[2]    All references to page numbers in the Complaint will
       be to the page numbers assigned by the court's
       electronic docketing system.

After Defendant Fernandez locked Plaintiff in his cell,
Defendant Fernandez walked over to Inmate Green's cell
and ordered Officer Ryan to open that cell. (Compl. at 8;
Pl.'s Dep. at 25). Although Plaintiff did not see what
transpired immediately after Defendant Fernandez entered
Inmate Green's cell, Plaintiff claims that he later
witnessed Defendant Fernandez slapping Inmate Green.
(Compl. at 8; Pl.'s Dep. at 26). Defendant Fernandez then
proceeded to Inmate Palmer's cell and ordered Officer
Ryan to open that cell. (Compl. at 8; Pl.'s Dep. at 30).
Plaintiff does not claim that he witnessed any assault on
Inmate Palmer, but claims that he heard repeated sounds

of a stick hitting a body and cries for help. (Compl. at 8; Pl.'s Dep. at 35). Plaintiff also claims to have witnessed Inmate Palmer being dragged to the day room in bloody clothing. (Compl. at 8; Pl.'s Dep. at 35).

**\*2** On February 15, 2008, Plaintiff states that a correctional officer told Plaintiff that he was being called as a witness in Inmate Palmer's disciplinary hearing that arose from the February 9 incident. (Compl. at 8; Pl.'s Dep. at 59). The officer asked Plaintiff: "Do you want to get involved with that?" (Compl. at 8). After Plaintiff responded affirmatively, the officer allegedly told Plaintiff that getting involved was not a "good idea." *Id.* After that officer left, another officer approached Plaintiff and asked him the same question. *Id.* Once again, Plaintiff replied affirmatively. *Id.* The officer then told Plaintiff that he would be called after lunch. *Id.*

Plaintiff states that he wanted to bring a written statement and other documents into Inmate Palmer's hearing. (Compl. at 8; Pl.'s Dep. at 64–65). On his way to the hearing room, after retrieving those items and placing them in an envelope, Plaintiff claims that he was stopped by Defendant Sergeant Jason Yung and an unidentified correctional officer. (Compl. at 8; Pl.'s Dep. at 65). Defendant Yung then allegedly threatened Plaintiff with being "locked up" if he testified at the hearing. (Compl. at 8; Pl.'s Dep. at 64).

As Plaintiff sat in the waiting pen, Correctional Officer (C.O.) Nieves told Plaintiff that his envelope would need to be searched before he could bring it into the hearing room. (Dkt. No. 39–11, Disciplinary Hr'g at 11; Dkt. No. 39–12, Hr'g Papers at 4). Plaintiff then shouted that he would not permit the officers to search his envelope, claiming that C.O. Nieves was interfering with his ability to testify for Inmate Palmer. (Pl.'s Dep. at 65; Disciplinary Hr'g at 11–12; Hr'g Papers at 4). C.O. Nieves then issued Plaintiff a disciplinary ticket. (Hr'g Papers at 4).

Based upon this misbehavior, Defendant Yung and another officer escorted Plaintiff back to his cell to pack for confinement in the special housing unit ("SHU"). (Compl. at 8; Disciplinary Hr'g at 17). During the escort to SHU, Defendant Yung allegedly called for more officers. (Compl. at 8). Plaintiff claims that Defendant Yung and the other officers began punching and kicking Plaintiff in the face and ribs. (Compl. at 8; Pl.'s Dep. at 70–73).

Once Plaintiff arrived at SHU, Plaintiff told his mental health counselor, Mr. Tatum, that he was crying because he had been assaulted. (Compl. at 8; Pl's Dep. at 78). Mr. Tatum transferred Plaintiff to the Office of Mental Health ("OMH") infirmary. (Compl. at 8; Pl.'s Dep. at 78). Plaintiff claims that was not seen by a doctor until February 27, 2008. (Compl. at 15). He believes that the delay in treatment occurred because he told Investigator Begmann of the Inspector General's Office about the February 9 and 15 assaults. *Id.*

## B. Mail Interference Claim Against M. Bathrick

As an initial matter, the court notes that Plaintiff fails to allege which Defendant (or any other individual) deprived him of his First Amendment right to the free flow of mail. Although Defendant Bathrick is named as a defendant in the caption of the Complaint and is later identified as a clerk in the Inmate Account Unit (Compl. at 3), the Complaint fails to contain any allegations indicating how Defendant Bathrick violated the law or injured Plaintiff. Under these circumstances, the claim would ordinarily have been subject to dismissal.[3] Defendants, however, have interpreted the allegation of mail interference to refer to Defendant Bathrick. (Dkt. No. 39–14, Defs.' Mem. of Law at 15). Moreover, Plaintiff states, in his opposition to summary judgment, that Defendant Bathrick is the defendant responsible for this alleged violation of Plaintiff's First Amendment rights. (Dkt. No. 43 at 24, Pl.'s 7.1 Statement ¶ 14). Accordingly, the Court will construe the Complaint as asserting a First Amendment mail interference claim against Defendant Bathrick. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (holding that where a party is proceeding pro se, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest").

[3]  *See, e.g., Orraca v. McCreery,* No. 9:04–CV–1183, 2006 U.S. Dist. LEXIS 22941, 2006 WL 1133254, at \*6 (N.D.N.Y. Apr.25, 2006) (dismissing claim against defendant where defendant named in complaint but complaint and supporting documents "fail[ed] to disclose any basis on which to conclude" that defendant was personally involved in the alleged unlawful conduct); *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) ( "Where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted."), *aff'd,* 210 F.3d 354 (2d Cir.2000).

**\*3** Plaintiff alleges that his First Amendment rights were violated at Coxsackie because he was denied his right to "communicate with the outside world." (Compl. at 13).

Following the alleged assaults discussed above, Plaintiff claims that he was depressed and wanted to communicate with this family. *Id.* Plaintiff states, however, that he was prevented from writing to his family because he was not permitted to buy stamps when he arrived at the SHU on February 15, 2008. (Pl.'s Dep. at 102). He states that he was unable to obtain stamps until March 2008. *Id.* at 106.

## C. Due Process Claims Against Defendant Kim Gerwer

Defendant Kim Gerwer, a Coxsackie Education Supervisor, presided over Plaintiff's Tier III hearing. (Compl. at 15; Disciplinary Hr'g at 1). Plaintiff alleges that his due process rights were violated at this hearing in a number of ways. (Compl. at 15). First, he claims he was not provided with notice of the charges against him twenty-four hours before the hearing. *Id.* Second, he claims that Defendant Gerwer refused, without a legitimate reason, to call a witness that would have supported Plaintiff. *Id.* Third, Defendant Gerwer failed to collect documents that Plaintiff had requested. *Id.* Fourth, Defendant Gerwer relied upon Officer Germaine's testimony, even though the officer did not endorse the disciplinary ticket as someone with "personal knowledge" of the incident. (Pl.'s Dep. at 85–87). Finally, Plaintiff was not provided with an impartial hearing because Defendant Gerwer had stated that the officer who wrote the ticket was a "good person." *Id.* at 82.[4]

---

[4] Plaintiff also appears to assert a conditions of confinement claim. (Compl. at 14). Plaintiff, however, has failed to make any allegations about how any of the named defendants are related to a possible condition of confinement claim. Accordingly, the Court will only address the claims asserted against the named defendants.

## II. *Legal Standard for Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ['material'] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential*

*Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**\*4** In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d at 790 (a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## III. *Eighth Amendment Excessive Force Claims*

Defendants Fernandez and Yung argue that Plaintiff has failed to properly exhaust the excessive force claims. (Defs.' Mem. of Law at 5). The Prison Litigation Reform Act's ("PLRA") exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes regardless of the subject matter of the claim. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). In *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, 765 L.Ed. 368 (2006), the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 92–93. "Proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 89–94. An inmate must appeal any denial of his grievance

to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

However, the Second Circuit has held that certain exceptions to exhaustion apply. The proper inquiry is to determine "whether: (1) administrative remedies were in fact available to the prisoner; (2) the defendants may have forfeited the affirmative defense of non-exhaustion by failing to preserve it ... or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense; and (3) special circumstances may have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." *Chavis v. Goord,* 333 Fed. App'x 641, 643 (2d Cir.2009) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (internal quotation marks omitted).

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp.Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program (IGP) encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance. *Id.* § 701.3(a).

**\*5** There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8. The inmate then files a grievance under the normal procedures outlined above; but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id* . § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment. If so, the Superintendent shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the Central Office Review Committee as in the regular grievance procedure.

*Id.* § 701.8(h).

Here, Defendants argue that Plaintiff did not properly exhaust his administrative remedies because he failed to grieve the excessive force claims through the state's three-tiered process in a timely and appropriate manner. (Defs.' Mem. of Law at 5). Plaintiff claims that a grievance officer told him that the grievance office did not handle staff assaults, and that he should, instead, complain to the Inspector General. (Compl. at 1; Pl's Dep. at 52–53; Pl.'s 7 .1 Statement ¶ 1). Plaintiff then wrote to the Inspector General's Office. (Pl.'s Dep. at 36–37).

An inmate's attempt to exhaust by simply writing a letter directly to the Inspector General will not suffice to exhaust administrative remedies. *See Grey v. Spearhawk,* No. 99 CIV. 9871, 2000 U.S. Dist. LEXIS, at *5, 2000 WL 815916 (S.D.N.Y. June 23, 2000) (holding that a complaint filed directly with the Inspector General did not excuse plaintiff from "adhering to the available administrative procedures"). It has been held that "a grievance through informal channels will satisfy the exhaustion requirement if the prisoner thereby obtained a *favorable resolution* of his grievance." *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (citations omitted) (emphasis added). The exhaustion requirement will be satisfied in that situation because the inmate would not have any reason to appeal a favorable resolution. *Andrews v. Cruz,* No. 04 Civ. 566, 2010 U.S. Dist. LEXIS 28124, at *16, 2010 WL 1141182, at *6 (S.D.N.Y. Mar. 24, 2010) (citations omitted). Thus, Plaintiff did not exhaust administrative remedies by writing to the Inspector General's Office, even though the Inspector General investigated plaintiff's allegations and found them to be unsubstantiated.

Defendants may "forfeit the affirmative defense of non-exhaustion ... [if] defendants' own actions inhibit[ed] the inmate's exhaustion of remedies .... " *Chavis v. Goord,* 333 Fed. App'x at 641 (citations omitted); *see, e.g., Jacoby v. Phelix,* No. 9:07–CV–872 (DNH/ATB), 2010 U.S. Dist. LEXIS 44222, at *26–28, 2010 WL 1839299, at *8–9 (N.D.N.Y. Mar.31, 2010) (Baxter, Mag. J.) (summary judgment denied where issues of fact remained on whether plaintiff was threatened by defendants into withdrawing his grievance), *report-recommendation adopted,* 2010 U.S. Dist. LEXIS 44201, 2010 WL 1839264 (N.D.N.Y. May 6, 2010) (Hurd, J.). Although plaintiff claims that an unidentified grievance officer told him that the grievance office did not handle staff assaults, nothing in the record indicates that Defendants Fernandez and Yung or any other DOCS employee actually inhibited Plaintiff's ability to exhaust administrative remedies. First, the IGP Supervisor at

Coxsackie denied telling plaintiff that allegations of assault are not grievable. (Dkt. No. 39–7, Bellamy's 7/30/2008 Letter at 1). Further, plaintiff has acknowledged that he wrote one grievance regarding the assaults on February 25, 2008, and then wrote another grievance after March 8, 2008, when the grievance office supposedly told him that "they do not deal with assaults on inmates by staff."[5] (Dkt. No. 39–8, Pl. 6/20/2008 Letter at 4). Whatever the Grievance Supervisor said, plaintiff's own statements indicate that he was not deterred from pursuing grievance regarding the alleged assaults.

[5]    Contrary to this purported advice, DOCS regulations clearly permit an inmate to file harassment grievances. 7 NYCRR § 701.8; see also id. § 701.2(e) (defining "harassment grievances" as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate").

**\*6** Plaintiff states that the he did mention the February 9 and February 15 incidents in a grievance that he filed on June 25, 2008. (Pl.'s Dep. at 55–56). The regulations provide, however, that an inmate must file a grievance within twenty-one days of the alleged occurrence. 7 NYCRR § 701.5(a)(1). An exception to this time limit may be granted based on "mitigating circumstances" if the extension is requested within forty-five days of the alleged occurrence. 7 NYCRR § 701.6(g)(1)(i)(a). Thus, to the extent that the June 25 grievance complained about the February 9 and 15 assaults, it would have been time-barred.[6]

[6]    Captain J.R. Raymond also responded to a April 29, 2008, letter of complaint that Plaintiff sent to Superintendent Lape. (Compl. at 38, Ex. 8). Even if the April 29 letter could be considered a grievance complaint, it would likewise be time-barred under 7 NYCRR § 701.6(g)(1)(i)(a).

Plaintiff appealed the denial of his June 25, 2008 grievance. In the CORC's decision, dated July 30, 2008, the Committee stated that "CORC notes that there is no record of the grievant filing prior grievances addressing the allegations of assaults by staff on 2/9/08 and 2/15/08. However, it is noted that both allegations were investigated by the Office of the Inspector General and determined to be unsubstantiated." (Dkt. No. 39–6 at 1). Thus, it is clear from the CORC's response to plaintiff that there was no record of a prior grievance, complaining about these alleged assaults.

Even though the forty-five day window to file a grievance regarding the alleged assaults had already expired, IGP Director Karen Bellamy advised Plaintiff on June 30, 2008, that he could contact the IGP supervisor with his mitigating circumstances. (Dkt. No. 39–7, Bellamy's 7/30/2008 Letter at 1). There is nothing in the record, however, to indicate that Plaintiff did so. No rational fact finder could determine that Plaintiff exhausted his administrative remedies, or was deterred from doing so by the actions of the Defendants or any DOCS employee.[7] Accordingly, it is recommended that summary judgment be **granted** as to the Eighth Amendment claims.

[7]    See Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted). See also Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").

### IV. *First Amendment Mail Interference Claim*
Plaintiff alleges that his First Amendment rights were violated because he was not permitted to buy stamps when he arrived at the SHU on February 15, 2008, and was unable to buy stamps until "some time in March" 2008. (Pl.'s Dep. at 102, 106). Because he was unable to buy stamps, Plaintiff claims that he was unable to communicate with his family about the February 15 assault. (Compl. at 13). At his deposition, however, he admitted that he was able to send out at least one letter between February 15 and March 2008, in which he notified his family about the February 9 assault. (Pl.'s Dep. at 106).

Under the First Amendment, prisoners have a right to "the free flow of incoming and outgoing mail." Johnson v. Goord, 445 F.3d 532, 534 (2d Cir.2006) (citations omitted). A plaintiff may bring a claim under the First Amendment for interference with non-legal mail, based upon his free speech right to send or receive mail. See Cancel v. Goord, No. 00 CIV 2042, 2001 WL 303713, at \*4 (S.D.N.Y. Mar. 29, 2001). "[A] prison official's interference with an inmate's mail may violate his First

Amendment right to free speech, which includes the 'right to be free from unjustified governmental interference with communication.' " *Id.* (quotation omitted).

**\*7** Although "[t]he boundary between an inmate's First Amendment right to free speech and the ability of prison officials to open or otherwise interfere with an inmate's mail is not precise[,] ... when analyzing such claims courts have consistently made distinctions between outgoing mail and incoming mail ... based on the various rights and interests at stake." *Id.* "[T]he Supreme Court has recognized that 'the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.' " *Id.* (quotation omitted). Thus, "the penological interests for interference with outgoing mail must be more than just the general security interest which justifies most interference with incoming mail." *Id.* (citation omitted). However, when reviewing an interference with mail claim, "district courts have generally required specific allegations of invidious intent or of actual harm where the incidents of tampering are few and thus the implication of an actionable violation is not obvious on its face." *Davis v. Goord,* 320 F.3d 346, 351–52 (2d Cir.2003); *see also John v. N.Y .C. Dep't of Corr.,* 183 F.Supp.2d 619, 629 (S.D.N.Y.2002) (requiring plaintiff to allege facts that show defendants acted with invidious intent and plaintiff was harmed by the interference); *Cancel v. Goord,* 2001 WL 303713 at \*6 (dismissing claim where only two incidents of tampering alleged and no other indications of a continuing practice).

In this case, Plaintiff admits that he was able to send out at least one letter between February 15, 2008, and March 2008. (Pl.'s Dep. at 106). Moreover, any inability to send mail to his family was limited to, at most, a one month period because Plaintiff was able to buy stamps in March 2008.[8] Thus, any alleged occurrences of mail interference were few, any delay was minimal, and there is no indication that it was an ongoing practice. Plaintiff has also failed to show any harm, physical or otherwise, caused by his failure to communicate with his family, and he has failed to show that Defendant Bathrick (or anyone else) acted with invidious intent. Accordingly, the Court recommends **granting** Defendants' motion for summary judgment as to Plaintiff's First Amendment claims.

[8]     Plaintiff could not remember the exact time in March that he was able to purchase the stamps. (Pl.'s Depo. at 102).

**V.** *Due Process Violations*
Defendant Kim Gerwer is an Education Supervisor at Coxsackie. (Dkt. No. 39–10, Gerwer Decl. ¶ 1; Dkt. No. 39–13, Defs.' 7.1 Statement ¶ 2). She served as the hearing officer for Plaintiff's Tier III disciplinary hearing, which arose from the misbehavior report that was issued on February 15. (Gerwer Decl. ¶ 2; Defs.' 7 .1 Statement ¶ 2). Plaintiff asserts that Defendant Gerwer's conduct at the disciplinary violated due process. (Compl. at 15–17).

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

**\*8** In *Wolff v. McDonnell,* 418 U.S. 539, 563–64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer).

**A. Liberty Interest**
An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Second Circuit, however, has refused to set a bright line rule on when confinement becomes atypical. Instead, "in order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998) (citations omitted).

Here, Plaintiff was sentenced to 180 days of SHU confinement. (Disciplinary Hr'g at 49). He also lost

commissary, phone, and package privileges for 180 days. *Id.* The Second Circuit has found that SHU confinement for 180 days may impose an "atypical and significant hardship." *See Kalwasinski v. Morse,* 201 F.3d 103, 106–08 (2d Cir.1999) (per curiam). Defendants do not address this issue, and the court will assume that plaintiff had a protected liberty interest without further analysis because the court finds that plaintiff received due process in any event.

**B. Notice**
Generally a prisoner must be provided with advanced written notice of the charges against him at least twenty-four hours prior to the hearing. *Wolff v. McDonnell,* 418 U.S. at 564–66; *see also Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001); *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986).

In this case, Plaintiff argues that his due process rights were violated because he did not receive notice of the charges against him at least twenty-four hours before the hearing. (Compl. at 15; Pl.'s Dep. at 84–85). Plaintiff admitted at his disciplinary hearing that he was served with formal notice of the charges on February 20, 2008, at 9:20, but it is unclear from the hearing transcript and other documents in the record whether Plaintiff was served at 9:20 A .M. or 9:20 P.M. (Disciplinary Hr'g at 1). The disciplinary hearing commenced on February 21, 2008, at 11:30 A.M. *Id.* If Plaintiff were served at 9:20 P.M., then he would not have received exactly twenty-four hour notice. Even assuming that plaintiff's allegation about the time that the misbehavior report was served is true, his due process rights were not violated by what was ultimately a technicality that had absolutely no impact upon plaintiff's right to proper notice of the disciplinary charges.

**\*9** The purpose of the twenty-four hour rule is to provide inmates with sufficient time to prepare to defend charges filed against them. *See Wolff v. McDonnell,* 418 U.S. at 564; *Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993). A review of the hearing transcript shows that Plaintiff received sufficient notice to prepare for the hearing. Although the hearing began at 11:30 A.M. on February 20, 2008, Defendant Gerwer adjourned the hearing at 11:35 A.M., five minutes after the hearing started. (Disciplinary Hr'g at 3). Plaintiff did not have to defend himself against anything on February 20th. The hearing did not commence again until one week later, on February 27, 2008, at 1:29 P.M. *Id.* This six-day adjournment, which guaranteed that Plaintiff would have sufficient time to prepare for his defense, cured any deficiencies that may have occurred. The February 27th hearing was also

adjourned at 2:05 P.M. and began again on March 6 at 3:25 P.M. *Id* . at 22. The second adjournment was necessary because Defendant Gerwer wanted secure the witnesses that Plaintiff requested. *Id.* The March 6 hearing adjourned at 3:45 P.M. so that Defendant Gerwer could secure another witness that Plaintiff requested. *Id.* at 32. The hearing reconvened on March 10 at 12:45 P.M. when that witness became available to testify. *Id.* The hearing was adjourned on at least three different occasions, ensuring that Plaintiff had sufficient time to prepare to defend the charges against him. Plaintiff has not alleged, and cannot claim, any prejudice to him that resulted from the fact that the initial hearing may have started less than twenty-four hours after he was served with the misbehavior report, because there was no "hearing" on that day. Plaintiff had plenty of time to defend against the charges and to produce evidence and witnesses in his defense.

**C. Evidence and Witnesses**
An inmate has a right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell,* 418 U.S. at 566; *see also Ponte v. Real,* 471 U.S. 491, 496, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985) ("Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority ....") (citations omitted). Moreover, a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony or evidence. *See Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (citing *Wolff v. McDonnell,* 418 U.S. at 566). A hearing officer may refuse to call a witness "on the basis of relevance or lack of necessity." *Kingsley v. Bureau of Prisons,* 937 F.2d at 30; *see also Scott v. Kelly,* 962 F.2d 145, 145–47 (2d Cir.1992) ("It is well settled that an official may refuse to call a witness as long as the refusal is justifiable.").

**\*10** Plaintiff alleges that his due process rights were violated because Defendant Gerwer excluded a log book from evidence. (Pl.'s Dep. at 88–89; Disciplinary Hr'g at 29–30). C.O. Nieves's signature appears on a misbehavior report dated February 15, 2008. (Dkt. No. 39–12, Disciplinary Hr'g Papers at 4). Plaintiff requested the log book because he did not believe that C.O. Nieves was assigned to the site of the incident at the time it occurred. (Pl.'s Dep. at 88; Disciplinary Hr'g at 29). C.O. Nieves testified at the disciplinary hearing that she wrote the February 15 report because Plaintiff had disobeyed her orders. (Disciplinary Hr'g at 11–12). Plaintiff questioned C.O. Nieves at the disciplinary hearing. *Id.* at 12–18. C.O.

Donovan also testified that C.O. Nieves was present at the site of the incident. (Disciplinary Hr'g at 32.) Plaintiff also had an opportunity to question C.O. Donovan. *Id.* at 33–34.

Thus, Defendant Gerwer had a rational basis to conclude that excluding the log book was proper because its inclusion was unnecessary as C.O. Nieves's presence at the site of the incident was substantiated by C.O. Donovan. Plaintiff questioned both officers at the disciplinary hearing. Since C.O. Nieves was the officer claiming that plaintiff violated her orders, the log book, showing whether she was assigned to the location in question at the time of the incident, was totally irrelevant.

Defendant Gerwer also allegedly refused, without a legitimate reason, to let Plaintiff call Mr. Tatum to testify on Plaintiff's behalf. (Compl. at 15; Pl.'s Dep. at 90). Plaintiff wanted Mr. Tatum, a mental health counselor, to testify about Plaintiff's mental state after the alleged February 15th assault. (Pl.'s Dep. at 90; Disciplinary Hr'g at 25). Plaintiff admits, however, that Mr. Tatum was not present at the time of the incident that gave rise to the disciplinary hearing, and plaintiff's mental state when he was taken to SHU had nothing to do with the incident that gave rise to the disciplinary hearing. (Disciplinary Hr'g at 25). The alleged assault, even if it did occur, happened after the conduct giving rise to the misbehavior report occurred. As such, Defendant Gerwer had a proper basis to deny Mr. Tatum's testimony as his testimony would not be relevant to any issues or incidents that gave rise to the disciplinary hearing. *See, e.g., Kalwasinski v. Morse,* 201 F.3d 103, 108–109 (2d Cir.1999) (indicating that testimony on the record that no one else was present at incident gave rational basis for excluding plaintiff's witnesses as irrelevant and unnecessary). Moreover, at Plaintiff's request, Defendant Gerwer attempted to call another inmate who was present at the scene of the incident. *Id.* at 22. That inmate, however, refused to testify. *Id.* Finally, at Plaintiff's request, Defendant Gerwer called Officers Donovan and Germaine to testify. *Id.* at 32, 41, 43. Thus, Defendant Gerwer's refusal to call Mr. Tatum did not violate Plaintiff's due process rights because Mr. Tatum's testimony was irrelevant, and Defendant Gerwer called other witnesses that Plaintiff requested.

**\*11** Defendant Gerwer allegedly committed another due process violation when C.O. Germaine was permitted to testify even though he had failed to sign the misbehavior report as DOCS regulations require. (Pl.'s Dep. at 85–87). However, violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v.*

*County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation).[9] Plaintiff's claim that this error violated his due process rights is further undermined because Defendant Germaine testified at Plaintiff's request. (Disciplinary Hr'g at 43).

[9]     "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* No. 01 Civ. 8235, 2002 U.S. Dist. LEXIS 17089, 2002 WL 31040370, at \*13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978)).

**D. Impartiality**

Finally, Plaintiff alleges that he was deprived of due process because Defendant Gerwer was not fair or impartial. (Compl. at 15; Pl.'s Dep. at 82, 85–87). "An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

Plaintiff first accuses Defendant Gerwer of saying on the record that C.O. Nieves was a "good person." (Disciplinary Hr'g at 48). Later, Plaintiff claims that Defendant Gerwer made this statement off the record. (Disciplinary Hr'g at 52). A review of the disciplinary hearing transcript shows Defendant Gerwer never made such a statement on the record.[10] But even if Defendant Gerwer made such a statement, either on the record or off

the record, it is not evidence of bias. As the hearing officer, Defendant Gerwer could make credibility determinations. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 U.S. Dist. LEXIS 98116, at *39–40 n. 25, 2010 WL 3785771, at *11 n. 25 (N.D.N.Y. Aug.5, 2010) (Baxter, Mag. J .) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *report-recommendation adopted,* 2010 U.S. Dist. LEXIS 98084, at *1, 2010 WL 3762016, at *1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.). Moreover, a review of the record belies Plaintiff's accusation that Defendant Gerwer had pre-determined Plaintiff's guilt. The disciplinary hearing spanned several weeks to locate witnesses and schedule a time for them to testify. Plaintiff was permitted to call witnesses to testify on his behalf, and was permitted to cross-examine the witnesses against him. (Disciplinary Hr'g at 12, 32, 41, 43). The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir.2004) (citing *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). In this case, there was clearly sufficient evidence supporting the hearing officer's determination. Thus, the record establishes that Defendant Gerwer was not biased and did not prejudge the evidence. Accordingly, Defendant Gerwer's summary judgment motion with respect to plaintiff's due process claim should be granted.[11]

[10]     Plaintiff, however, kept accusing defendant Gerwer of stating that fact. (Disciplinary Hr'g at 48, 50). At one point, plaintiff stated that "I object to this Hearing Officer on the grounds as she said on the record that Ms. Nieves is a good person.... so therefore I'm feeling like she feels like I'm the bad person." *Id.* at 48. Defendant Gerwer then stated that she wanted to "clarify for the record" that she was "an unbiased Tier Hearing Officer." *Id.* This court cannot find any statement on the record, made by Defendant Gerwer, that Officer Nieves was a "good person." Later during the hearing, Defendant Gerwer interrupted plaintiff and stated that "I said that 'the testimony of Ms. Nieves was believable to this Tier Hearing Officer." *Id.*

[11]     In his response to the summary judgment motion, Plaintiff asserts that Defendant Gerwer and others were engaged in a conspiracy to deprive him of his constitutional rights. (Dkt. No. 43 at 12). A civil rights conspiracy must be proven with specificity, as bare claims of illegal agreement, supported only by allegations of conduct easily explained as individual action, is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143,

177 (2d Cir.2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations, such as those in this Plaintiff's response, are insufficient to support a civil rights conspiracy claim. *Ciambriello v. County of Nassau,* 292 F.3d 307, 325 (2d Cir.2002); *X–Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir.1999). In any event, as discussed herein, Plaintiff has not asserted any viable substantive constitutional claims that would support a conspiracy claim.

## VI. *Qualified Immunity*

*\*12* Defendants argue that they are entitled to qualified immunity with respect to all of Plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *modified, Person v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 811, 172 L.Ed.2d 565 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz,* 533 U.S. at 201. Accordingly, this Court need not address qualified immunity with respect to Plaintiff's claims because, as discussed above, he has not established those alleged violations of constitutional rights.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED** and the complaint be **DISMISSED IN ITS ENTIRETY .**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d

Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 7629513

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3785771
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marc LEWIS, Plaintiff,
v.
J. JOHNSON, et al., Defendants.

No. 9:08–CV–482 (TJM/ATB).
|
Aug. 5, 2010.

**Attorneys and Law Firms**

Marc Lewis, pro se.

Christina L. Roberts–Ryba, Asst. Attorney General, for
Defendants.

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter was referred by Senior U.S. District Judge
Thomas J. McAvoy, for Report and Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y.
72.3(c). The case was transferred to me on January 4,
2010, following the retirement of U.S. Magistrate Judge
Gustave J. Di Bianco. (Dkt. No. 125).

While an inmate in the custody of the Department of
Correctional Services ("DOCS"), plaintiff filed his
complaint, pursuant to 42 U .S.C. § 1983, regarding
incidents that occurred during his incarceration at
Franklin Correctional Facility ("Franklin") and Upstate
Correctional Facility ("Upstate"). Liberally construed,
plaintiff's amended complaint[1] (Dkt. No. 40) makes
several claims against 14 defendants[2] relating to events in
2006 and 2007. He alleges that, in retaliation for his filing
of a letter complaining of an assault of another inmate by
correction officers at Franklin on or about June 15, 2006,
defendant Johnson filed a false misbehavior report against
plaintiff, and defendant Gardner made inflammatory
statements regarding plaintiff to other staff, prompting
further acts of retaliation.[3] Plaintiff claims that defendants
Secore and Favro violated his Eighth Amendment rights
by assaulting him on June 19, 2006, and that defendant
Norcross failed to intervene. He also alleges that he was a

victim of another unconstitutional assault on June 24,
2006, by defendant Reardon and other unnamed officers.
Plaintiff claims that, over the following days and weeks,
nurses Davenport, Volpe, Walsh, and Chesbrough, and
physician assistant ("PA") Tichenor all denied him
constitutionally-adequate medical care, by failing to
properly treat him for the various injuries he suffered as a
result of the two "assaults." He states that defendant
Demars violated his due process rights, while presiding at
the disciplinary hearing on the charges brought by
defendant Johnson, which resulted in plaintiff's
confinement in a Special Housing Unit ("SHU") until the
charges were reversed by DOCS in June 2007. Finally,
plaintiff suggests that defendants McCasland and
Hoffnage violated plaintiff's First Amendment rights by
improperly handling his legal mail in January 2007.
Plaintiff seeks substantial monetary damages from the
defendants.

1    Plaintiff was granted leave to file an amended
complaint on January 26, 2009. (Dkt. No. 39).

2    It is well-settled that the state itself cannot be sued
under section 1983. *Komlosi v. New York State
OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v.
Michigan Department of Police,* 491 U.S. 58, 71
(1989)). An action against state officers in their official
capacities is tantamount to an action against the state.
*Yorktown Medical Laboratory, Inc. v. Perales,* 948
F.2d 84, 87 & n. 1 (2d Cir.1991). To the extent that the
defendants are being sued in their official capacity for
money damages, that cause of action should be
dismissed under the Eleventh Amendment. *Huang v.
Johnson,* 251 F.3d 65, 69–70 (2d Cir.2001); *Posr v.
Court Officer Shield # 207,* 180 F.3d 409, 414 (2d
Cir.1999).

3    Plaintiff characterizes the subsequent actions of
defendants Secore, Favro, Norcross, Reardon, Demars,
McCasland, and Hoffnagle as retaliation, although he
states or implies that their actions constituted separate
constitutional violations, as well.

Presently pending is defendants' motion for summary
judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 110).
Plaintiff has responded in opposition to the motion.
(Dkt.Nos.123, 124). Defendants filed a reply (Dkt. No.
128), and plaintiff submitted a sur-reply (Dkt.Nos.129,
130). For the following reasons, this court recommends
that defendants' motion be granted in part and denied in

part. I particular, this court recommends that summary judgment be denied with respect to the Eighth Amendment excessive force or failure-to-intervene claims against defendants Secore, Favro, Norcross, and Reardon. Dismissal is recommended with respect to the plaintiff's other causes of action.

## DISCUSSION

### I. *Facts*
**\*2** Plaintiff authored and signed a letter dated June 15, 2006, complaining to the Superintendent of Franklin and other DOCS officials about the alleged assault of another inmate by at least four correction officers that evening. (Pl.'s Decl., Ex. A, Dkt. No. 124–3). Plaintiff spoke to the Superintendent in the mess hall about the letter on Saturday, June 17th, and the Superintendent said he would look for the letter and get back to the plaintiff. (Pl.'s Deposition ("Dep.") at 18–19, Dkt. No. 110–3). The letter was stamped as received in the administrative office at Franklin, on June 20, 2006 at 12:42 p.m. (Pl.'s Decl., Ex. A).

### A. The Misbehavior Report Filed by Defendant Johnson
On June 19, 2006, the administration at Franklin received a number of anonymous notes from inmates indicating that violence toward the facility staff was imminent because of prior staff actions involving inmates. Defendant Johnson, who was assigned to investigate these letters, was advised that the plaintiff had approached the Superintendent with "similar concerns" on June 17th. Lt. Johnson obtained samples of plaintiff's handwriting from his guidance folder and compared them to the anonymous, threatening notes. (Johnson Decl. ¶ 5, Dkt. No. 110–8).[4] He concluded that plaintiff's known handwriting was similar to the writing on four of the anonymous letters, including one of the most threatening ones. (*Id.* ¶¶ 5, 6). Based on that and other investigation conducted by several officers, Lt. Johnson filed a misbehavior report on June 19th, accusing plaintiff of authoring some of the threatening letters. (*Id.* ¶ 6 & Ex. A, Dkt. No. 110–8 at 6). He directed that plaintiff be confined in the SHU pending the disciplinary hearing (*Id.,* Ex. A), which is permitted by DOCS directives governing inmate discipline (DOCS Directive 4932, Parts 251–1.6 & 251–1.7, *Id.,* Ex. C, Dkt. No. 110–8 at 21–22).

[4] Lt. Johnson had prior, on-the-job experience comparing handwriting, but no formal forensic training. (*Id.* ¶ 9; Disc. Hearing Transcript at 21, 23, Dkt. No. 110–8). Citations to the disciplinary hearing transcript will reference the consecutive page numbers on the bottom righthand corner of the pages, not the page numbers in the CM–ECF header.

A disciplinary hearing regarding these charges, for which defendant Demars served as the hearing officer, was conducted over several days. Plaintiff and several other witnesses, including Lt. Johnson and the Franklin Superintendent, testified. (Disc. Hearing Transcript at 1–67). Plaintiff was found guilty of the charges and was sentenced, on July 5, 2006, to serve nine months in SHU with corresponding loss of privileges. (Disc. Hearing Transcript at 66; Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 4). After various levels of appeal and review, the guilty disposition was administratively reversed by DOCS on June 19, 2007 because the hearing officer (defendant Demars) did not conduct an independent review of the handwriting comparisons about which Lt. Johnson testified. (Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 6, 13).[5] On or about July 2, 2007, plaintiff was ordered released from the SHU at Upstate. (*Id.,* Dkt. No. 124–4 at 14).

[5] During June 2006, plaintiff received several other misbehavior reports for which he was found guilty and sentenced to additional time in the SHU. Although plaintiff seems to contend that one of these other hearings was reversed, the documentation submitted seems to indicate that only the disciplinary conviction of July 5, 2005 was reversed. (*Id.,* Dkt. No. 124–4 at 4–6, 11–14).

### B. The First "Assault" on June 19, 2005
Plaintiff alleges that defendant Gardner, then a sergeant at Franklin, was involved in plaintiff's transfer to the SHU on June 19, 2005, following the filing of the disciplinary charges relating to the threat letters. (Amended Complaint ("AC"), Statement of Facts, ¶¶ 3–4, Dkt. No. 40 at 9–10;[6] Gardner Decl. ¶¶ 2–7, Dkt. No. 110–10). Plaintiff alleges that, during the transfer, Sgt. Gardner told defendants Secore and Favro that the plaintiff "needed to be taught the policies and procedures of the Franklin Correctional Facility because the plaintiff liked to make threats at correctional staff and write them up."[7] (AC ¶ 4).

[6] Subsequent references to the Amended Complaint will refer only to the paragraph number in the "Statement of

Facts," unless the reference is to another section of the pleading.

[7]   Defendant Gardner did not recall the plaintiff, but states that he would not have made such a statement to an inmate. (Gardner Decl. ¶¶ 5–6).

**\*3** Plaintiff claims that defendants Secore and Favro then escorted him into the main foyer of the SHU where they struck him on the back of the head and on the jaw. (AC ¶¶ 6–8). Plaintiff alleges these two plaintiffs then dragged him into the "strip frisk room" where these two correction officers tripped plaintiff and then repeatedly punched and kicked him while he was handcuffed on the floor. (AC ¶¶ 9–10). Plaintiff claims further that defendant Norcross was in the strip frisk room while this assault was going on, and failed to intervene. (AC ¶ 11). While there are some minor discrepancies in their accounts, defendants Secore, Favro, and Norcross all state that, during the strip frisk procedure at the SHU, plaintiff raised a fist and then struggled when the officers moved to restrain him. The officers assert that they used the minimum force necessary to bring plaintiff under control, and that he was not "assaulted." (Secore Decl., Dkt. No. 110–11; Favro Decl., Dkt. No. 110–12; Norcross Decl., Dkt. No. 110–18).[8]

[8]   The correction officer's account of the incident was documented in a use-of-force report and a subsequent disciplinary hearing, which resulted in a finding that the officers used reasonable and necessary force, and that the plaintiff engaged in violent conduct and other infractions. (Id.).

Plaintiff claims that, as a result of the assault, he suffered injuries to his rib cage and a dislocated jaw. He alleges that, in the hours and days following the incident, Nurse Davenport and Nurse Volpe refused to examine him and treat his injuries. (AC ¶¶ 13–17). Both nurses state that they spoke with and examined plaintiff between June 19 and 22, and found no evidence that he was injured. (Davenport Decl., Dkt. No. 110–19; Volpe Decl., Dkt. No. 110–14). The nurses completed an Inmate Injury Report and/or medical records, which documented their examinations of plaintiff. (Id.; Secore Decl., Ex. B, Dkt. No. 110–11 at 8, 15, 18–19, 22–25; Medical Records[9] at 34–36). Plaintiff claims that these records were fabricated and false. (AC ¶ 15; Pl.'s Decl., Dkt. No. 124–2 at 4–6).

[9]   The defendants submitted the plaintiff's medical

records *in camera* and they are stamped with sequential page numbers.

### C. The Second "Assault" on June 24, 2005

Plaintiff alleges that, on June 24, 2005, defendant Reardon assaulted him in his cell in the presence of other unnamed correction officers. Plaintiff alleges that defendant Reardon "took the plaintiffs [sic] left arm and pulled all the way back into a 90 ° degree angle while having him in a body lock ..." (AC ¶ 20). Plaintiff claims that, as a result of this assault, he suffered a torn tendon to his left armpit. (AC ¶ 23).

Officer Reardon acknowledged having contact with plaintiff in the Franklin SHU on June 20 and 24, 2006; he issued inmate misbehavior reports against the plaintiff on both dates. (Reardon Decl. ¶¶ 3–4, 10–12, Dkt. No. 110–13). Defendant Reardon denies assaulting plaintiff and notes that, on June 29th, at the disciplinary hearing regarding the June 20th misbehavior report, plaintiff said nothing about the alleged assault five days earlier. (Id. ¶¶ 5–8, 14). Plaintiff did, however, complain of the alleged assault in a grievance dated June 25th. (Pl.'s Decl., Ex. C, Dkt. No. 124–5 at 39–41). As a result of the grievance, plaintiff was eventually transferred to the SHU at Upstate. (Id.).

### D. Further Issues Regarding Medical Treatment

**\*4** Plaintiff claims that, upon his admission to Upstate on July 12, 2006, Nurse Walsh refused to examine plaintiff for injuries relating to the two prior assaults, advising him to request sick call. He alleges further that Nurse Chesbrough refused to provide him with treatment the next day because this defendant thought the plaintiff was lying about not being treated earlier at Franklin. (AC ¶¶ 23–24). After reviewing the relevant medical records, defendants Walsh and Chesbrough both concluded that Nurse Chesbrough examined plaintiff both on July 12th and 13th, and concluded that he had no apparent medical problems. (Walsh Decl. ¶¶ 6–7, Dkt. No. 110–15; Chesbrough Decl. ¶¶ 6–9, Dkt. No. 110–16).

Plaintiff also complains that PA Tichenor examined him several months after the alleged assaults, mis-diagnosed his left arm injury, and refused to examine his rib cage and jaw despite claims of continuing pain in those areas. (AC ¶ 25). Based on her review of plaintiff's medical records, defendant Tichenor stated that she examined and treated plaintiff conservatively for various medical

conditions, including back and shoulder pain, on September 6, 2006 and several times thereafter. (Tichenor Decl., ¶¶ 6–11, Dkt. No. 110–17).

### E. Issues Regarding Legal Mail
Plaintiff alleges that, on January 22 and 23, 2007, defendants McCasland and Hoffnagle attempted to deliver two pieces of legal mail that had been opened outside of plaintiff's presence, contrary to DOCS procedures. Plaintiff refused to accept the opened mail on two occasions, and claims that defendant Hoffnagle then lost or destroyed the two parcels, which should have been returned to the sender. (Dep. 66–71, AC ¶¶ 31–33). Plaintiff does not document that he was prejudiced in any particular legal proceedings as a result of the alleged mishandling of his mail.

Defendant McCasland stated that he opened the two parcels of legal mail in plaintiff's presence on January 22nd, but that plaintiff refused the mail because he was upset that another parcel was returned to plaintiff for insufficient postage. (McCasland Decl. ¶¶ 6–9, Dkt. No. 110–20). Defendant Hoffnagle states that, when plaintiff refused the two open parcels the next day, he returned them to the mail room. (Hoffnagle Decl., ¶¶ 4–10, Dkt. No. 110–21). Based on a grievance filed by plaintiff, DOCS found no evidence that the defendants mishandled plaintiff's legal mail, although one report found that the mail officers did not properly document their handling of the parcels. (McCasland Decl., Ex. B, Dkt. No. 110–20 at 44).

## II. *Summary Judgment—Legal Standards*
Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

**\*5** The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S.

317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. "[I]n a pro se case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers ." *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (citing, *inter alia, Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir .1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest")). "However, a pro se party's "bald assertion," completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)). While a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous review of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

## III. *Excessive Force/Failure to Intervene*

### A. Legal Standards

### 1. Eighth Amendment–Excessive Force
Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the

defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se [,]" regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

**\*6** The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

**2. Failure to Intervene**

A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate. *See, e.g., Cicio v. Graham,* No. 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at \*13 (N.D.N.Y. March 15, 2010); *Tafari v. McCarthy,* No. 9:07–CV654 (DNH/GHL), 2010 WL 2044705, at\*8 (N.D.N.Y. May 24, 2010) .[10] A law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated by other officers in his or her presence. *Id.*[11] In order to establish liability under this theory, a plaintiff must prove that the defendant in question (1) possessed actual knowledge of the use by another correction officer of excessive force; (2) had a realistic opportunity to intervene and prevent the harm from occurring; and (3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Id.;*

*Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted).

[10]   *See also Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (reversing grant of summary judgment for defendant based on evidence that defendant was in the vicinity of an assault on plaintiff and failed to intervene); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

[11]   *See also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

**B. Application**

Plaintiff has adequately alleged that the named correction officers either participated in, or were present for and failed to intervene in, the application of excessive force. While plaintiff's excessive force claims have weak evidentiary support, he has established that there are genuine issues of material fact that should be resolved by a jury.

**1. The "Assault" on June 19, 2010**

Defendants Secore and Favro admittedly used force to subdue plaintiff on June 19, 2010. In his amended complaint (Dkt. No. 40), deposition (Dep. at 31–38, and pleadings in opposition to the summary judgment motion, plaintiff consistently alleged details of an assault which, if believed, would amount to a "malicious use of force to cause harm" that constitutes a *per se* Eighth Amendment violation regardless of the seriousness of his injuries. *Blyden,* 186 F.3d at 263. Plaintiff claims he was struck in the head or face by each defendant, dragged to another room, tripped, and repeatedly punched and kicked while he was lying handcuffed on the floor. Although plaintiff admits that he kicked at the correction officers to try to defend himself from their blows once he was on the floor (Dep. at 33–34), this did not justify the alleged prior application of excessive force. As described by plaintiff, the incident involved more than a *de minimis* use of force and a malicious and wanton attempt to cause harm. *Sims,* 230 F.3d at 22; *Hudson,* 503 U.S. at 7.

**\*7** The correction officers and Sgt. Norcross all vehemently deny that more than the minimum amount of

force required to restrain the plaintiff was used, and the medical evidence does not corroborate plaintiff's claims of significant injuries to his rib cage and jaw.[12] However, given that issues of credibility should not be resolved on a summary judgment motion, this court cannot conclude that no rational juror could find that defendants Secore and Favro violated plaintiff's Eighth Amendment rights on June 19, 2006. *See, e.g., Griffin v. Crippen,* 193 F.3d 89, 90–92 (2d Cir.1999) (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Sims v. Artuz,* 103 Fed. Appx. 434, 437 (2d Cir.2004) (plaintiff's allegations that he was kicked and punched while being removed from his cell after causing a disruption, corroborated in part by documented minor injuries,[13] were sufficient to withstand a summary judgement motion); *Dallio v. Sanatamore,* 9:06–CV–1154 (GTS/DRH), 2010 WL 125774, at *9 (N.D.N.Y. Jan. 7, 2010) (because the court should not weigh the evidence or make credibility determinations, summary judgment would be denied where plaintiff alleged that he was repeatedly kicked and punched after he was subdued and restrained by correction officers, notwithstanding the relatively minor injuries the plaintiff suffered and the substantial contrary evidence proffered by the defendants); *Cicio v. Lamora,* 9:08–CV–431 (GLS/DEP), 2010 WL 1063875, at *7–8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on plaintiff's claim that defendant correction officer hit inmate several times after he was subdued and helpless, despite "seemingly overwhelming" contradictory evidence, including the fact that plaintiff suffered only a minor bruise).

[12] As discussed below, medical records indicate that plaintiff complained of, and in some cases received treatment for, pain in his back and shoulder in the months following June 2006. Plaintiff may have difficulty establishing that his subsequent medical problems were caused by the alleged incident of excessive force. While that may well be the case, and plaintiff may have few, if any compensable injuries, that does not support dismissal on summary judgment. *See, e.g., Reyes v. McGinnis,* 00–CV–6352, 2003 WL 23101781, at *6 (W.D.N.Y. Apr. 10, 2003) (whether an injury to inmates wrist was caused by trauma resulting from defendant's use of handcuffs was a factual issue for the jury); *Gibeau v. Nellis,* 18 F.3d 107, 110 (2d Cir.1994) (while plaintiff may not have proved compensable injuries caused by the use of excessive force, he still could be entitled to a judgment under

Section 1983 and an award of nominal damages at trial).

[13] The Second Circuit reversed the grant of summary judgment, which was based, in part, on the district judge's conclusion that the plaintiff "would have suffered 'far greater injury than actually occurred' if his account [of the incident] were accurate." *Id.*

Plaintiff alleges that he saw that Sgt. Norcross was present while he was being kicked and punched on the floor of the strip frisk room and told plaintiff to "calm down." (Dep. at 36–38). Defendant Norcross admits he was in the room with plaintiff and defendants Secore and Favro, although he denies that any excessive force was applied. (Norcross Decl. ¶¶ 4–9, Dkt. No. 110–18). Given plaintiff's allegations about the nature and duration of the beating he received while in Sgt. Norcross's presence, it would have been clear to this defendant that excessive force was being applied, and he would have had an opportunity to intervene to stop the assault by his subordinates. While there are obviously issues of credibility that may ultimately be resolved against the plaintiff, he has established that there are issues of fact regarding defendant Norcross's culpability that should be addressed at trial.

**\*8** To the extent that plaintiff is alleging that defendants Gardner and Davenport were personally involved in the application of excessive force by defendants Secore and Favro, this court recommends dismissal of those claims.[14] Neither defendant was present during the alleged assault and thus did not have a realistic opportunity to intervene. There is no allegation that Nurse Davenport had any reason to anticipate the alleged assault, or any knowledge of the incident until it was over. In any event, she lacked the authority to intervene while correction employees were using force on an inmate, even if she were present.[15]

[14] *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

[15] *See e.g., Rendely v. Town of Huntington,* No. 2:03–CV–3805, 2006 WL 5217083, at *6 (E.D.N.Y. Aug. 30, 2006) (because defendants were civilian government employees, they had no authority or duty to prevent the police officers from taking plaintiff into custody);

*Phoenix v. Reddish,* 175 F.Supp.2d 215, 220 (D.Conn.2001) (there is no Supreme Court or Second Circuit authority that imposes an affirmative duty on a non-police state actor to intervene to prevent a police officer from conducting an unlawful search and seizure).

Even if then Sgt. Gardner made the comment to defendants Secore and Favro that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," that alone would not suggest the state of mind required to establish his responsibility, under the Eighth Amendment, for a subsequent assault by the other correction officers. *Cf. Bouknight v. Shaw,* 08 Civ. 5187, 2009 WL 969932, at *5 (S.D.N.Y. Apr. 6, 2009) (to establish officer's liability, under Section 1983, for the assault of plaintiff by other inmates, plaintiff needed to allege more than the fact that the officer spread rumors that plaintiff was a "snitch" and a homosexual; plaintiff needed to allege facts establishing that the officer intended to incite an assault or knowingly disregarded that he had created an environment that generated a significant risk of harm).[16] A comment that plaintiff needed to be taught the rules of the prison, as he was being transported to the SHU because of a disciplinary charge, is subject to a completely benign interpretation. Plaintiff's bare allegation that defendant Gardner made that statement does not establish a viable cause of action that Gardner induced the other defendants to commit assault.

[16]    It should be noted that verbal abuse, whether threatening, vulgar, or racial in nature, does not, by itself, rise to the level of a constitutional violation. See, e.g., *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996).

## 2. The "Assault" on June 24, 2006

Plaintiff alleges that, during a cell search on June 24, 2006, defendant Reardon pulled plaintiff's arm back at almost a 90 degree angle while holding him up against a wall. Plaintiff asserts that defendant Reardon was talking "tough stuff" during the incident and was either trying to break plaintiff's arm or cause him pain. (Dep. at 64.) Plaintiff claims that he suffered a tear to the tendon under his left arm, which caused lasting limitations in function. (Pl.'s Memo. of Law at 24–25, Dkt. No. 124–1; Dep. at 80.) Some months later, PA Tichenor diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left

pectoralis major tendon. (Tichenor Decl. ¶ 10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008, he detected a slight defect in plaintiff's "left bicep [?] tendon" that was, by that time, "functionally insignificant." (Medical Records at 11; Dep. at 80).

Officer Reardon admittedly interacted with plaintiff on June 24th, when he issued a misbehavior report to him, but denies that he applied any physical force. (Reardon Decl. ¶¶ 10–14). Defense counsel argues that plaintiff failed to mention the alleged assault on June 24th during a subsequent disciplinary hearing on a prior charge defendant Reardon filed on June 20th, indicating that the incident never happened. However, as noted, plaintiff filed a grievance on June 25th describing the assault. His allegations, although largely unsupported, are sufficient to create an issue of fact regarding what force, if any, defendant Reardon applied during the incident on June 24th.

*9 Defendants also argue that any use of force on plaintiff on June 24th was *de minimis* and not sufficient to support an Eighth Amendment claim. The alleged use of force described by plaintiff exceeded what was reasonable and necessary under the circumstances—a cell inspection with no suggestion that plaintiff physically resisted or posed any threat to the safety of the officers.[17] While the alleged use of force on plaintiff's left arm was brief, plaintiff has alleged that it was intense and caused a significant and lasting injury, for which he has provided some, albeit marginal, supporting medical documentation.[18]

[17]    Defense counsel construes a comment during plaintiff's deposition as an admission that he "came off the wall" during the cell search. (Def. Memo. of Law at 19–20, Dkt. No. 110–6). This court interprets plaintiff's testimony (Dep. at 62–63) as speculation that multiple guards were present during the cell search in case he came off the wall or otherwise resisted. Defendant Reardon's declaration about his interaction with plaintiff on June 24th, and the misbehavior report issued against plaintiff, do not suggest that plaintiff did anything to necessitate the use of force. (Reardon Decl. ¶¶ 10–14 & Ex. D, Dkt. No. 110–13 at 32).

[18]    Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm allegedly caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in his cell door. (Medical Records at 24). So the extent to which the left arm injuries detected by the doctor in 2008 were caused by the alleged assaults in June 2006 is unclear.

Plaintiff's allegations regarding defendant Reardon's state of mind are fairly conclusory; however, he does claim that the defendant was talking "tough" under circumstances which could provoke a malicious use of force.[19] While plaintiff's claim of excessive force against defendant Reardon is very thin, this court finds that there are genuine and material issues of fact that require credibility assessments, which should not be made in the context of a summary judgment motion. *See, e.g., Mitchell v. Keane,* 974 F.Supp. 332, 340–41 (S.D.N.Y.1997) (allegation that officers twisted baton in the chain of the inmate's shackles, causing considerable pain, when inmate was not resisting and had been subdued, were sufficient to meet objective and subjective elements of Hudson test, so as to preclude dismissal); *Rivera v. Goord,* 119 F.Supp.2d 327, 342 (S.D.N.Y.2000) (finding plaintiff's allegations that defendants "pinned him against a wall, face-first, twisted his arms behind his back, and banged his face against the wall" sufficient to state a claim for excessive force); *Reyes v. McGinnis,* 00–CV–6352, 2003 WL 23101781, at *1, 6 (W.D.N .Y. Apr. 10, 2003) (denying summary judgment motion on excessive force claim against correction officer who, *inter alia,* allegedly applied handcuffs too tightly, and lifted plaintiff from the floor by his handcuffs, causing nerve damage in his wrists and a possible ganglion cyst). *Cf. Robison v. Via,* 821 F.2d 913, 924–25 (2d Cir.1987) (sustaining excessive force claim where the arresting officer twisted the plaintiff's arm, "yanked" her, and threw her up against a car, causing only bruising).

[19]     During his deposition, plaintiff acknowledged that he was being uncooperative with the guards following his confinement in the SHU—*e.g.,* by refusing meals brought by the officers and acting like a "knucklehead." (Dep. at 63, 65).

## IV. *Due Process*

Plaintiff claims that defendant Demars violated his due process rights in presiding over the disciplinary hearing on the charges initiated by defendant Johnson. For the reasons set forth below, this court finds that the due process claim is not viable and that, in any event, defendant Demars would be protected by qualified immunity for his conduct as a hearing officer.

### A. Applicable Law

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003). Defendants apparently concede that the disposition of the most serious disciplinary charge against plaintiff, which resulted in a sentence of nine months in the SHU, implicated a liberty interest, the deprivation of which required due process safeguards.[20]

[20]     In *Sandin v. Conner,* 515 U.S. 472, 484 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." The Second Circuit has explicitly avoided a bright line rule that a certain period of SHU confinement automatically give rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under Sandin." *Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Although shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest, SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions. *Palmer v. Richards,* 364 F.3d at 65. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in SHU was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual SHU conditions. *Id.* at 65–66 (collecting cases).

*10 In *Wolff v. McDonnell,* 418 U.S. 539, 563–64 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written

statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation).[21]

[21]   "While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation." *Samuels v. Selsky,* 01CIV.8235, 2002 WL 31040370, at *13 n. 21 (S.D.N.Y. Sept. 12, 2002) (citing *Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

An inmate's right to assistance with his disciplinary hearing is limited. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993). An assistant has been held to be constitutionally necessary in cases in which a plaintiff is confined in SHU, illiterate, or unable to grasp the complexity of the issues, and, therefore, unable to marshal evidence and present a defense. *Id.* (citation omitted). In those cases, the assistant must do what the plaintiff would have done if he were able, but need not go beyond the inmate's instructions. *Id.*

## B. Application

In his amended complaint and Memorandum of Law, plaintiff sets forth several ways in which he alleges that defendant Demars, the hearing officer determining whether plaintiff wrote several anonymous threatening letters, denied him due process in conducting the hearing.[22] Plaintiff alleges first that there was no evidence to support the allegations on which defendant Demars found him guilty. (AC ¶ 19). Plaintiff argues further that the hearing officer failed to make an independent assessment of the handwriting comparison evidence, which was the basis on which his guilty disposition was eventually overturned by DOCS. (Pl.'s Memo. of Law at 32; Pl.'s Decl., Ex. B, Dkt. No. 124–4 at 13). Finally plaintiff claims that his right to assistance in handling his disciplinary hearing was violated in several ways, in part because the hearing officer, not another DOCS employee or inmate, provided the assistance. (Pl.'s Memo. of Law at 30).[23]

[22]   Plaintiff claims that he was illegally confined in the SHU from June 19, 2006, when Lt. Johnson's disciplinary charge was filed, until the disciplinary hearing was completed on July 5th. (Pl.'s Memo. of Law at 31, 33). This period of administrative detention in the SHU does not trigger due process protection because it was of such a short duration. *See, e.g., Brown v. Secore,* 9:08–CV–085, 2010 WL 980233, at *5 (N.D.N.Y. March 15, 2010) (The district courts in the Second Circuit, applying *Sandin,* have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days or less, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.) (collecting cases).

[23]   Plaintiff claims that defendant Demars violated New York state regulations when he started the hearing on the same day that plaintiff indicated that he wanted assistance in handling the proceeding, without giving plaintiff additional time to prepare. (Pl.'s Memo of Law at 32; DOCS Directive 4932, Part 254.6(a)(1), Dkt. No. 110–8 at 28). However, after defendant Demars ascertained what assistance plaintiff needed on the first day of the hearing (June 22, 2006), he adjourned the hearing for several days (until June 30th) while he made arrangements to procure the documents and witnesses plaintiff requested. (Disc. Hearing Transcript at 6–9). Even if there was a technical violation of the DOCS directive, plaintiff waived any objection on June 22nd (*Id.* at 6–7), and clearly suffered no due process violation because he was given ample time to prepare for the continuation of the hearing.

## 1. "Some" Evidence

In finding plaintiff guilty of two charges relating to the anonymous, threatening letters, defendant Demars stated that he relied primarily upon the inmate misbehavior report and Lt. Johnson's testimony regarding the similarities that he observed in the handwriting of several of the threat letters and known samples of plaintiff's writing. (Disc. Hearing Transcript at 66).[24] The anonymous letters, which were exhibits at the hearing, threatened physical retaliation against the corrections staff if there was another beating of an inmate, following an alleged assault of an inmate by officers in G-dorm at Franklin. (Johnson Decl., Ex. B, Dkt. No. 110–8 at 8–14).

Defendant Johnson's misbehavior report noted that plaintiff had expressed "similar concerns" to the Superintendent two days before the threat letters were received. (Johnson Decl., Ex. B, Dkt. No. 110–8 at 6). During his testimony at the disciplinary hearing, Lt. Johnson set forth his prior experience in handwriting comparison and explained, in some detail, the similarities he observed between the threat letters and the samples of plaintiff's writing from his guidance folder, which were also exhibits. (Disc. Hearing Transcript at 21–22).

[24]    Lt. Johnson also noted that he considered the testimony of plaintiff and the other hearing witnesses in reaching his conclusions. (*Id.*) Capt. Phelix, when called and questioned by plaintiff, corroborated Lt. Johnson's opinion that there were numerous similarities between plaintiff's handwriting and the writing on some of the threat letters. (Disc. Hearing Transcript at 32–33).

**\*11** While meager, the proof relied upon by defendant Demars constituted "some evidence" sufficient to satisfy the requirements of due process applicable to prison disciplinary hearings. *See, e .g., Monier v. Holt,* 4:CV–05–2062, 2005 WL 3531369, at \*2 (M.D.Pa. Dec. 21, 2005), *aff'd,* 259 Fed. Appx. 518 (3d Cir.2007) (testimony of officer that the threatening note was comparable to a sample of petitioner's handwriting constituted "some evidence" sufficient for due process); *Brown v. Dotson,* 1:07CV114–03, 2007 WL 1033359, at \*3 (W.D.N.C. Apr. 2, 2007), *aff'd,* 242 Fed. Appx. 19 (4th Cir.2007), *cert. denied,* ─── U.S. ───, 128 S.Ct. 2960 (2008) (testimony regarding handwriting comparison by investigating officer constituted "some evidence" for due process purposes even though a copy of the inappropriate letter he was accused of writing was not made available to him); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 341 n. 3 (W.D.N.Y.2008) (fact that a harassing letter appeared to be in plaintiff's handwriting, and that he had handed a copy to a correction officer, constituted "some evidence" supporting the disciplinary charge); *Bennett v. Jackson,* 2:06CV019, 2006 WL 618124, at \*2 (E.D.Ark. Mar. 9, 2006) (testimony by officer that handwriting on the threatening letter was comparable to a sample of plaintiff's writing satisfied due process standards). While DOCS ultimately determined, as a matter of equity or state law, that the hearing examiner should have made an independent handwriting comparison, his apparent failure to do so did not violate the federal due process rights of the plaintiff. *See, e.g ., Monier v. Holt,* 2005 WL 3531369, at \*2 (hearing officer did not violate due process by accepting the officer's testimony regarding his handwriting comparison); *Bennett v. Jackson,* 2006 WL 618124, at \*2 (hearing officer who

accepted officer's testimony regarding handwriting comparison without requiring expert analysis satisfied due process standards); *Brown v. Dotson,* 2007 WL 1033359, at \*3 (testimony regarding handwriting comparison by investigating officer was not corroborated because the inappropriate letter plaintiff was accused of writing, which was tainted with bodily fluids, was destroyed).[25]

[25]    In limited circumstances, the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing. *See, e.g., Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001) (a finding based on information from a confidential informant will satisfy due process requirements only when there has been some examination of the factors relevant to the informant's credibility); *Luna v. Pico,* 356 F.3d 481, 489–90 (2d Cir.2004) (a bare accusation from a non-testifying victim is insufficient to support a disciplinary finding unless the examiner has engaged in some examination of the factors bearing on the victim's credibility). However, the Second Circuit cases have not engrafted, on the "some evidence" standard of *Superintendent v. Hill,* a general requirement that officers at prison disciplinary hearings independently assess the reliability of other sources of evidence. *See Luna v. Pico,* 356 F.3d at 491 (noting that the holding of *Taylor v. Rodriguez* regarding confidential informants provides some guidance, but is not controlling, with respect to other sources of evidence). This court concludes that *Taylor* and *Luna* do not impose a due process requirement that a hearing officer perform independent analysis of lay handwriting comparisons of a witness who testifies at a prison disciplinary hearing and is subject to cross-examination. If Second Circuit or Supreme Court authority is subsequently construed to require such independent analysis in the context of this case, defendant Demars would be entitled to qualified immunity because it would not have been clear to him, in 2006, that his conduct of the hearing violated plaintiff's due process rights.

### 2. Adequacy of Assistance at the Hearing

Because he was transferred to the SHU after disciplinary charges relating to the threatening notes were filed against him, plaintiff was clearly entitled to assistance in preparing for his hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988). On the first day of the hearing, defendant Demars noted that plaintiff had not signed the form served on him with the formal charges by which he could request assistance in connection with the hearing. (Disc. Hearing Transcript at 1).[26] Dep. Sup. Demars offered

assistance to plaintiff in securing witnesses and documents for the hearing, and plaintiff accepted. Plaintiff explained what help he needed and, before the hearing was adjourned for several days, stated that he was satisfied with the assistance that the hearing officer provided. (Disc. Hearing Transcript at 1–7).

26    Plaintiff completed the form requesting independent assistance in connection with another disciplinary hearing that was proceeding in June 2006, so he clearly was aware of his right to assistance and the related DOCS procedures. (Secore Decl., Ex. C, Dkt. No. 110–11 at 28). Plaintiff formally waived his right to any assistance in connection with another hearing that month. (Reardon Decl., Ex. B, Dkt. No. 110–13 at 10).

**\*12** Ultimately, defendant Demars arranged for the testimony of all of the witnesses that plaintiff deemed critical, including the Superintendent of Franklin, although Dep. Sup. Demars was dubious about why plaintiff needed the Superintendent. (Disc. Hearing Transcript at 10–19, 25–29, 39, 41–42, 44–45, 53, 61). The hearing officer procured copies of most of the documents that plaintiff requested, although the facility was unable to locate one "pass" which plaintiff requested. Defendant Demars turned down plaintiff's request for DNA testing of the anonymous, threatening letters that prompted the charges. (Disc. Hearing Transcript at 9–10, 29). While plaintiff raised numerous "objections" at the end of the hearing, he did not object to any deficiencies in the assistance he received from defendant Demars. (Disc. Hearing Transcript at 64–65) .[27]

27    Plaintiff did object that defendant Demars was biased because he was a "Dep.," (presumably referring to his position as a Deputy Superintendent at Franklin); he stated, at the end of the hearing, that "Albany" (presumably DOCS headquarters) should have appointed a hearing officer. (Disc. Hearing Transcript at 65). *See Chavis v. Flagler,* 01–CV–0510, 2005 WL 563055, at \*4 (W.D.N.Y. Mar. 8, 2005) (in due process analysis, prison disciplinary hearing officer are not held to the same standards regarding neutrality and conflicts of interests as judges or adjudicators in other contexts, although they may not prejudge the evidence).

Plaintiff cites a 1995 opinion of then-District Judge Sotomayor for the proposition that a hearing examiner who purports to provide assistance to the charged inmate cannot be "impartial" and violates the due process rights of the accused *per se. Lee v. Coughlin,* 902 F.Supp. 424, 433–34 (S.D.N.Y.1995). However, the plaintiff in *Lee* specifically requested assistance from individuals other than the hearing officer. In this case, plaintiff waived any objection to having the hearing officer also provide him assistance in procuring documents and witnesses, by his failure to complete and submit the form requesting assistance from another source, and his statement expressing his satisfaction with the alternative arrangement offered by defendant Demars. *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (the courts in this circuit have established that an inmate's silence can constitute waiver of his right to assistance at a disciplinary hearing) (citing, *inter alia, Murray v. Dixon,* 107 F.3d 3 (table), 1997 WL 73152, at \*2 (2d Cir.1997) (affirming hearing officer's determination that inmate waived his right to assistance because the inmate "admits that he refused to sign the required request for employee assistance presented to him when he was served with the misbehavior report, and he does not allege that he requested assistance between his refusal and the hearing")).

Moreover, the *Lee* court found that the hearing officer, in fact, provided assistance that was deficient in several substantial respects. *Id.* In a 1998 decision, the Second Circuit held that, when an inmate agrees to accept assistance from a hearing officer who thereafter does nothing to assist, the inmate's due process rights are violated. *Ayers v. Ryan,* 152 F.3d at 81. While the Second Circuit characterized it as possibly "odd or irregular" for a hearing officer to offer to serve as an assistant and for the inmate to accept that offer, it did not characterize this arrangement as a *per se* due process violation. *Id.* At least one subsequent district court in this circuit has held that, where the hearing officer actually provided adequate assistance to an inmate, the fact that the hearing officer also served as the assistant does not violate due process. *Clyde v. Bellnier,* 9:08–CV–909, 2010 WL 1489897, at \*6 (N.D.N.Y. April 13, 2010) (Singleton, J.).

**\*13** As discussed above, defendant Demars actually provided reasonable and adequate assistance to plaintiff in connection with his disciplinary hearing. *See, e.g., Jackson v. Johnson,* 30 F.Supp.2d at 619 (a hearing assistant's role is not to act as legal advisor or advocate, but to serve as a surrogate, performing functions, such as contacting witnesses, which the charged inmate could not do because he is not among the general population) (collecting cases); *Clyde v. Bellnier,* 2010 WL 1489897, at \*6 (no due process violation arose when the hearing officer/assistant failed to provide documents that did not exist or that were not relevant to the defense)[28]; *Brown v. Dotson,* 2007 WL 1033359, at \*3 (inmate facing disciplinary charges for writing a threatening note was not constitutionally entitled to DNA tests in connection with the hearing). This court concludes that, based on the

Second Circuit's holding in *Ayers v. Ryan,* defendant Demars did not violate plaintiff's due process rights in connection with his rendering of assistance in connection with the hearing. In any event, Dep. Sup. Demars would be entitled to qualified immunity because he could not have reasonably understood, based on the uncertain controlling law in 2006, that his role in providing reasonable and adequate assistance to plaintiff, while serving as the hearing officer, violated plaintiff's due process rights.

28    *See also Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W . D.N.Y.2008) (to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing) (collecting cases).

## V. *Alleged Mail Tampering*

The First and Fourteenth Amendments to the U.S. Constitution are implicated when a prisoner's legal mail is obstructed, but a plaintiff must allege that the defendants' actions hindered the prisoner's "efforts to pursue a legal claim." *See Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d. Cir.1997). In order to establish a claim that a prisoner's right of access to the courts has been abrogated, actual injury must be shown. *See Lewis v. Casey,* 518 U.S. 343, 351–52 (1996).

Prior to the Supreme Court's decision in Lewis, the Second Circuit had held that "an isolated instance" of interference with an inmate's legal mail delivery was insufficient to state a First Amendment claim, either with respect to the mail itself or with respect to access to courts, where "the infraction was not in accordance with official policy or practice and where no showing had been made that the inmate's right to access to courts was chilled .... " *Washington v. James,* 782 F.2d 1134, 1139 (2d. Cir.1986) (citation omitted). *Lewis* also suggests that the actual harm must be to direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

**\*14** Although the amended complaint alleges generally that plaintiff's mail was obstructed while he was in

Franklin and Upstate,29 his only focused claim of tampering with legal mail relates to an incident at Upstate in January 2007 involving defendants McCasland and Hoffnagle. (AC ¶¶ 29–33). During his deposition, plaintiff acknowledged that only two pieces of legal mail were opened outside of his presence, and that they may well have been opened by mistake or accident. (Dep. at 67, 74). Although the incident left Plaintiff "a little upset," he did not articulate how the opening and eventual loss30 of the two items interfered with any pending legal matter. (Dep. at 71–75). Even accepting plaintiff's allegations as true, which the defendants dispute (McCasland Decl., Hoffnagle Decl.), the claim relating to the opening and possible destruction of two items of legal mail, without any showing of how plaintiff was prejudiced in a legal proceeding, does not support a viable First Amendment claim. *See, e.g., Morgan v. Montanye,* 516 F.2d 1367, 1370–71 (2d Cir.1975) (inmate's showing of only a single instance where clearly marked legal mail was opened out of his presence, in absence of any indication that the incident affected the correspondence between the inmate and his attorney concerning prisoner's criminal appeal or any other legal matter, was insufficient to survive summary judgment).

29    The conclusory and general allegations of mail tampering are insufficient to overcome summary judgment, and do not identify particular defendants who were personally involved in the alleged violations. *See, e.g., Gilliam v. Quinlan,* 608 F.Supp. 823, 838 (S.D.N.Y.1985) (conclusory allegations of mail tampering insufficient to withstand summary judgment).

30    Plaintiff refused to accept the "opened" mail twice and then tried to recover it. By that time, the two items could not be located by DOCS, the post office, or the senders of the mail. Plaintiff alleges that defendant Hoffnagle and DOCS failed to return the mail to the sender pursuant to DOCS procedures. After an investigation, DOCS could not document what happened to the mail, but concluded that was no malfeasance of the part of the staff at Upstate. (Pl.'s Decl. ¶¶ 26–32, Ex. D, Dkt. No. 124–5 at 43–61).

## VI. *Retaliation Claims*

Plaintiff alleges that, in retaliation for his filing of a letter complaining of an assault of another inmate by correction officers, defendant Johnson filed a false misbehavior report against plaintiff, and defendant Gardner made inflammatory statements regarding plaintiff to other staff,

prompting further acts of retaliation. Plaintiff characterizes, as retaliation, the subsequent "assaults" involving defendants Secore, Favro, Norcross, and Reardon; the conduct of the disciplinary hearing by defendant Demars; and the alleged mail tampering by defendants McCasland and Hoffnagle. For the reasons set forth below, this court will recommend that plaintiff's retaliation claims is dismissed, either on the merits or on qualified-immunity grounds.

### A. Applicable Law

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

*15 The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive, full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

### B. Application

#### 1. First Amendment Protection

The plaintiff alleges that various acts of retaliation resulted from a letter he wrote and signed, complaining about the assault of another inmate by correction officers. It is unclear, under Second Circuit authority, whether an inmate's complaints about the treatment of another inmate are protected by the First Amendment and, thus, whether they could be the basis of a retaliation claim. *See, e.g., Smith v. Greene,* 9:06–CV–0505, 2010 WL 985388, at *3 (N.D.N.Y. Mar. 16, 2010) (it is far from certain whether the First Amendment protected an inmate's letter to the New York State Inspector General complaining about the use of force against a fellow inmate) (citing *Nevares v. Morrisey,* 95–CV–1135, 1991 WL 760231, at *6 (S.D.N.Y. Sept. 27, 1999) (complaining aloud to correction officers about the treatment of another inmate is not constitutionally protected activity under the First Amendment)); *Pettus v. McGinnis,* 533 F.Supp.2d 337, 339 (W.D.N.Y.2008) (it is unclear whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d 470, 478–79 (2d Cir.1995) (an inmate has no clearly established First Amendment right to approach and complain to an officer about how he is disciplining another inmate). We will assume, for sake of argument, that plaintiff's complaint letter in this case was protected by the First Amendment. However, as discussed below, the defendants who allegedly took adverse actions against plaintiff based on this letter would be protected by qualified immunity because it was not clear under controlling law, in 2006 and 2007, that such conduct would violate plaintiff's First Amendment rights.

#### 2. Connection Between "Speech" and Alleged Adverse Actions

*16 Plaintiff has alleged that the actions of nine different defendants between June 19, 2006 and January 2007 were

carried out in retaliation for his letter of June 15, 2006. With two possible exceptions, plaintiff provides no support for the conclusory claim that these defendants were even aware of his letter when they allegedly took adverse action against the plaintiff. It is unlikely that defendants Gardner, Secore, Favro, and Norcross, who were merely involved in plaintiff's move to the Franklin SHU on June 19th, were aware of plaintiff's letter, which was not received in the administrative office at Franklin until the following day. (Pl.'s Decl., Ex. A; Disc. Hearing at 52–53). To the extent these defendants were motivated to take some adverse action[31] against plaintiff, which they deny, the fact that plaintiff was just charged with creating some of the anonymous letters threatening the Franklin staff, would be a much more likely trigger.

[31]   Defendant Gardner's alleged statement on June 19th that plaintiff "needed to be taught the policies and procedures" of the facility "because plaintiff likes to make threats at correctional staff," would not support a retaliation claim because they would not deter an inmate of ordinary firmness in exercising his constitutional rights. *See, e.g, Davis v. Goord,* 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing, *inter alia, Dawes v. Walker,* 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation). As noted above, this court rejected plaintiff's conclusory claim that this comment was an actionable incitement of defendants Secore and Favro to assault the plaintiff.

Plaintiff provides no support for the suggestion that defendant Reardon was aware of or motivated by plaintiff's June 15th letter when he allegedly used excessive force on June 24th. In fact, plaintiff provides a more plausible explanation for why defendant Reardon and the other SHU officers might be inclined to "assault" him on June 24th—plaintiff was refusing meals and generally acting like a "knucklehead" toward the staff. (Dep. at 63, 65). There is certainly no indication that defendants McCasland and Hoffnagle, correction officers at Upstate who allegedly tampered with plaintiff's mail in January 2007, knew of or were influenced by plaintiff's June 15, 2006 letter to officials at Franklin.

When he filed the disciplinary action against plaintiff on the afternoon of June 19th, defendant Johnson may not have seen plaintiff's letter, which was not received by the administrative office until the following day. However, Lt. Johnson's inmate misbehavior report confirms that he was advised about plaintiff's prior contact with the Superintendent on June 17th, so there is some corroboration he was aware of at least the general

contents of plaintiff's letter. Defendant Demars, the hearing officer at plaintiff's disciplinary hearing, was clearly aware of the June 15th letter, because plaintiff asked that it be made an exhibit.

However, plaintiff provides no information other than the temporal proximity between his June 15th letter and the conduct of defendants Johnson and Demars to suggest that the letter substantially motivated the alleged adverse actions by the prison officials. There is no indication of any contact between plaintiff and Lt. Johnson before the disciplinary charges were filed, and no evidence of any statements or prior conduct suggesting a retaliatory animosity on the part of either defendant. (Dep. at 19; Johnson Decl. ¶ 4). It is clear that plaintiff was identified as a possible suspect in the investigation of the anonymous threat letters because he expressed "similar concerns" to the Superintendent and in his June 15th letter. However, the disciplinary hearing transcript indicates that defendants Johnson and Demars were motivated by the goal of determining if plaintiff generated some of the anonymous threat letters, not the desire to retaliate against plaintiff for drafting and signing the June 15th letter (which contained complaints, but no threats). Given the record developed in connection with the pending summary judgment motion, plaintiff's conclusory allegations are not sufficient to establish that any of the nine defendants were substantially motivated by his June 15, 2006 letter in taking the actions they took. *See, e.g., Ayers v. Stewart,* 101 F.3d 687 (table), 1996 WL 346049, at *1 (2d Cir.1996) (given the weakness of his retaliation claim, plaintiff's reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment); *Crenshaw v. Herbert,* 445 F.Supp.2d 301, 305 (W.D.N.Y.2006) (because plaintiff offers nothing more than speculation that the moving defendants did what they did because he had filed a grievance, the temporal proximity between the protected activity and the adverse action is not enough to give rise to a genuine issue of material fact); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (although the temporal proximity of the filing of the grievance and the issuance of the misbehavior report is circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment).

## VII. *Deliberate Indifference to Medical Needs*

### A. Legal Standards

*17 In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the

plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184.

### 1. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer,* 511 U.S. at 844–47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id .* If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003)). However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower. *Id.* If the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith,* 316 F.3d at 185). Thus, the court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

**\*18** In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. (citing *inter alia Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

## B. Application

### 1. "Seriousness" of Plaintiff's Medical Condition and any Alleged Deprivation

Plaintiff claims that, as a result of the alleged assaults on June 19 and 24, 2006, he suffered a "possible" fractured rib cage, dislocated jaw, and a torn tendon in his left armpit. (AC ¶¶ 14, 23). At his deposition in June 2009, plaintiff complained of continuing physical limitations because of a "torn ligament" in his armpit, as well as discomfort from a lump on his rib cage and a prior injury to his jaw. (Dep. at 80–81).

The record of the medical examinations of plaintiff by several health care providers over the days and weeks following the alleged assaults did not document the injuries claimed by plaintiff. (Secore Decl., Ex. B, Dkt. No. 110–11 at 8, 15, 18–19, 22–25; Medical Records at 25–36). In September and October 2006, PA Tichenor evaluated plaintiff's claims of back, shoulder, and knee pain, and diagnosed plaintiff with a left shoulder sprain and then tendinitis of the left pectoralis major tendon. (Tichenor Decl. ¶¶ 8–10; Medical Records at 27, 31). When plaintiff was examined by a prison doctor in April 2008 regarding complaints of problems with his knees, feet, and arm,[32] the physician detected a slight defect in plaintiff's "left bicep [?] tendon" that was "functionally insignificant" and did not effect his range of motion or strength. (Medical Records at 11; Dep. at 80). Medical records from January 2007 indicate that plaintiff complained of new injuries to his left arm caused by an unrelated incident during which a correction officer allegedly pulled that arm through the slot in a cell door. (Medical Records at 24). Hence, it is unclear whether the doctor's observations relating to the left arm in 2008 are related to the alleged assaults in June 2006 or the later incident.

[32]   Even plaintiff does not relate medical problems beyond his jaw, rib cage, and left arm to the alleged assaults in June 2006 and related claims of deliberate indifference to those injuries. (Pl.'s Memo. of Law at 10–11; Dep. at 80–81). So, plaintiff's later claims of problems with his back, knees, and feet are not relevant to the evaluation of whether plaintiff had a "serious" medical condition to which the defendants were deliberately indifferent.

**\*19** A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining

whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; or (3) the existence of chronic and substantial pain. *See, e.g., Chance,* 143 F.3d at 702–03. Plaintiff's medical issues in June and July 2006 do not meet the objective standards of a "serious" medical condition. *See, e.g., Ninortey v. Shova,* 05 Civ. 542, 2008 WL 4067107, at *5, 16 (S.D.N.Y. Sept. 2, 2008) (inmates's complaints of bruises, cuts, a twisted ankle, shoulder pain, a bloody mouth and cracked teeth following an alleged assault, much of which was not confirmed by records of frequent medical examinations and treatment, did not constitute a "serious medical condition"); *Evering v. Rielly,* 98 CIV. 6718, 2001 WL 1150318, at *9 (S.D.N.Y. Sept. 28, 2001) (bruises, redness, soreness, a knot on the back, and a cut on the forearm are superficial injuries that require time to heal, but do not satisfy the objective component of the deliberate indifference standard); *Rodriguez v. Mercado,* 00 CIV. 8588, 2002 WL 1997885, at *8 (S.D.N.Y. Aug. 28, 2002) (plaintiff who claimed to sustain bruises to his head, back, and wrist following an excessive force incident did not have a "sufficiently serious" medical condition); *Tafari v. McCarthy,* 2010 WL 2044705, at *20 (bruises and superficial lacerations resulting from an alleged assault did not satisfy the "serious medical condition" test).

Plaintiff complained that prison medical officials refused to examine or treat him for the injuries relating to the alleged assaults, particularly in June and July 2006. He alleges that, in the days following the assaults, his face and jaw were swollen and he was having difficulty breathing as a result of his rib cage; but does not claim he had more serious injuries or substantial, persistent pain. (AC ¶¶ 14, 17). Plaintiff denied any injuries on June 19th. (Davenport Decl., Exs. A & B). The prison medical records document that he was examined on several occasions by different providers in two facilities who found little evidence of the medical problems about which plaintiff complained.[33] Based on the defendants' declarations and the corroborating medical records, plaintiff's conclusory allegations about his denials of medical care would not, in this court's view, create an issue of fact. *See, e.g., Brown v. White,* 9:08–CV–200, 2010 WL 985184, at *8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record.); *Benitez v. Pecenco,*

92 Civ. 7670, 1995 WL 444352 at n. 5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue) (*citing Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case")).[34]

[33]    The defendants' Memorandum of Law competently summarizes the conflict between plaintiff's claims and the declarations of the defendants and their contemporaneous medical records. (Defs.' Memo. of Law at 4–10, Dkt. No. 110–6).

[34]    *See also Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account." (citation omitted)).

**\*20** However, plaintiff challenges the prison medical records that contradict his claims of injury and denied treatment, making conclusory allegations that various medical records were falsified and/or that his medical problems were mis-diagnosed. (AC ¶ 15; Pl .'s Memo. of Law at 3–13). It should be noted that the defendants' declarations and supporting medical records indicate that the plaintiff tried to manipulate care providers to document alleged injuries that the nurses did not detect.[35] Plaintiff's conclusory allegation that multiple medical professionals in two different prisons fabricated plaintiff's medical records to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, also be insufficient to sway any rational fact finder. *See, e.g., Benitez v. Mailloux,* No. 9:05–CV–1160, 2009 WL 1953847, at *8 (N.D.N.Y. Mar. 25, 2009) (Treece, MJ) (plaintiff's conclusory contention that defendant falsified his ambulatory health care record is not enough to withstand summary judgment on his deliberate indifference claim), *report-recommendation rejected, in part, on other grounds,* 2009 WL 1953752 (N.D.N.Y. July 2, 2009) (Mordue, DJ); *Liner v. Goord,* 115 F.Supp.2d 432, 435 (S.D.N.Y.2000) (dismissing conclusory claims that defendants conspired to tamper

with and destroy plaintiff's medical records).[36]

[35]    Defendant Chesbrough states that he saw plaintiff on nurse's sick call at Upstate on July 13, 2006. "At that time the plaintiff stated he was injured on June 19th at Franklin and that he was not seen by a nurse. I asked him why he would waiting until now to report it. He stated, 'None of your business, just document it.' I again reviewed the medical record which indicated that the plaintiff was seen by an RN on 6/19/06." (Chesbrough Decl. ¶ 9; Medical Records at 32).

[36]    *But see Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) (The records maintained by the prison officials and hospital do substantiate the conclusion that appellees provided Archer with comprehensive, if not doting, health care. Nonetheless, Archer's affidavit in opposition to the motion for summary judgment does raise material factual disputes, for example by alleging that defendants delayed her access to medical care at a time she was in extreme pain.); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512–13 (N.D.N.Y.1999) (although records maintained by prison officials lend credence to [Defendant]'s version of events in that they show Plaintiff was provided with substantial medical care and treatment, Plaintiff's affidavits in support of summary judgment nonetheless raise material factual disputes, regardless of their likely resolution).

Even if plaintiff's conclusory attacks on the reliability of his medical records are not rejected, this court concludes that he did not suffer from a sufficiently "serious" medical condition or suffer a "serious" deprivation of medical care under Eighth Amendment standards. Plaintiff does admit that he received medical attention on several occasions in the months following the alleged assaults in June 2006. (Dep. at 48–57). He does not take issue with the conservative treatment prescribed by PA Tichenor in the Fall of 2006. (Pl.'s Memo. of Law at 11; Tichenor Decl. ¶¶ 9–10). Even crediting only the medical evidence that plaintiff does not claim is fabricated,[37] there is no indication that alleged delays in his examination or treatment resulted in any substantial harm or required a dramatic change in the course of his treatment. *See, e.g., Evans v. Manos,* 336 F.Supp.2d 255, 261–62 (W.D.N.Y.2004) (delay in treatment of prisoner who claimed "extreme" back pain, which did not result in substantial harm to plaintiff or significantly change the course of his eventual treatment, was not a "serious" disruption of his medical care). *See also Smith v. Carpenter,* 316 F.3d 178, 188 (2d Cir.2003) (although demonstrable adverse medical effects may not be required under to establish an Eighth Amendment medical-care claim, the absence of subsequent physical injury will

often be probative in assessing the risk of delaying treatment in the past).

[37] Plaintiff credits, for example, the findings of the prison doctor in April 2008. (Dep. at 44–45, 80–81; Pl.'s Sur–Reply, Dkt. No. 129 at 7). As noted, the only injury that the doctor detected that could be related to the assaults in June 2006 was a possible defect in a tendon that was "functionally insignificant" and did not effect plaintiff's range of motion or strength. (Medical Records at 11). The doctor documented no residual evidence of the jaw and rib cage injuries that plaintiff still claimed to be suffering from as of the time of his deposition in June 2009. (Medical Records at 11; Dep. at 80–81). PA Tichenor, who examined plaintiff in 2006, also makes no notation of jaw or rib case issues. With respect to plaintiff's shoulder issues, defendant Tichenor found, in September 2006, that plaintiff's gait, range or motion, strength, and sensation were all normal. (Tichenor Decl. ¶¶ 8–11, Medical Records at 31). When PA Tichenor diagnosed plaintiff with tendinitis in his left arm in October 2006, he found the tendon was "tender but intact." (Medical Records at 27).

The record does not indicate that plaintiff was suffering from a serious medical condition which, even if completely ignored in June and July 2006, would have created a serious risk to his health. Nor does plaintiff's subsequent medical history reveal that the alleged delay or denial of medical treatment had any adverse impact on plaintiff. Accordingly, this court concludes that summary judgment should be granted with respect to the plaintiff's medical care claims because no rational juror would find that plaintiff suffered a sufficiently serious medical condition or deprivation.

**2. "Deliberate Indifference"**

**\*21** The declarations of defendants Davenport, Volpe, Walsh, Chesbrough, and Tichenor, and the supporting medical records, also undercut plaintiff's conclusory allegations that they were deliberately indifferent to his medical needs. Based on the above analysis of plaintiff's medical condition in June and July 2006, plaintiff cannot establish that the defendants recognized a serious risk to his health and deliberately ignored it. Given the court's finding that plaintiff has not established the objective elements of an Eighth Amendment medical care claim, a detailed analysis of the subjective element is not necessary. However, a few specific observations about two defendants are appropriate.

The only allegation against nurse Walsh in the amended

complaint is that she refused to examine plaintiff on the day he was transferred to Upstate–July 12, 2006. (AC ¶ 23). The medical records indicate that nurse Chesbrough conducted plaintiff's intake examination of plaintiff on July 12th and saw him in sick call on July 13th. (Chesbrough Decl. ¶¶ 7–9; Medical Records at 32–34).[38] Even if defendant Walsh "refused" to examine plaintiff on July 12th, she apparently did so with the knowledge that he would be seen that day by another nurse. Such a claim cannot support a viable cause of action for deliberate indifference.[39]

[38] The plaintiff may be mistaken in his recollection of which nurse performed his intake examination at Upstate on July 12, 2009. (Dep. at 51–53).

[39] Even plaintiff's more pointed claims that defendants Davenport, Volpe, and Chesbrough refused to examine or treat him on one or more occasions (Dep. at 41–42, 47, 49–50, 51–53) would not support a claim of deliberate indifference. *See, e.g., Savage v. Brue,* 9:05–CV–857, 2007 WL 3047110 at \*9 (N.D.N.Y. Oct. 18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent); *Evans v. Manos,* 336 F.Supp.2d at 261–62, 263 (terminating and postponing, for two more weeks, the medical appointment of a prisoner who claimed "extreme" back pain because he complained about his care did not constitute deliberate indifference where the doctor had no intention of doing the inmate harm).

Finally, plaintiff's Eighth Amendment claim against PA Tichenor is that he failed to detect or that he mis-diagnosed plaintiff's alleged injuries. (AC ¶ 25; Dep. at 44–45, 56–57, 80–81).[40] Based on the authority cited above, even if defendant Tichenor negligently mis-diagnosed plaintiff, that would not constitute "deliberate indifference."

[40] Plaintiff does dispute the number of times defendant Tichenor treated him, but does acknowledge he saw the physician assistant several times in 2006 and 2007. (Pl.'s Memo. of Law at 10–11).

**VIII.** *Qualified Immunity*

Defendants argue that they are entitled to qualified immunity with respect to all of plaintiff's claims. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). However, even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v.. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* —— U.S. ——, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's Eighth Amendment claims against defendants Gardner, Davenport, Volpe, Walsh, Chesbrough, and Tichenor because, as discussed above, he has not established those alleged violations of his constitutional rights.

**\*22** Defendant Demars is entitled to qualified immunity with respect to the due process claim relating to his conduct of plaintiff's disciplinary hearing. As discussed above, the Second Circuit's decisions in *Taylor v. Rodriguez,* 238 F.3d at 194 and *Luna v. Pico,* 356 F.3d at 489–90 did not clearly impose a due process requirement that a hearing officer at a prison disciplinary hearing perform independent analysis of lay handwriting comparisons made by a testifying witness. If the controlling authority were subsequently construed to require such independent analysis in the context of this case, this court finds it would not have been clear to defendant Demars in 2006 that his reliance on the witness' handwriting comparisons violated plaintiff's due process rights.[41] Similarly, the court concluded that the controlling authority in this circuit did not clearly prohibit a hearing officer at a prison disciplinary proceeding from also providing required assistance to the charged inmate. *Ayers v. Ryan,* 152 F.3d at 81. Because defendant Demars could not have reasonably understood that he could be violating plaintiff's due process rights by effectively providing assistance at the hearing over which he presided, he is entitled to qualified immunity with respect to that claim.

[41]   *Cf. Luna v. Pico,* 356 F.3d at 491 (defendant is protected by qualified immunity because a reasonable hearing officer would not have clearly understood from *Taylor* and other then-existing law that an independent review of the credibility of a non-testifying victim was required by due process).

To the extent a higher court were to determine that any defendant who took adverse action against plaintiff was substantially motivated by plaintiff's June 15, 2006 letter complaining about the beating of another inmate, that defendant would be protected by qualified immunity with respect to a retaliation claim. As of 2006 and early 2007, the controlling authority in this circuit did not clearly provide First Amendment protection to complaints by one inmate about the alleged mistreatment of another inmate. *See, e.g .,* *Pettus v. McGinnis,* 533 F.Supp.2d at 339 (defendant is entitled to qualified immunity because of the uncertainty as to whether the First Amendment protected inmate from retaliation for testifying, at a disciplinary hearing of another inmate, that a correction officer assaulted the other inmate); *Rodriguez v. Phillips,* 66 F.3d at 479.

As to plaintiff's excessive force and failure to intervene claims against defendants Secore, Favro, Norcross, and Reardon, it was clearly established, as of the time of the alleged incidents in June 2006, that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. *See, e.g., Hudson,* 503 U.S. at 9–10. Thus, accepting all of plaintiff's allegations about the two incidents on that day as true, qualified immunity cannot be granted to those defendants, because a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation. *See, e.g., Dallio v. Sanatamore,* 2010 WL 125774, at \*14.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' summary judgment motion be **DENIED IN PART,** as to (1) plaintiff's Eighth Amendment claims based on excessive force and/or failure to intervene against defendants Secore, Favro, and Norcross and (2) the Eighth Amendment claims based on excessive force against defendant Reardon. And, it is further

**\*23 RECOMMENDED,** that defendants' motion for

summary judgment (Dkt. No. 110) be **GRANTED IN PART,** and that the complaint be dismissed in its entirety as to the remaining claims against all defendants.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing

*Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3785771

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Woodward v. Perez, S.D.N.Y., August 29,
2014

2007 WL 1500382
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Detroy LIVINGSTON, Plaintiff,

v.

P. GRIFFIN, Correction Captain, State of New
York Correctional Services (DOCS); Donald
Selsky, Director of Special Housing for DOCS; R.
Lee, Correction Officer (C.O.); S. Hurteau, C.O.; S.
Gawlicky C.O.; LeFrance, Sergeant of DOCS; M.
Foster, C.O.; D. Abair, C.O.; S. Salls, Sergeant of
DOCS; J. Bouyea, C.O., Defendants.

No. 9:04-cv-00607-JKS.
|
May 21, 2007.

**Attorneys and Law Firms**

Detroy Livingston, Elmira, NY, pro se.

Bridget Erin Holohan, New York State Attorney General,
the Capitol Albany, NY, for Defendants.

MEMORANDUM DECISION and ORDER

JAMES K. SINGLETON, JR., United States District
Judge.

I. MOTION PRESENTED

**\*1** At Docket No. 56 defendants P. Griffin, Donald
Selsky, R. Lee, Scott Hurteau, S. Gawlicky, G. LeFrance,[1]
M. Foster, D. Abair, S. Salls and J. Bouyea have moved
for summary judgment in their favor under FED.R.CIV.P.
56. At Docket No. 62 Plaintiff Detroy Livingston has
opposed the motion to which Defendants replied at
Docket No. 66. After reviewing the moving and opposing
papers the Court has determined that the issues are fully
briefed and oral argument would not assist the Court in
ruling on the motion. The matter is decided on the moving

and opposing papers.

[1]    In various documents filed with the Court, "LeFrance"
is spelled "LaFrance." For purposes of consistency the
Court will use the LeFrance spelling in this
memorandum decision and order.

II. BACKGROUND/JURISDICTION

Plaintiff Detroy Livingston ("Livingston") is an inmate in
the custody of the New York Department of Correctional
Services ("DOCS") incarcerated at the Coxsackie
Correctional Facility, Coxsackie, New York. Defendants
P. Griffin ("Griffin"), Donald Selsky ("Selsky"), R. Lee
("Lee"), Scott Hurteau ("Hurteau"), S. Gawlicky
("Gawlicky"), G. LeFrance ("LeFrance"), M. Foster
("Foster"), D. Abair ("Abair"), S. Salls ("Salls") and J.
Bouyea ("Bouyea") are all employees of DOCS in various
capacities. Livingston, appearing *pro se,* has sued all the
defendants in their individual capacities under 42 U.S.C.
§ 1983 alleging various violations of his civil rights under
the Constitution and laws of the United States in 17
causes of action. These causes of action are divided into
seven separate claims at three separate correctional
facilities.

In his first count, Livingston sets forth his first four
causes of action alleging that Griffin denied him due
process of law under the Sixth and Fourteenth
Amendments arising out of a disciplinary hearing.
Livingston's fifth cause of action, contained in his second
count, alleges that Selsky in reviewing and modifying the
disposition of the disciplinary action also violated his due
process rights under the Sixth and Fourteenth
Amendments. The third count contains the sixth and
seventh causes of action alleging that Lee inflicted cruel
and unusual punishment on him in violation of the Eighth
and Fourteenth Amendments as well as violated New
York law by feeding him foods mixed with unknown
drugs. Livingston's fourth count contains Livingston's
eighth and ninth causes of action alleging that Hurteau
inflicted cruel and unusual punishment on him in
violation of the Eighth and Fourteenth Amendments as
well as violated New York law by feeding him foods
mixed with unknown drugs. In his fifth count Livingston
sets forth his tenth, eleventh, and twelfth causes of action
alleging that Gawlicky fabricated a misbehavior report
subjecting him to cruel and unusual punishment in
violation of Fifth, Eighth and Fourteenth Amendments

and provided false testimony that resulted in a violation of the Sixth and Fourteenth Amendments. In the sixth count, Livingston's thirteenth cause of action alleges that LeFrance tried to force him to be chained to a transsexual/homosexual contrary to Livingston's religious beliefs in violation of First and Fourteenth Amendments and the fourteenth cause of action alleges that Foster fabricated a misbehavior report arising out of his refusal to be transported while chained to a transsexual/homosexual in violation of his First and Fourteenth Amendments. Livingston's seventh count contain Livingston's fifteenth, sixteenth, and seventeenth causes of action alleging that Abair, Salls, and Bouyea, respectively, denied him religious meals in violation of the First, Eighth, and Fourteenth amendments.

**\*2** This Court has jurisdiction over the federal constitutional claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

## III. ISSUES PRESENTED

Defendants' Motion raises essentially two issues: (1) that there is insufficient evidence to support any of the claims made and (2) defendants Griffin, Selsky, Foster, LeFrance, Salls, Abair, and Bouyea are entitled to qualified immunity.

The claims under Count One and the Second Count raise the issue of the due process requirements in prisoner disciplinary actions to (1) compulsory production of witness; (2) the extent to which documentary evidence used by the hearing officer in making his decision must be provided to the prisoner; and (3) whether a recording of the proceedings is constitutionally mandated.

The claims under the Third and Fourth Counts raise the issues of (1) whether expert testimony is required to establish a claim that food fed to an inmate was drugged and (2) whether a private cause of action exists for a violation of the New York penal Code.

The Fifth Count deals with the issue of whether temporal proximity between the filing of a complaint against a correctional officer and an adverse action (issuance of a misbehavior report), standing alone, is sufficient evidence to survive a summary judgment motion on a retaliation claim.

The Sixth Count presents the issue of whether a sincerely held religious belief that homosexuality is an abomination

justifies a refusal to be shackled to or be compelled to sit next to a transsexual/homosexual individual.

The Seventh Count presents an issue of whether a prisoner's dietary restrictions must be central to his religious beliefs.

## IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment in its favor as a matter of law. FED.R.CIV.P. 56(c); *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.2000). Support and opposition to a motion for summary judgment is made by affidavit made on personal knowledge of the affiant, depositions, answers to interrogatories, setting forth such facts as may be admissible in evidence. FED.R.CIV.P. 56(e). "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. AND PROC. CIV. (3rd) § 1339 (noting that a verified pleading may serve as an affidavit only if it contains facts known to be true in the affiant's own knowledge and if it has a certain level of factual specificity).

In response to a properly supported motion for summary judgment, the opposing party must come forth with evidence that would be sufficient to support a jury verdict in his favor at trial. *Colon v. Coughlin, supra; Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).[2] The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. In order to show that a genuine issue of material fact exists a nonmoving plaintiff must introduce probative evidence that establishes the elements of the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id.,* at 255. All reasonable inferences are drawn in favor of the

non-moving party and the moving party bears the burden of both production and persuasion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Additionally, *pro se* litigants should generally be afforded "special solicitude" regarding motions for summary judgment. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir .1988).[3]

---

[2]    The Court notes that in their motion Defendants offer DOCS records that although authenticated by counsel are not properly authenticated by the custodian of records. However, Plaintiff has not objected to their use and their admissibility at trial is not subject to dispute. Consequently, the Court will consider the records. *See H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2d Cir.1991).

[3]    The Court need not, however, accept conclusory statements or allegations. *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2004).

## V. DISCUSSION

## A. **Denial of Due Process Claims (Count One-Griffin; Second Count-Selsky).**

**\*3** The basic facts underlying these claims is not disputed. On November 27, 2001, Livingston was issued a misbehavior report charging him with violating prison rules 100.11 (assault on staff) and 106.10 (direct order). Griffin conducted a disciplinary hearing on November 30, December 5, and December 8, 2001. Livingston's defense was that the C.O. assaulted him by pushing him down the stairs.[4] Eight witnesses testified at the hearing, one inmate witness refused to testify, and Griffin denied Livingston's request to call the facility doctor as a witness. Livingston was provided a copy of the denial of witness form. Livingston was furnished and submitted a redacted copy of the unusual incident report and the officers' 'To/From' forms, which comprise the report. Following the hearing, Livingston was found guilty and sentenced to 36 months in the special housing unit ("SHU"). Livingston appealed the guilty disposition and sentence to Selsky, Director of Special Housing/Inmate Disciplinary Program. Selsky affirmed the guilty disposition, but modified the sentence imposed to 12 months in the SHU.

[4]    The C.O. who filed the complaint against Livingston, T. Notobartolo, is not a party to this lawsuit.

Livingston alleges that Griffin violated his Sixth and Fourteenth due process rights by: (1) failing to call witnesses; (2) taking testimony off the record; (3) denying Livingston documentary evidence; (4) failing to personally ascertain whether an inmate witness in fact refused to testify and failing to provide him with the refusal to testify form; and (5) knowingly used a defective tape recorder. With respect to Selsky, Livingston alleges that, notwithstanding the reduction in the sentence to the SHU, in affirming the finding of guilt notwithstanding the due process violations, Selsky also violated Livingston's Sixth and Fourteenth Amendment due process rights.

In his complaint Livingston alleges:

20. On November 30, 2001 Plaintiff informed defendant P. Griffin that he wanted to call all the c.o.'s as witnesses that responded to the incident because he did not know their names.

21. Defendant P. Griffin failed to call but four of the c.o.'s that responded to the incident.

22. There was over ten c.o.'s that responded to the November 26, 2001 incident.

23. C.O. Keller witnessed part of the incident and he gave defendant P. Griffin the name of another C.O. that responded to the incident during a off-the-record testimony which Plaintiff over heard.

24. When Plaintiff requested the C.O. whose name c.o. Keller gave to defendant P. Griffin to be call as a witness he refused to call him or disclose the name.

25. Defendant P. Griffin's off-the-record testimony violated Title 7 NYCRR § 254.6(b).

26. Defendant P. Griffin denied Plaintiff the injury report of C .O. T. Notobartolo concerning the November 26, 2001 incident.

27. Defendant P. Griffin denied Plaintiff the institution doctor as a witness at the hearing.

28. Defendant P. Griffin did not personally ascertain whether inmate Shabazz in fact refused to testify at the hearing, and place his findings on the record.

**\*4** 29. Defendant P. Griffin did not furnish Plaintiff

with any of the forms to explain the refusal of witnesses, refusal to testify, nor denial of documentary evidence.

30. Defendant P. Griffin refused Plaintiff the Unusual incident report, and accident reports even though he promised that he will.

31. Defendant P. Griffin knowingly [*sic* ] used a defective tape recorder which did not clearly record Plaintiff's objections and conclusions.

The minimum due process requirements for prison disciplinary proceedings were laid down by the United States Supreme Court more than 30 years ago in *Wolff v. McDonnell,* 418 U.S. 539, 563-71 (1974). Summarized, these include: (1) written notice of the charges; (2) sufficient time to marshal the facts and prepare a defense; (3) a limited or restricted right to call witnesses and present documentary evidence; and (4) a written statement by the fact finder as to the evidence relied upon and the reasons for the disciplinary action. Prison officials have the discretion to keep to keep a disciplinary hearing within limits and refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as limit the access to other inmates to collect statements or compile documentary evidence. Although not prescribed, it is useful for the reason for refusal to call a witness to be stated. Confrontation and cross-examination are not constitutionally required. Nor does the inmate have a right to counsel; however, where an illiterate inmate is involved or the complexity of the issues render it unlikely the that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff.

Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence that supports the decision to impose discipline on the inmate. Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 454-55 (1985).

The ordinary disciplinary procedures of the New York prison system comport with the appropriate due process standards outlined in *Wolff. See Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). In a § 1983 civil rights action, the only relevant inquiry is whether the constitutional minimal requirement for imposing disciplinary punishment was met, not whether state procedures were followed. *Shakur v. Selsky,* 391 F.3d 106, 118-19 (2d Cir.2004). The record in this case clearly establishes that Plaintiff's constitutional due process rights were satisfied. Of the rights recognized in *Wolff* only the right of right to call witnesses and present documentary evidence is implicated in this case.

**\*5** The Court notes initially that, with respect to the disciplinary charge, only Plaintiff and C.O. T. Notobartolo were present during the altercation on the stairs. At the disciplinary hearing the two gave diametrically opposed versions of what occurred. According to the testimony of Notobartolo while he was escorting Livingston down the stairs Livingston turned and punched him in the side of the face. Notobartolo then grabbed Livingston in a bear hug in an upper body hold and the two tumbled down the stairs. After scrapping for a while, Notobartolo gained control of Livingston, rolled him over face forward, put his knee on Livingston's buttocks and held him while two other officers applied mechanical restraints. Livingston testified that Notobartolo pushed him down the stairs and that, while holding him down, Notobartolo mouthed to an unidentified officers to hit him (Notobartolo) in the face, which the unidentified officer did.

The two inmate witnesses testified as to what they observed prior to the time Notobartolo and Livingston entered the stairwell but did not observe what occurred in the stairwell. None of the other four correctional officers who testified, all of whom arrived on the scene after Notobartolo had regained control of Livingston in the stairwell, corroborated Livingston's testimony concerning the officer who allegedly was requested to and did hit Notobartolo.

Turning first to the unidentified C.O. who was not called (¶¶ 23 and 24). A review of the transcript and Livingston's statement of facts simply do not support the speculative and conclusory allegation that Griffin Keller identified the C.O. Livingston believes was present. Livingston was permitted to call every C.O. identified either by testimony or in a report submitted. Keller testified that he, Sgt. Shanley, C.O. Kukla, and an unidentified C.O. responded to the scene. C.O. Kukla testified that he, C.O. Keller, and C.O. Notobartolo were present and that C.O. Hemeon came later. Sgt. Shanley testified that he came on the scene after Livingston was under control. Griffin explained that he was unable to learn the identity of the C.O., which is clearly a valid reason for not calling the witness. Livingston's position in

this case would go further and require Griffin to prove that he was unable to learn the identity. This, the Court may not do. *See Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) citing *Ponte v. Real,* 471 U.S. 491, 497 (1985). Moreover, while due process requires that an inmate be permitted to call witnesses in his defense, there is no authority for the proposition that due process requires the hearing officer to identify and locate witnesses for the inmate.

With respect to the recording allegations (¶¶ 25 and 31) due process does not require that the proceedings be recorded. Accordingly, while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process.

**\*6** As the hearing officer (Griffin) explained in denying access to C .O. Notobartolo's injury report (¶ 26), those records are confidential. Their relevance to the disputed issues is, at best, tangential. The extent of the injuries Notobartolo may have suffered was not at issue. Livingston does not cite and the Court's independent research does not reveal any authority for the proposition that, in the context of the disputed issues involved in this case, Livingston was entitled to see that report. Griffin also adequately and properly explained his denial of Livingston's request to call the institution doctor (¶ 27), *i.e.,* that testimony of the doctor, who was not at the scene and did not witness the incident, was irrelevant. All the institutional doctor could have testified to was the extent of Livingston's injuries, not how he incurred them. The Court notes that the injuries Livingston suffered were, by his own admission, as a result of falling down the stairs. Whether he was pushed, as Livingston alleges, or was grabbed and fell in the grasp of Notobartolo as Notobartolo alleges, is not a matter to which the doctor could competently testify. Since the refusal to call the doctor was based upon irrelevance, that refusal was justified and did not violate constitutional due process. *Kingsley v. Bureau of Prisons,* 962 F.2d 145, 146-47 (2d Cir.1992).

With respect to the testimony of Shabazz (¶ 28), the hearing transcript shows that Griffin received the refusal form signed by Shabazz that he would not testify and heard the testimony of the C.O. who obtained and witnessed the signed refusal to testify form. Due process does not require, as Livingston suggests, that the hearing officer personally ascertain that a witness refuses to testify.

Finally, turning to Griffin's refusal to furnish the forms and denial of documentary evidence,[5] the unusual incident, and accident reports (¶¶ 29 and 30).[6] Livingston complains he was not furnished the refusal to testify form signed by Shabazz and an unredacted copy of the unusual incident report. The material redacted from the unusual incident report was a portion of a sentence that described the injuries received by Notobartolo. That was properly withheld from Livingston for the same reason as was the injury report. As for the refusal to testify form is concerned, as noted above, the hearing officer received the form and heard testimony concerning how it was obtained and signed. Even assuming that not giving it to Livingston (the transcript does not indicate that he requested a copy or to examine it) constituted a denial of due process, it was harmless. Livingston merely complains that he was not provided a copy of the refusal form but does not contend that Shabazz did not refuse or even make any offer as to what the testimony of Shabazz might be or what disputed issue of fact to which it might related.

[5]    Livingston does not identify what other documentary evidence he was denied.

[6]    The accident report is the injury report referred to in ¶ 26 and disposed of above.

Livingston's constitutional due process rights were not violated by either the Tier III hearing by Griffin or its review by Selsky. Moreover, with respect to Selsky, Livingston has failed to provide facts that even hint at, let alone establish, Selsky had a personal involvement in the alleged denial of his constitutional due process rights. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Although he alleges that the complaint by the C.O. was "fabricated," the record contains ample evidence to support the finding that Livingston was guilty of the infractions of which he was charged. Griffin is entitled to judgment in his favor on Count One (First, Second, Third, and Fourth Causes of Action) and Selsky is entitled to judgment in his favor on the Second Count (Fifth Cause of Action).

## B. Cruel and Unusual Punishment-Food Drugging (Third Count-Lee; Fourth Count-Hurteau).

**\*7** Livingston contends that on various dates in July 2002 Lee and Hurteau knowingly, intentionally, and deliberately served him food trays laced with unknown drugs. As a result each time Livingston ate the food he became dizzy, light headed, disoriented, sleepy and

rendered unconscious. Livingston also contends that he had to file a felony complaint before the poisoning of his food ceased. In his Affidavit, Livingston states:

14. Defendant R. Lee knowingly gave Plaintiff food trays with some kind of drugs mixed into the food. Plaintiff was poisoned by defendant Lee on July 15, 16, 17, 21 and 29, 2002. Each time Plaintiff ate the food defendant Lee gave him the drug made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious. That is how Plaintiff realized that defendant Lee was poisoning him through the food tray.

15. The poisoning of Plaintiffs food started after he wrote some complaints and grievances on defendant Lee. The first grievance Plaintiff wrote on defendant Lee was that he refused to pick up his mail, and the next was in regard to him not giving Plaintiff his law library request. Plaintiff did not have any problem with defendant Lee before these instances. Nor was Plaintiffs food poisoned until after he wrote the grievances and complaints against defendant Lee. The poisoning of Plaintiffs was done in retaliation for writing grievances and complaints against defendant Lee.

16. When defendant Lee gave Plaintiff his food tray he would make sarcastic remarks about the food like, "don't forget to eat your vegetables, it's good for you", and "I put something good for you in there." Plaintiff did not really know what defendant Lee meant by these remarks until after he ate the food, and felt the effects of the poison.

17. Plaintiff complaint numerous times about defendant Lee poisoning his food. Plaintiff went as far as filing a felony complaint against defendant Lee in an attempt to stop him from poisoning his food.

18. Plaintiff also tried to get medical tests performed to figure out what was causing the dizziness, disorientation and unconsciousness after he ate the food. Nurse Gomez did not have any medical tests done when Plaintiff requested them, and complained about the effects of the poisoned food to him.

19. Defendant S. Hurteau also knowingly and deliberately gave Plaintiff poisoned food. On July 23, and September 4, 2002 defendant Hurteau deliberately gave Plaintiff food trays in which unknown drugs were mixed into the food. Each time Plaintiff ate the food defendant Hurteau gave him the drugs made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious.

20. Plaintiff was being poisoned by defendant Hurteau, because of the grievances he wrote on him. Plaintiff had written a couple of grievances on defendant Hurteau for breaking the cell headphones and then writing him a misbehavior report for breaking the headphones.

21. At no time did Plaintiff consent to have drugs planted in his food by defendant Hurteau, or anyone else. Nor did a medical doctor authorize drugs to be put in Plaintiff's food by defendant Hurteau, or anyone else. Plaintiff was taking medication for a chronic illness at the time that his food was being poisoned by defendant Hurteau, but the medication did not cause any vertigo, unconsciousness, or dizziness. It was the unknown drugs that were in the food that cause these effects in Plaintiff.

*8 22. Plaintiff had to resort to filing a felony complaint on defendant Hurteau for poisoning his food for the violation to stop.

23. Plaintiff told the other prisoners in his area that sometimes when he ate the food he felt the effects of being drugged. Some of these prisoners also told Plaintiff that they also felt drugged up after eating the food.

24. Plaintiff loss 50 pounds because defendants Lee and Hurteau were poisoning his food and he was in fear of eating the food.

In his deposition with respect to Lee, Livingston testified:

Q How do you know Defendant Lee put drugs in your food?

A Because sometime he will say something to the effect of eat-don't forget to eat your vegetables, and it's good for you, and I put something good for you in there and stuff like that.

Q Did he tell you he put drugs in your food?

A Not, not like that. He didn't come outright and say there's drugs in your food poisoning you. He would say some sarcastic things like I put something good in there, and don't forget to eat your vegetables and stuff like that.

Q What made you think that those comments reflected that Defendant Lee put drugs in your food?

A At first I didn't-when he said it, I didn't 24 think-you know, he was just talking. But after eating it, then I feel the effect of the drugs, then I knew what he's

doing-what he meant by what he said.

Q And what effects are you referring to?

A I would get lethargic, sleepy, dizzy, and I 4 would sometimes fall out-go to sleep.

Q Why would Defendant Lee put drugs in your food?

A Retaliation.

Q For what?

A For writing him up.

Q When did you write him up?

A While I was there. I don't remember the dates, but I wrote him up about not. giving me my law library and stuff like that.

Q Are you referring to formal grievances that you wrote?

A Formal grievances and complaints that the Superintendent was provided.

With respect to Hurteau, Livingston testified:

Q And how do you know Defendant Hurteau put drugs in your food?

A Because he was the one that was giving me that food, that specific tray right there, and he had an ax to grind or something to retaliate against me for writing him up and ...

Q And how do you know those two trays had drugs in it?

A After eating it, I felt the effects of the poison.

Lee and Hurteau do not contradict the facts asserted by Livingston. Instead they rely on the perceived weaknesses in his case. Contrary to the arguments of Lee and Hurteau, Livingston's medical records for July 24, 2002, reflect: "When I been eating food in the last month I've been feeling dizzy, light headiness, sleep, I want to take [illegible writing] see why this is happening" and the notation under "Plan" "0: Thinks it the food-Discuss [medical symbol for with] PA." Although Livingston's medical records show several visits with medical personnel in the month following his initial complaint, the record does indicate any further investigation of Livingston's complaints was undertaken. Lee and Hurteau also argue that because Livingston has no expert medical

testimony to establish a causal connection between his alleged health ailments and the alleged drugs in his food and the cause of the injury is not within common knowledge of a layperson, his claim must fail, citing *Wills v. Amerada Hess Corp.,* 379 F.3d 32, 46 (2d Cir.2004) and *Barnes v. Anderson,* 202 F.3d 150, 159 (2d Cir.1999).

**\*9** Neither *Wills* nor *Barnes* is apposite to this case. In *Wills* the issue presented was the causal connection between squamous cell carcinoma and exposure to benzene or PAHs. *Barnes* presented the issue of the causal connection between a miscarriage and an incident that was alleged to have caused substantial emotional stress. This case, on the other hand, involves a situation in which it is uncontested that Livingston ingested food provided him by Lee and Hurteau and after ingesting the food became dizzy, lightheaded, disorientated, sleepy and rendered unconscious. No medical or laboratory tests were run on Livingston. Under these circumstances it is impossible to determine from direct objective evidence what, if any, foreign substance adulterated the food he ingested. Without this critical information it would not be possible for a medical expert to testify with any reasonable degree of medical certainty the cause of the symptoms exhibited by Livingston. At best, a medical expert could only provide the trier of fact with a list of those substances that, when added to food, (1) would not necessarily be readily detectable while it was being eaten and (2) would cause similar symptoms to occur. The facts in this case are more akin to an ordinary food poisoning case. It is within common knowledge that when one eats contaminated food and suffers food poisoning one becomes ill. The severity of the illness may be dependent upon the exact nature of the contaminant but irrespective of the contaminant the person who ingests contaminated food suffers to some degree from food poisoning. In this case, if the jury accepts Livingston's claim that Lee and Hurteau drugged or poisoned the food he was served, the causality nexus between that and the ensuing symptoms may be logically inferred from temporal proximity.

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct. *Blyden v. Mancusi,* 186 F.3d at 262 (quoting *Wilson v. Seiter,* 501 U.S. 294, 299 (1991)); *see, e.g., Davidson v. Flynn,* 32 F.3d 27, 30

& n. 2 (2d Cir.1994).

Administering a harmful foreign substance through food causes bodily injury just as does the use of excessive force. In an excessive-force case, whether conduct was "wanton" turns on whether force was applied in a good-faith effort to further a legitimate penal objective, or maliciously and sadistically to cause harm. *Hudson,* 503 U.S. at 7; *see also Blyden v. Mancusi,* 186 F.3d at 262-63. Applying that principle to the uncontested facts of this case, the deliberate adulteration of food without any connection whatsoever to a legitimate penological objective, a rational jury could reasonably find that the actions of Lee and Hurteau were wanton.

**\*10** The objective component of a cruel-and-unusual-punishment claim focuses on the harm done; but the amount of harm that must be shown depends on the nature of the claim. *See, e.g., Hudson,* 503 U.S. at 8. This objective component is "contextual and responsive to contemporary standards of decency," *id.* (internal quotation marks omitted), and there are significant differences between the harm that must be shown to support a claim based on prison conditions and the harm that will suffice to support a claimed use of excessive force. No showing of extreme injury is required when the claim is that prison officials used excessive force:

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.

*Hudson,* 503 U.S. at 9. Applying that principle to the facts in the case before the Court, a rational jury could reasonably find that the deliberate inclusion of a harmful substance in food and serving it to a prisoner was done maliciously and sadistically intending to cause harm, thereby violating contemporary standards of decency. In that case, irrespective of whether Lee and Hurteau, or either of them, intended to cause Livingston serious bodily harm or death and only to make him ill, they subjected him to cruel and unusual punishment.

Based on the undisputed facts in the record before it the Court can not say that a rational jury could not reasonably find in favor of Plaintiff. The Court agrees that there is no direct objective evidence corroborating Livingston and the circumstantial evidence is weak.[7] Nonetheless, a jury could find, based upon the uncontradicted testimony of

Livingston that he ingested food and became ill shortly thereafter, in the absence of any other plausible cause, more likely than not he became ill because of some harm substance added to the food. The jury could also find that Lee and Hurteau had both the opportunity (as the persons who delivered the food) and the motive (retaliation) to place a harmful substance in the food.[8]

[7]  In the context of a summary judgment motion, not only must the Court accept as true the factual assertions of the non-moving party, but in this case neither Lee nor Hurteau have denied under oath Livingston's factual statements that they served him drugged, poisoned, or otherwise contaminated or adulterated food.

[8]  To the extent that Livingston asserts a retaliatory animus claim based on temporal proximity to previously filed grievances against Lee and Hurteau, strength of temporal proximity weighs greater than that of the claim against Gawlicky discussed below. The issuance of an inmate misbehavior report is a normal function of a correctional officer entitled to a presumption of regularity. On the other hand, spiking an inmate's food with drugs, poison, or another harmful substance is most decidedly not. Moreover, unlike the claim against Gawlicky, Lee and Hurteau have as yet presented no evidence to counter its weight.

In his Seventh and Ninth Causes of Action Livingston alleges that the acts of Lee and Hurteau violated N.Y. PEN. LAW § 120.05(5) (Assault in the second degree). Defendants argue that Livingston lacks standing to bring the claim citing *Leeke v. Timmerman,* 454 U.S. 83, 91 (1981). While the Court agrees that Livingston lacks standing to bring a criminal action, that is not the issue. The issue, as it relates to N.Y. PEN. LAW 120.05(5), is whether it gives rise to a private cause of action under New York law. Defendants have not cited any case that no private cause of action lies for a violation of that provision and independent research by the Court has not found any such authority. It is clear that New York recognizes the existence of a private cause of action for violations of its Penal Law. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 451 N.E.2d 459, 463 (N.Y.1983). Under New York law, as applied by the New York Court of Appeals, unless the legislature specifically provides that the provisions of the penal law are exclusive and private litigants are not intended to have a cause of action for its violation, it is for the courts to determine, in light of statutory provisions, particularly those relating to sanctions and enforcement, and their legislative history, and of existing common-law and statutory remedies, whether legislature intended private litigants to have

cause of action for violation of provisions. *Id.* Whether a private cause of action was intended under a penal statute turns in the first instance on whether Livingston is one of the class for whose especial benefit statute was enacted. However, inquiry does not end there, rather, factors include what indications there are in statute or its legislative history of intent to create or deny such remedy and, most importantly, consistency of doing so with purposes of underlying legislative scheme. *Id.* Although they have the burden of establishing entitlement to judgment as a matter of law, Lee and Hurteau have not briefed this critical issue.

**\*11** Additionally, it appears that New York would recognize a civil tort cause of action under the facts of this case. *Cf. McCrory v. State,* 721 N.Y.S.2d 712, 713 (N.Y.A.D.2001) (dismissing food poisoning claim for failure to prosecute); *Hakeem v. Wong,* 636 N .Y.S.2d 440, 441 (N.Y.A.D.1996) (dismissing a prisoner's claim that prison officials deliberately poisoned foods purchased from a vending machine for failure to exhaust administrative remedies). In addition, the Second Circuit has indicated that a civil battery claim lies under N.Y. PEN. LAW § 35.30. *See Nimely v. City of New York,* 414 F.3d 381, 391 (2d Cir.2005). This Court perceives no principled reason to assume that a civil battery claim may not be asserted under § 120.05(5).

Having failed to establish that they are entitled to judgment in their favor as a matter of law, Lee and Hurteau are not entitled to judgment on Count Six (Sixth, Seventh, Eighth, and Ninth Causes of Action).

## C. False Misbehavior Report (Fifth Count-Gawlicky)
The basic facts of the events and sequence in this case are undisputed. Livingston lodged complaints with the Superintendent against Gawlicky on March 17 and April 6, 2003. On April 11, 2003, Gawlicky issued a misbehavior report against Livingston charging him with making threats against her and disobeying a direct order. Following a hearing, Livingston was found guilty of making of the threat charge and not guilty of violating a direct order and sentenced to four months punitive confinement, with loss of privileges.

Livingston contends that the report was false and Gawlicky fabricated it in retaliation for Livingston having filed the complaints against her and that she falsely testified that she feared Livingston might reach through the cell bars to assault her so that he would be placed in a plexiglass cell.

Because they involve questions of intent and are easily

fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, courts must approach prisoner claims of retaliatory action with skepticism and care. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To sustain a First Amendment retaliation claim Plaintiff must show that: (1) the speech or conduct at issue was protected; (2) the defendant took an action adverse to him; and (3) a causal connection between the protected speech or activity and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004); *Dawes v. Walker,* 239 F.3d at 492. Defendant concedes that the complaints filed by Livingston constituted a protected activity and it appears beyond cavil that the filing of a misbehavior report that results in disciplinary action is adverse. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). This leaves as the only open issue the causal connection between the two.

The only evidence that Livingston offers for his retaliation claim is the temporal proximity between his complaints against Gawlicky and the filing of the disciplinary charges against him. This is circumstantial evidence of retaliation. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002); *Colon v. Coughlin, supra,* 58 F.3d at 872. The question becomes whether this, standing alone, is sufficient to defeat summary judgment. In *Colon* the Second Circuit suggested that if this were the sum and total of plaintiff's case, it might be inclined to affirm the grant of summary judgment to the defendants based upon the weakness of plaintiff's case. 58 F.3d at 873. In this case, unlike *Colon,* Livingston offers no direct evidence of a retaliatory motive. Other circumstantial evidence that might lend support to his case, *e.g.,* his disciplinary record and the nature of the more recent disciplinary violations, *see Flaherty v. Coughlin,* 713 F.2d 10, 14 (2d Cir.1983), in reality undercut Livingston's claim. The record shows that between December 1989 and April 2003 Livingston was the subject of more than 100 disciplinary actions, several of which involved assaults on or threats made to staff. In *Gayle,* unlike this case, the misbehavior report was not only temporally close but arose from statements made in a protected activity (discussion of a grievance) and the conviction was reversed on appeal.

**\*12** The Court, balancing the principles of the special solicitude to be given to *pro se* plaintiffs and the general rule against weighing the evidence against the skepticism with which it must view retaliation claims, is of the opinion that, based on the evidence in this case, no rational trier of fact could reasonably find in favor of Livingston. Gawlicky is entitled to summary judgment in her favor on the Count Five (Tenth, Eleventh, and

Twelfth Causes of Action).

## D. Interference with Religious Beliefs (Count Six-LeFrance and Foster; Count Seven-Abair, Salls, and Bouyea).

Both Count Six and Count Seven appear to be predicated upon an alleged infringement of Plaintiff's religious beliefs as a Rastafarian. In his complaint, Livingston alleges that LeFrance tried to force him to be handcuffed or sit next to a person who was clearly a transsexual/homosexual and that because of this Foster fabricated a misbehavior report that Livingston disobeyed a direct order. He further alleges that Abair, Salls and Bouyea refused to serve him alternative religious meals, *i.e.,* substitute meals when red meat was served. Livingston's claim of religious belief is clouded by certain undisputed facts. Livingston admits to having been raised as a Seventh Day Adventist. In approximately 1984 he became a Muslim. At some subsequent date that does not appear in the record, Livingston converted to Rastafarianism. However, irrespective of the date of his conversion, Livingston did not inform prison officials of this conversion until on or after August 21, 2004, after the dates that the events of which Livingston complains occurred.

### 1. *LeFrance and Foster.*
In his affidavit, Livingston testified:

> 38. On July 21, 2003 when Plaintiff was being transferred out of Upstate C.F. SHU, defendant LaFrance tried to force him to be shackled with an inmate that was clearly a transsexual/homosexua1. Due to Plaintiffs religious belief he refused to be shackled with the transsexual/homosexual inmate.

> 39. When Plaintiff was called to the pen gate to be shackled, and he saw the inmate whom was to be shackled with him Plaintiff calmly asked defendant LaFrance, "is this person going to be handcuffed to me". Defendant LaFrance answered "yes". That is when Plaintiff clearly, calmly and respectfully told defendants LaFrance, M. Foster, and the other c.o.'s in the area that it's against his religion to be in such a close proximity with a transsexual/homosexual person, and could he be shackled to somebody else. The defendants said "no". Plaintiff then sat beck [*sic* ] down.

> 40. Plaintiff was again asked to be shackled to the transsexual/homosexual inmate. Plaintiff again refused

to be shackled to that inmate, and again stating his religious concerns.

> 41. Defendant LaFrance then got on the telephone and spoke to someone about Plaintiff and the situation. While on the telephone defendant LaFrance suggested an alternative solution to the situation. The alternative was that Plaintiff would not be shackled to this person, but he still had to be seated next to the same person, Plaintiff agreed to not being shackled to this person, but questioned the logic of being forced to being seated next to this person still. Defendant LaFrance then told the person on the telephone that Plaintiff still refused to get on the bus. If Plaintiff were not shackled to this person it would be no need for him to be seated next to this person for the long bus ride. Sitting next to the transsexual/homosexual person was the same as being shackled to him.

> **\*13** 42. Plaintiff would have been force to be seated next to the transsexual/homosexua1person for six to eight uncomfortable hours. Plaintiff did not want to violate his religious belief, and be stressed out for not adhering to his religious dogma.

> 43. Plaintiffs religious belief comes from the Holy Bible, and the way his mother raised him. In the book of Leviticus chapter 18 verse 22 through 26states that, "you shall not lie with a male as with a woman; it is an abomination ..." There are many other verses in the Bible such as this one that forbid homosexual acts and association. Jamaican parents who were strict with the teachings of the Bible raised plaintiff. Also, the Jamaican people when Plaintiff was growing up took anti-homosexual stance very serious, because of what the Holy Bible states regarding any homosexual activities. God did destroy Sodom and Gomorrah, because of the abundance of homosexual abomination that was occurring in these two cities.

> 44. Plaintiff stated his religious concerns to both defendants LaFrance and Foster, but they were hell bent on violating Plaintiffs religious beliefs.

> 45. Plaintiff was escorted back to SHU, and the next day, July 22, 2003 was issued a bogus fabricated misbehavior report written by defendant M. Foster.

> 46. Defendant Foster fabricated that Plaintiff stated that he "wasn't gonna be shackled to any Homo". And also said, "You guys might be Homo's, but I'm not and you ain't putting me with that Homo". Plaintiff never said any of these alleged quotes. At all time during the incident Plaintiff calmly, clearly and respectfully expressed his religious position to defendants LaFrance

and Foster regarding his religious belief and the reason why he did not want to be shackled to the transsexual/homosexual person. At no time did Plaintiff verbally harass or abuse anyone. These defendants asked Plaintiff to be shackled to get on the bus; they did not give a direct order. Either way Plaintiff would have still stand on his religious rights and beliefs to not be shackled to the transsexual/homosexual person.

47. There were other inmates that were associating with the transsexual/homosexual while in the pen that would have been willing to be shackled to this person.

48. Plaintiff was found guilty at the disciplinary hearing by the H.O., and sentenced to four (4) months SHU with loss of all privileges, and sixty (60) days was suspended and deferred.

49. Plaintiff submitted an administrative appeal. The hearing disposition was reversed and expunged on administrative appeal after Plaintiff completed his SHU sentence. In all Plaintiff did sixty-one (61) days in SHU due to the fabricated misbehavior report written by defendant Foster and endorsed by defendant LaFrance.

In his Deposition, Livingston testified:

Q Okay. I'm going to turn now to the events that you've included in this Complaint that occurred on the date of July 21 st, 2003, at Upstate Correctional Facility.

**\*14** Could you please describe what. happened on July 21 st, 2003?

A Well, I got-I was escorted to the receiving room to be processed to be released from S.H.U. Upstate, and at one point I saw that the Sergeant wanted me to be handcuffed to this inmate that was, say-he was a transsexual. Like-I don't know. He had-he had fake breasts or whatever you want to call it, and he made himself up to look like a girl-female or whatever. And I told the Sergeant I don't want to be handcuffed to this dude right here, and I told him the reason why, and he tried to force me to still. I told him, no, I'm not going to. And he-after going back and forth, I still told him I refused, and he got on the phone. He spoke to somebody. And he came with an alternative way to be-to be placed on the bus, but it was still something to do with being handcuffed to the dude. And I told him no. So he said well, you know, you get put back in your cell. I said: If that's how it's going to be, that's how it was going to be. It's my religious right not to be forced to be handcuffed to this person. That's what I told him. So they put my back in my cell and wrote me a force

ticket saying this and that happened, when none of that happened in the ticket. They found me guilty. And I appealed it, and they found in my favor.

Q So the ticket was ultimately reversed?

A Yes.

Q Who first gave you the order to be handcuffed to this transsexual inmate?

A. I think it was LeFrance 'cause I turned to him after I saw what was-what was taking place, I turned to him and said: I'm not gonna be handcuffed to this person right here.

Q And what did LeFrance do?

A He said if you want-he said-he said something like if you want to get on the bus you are. And I said I'm not, and we went back and forth with it. And I told him the reason why, and he still didn't care. And I told him, well, I refused. And he made a phone call to somebody.

Q Did LeFrance give you a direct order to be handcuffed to the transsexual inmate?

A You could probably say it was an order, but I still wasn't going to.

Q And you refused the direct order?

A If it was an order, I refused it.

Q And you refused to obey the direct order on religious grounds

A Yes.

Q And what are those religious grounds

A Not to be in close proximity and interactive with persons of that persuasion.

Q And is that part of your Rastafarian beliefs?

A It's my belief. It comes out of the Bible. I think I sited [*sic* ] the place in the Bible where it states Leviticon-Leviticus.

Q In Paragraph 71 of your Complaint you correctly note that you cite Leviticus 18[:]22 through verse 26. Do you know what that verse states?

A Not verbatim.

Q Could you summarize it for me?

A Basically what I just said about, you know, being associated, proximity, interaction, you know, with persons like that person was.

Q And did you cite this verse to Sergeant LeFrance?

**\*15** A No. But I told him that's my religious belief not to be handcuffed to this person like that.

Q Were you actually ever handcuffed to this other inmate?

A No.

Q So the only injury suffered as a result of the events of July 21 st, 2003, is the ticket that was issued to you?

A I had to do 61 days, and my religious belief was compromised.

Q How was your religious belief compromised?

A Because they wanted me-to handcuff me to the person-this person knowing that. And since I refused, they gave me 61 days because of my religious belief.

Q So the injuries suffered was the 61 days in S.H.U.?

A And my religious beliefs.

Q In Paragraph 74 of your Complaint you say: Defendant M. Foster fabricated a misbehavior report stating that Plaintiff disobeyed a direct order, verbal harassment, and staff direction for movement.

Why was the ticket fabricated?

A Because in the description of the incident, none of that happened. He said I start-I don't remember what he wrote, but he's saying that I start yelling, screaming, and causing a scene and all kinds of stuff. But I never did that. All I stated was my religious belief and my reason for refusing to be handcuffed to this person. But he just made up lies, fabrication, and said all kind of stuff happened beside, you know, that really happened.

Q A hearing was conducted on this incident?

A Yes.

Q What was your defense at the hearing?

A That because of my religious belief I didn't want to be handcuffed to this person and none of the description of the incident was true.

Q Did Defendant Foster give you a direct order?

A Not that I remember. All I kept speaking to was the Sergeant because he was the one in charge. So all my verbal comments was directed to him.

A little later he further testified.

Q Were you ever given an order to get onto the bus?

A I guess so if-'cause that's what they was trying to do. It might not have been an order-order, but it was, you know, they wanted me to get on the bus.

Q And did you refuse because of your religious beliefs?

A Yes

Four facts emerge from Livingston's testimony. First, he refused to be shackled or, alternatively, sit unshackled next to a person he described as being a transsexual or homosexual for transport between two prison facilities. Second, his refusal was based upon his professed religious beliefs. Third, his refusal to be shackled resulted in his not being transported and was, at the very least, the functional equivalent of refusing to obey a direct order. Fourth, Livingston was subjected to disciplinary action for his failure to obey the order.

Livingston has the threshold burden of establishing that the action of which he complains substantially burdened his sincerely held religious belief. *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006). Once Livingston has met this burden, the burden shifts to the Defendants to identify the legitimate penological purpose justifying impingement upon that right and that the burden is reasonable. *Id.* In making the reasonableness determination, this Court must evaluate four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether Plaintiff had an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating Plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Id.,* citing *Turner v. Safley,* 482 U.S. 78, 90-91 (1987).

**\*16** The question is twofold: what was believed and how was it burdened? Livingston's belief in this case is that homosexuality is an abomination and that he should "not be in close proximity and interactive with persons of that persuasion."⁹ By his own admission Livingston was not handcuffed nor was he forced to ride seated next to the homosexual/transsexual. The burden he alleges imposed

was that Foster issued him a fabricated misbehavior report and he was subjected to disciplinary action for refusing to be handcuffed to a homosexual/transsexual.

[9]    In addressing Plaintiff's threshold burden, this Court starts with the assumption that Plaintiff's religious belief is sincerely held. *See Ford v. McGinnis,* 352 F.3d 582, 590 n. 8 (2d Cir.2003).

The fatal infirmity in Livingston's case against LeFrance is that there is no factual support for a finding that LeFrance infringed on any religious belief. He admits that he does not know and is only guessing that LeFrance ordered Foster to issue the ticket. Other than to order him to be handcuffed to the homosexual/transsexual person and board a transport bus, which order Livingston admittedly refused to obey, LeFrance had no further direct or personal involvement in the incident. While perhaps showing that LeFrance *attempted* to burden Livingston's religious beliefs, Livingston falls far short of establishing that LeFrance burdened them. Moreover, even assuming LeFrance ordered the misbehavior report be issued, as discussed further below, it does not establish his liability. LeFrance is entitled to judgment in his favor on the Thirteenth Cause of Action.

Livingston's action against Foster suffers from several infirmities. The misbehavior report charged Livingston with disobeying a direct order, verbal harassment, and staff direction for movement. Livingston claims the misbehavior report was fabricated. The fabrication claimed by Livingston was in the description of his behavior, *e.g.,* "yelling, screaming, and causing a scene and all kinds of stuff." What Livingston fails to contend is that he did not disobey an order or staff direction for movement. Quite to the contrary, Livingston admits he refused to be handcuffed or sit next to the transsexual/homosexual for movement and as a consequence missed the movement. Even accepting as true Livingston's conclusory allegation that the description was false, having admitted he refused to be handcuffed and board the bus, Livingston's conclusory assertion that the infraction of the rules with which he was charged was fabricated lacks factual foundation.[10]

[10]    The Court is not unmindful of the fact that Defendant's conviction of this charge was later reversed on appeal. Not only is no reason shown for the reversal, but the fact that Livingston may have been exonerated on appeal does not render the misbehavior report "bogus" or "fabricated" in a case where he admits the facts that underlie the charges in the misbehavior report to be true.

Plaintiff's only defense to the misbehavior report was the exercise of his religious beliefs was being infringed. The question becomes whether being handcuffed or, alternatively, forced to sit next to a homosexual/transsexual on a bus would substantially burden Plaintiff's religious beliefs. It would not. According to Plaintiff, being forced to sit next to a homosexual/transsexual for six to eight hours would have been uncomfortable and he would have been stressed out for not adhering to his religious dogma. This case does not rise to level of those cases in which a substantial burden on religious tenets was found to exist. Plaintiff was not denied the right to participate in congregate services (*Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); right to participate in a religious ceremony of his choice (separate Shia and Sunni services during Ramadan) (*Salahuddin v. Goord, supra* ); denied a religious meal (*Ford v. McGinnis,* 352 F.3d 582, 594 (2d Cir.2003)); or forced to swear on a bible in church (*Doe v. Phillips,* 81 F.3d 1204, 1211-12 (2d Cir.1996)). Plaintiff was simply going to be uncomfortable sitting next a person whom he believed to be a moral abomination. This fits within those cases in which it can comfortably be said that is so peripheral to Plaintiff's religion that the burden is constitutionally *de minimis. See Ford v. McGinnis, supra,* 352 F.3d at 593. Moreover, nowhere has it been clearly established that no matter how strongly or sincerely held his religious beliefs may be, a prison inmate has the right to be free from being in the proximity of or interactive with another person because of that person's sexual orientation. Indeed, such a rule, just as one founded upon color, creed, religious beliefs, gender, or national origin, would be repugnant to the strong public policy of this country and this Court declines to adopt such a rule.

**\*17** Defendants argue that, assuming that the misbehavior report constituted an impermissible burden on his religious beliefs, Livingston is not entitled to recover because LeFrance and Foster have qualified immunity. Under the doctrine of qualified immunity, *i.e.,* freedom from being sued, the court follows a two-step process: first was there a violation of a constitutional right and second was the right clearly established at the time of the violation. *Clubside, Inc. v. Valentin,* 468 F.3d 144, 152 (2d Cir.2006) citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "The relevant dispositive in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct is unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. at 202. If the facts establish a violation, the inquiry becomes whether the evidence, when viewed in the light most

favorable to plaintiff and all permissible inferences drawn in his favor, is such that no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not violate a clearly established right. *Salahuddin v. Goord,* 467 F.3d at 273.

While a general right of a prisoner to freely exercise his religious beliefs, although subject to some restriction, was clearly established in 2003, the question is whether that right extended to Livingston's conduct. *See, e.g., Shabazz v. Coughlin,* 852 F.2d 697, 700-701 (2d Cir.1988) (holding that while the right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not). As noted above, no such right as that claimed by Livingston in this case has been clearly established and defendants are entitled to qualified immunity.

LeFrance and Foster are entitled to judgment in their favor on the Sixth Count (Thirteenth and Fourteenth Causes of Action).


2. *Abair, Salls, and Bouyea.*
In his affidavit Livingston testified:

50. On August 5, 2003 defendant D. Abair started denying Plaintiff his alternative/religious meals while in Upstate C.F. Plaintiff notified sergeant Trim, but nothing was done about this problem. Plaintiff had to go hungry for the last two chows (lunch & dinner). Plaintiff told defendant Abair that he have been getting the religious/alternative since he arrived in Upstate C.F. on May 2, 2003. Defendant Abair still refused to give Plaintiff his meal.

51. On August 6, 2003 again Plaintiff did not get his religious/alternative meals. Plaintiff spoke to defendant S. Salls on the 7 to 3 shift about the problem. Plaintiff had to go hungry because his meal was not given to him, and he did not eat meat for religious reasons. When the 3 to 11 shift came on Plaintiff spoke to Sgt. Bass about the problem, but nothing changed Plaintiff still had to go hungry.

52. On August 7, 2003 during the 7 to 3 shift Plaintiff again spoke to defendant Salls twice. Defendant Salls told Plaintiff he wouldn't be getting the religious/alternative meal until September 1,2003.

**\*18** 53. Plaintiff even spoke to the Muslim Iman [*sic* ] Dr. Ali on August 7, 2003 about him being denied his religious/alternative meal. Dr. Ali said he would tell

somebody about the problem. Plaintiff still did not get his meals.

54. On August 11, 2003 defendant J. Bouyea came back to work on A-gallery in 8-Building, for which he was the steady C.O. Plaintiff spoke to defendant Bouyea about the problem of him not getting his religious/alternative meal. Defendant Bouyea wrote the sign back on the door indicating that Plaintiff was to get a religious/alternative meal. Defendant Bouyea told Plaintiff that he must have "pissed off somebody for them to change his alternative meal to regular." Plaintiff started getting his religious/alternative meal then.

55. On August 13, 2003 defendant Salls came to Plaintiff cell during feed-up time and made defendant Bouyea change the religious/alternative meal tag on the cell door to regular meal. Defendant Salls told Plaintiff he "will make sure you don't get your religious meal." Plaintiff did not get his meal and he went hungry again.

56. On August 14,2003 defendant Salls came to Plaintiff on the pretense of investigating him not get his allotted cell property. Defendant Salls tried to make a mockery of Plaintiff situation. At one point defendant Salls told Plaintiff "you just don't understand you are not getting anything."

57. On August 14, 2003 defendant Bouyea refused to give Plaintiff his religious/alternative meal during the lunch feed-up. Defendant Bouyea told Plaintiff that defendant Salls said, "you not alternative, so you not getting it." It was reported to the console that Plaintiff refused chow. Plaintiff still was not getting his meals.

58. On August 17, 2003 Plaintiff was not feed [*sic* ] at all because there was no religious/alternative meals on the food cart for him. This was not reported to the console to be recorded in the logbook.

59. On August 20,2003 Plaintiff spoke to Correction Lieutenant D. Phelix about his meal being changed from religious/alternative to regular without him requesting the change. He said he would check into the situation. Plaintiff did this when he was moved from 8-B-2cell to 8-A17cell.

60. On August 22, 2003 Plaintiff spoke to Correction Captain Bezio regarding him not getting his religious/alternative meal. He told Plaintiff that defendant Salls investigated the matter. Defendant Salls never investigated Plaintiff about the food after August 7,2003. In fact, it was defendant Salls whom had Plaintiff [*sic* ] meal changed without consent or a

request after the problem was corrected on August 13, 2003 Plaintiff told this to Capt. Bezio.

61. On August 28, 2003 Plaintiff told Correction Captain Racette about the problem he was having regarding not getting his religious/alternative meals, and it being changed to regular meals without his request. Capt. Racette saw for himself that the alternative meal sign on the cell door was scratched off with a black marker and regular was written on the place card.

**\*19** 62. All of the discrepancies about Plaintiff's religious/alternative meals started after he refused to be shackled to the transsexual/homosexual inmate on July 21, 2003. Which was a deliberate attempt to violate Plaintiff's religious beliefs.

63. The denial of Plaintiff [*sic* ] religious/alternative meals was once again an attempt to violate his religious beliefs. Because of Plaintiff's religious beliefs he do not eat red meat, pork, crustaceans or fishes without scales. Plaintiff went hungry when red meat was served.

In his Deposition Livingston testified in part:

Q What are your religious dietary restrictions under Rastafarianism?

A I don't eat any red meat and stuff like that.

Q You're going to need to elaborate on what "stuff like that" is?

A Just red meat and you know ...

Q Do you eat other forms of meat?

A. Yes.

Q Chicken?

A Yes, I eat chicken.

Q Fish?

A Fish.

Q So it's basically just no red meat like-

A Yes.

Q -beef?

A Yes. And I don't eat shrimps, crabs, oysters, and those things without scales and stuff like that.

Q So no seafood?

A No. I eat seafood but certain seafood like unscaled seafood. Like, you know, certain-it's basically what the Bible said not to eat. The Bible said not to eat unscaled fish and basically that's what I-I don't eat shrimps, crabs and lobsters.

Q I can't imagine that the Department of Correctional Services serves lobster too often.

A They never do. But you can buy it, though.

Q Really?

A Yeah.

Q Hmm. And the dietary restriction of red meat and no unscaled seafood, is that a basic tenant of Rastafarianism?

A That's how I grew up from my mother. My mother never cooked pork and stuff like that. That's one other thing. Unscaled fish, she never cooked those.

Q And is your mother a Rastafarian?

A. No, she's Seven [*sic* ] Day Adventist. But she followed-she just followed the Bible strict, like, you know, as far as dietary things.

Q So even though you converted to Rastafarianism, you kept the dietary restriction of a Seven [*sic* ] Day Adventist?

A Basically. It's basically the same thing, but they just follow the Old Testament, you know, Torah and all that other stuff.

Q Now, it was my understanding that Rastifarians are complete vegetarians; is that true?

A Some. Some.

Q Why have you chosen not to be a complete vegetarian?

A Because I think I need some-some of that, you know, protein and things.

Q Now, in August of 2003, were you serving a S.H.U. sentence?

A Yes, I think so. I think-yeah, 2003.

Q When you came into DOCS custody, did you inform them of your no red meat dietary restriction?

A At one point.

Q When?

A Every time that I went to the box or S.H.U. I informed them that, you know, I'd like the alternative meal-the religious meal.

Q Now, how do you go about telling them that you want the alternative meal?

**\*20** A You know, each facility prison, you know, verify how they want to be told. Some make you sign a paper-documents that all you want is the alternative meal, and others they just ask you when you come in what kind of food you want and you tell them.

Q How does Upstate do it?

A When I first went there in '01, I think it was I went there-or '02 I told-I signed a piece of paper before. But when I returned the most-last one-recent one-the most recent one I just told them. They just put it up on the door of the cell that, you know, he eats alternative.

Q And how about in '03, what was the process at Upstate?

A '03, that's the most recent one. I think I told-that's why I told them. I told them-the first time I went there, I had to sign a document saying I wanted the religious meal. The last time I went there, they just put it on the door after I told them I only eat alternative meal.

Q. And how do they put it on the door?

A. They write it on a piece of paper and they have some magnets like, you know, you might use on your refrigerator to stick it up there on the metal door.

Q And what's the difference between the regular meal and the religious alternative meal?

A They don't serve meat. Soy beans and-

Q So the religious alternative meal is completely vegetarian?

A Yes. And fish.

Q It includes fish, though?

A Yes.

Q And when you were in S.H.U., your meals are delivered to you?

A Yes.

Q And how many times a day are meals delivered to S.H.U. inmates?

A Three times.

Q And generally what would be in your breakfast?

A Everybody get the same breakfast generally. I can't-it varies everyday; toast and hot cereal, cold cereal, coffee cake and jelly, milk, coffee if you drink coffee, juice.

Q Is there ever any meat products in the breakfast?

A If you consider eggs or they have some, I think, turkey sausages/links.

Q And do you eat eggs under your religious dietary restriction?

A Yes, I eat eggs.

Q And do you eat turkey sausage as part of your religious-

A I eat turkey.

Q So any breakfast that was delivered to you would have complied with your religious dietary needs?

A. Yes.

Q What generally is in a lunch that was delivered to you in S.H.U.?

A Non-meat. Alternative-on the alternative meal it's non-meat, that's all. But it varies from meal to meal.

Q What about in the general-the non-alternative meal, what would be included in that?

A It varies too, but they have meat in theirs, most likely.

Q Would there be non-meat products included in the lunch?

A Like potatoes, and rice, and stuff like that?

Q Yeah.

A Mm-hmm. Vegetables. But the main course would be something with meat, most likely. They also get chicken and fish, turkey.

Q And for dinner on the non-alternative meal, what was generally served?

A Basically the same thing; meat biproducts [*sic* ] and carbohydrates, bread.

**\*21** Q So the main entree would have either chicken, fish or beef-

A Right.

Q -and then there would be two sides-

A Two sides.

Q-like a serving of vegetables?

A Yeah.

Q And then maybe a serving of potatoes and rice?

A Yeah, dessert. Mm-hmm.

Q And bread?

A Yes.

Q You allege in your Complaint that from August 5th to August 11th, 2003, you had to go hungry when red meat was served. How many times was red meat served to you in S.H.U. from August 5th to August 11th, 2003?

A I didn't count but basically every day red meat is served. Sometime it be mixed into it where you can't even, you know, separate and eat what's not red meat like potatoes or rice.

Q What do you mean "every day red meat was served"?

A Some kind of red meat was served-I wouldn't say every day, but most days it would be red meat. You know, beef, chopped beef, Salisbury steak, stuff like that.

Q And which meal of the day, breakfast, lunch or dinner, could you not eat because it had red meat?

A Probably the last two lunch and dinner.

Q So you were always able to eat your breakfast?

A Yes.

Q And were there days when both lunch and dinner on the same day included red meat?

A Yes.

Q How many days was that?

A I didn't count them, so I couldn't really give you a specific answer on that.

Q Were there ever consecutive days in which both lunch and dinner included red meat?

A Yes.

Q How many?

A I couldn't say.

Q When you arrived at Upstate, who did you tell about your dietary restriction?

A Officer on the gallery.

Q Do you remember his name?

A No.

Q And when did you first arrive in S.H.U. at Upstate in 2003?

A I think I got there May.

Q And from May to August of 2003, you had no problems receiving your alternative meal?

A No. I think it was from May to July 'cause I was gonna get out in July on the 21 st. And then when I told them I didn't want to be handcuffed to that other inmate and they put me back into the cell, that's when all the problems started about my meal.

\* \* \* \*

Q But your only complaint was when the meal contained read meat?

A My complaint is them not wanting to comply with my request for religious meal because that's what I was getting and they knew it. And they just outright refused me because, I think, in retaliation of what they-what I did when I said I didn't want to be handcuffed to that-to that person.

* * * *

Q Did you ever complain to Officer Abair that he was denying you your religious meal?

A Yes, I did.

Q. When did you have this conversation?

A At the time he denied it.

Q And what did he say to you?

A What did he say? Basically you're not getting it. You're not getting an alternative meal. We went back and forth. I told him: I been getting it. He said: You're not getting it now. I said: Why not? He didn't give me no reason.

Q What are your claims again Defendant Bouyea?

**\*22** A Yeah. He started not giving me my alternative meal, also.

Q When?

A Shortly after that incident. Shortly after Abair started that and he knew. 'Cause when Abair started that, not giving me my alternative meal, he wasn't on. He was the steady officer. And when he came back, he knew I was there for a while on that gallery, and he put the alternative tag back on my cell. Because he knew, you know, since I been there I was getting the alternative meal. And then about a week or so after, Sergeant Salls, S-A-L-L-S-

Q Mmhmm.

A-Salls told him to take it off right in front of me. Take it off. Take that off the door, he's not getting it. So he start not giving me my alternative meal.

Q So who's the officer who was in charge of the gallery at Upstate S.H.U. that you were housed in at August and September 2003?

A August? That's when they moved me from one side to the other. So I don't really know who was the officer that was in charge. But on the gallery, on B Gallery where I was before where this-where it started, he-that other officer who you said his name, he was the steady officer and he knew my dietary requirements.

Q So in July of 2003, where were you housed?

A In 8 Building, B Block, in Two Cell.

Q And when you were going to be transferred out of Upstate in July of 2003, you had an incident with Officer LeFrance and Officer Foster, so you were not transferred out of Upstate; correct?

A Yeah, I was-yep, they sent me back to my cell. That cell right there.

Q So they sent you to the 8 Building, B Block?

A No. They sent me right back to the same cell, 8 Building, B Block, Two Cell.

Q And was this the cell you were in from August 5th to August 11th, 2003?

A August 5th to August 11th, 2003. I might have the dates mixed up, but at one point they had moved me from A Building, B Gallery, Two Cell to A Block-A Building, A Block-A Gallery, 19 cell or something, if I'm not mistaken.

Q And this is where you were denied your religious meals?

A Most of the time. But it was happening on the other gallery, too, before I got moved.

Q And was it Officer Bouyea who was in charge of 8 Building,

A Block-A B Block.

Q B Block?

A No, B Gallery. It's 8 Building, B Gallery and the cell. Yeah, he was the officer-he was the main officer that was on. Him and another officer.

Q And just so I'm getting this straight, he was the officer in charge of the 8 Building or the A Building?

A Eight. Eight. The number eight.

Q Who was in charge of A Building?

A I don't know.

Q Did you see Officer Bouyea from August 5th, 2003, to August 11th, 2003?

A Did I see him? Occasionally, yeah. Mm-hmm.

Q And did you complain to him that you weren't getting your religious meals?

A He knew I wasn't getting my religious meals after that Sergeant told him to take the religious alternative meal that was posted on my door down. That's when I stopped getting it again.

**\*23** Q Right. And that's on August 13th, 2003. But prior to that, from August 5th to August 11th, 2003, did you complain to Officer Bouyea that you weren't getting your religious meals?

A Yeah. Because when he came back to work. 'Cause before that-before that, he wasn't on. But when he came back to work I was like-I was telling him they stopped giving my religious meal, and I told him: You knew I Iwas getting that before. And he said: Yeah. And then he put it back up. He post it back on the door, and I start getting it again. And then that's when Salls-a Sergeant Salls told him to take it down and not to give me no more-give me the trays of the alternative meal anymore.

Q How do you know Sergeant Salls told Officer Bouyea to take the sign off of your door?

A Did it right in front of me.

Q What did Sergeant Salls say?

A He told him to take it down and don't give him no more alternative meal.

Q Why did Sergeant Salls tell him to do that?

A I don't know.

Q So what are your claims again Officer Bouyea?

A That he took-he stopped giving me my alternative meal when he know that I was supposed to be getting it.

Q Why do you think Sergeant Salls stopped giving you your alternative meals?

A I think it came out of that incident that happened when I was getting transferred. 'Cause after that happened then, that's when all the things about my food started. Before that incident, it was no problem getting my trays-my food tray-alternative food trays. But after that incident, just all kinds of problems about that.

\* \* \* \*

Q Now, after the sign was taken off of your door on August 13th, 2003, how long did you go without your alternative meals?

A From then on I never got it until sometime in September.

Q What happened in September?

A After complaining to everybody that walked past, even writing complaints to the Superintendent and others, and they came up with an idea that I had to sign a request form for that kind of a meal, which I did, and they started giving me my meal-the alternative meal again.

Q Now, from August 13th to September 1 st, 2003, the breakfast that was served always complied with your religious dietary restrictions?

A I was able to eat, yeah.

Q From August 13th to September 1 st, 2003, how many lunches could you not eat because it had red meat?

A I didn't count it.

Q More than one?

A Yes.

Q More than five?

A Probably.

Q More than ten?

A Probably.

Q. More than 15?

A Probably.

Q More than 20?

A Probably.

Q Sir, how many lunches were severed to you from August 13th to September 1st?

A I don't know. I didn't count.

Q You get one lunch a day; correct?

A Yep. I still didn't count them.

Q How many dinners were served to you from August 13th to September 1st, 2003?

A I don't know. I didn't count them.

Q Well, you get one dinner a day; correct?

A Right. If you want to do math, probably could figure it out.

**\*24** Q And how many dinners had red meat?

A I don't know. Probably the majority of them had red meat, though. Sometimes there was fish and turkey, depending on the meal or the menu.

Defendants' argument is essentially twofold. First, Defendants argue that Livingston's dietary restrictions are not central to his Rastafarian religion but are based upon his having been raised as a Seventh Day Adventist. Therefore, Defendants argue his religious beliefs are not sincere. Second, that Livingston did not inform the DOCS officials of his conversion to Rastafarianism until approximately one year after the incidents forming the basis for his claims. For the reasons that follow, the Court rejects those arguments.

Defendants' first argument is contrary to controlling authority. In determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, the relevant inquiry is not whether, as an objective matter, the belief is accurate or logical, but whether the beliefs professed by a claimant are sincerely held and whether they are, in his own scheme of things, religious; a claimant need not be a member of a particular organized religious denomination to show sincerity of belief. *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999). In the very case cited by Defendants in support of their argument, *Ford v. McGinnis, supra,* the Second Circuit rejected a narrow reading of *Jackson.* Instead, following *Frazee v. Illinois Department of Employment Security,* 489 U.S. 829, 832-33 (1989) (free exercise of religious beliefs does not turn on a membership in a particular sect or a particular tenet of the sect involved), *Ford* rejected any objective test in determining the sincerity of religious beliefs. 352 F.3d at 588-91; *see also Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996); *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir .1984) ("differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud"). At best, Defendants' argument raises a triable issue of fact as to Livingston's sincerity.

Defendants' second argument rings hollow. First, there is no indication in the record that Livingston was denied alternative religious meals because of his failure to formally advise DOCS of his conversion to Rastafarianism until approximately a year later. Second, the testimony of Livingston that he advised the Defendants of his religious preferences is uncontradicted and there is no evidence that Defendants made any investigation into his claim. Third, and perhaps more importantly, the uncontradicted testimony of Livingston that, notwithstanding the lack of formal notification of conversion to Rastafarianism, he had received alternative religious meals prior to August 2003 eviscerates any suggestion that such formal notification was required. Moreover, even by his official stated religious belief as a Muslim, Livingston was entitled to receive alternative religious meal.

**\*25** Abair, Salls, and Bouyea contend that they are entitled to qualified immunity. The Court disagrees. Not only have they failed to adequately develop that issue but they lose on the merits as well. As noted above, qualified immunity does not exist where there is a clearly established right and no reasonable officer could not be aware that his conduct violated that right. It was clearly established law in 2003 that prison inmates have a right to a diet consistent with the prisoner's religious scruples. *See Kahane v. Carlson,* 527 F.2d 492, 495-96 (2d Cir.1975).

Defendants have not advanced any legitimate penological justification for denying Livingston alternative religious meals and none appears from the record before this Court. Consequently, this Court rejects the qualified immunity argument of Abair, Salls, and Bouyea for the same reason as did the Second Circuit in *Ford,* 352 F.3d at 597 ("prior cases make it sufficiently clear that absent a legitimate penological justification, which for present purposes we must assume defendants were without, prison officials' conduct in denying [Plaintiff a meal consistent with his religious tenets] was unlawful."). *See also Salahuddin v. Goord,* 467 F.3d at 275.[11]

[11]    Put another way, if the actions of Abair, Salls, and Bouyea did not infringe on Livingston's First Amendment free exercise right, there is no liability in any event and the Court need not reach the issue of qualified immunity. On the other hand, if those actions did, in fact, constitute violation of a clearly established First Amendment free exercise right, in the absence of a legitimate penological justification Abair, Salls, and Bouyea are not entitled to qualified immunity.

Abair, Salls, and Bouyea are not entitled to judgment as a matter of law on the Seventh Count.[12]

[12]    The Court notes that, as it appears he was following the

orders of a superior, the liability of Bouyea is questionable. However, that argument has not been presented to the Court for consideration.

### VI. CONCLUSION

Based upon the foregoing, Defendants' Motion for Summary Judgment at Docket No. 56 is GRANTED in part and DENIED in part.

IT IS ORDERED THAT the First, Second, Third, Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, and Fourteenth Causes of Action are hereby DISMISSED, with prejudice.

IT IS FURTHER ORDERED THAT this action is DISMISSED, with prejudice in its entirety, as against Defendants P. Griffin, Donald Selsky, S. Gawlicky, G. LeFrance, and M. Foster.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1500382

---

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4033723
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Mark W. GANTT, Plaintiff,
v.
Gary MIELENZ, Commissary Clerk IV, Coxsackie
Corr. Facility, Defendant.

No. 9:10–CV–0083 (GTS/TWD).
|
Sept. 12, 2012.

**Attorneys and Law Firms**

Mark W. Gantt, Collins, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Laura A. Sprague, Esq., Assistant U.S. Attorney, of Counsel, Albany, NY, for Defendant.

***MEMORANDUM–DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner civil rights action filed by Mark W. Gantt ("Plaintiff") against the above-captioned correctional employee ("Defendant"), are the following: (1) Plaintiff's motion for a temporary restraining order (Dkt. No. 44); (2) Defendant's motion for summary judgment (Dkt. No. 31); and (3) United States Magistrate Judge Therese Wiley Dancks' Report–Recommendation recommending that Plaintiff's motion be denied and Defendant's motion be granted (Dkt. No. 49). For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety, Plaintiff's motion is denied, and Defendant's motion is granted.

**I. RELEVANT BACKGROUND**
On January 22, 2010, Plaintiff filed his Complaint in this action. (Dkt. No. 1.) Generally, construed with the utmost of liberality, Plaintiff's Complaint alleges that in September 2009, while he was incarcerated at Coxsackie Correctional Facility ("Coxsackie"), Defendant filed a misbehavior report against him (charging him with

making a false statement) in retaliation for Plaintiff's having filed a grievance against Defendant for charging him $10.49 for a commissary purchase that he never made. (*Id.*) Plaintiff further alleges that he was found guilty of the disciplinary charge at a disciplinary hearing, which resulted in the imposition of a $5.00 fine and the loss of commissary privileges for 30 days. (*Id.*) Based on these factual allegations, Plaintiff asserts the following two claims: (1) a First Amendment retaliation claim against Defendant Mielenz for the grievance filing; and (2) a Fourteenth Amendment due process claim against the (unnamed) hearing officer who presided over the disciplinary hearing. (*Id.*)[1] For a more detailed recitation of Plaintiff's claims and the factual allegations supporting those claims, the Court refers the reader to the Complaint in its entirety, and to Magistrate Judge Dancks' Report–Recommendation. (Dkt.Nos.1, 49.)

[1] On August 11, 2010, more than 21 days after being served with a motion for judgment on the pleadings, Plaintiff filed a one-page letter requesting leave to amend his complaint to add the hearing officer as a Defendant. (Dkt. No. 15.) Defendants opposed that request. (Dkt. No. 16.) On January 18, 2011, United States Magistrate Judge George H. Lowe denied Plaintiff's request without prejudice to renewal upon the filing of a procedurally proper motion. (Dkt. No. 25.) However, Plaintiff did not subsequently move to amend his complaint. (*See generally* Docket Sheet.)

On September 19, 2011, Defendant filed a motion for summary judgment. (Dkt. No. 31.) Generally, in his motion, Defendant asserts the following three arguments: (1) based on the current record, Plaintiff has failed to exhaust his available administrative remedies as a matter of law; (2) in the alternative, Plaintiff has failed to allege facts plausibly suggesting either a retaliation claim or a due process claim, and has failed to adduce admissible record evidence establishing a retaliation claim; and (3) based on the current record, Defendant is protected from liability as a matter of law by the doctrine of qualified immunity. (Dkt. No. 31, at Parts I–III.) Plaintiff opposes the motion through both a response and an untimely "supplemental response" (which was accepted apparently out of special solicitude to Plaintiff as a *pro se* civil rights litigant). (Dkt.Nos.33, 40.)

On April 12, 2012, Plaintiff filed a motion for a temporary restraining order. (Dkt. No. 44.) Generally, Plaintiff's motion seeks the following relief: (1) an Order of this Court transferring him to a different correctional facility or (22) an Order of the Court restraining Coxsackie correctional staff from future retaliatory acts.

(*Id.*) Defendant opposes the motion. (Dkt. No. 45.)

**\*2** On July 31, 2012, Magistrate Judge Dancks issued a Report–Recommendation recommending that Plaintiff's motion for a temporary restraining order be denied and that Defendant's motion for summary judgment be granted. (Dkt. No. 49.) More specifically, with respect to Plaintiff's motion, Magistrate Judge Dancks found that Plaintiff failed to demonstrate that the alleged ongoing retaliatory acts by correctional officers at Coxsackie Correctional Facility are in any way related to the retaliation claim asserted against Defendant Mielenz asserted in his Complaint. (*Id.* at Part II.B.) With respect to Defendant's motion, Magistrate Judge Dancks found that, while a triable issue of fact (barely) exists with regard to whether Plaintiff failed to exhaust his administrative remedies, Defendant's motion should nonetheless be granted for the following two reasons: (1) because the receipt of a misbehavior report resulting in a five-dollar fine and a 30–day loss of commissary privileges is considered only de minimus punishment, Plaintiff failed to alleged facts plausibly suggesting sufficient adverse action to state a retaliation claim; and (2) because inmates are granted post-deprivation remedies for the loss of property under New York State law, Plaintiff's due process claim also fails. (*Id* . at Part III.)

Neither party has filed an Objection to the Report–Recommendation, and the deadline by which to do so has expired.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c).[2] When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.[3]

[2]    *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed

objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

[3]    *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition.[4] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[6]

[4]    *See also Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

[5]    *See Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

[6]    *See also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**\*3** After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**B. Standard of Review Governing Motions for Summary Judgment and Motions to Dismiss**

Magistrate Judge Dancks accurately recites the legal standard governing motions for summary judgment and motions to dismiss. (Dkt. No. 49, at Part III.A.) As a result, these standards are incorporated by reference in this Decision and Order, which (again) is intended primarily for the review of the parties.

The Court would add only the following point of law. Implied in the above-quoted burden-shifting standard described in Part III.A.1. of the Report–Recommendation is the fact that, where a nonmoving party willfully fails to

adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that nonmoving party is proceeding *pro se.*[7] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[8] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[9] For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement[10]—even where the nonmoving party was proceeding *pro se* in a civil rights case.[11] However, even when this Court has declined to exercise its discretion to conduct a *sua sponte* review of the record in search for a dispute of material fact, the Court will not turn a blind eye to such a dispute, should it discover one during the review it conducts of the record to determine if the movant has met his modest threshold burden.[12]

[7]    *Cusamano v. Sobek,* 604 F.Supp.2d 416, 426 & n. 2 (N.D.N.Y.209) (Suddaby, J.) (citing cases).

[8]    *Cusamano,* 604 F.Supp.2d at 426 & n. 3 (citing cases).

[9]    *Cusamano,* 604 F.Supp.2d at 426–27 & n. 4 (citing cases).

[10]    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

[11]    *Cusamano,* 604 F.Supp.2d at 427 & n. 6 (citing cases).

[12]    *See, e.g., Goodson v. Artus,* 09–CV–0494, 2012 WL 1037444, at *5 (N.D.N.Y. March 27, 2012) (Suddaby, J.).

## III. ANALYSIS

Because Plaintiff did not submit an objection to the Report–Recommendation, the Court reviews the Report–Recommendation only for clear error, as described in Section II.A of this Decision and Order. After carefully reviewing the relevant filings in this action, the Court can find no error in the Report–Recommendation. Magistrate Judge Dancks employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 34) As a result, Magistrate Judge Dancks' Report–Recommendation recommending dismissal of Plaintiff's complaint is accepted and adopted in its entirety for the reasons stated therein. (*Id.*)

The Court would add only the following five brief points. First, Magistrate Judge Dancks' thorough and correct Report–Recommendation would survive even a *de novo* review.

Second, Plaintiff has (despite having been given due notice and two opportunities to do so) neglected to submit a response to Defendant's Local Rule 7.1 Statement. For the reasons, the Court deems admitted each of the factual assertions contained in Defendant's Local Rule 7.1 Statement, which the Court finds to be supported by accurate record citations, with one exception. *See, supra,* Part II.B. of this Decision and Order. That one exception is the factual assertion contained in Paragraph 29, which the Court finds to be contradicted by his deposition testimony stating that Defendant came to his cell holding the original version of Plaintiff's grievance (which the Court came across during the review it conducts of the record to determine if Defendant has met his modest threshold burden on his motion).

\*4 Third, as to Magistrate Judge Danck's (correct) finding regarding Defendant's exhaustion argument, there is, of course, a difference between the grievance Plaintiff attempted to file regarding the underlying overcharge on his commissary account, and a grievance regarding the subsequent retaliation and due process violation he is allegedly experienced due to Defendant's misbehavior report (and Plaintiff's disciplinary hearing). However, the Court agrees that Plaintiff's deposition testimony (stating that Defendant came to his cell holding the original version of the former grievance and screaming at Plaintiff) constitutes at least some admissible record evidence from which a rational fact finder could conclude that it would have been futile to even attempt to file the latter grievance (or to appeal from the non-filing of the first grievance).

Fourth, as to Magistrate Judge Danck's (correct) finding regarding Defendant's retaliation claim, that claim is dismissed on the alternative ground that Plaintiff has failed to adduce admissible evidence establishing the adverse action element of such a claim. The Court notes that, while the second argument asserted in Defendant's motion for summary judgment is labeled "Plaintiff Has Failed to State a Claim," that argument is premised not only on Fed.R.Civ.P. 12(b)(6) but also on Fed.R.Civ.P. 56 as it relates to Plaintiff's retaliation claim, due to its reliance on citations to record evidence rather than the four corners of Plaintiff's Complaint. (Dkt. No. 31, Attach. 3, at 10–14 [attaching pages "8" through "12" of Def.'s Memo. of Law].)

Fifth, and finally, as to Magistrate Judge Danck's (correct) finding regarding Plaintiff's due process claim, that claim is dismissed on the alternative ground that Plaintiff has failed to adduce admissible evidence establishing, or even allege facts plausibly suggesting, that Defendant was personally involved in any such due process violation, which allegedly occurred because of the conduct of the disciplinary hearing officer. (*See generally* Dkt. No. 1, at ¶ 6.) The Court would reach no different conclusion even if Defendant somehow controlled the independent hearing officer's use of the misbehavior report: just as an inmate possesses no due process right to be free from being issued a false misbehavior report, an inmate possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at a disciplinary hearing.[13]

---

[13]    *See Freeman v. Rideout,* 808 F.2d 949, 952–53 (2d Cir.1986) (holding that an inmate who was found guilty by a prison disciplinary committee based on a false report did not have an actionable due process claim because the inmate was granted a hearing and the opportunity to rebut the false charges against him); *accord, Richardson v. Ray,* No. 12–CV–6399, 2012 WL 3105224, at *1 (4th Cir. Aug. 1, 2012); *see also Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997); *Velez v. Burge,* No. 11–CV–2897, 2012 WL 1889402, at *1 (2d Cir. May 25, 2012).

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 49) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Plaintiff's motion for a temporary restraining order (Dkt. No. 44) is *DENIED;* and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 31) is **GRANTED;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED.**

**\*5** The Clerk's Office is directed to enter judgment and close this action.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4033723

© 2016 Thomson Reuters. No claim to original U.S. Government Works.